Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

Division

**20-CV-3087**

**DONNELLY, J.
BLOOM, M.J.**

|  |  |
|---|---|
| THOMAS, EUGENE ex rel. | ) |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) |
| -v- | ) |
|  | ) |
| DEUTSCHE BANK NATIONAL TRUST COMPANY et al. | ) |
| *Defendant(s)* | ) |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) |

Case No. _____

*(to be filled in by the Clerk's Office)*

RECEIVED
JUL 09 2020
PRO SE OFFICE

## COMPLAINT AND REQUEST FOR INJUNCTION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | THOMAS, EUGENE ex rel |
| Street Address | 2260 Hampden Place |
| City and County | Bronx |
| State and Zip Code | New York 10468 |
| Telephone Number | 28 U.S.C. § 1332(a) |
| E-mail Address | ANTIGUANAMERICAN@GMAIL.COM |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

Defendant No. 1

| | |
|---|---|
| Name | DEUTSCHE BANK NATIONAL TRUST COMPANY et al.. |
| Job or Title *(if known)* | C/o Achleitner, Paul d/b/a CHAIRMAN |
| Street Address | 1761 E St Andrew PL |
| City and County | Santa Ana |
| State and Zip Code | CALIFORNIA 92705 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

28 U.S.C. § 1332(a)

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

a.     If the plaintiff is an individual

The plaintiff, *(name)*   Thomas, Eugene et al.                           , is a citizen of the State of *(name)*   United States of America           .

b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ ,

and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

a.     If the defendant is an individual

The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

b.    If the defendant is a corporation

The defendant, *(name)*   DEUTSCHE BANK NATIONAL        , is incorporated under

the laws of the State of *(name)*    California                        , and has its

principal place of business in the State of *(name)*   California                        .

Or is incorporated under the laws of *(foreign nation)*    Germany                    ,

and has its principal place of business in *(name)*    Frankfurt Germany              .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

The trust deed is not a lien against the subject properties, ordering the immediate release of the trust deed of record, and quieting title to the subject properties in Plaintiff and against Defendants and all claiming by, through or under them

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

SEE ANNEXED

B.    What date and approximate time did the events giving rise to your claim(s) occur?

SEE ANNEXED

C.      **What are the facts underlying your claim(s)?**  *(For example:  What happened to you?  Who did what?*
        *Was anyone else involved?  Who else saw what happened?)*

      **SEE ANNEXED**

## IV.      Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you
sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation
could not be measured.

**SEE ANNEXED**

## V.      Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

**SEE ANNEXED**

**STATE OF NEW YORK**
**COUNTY OF BRONX**                              SS:
**COUNTY CLERK'S OFFICE**

I, Luis M. Diaz, County Clerk of the County of Bronx, State of New York and also Clerk of the Supreme Court in and for said County and State, the same being a Court of Record and having a seal;

**DO HEREBY CERTIFY THAT  AMANKWAA, KOFI O  AM4839742**
**Term 8/31/2017 to 8/31/2021**

Whose name is subscribed to the annexed affidavit, deposition, certificate of acknowledgment or proof, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of their official character, and autograph signature, have been filed in my office; that as such the Notary Public was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, powers of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such Notary Public or have compared the signature on the annexed instrument with their autograph signature deposited in my office,

IN WITNESS WHERE OF, I have hereunto set my hand and affixed my official seal at Bronx, Bronx County, New York on June 24, 2020

LUIS M. DIAZ
BRONX COUNTY CLERK

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    6/24/2020

BEFORE ME 6/24/2020

Signature of Plaintiff        _Euges Thomas_

Printed Name of Plaintiff    _Eugene Thomas_

KOFI OWUSU AMANKWAA
Notary Public, State of New York
No. 03-4839742
Certified in Bronx County
Commission Expires Aug 20 21

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____
Printed Name of Attorney _____
Bar Number               _____
Name of Law Firm         _____
Street Address           _____
State and Zip Code        _____
Telephone Number         _____
E-mail Address           _____

| | |
|---|---|
| UNITED STATES DISTRICT COURT FOR EASTERN DISTRICT OF NEW YORK | ) ) |
| -------------------------------------------------X | ) |
| THOMAS, EUGENE ex rel., | ) **<u>PLAINTIFF'S</u>** |
| | ) **<u>MEMORANDUM OF LAW</u>** |
| Plaintiffs | ) **<u>IN SUPPORT OF STATUS AS</u>** |
| | ) **<u>LITIGANT 28 U.S.C. 1654 IN</u>** |
| -Against- | ) **<u>PARI MATERIA; ARTICLE I,</u>** |
| | ) **<u>SECTION 8, CLAUSE 17 U.S.</u>** |
| DEUTSCHE BANK NATIONAL TRUST | ) **<u>CONSTITUTION, 4 U.S.C. 72</u>** |
| COMPANY et al., | ) |
| | ) TRIAL BY JURY DEMAND |
| Defendants(s) | ) |
| -------------------------------------------------X | |

**TAKE NOTICE** ''expressum facit cessare tacitum''.

**COMES NOW** Eugene Thomas *Sui Juris*, a named Plaintiff in the above

entitled case (hereinafter "Mr. Thomas"), without waiving or conferring any

jurisdiction, to file His MEMORANDUM OF LAW IN SUPPORT OF

STATUS AS LITIGANT PROCEEDING *IN PROPRIA PERSONA supra*,

and to provide formal Notice to all interested parties of same.

When a litigant appears *In Propria Persona*, this Court itself should

undertake to insure to the litigant that no meritorious case may be lost

because of any lack of legal skill.  See the comparable federal statute at 28

U.S.C. 1654 *in pari materia*.

Implicit in the right of self-representation is an obligation on the part of any court to make reasonable allowances to protect *Pro Per* litigants from any inadvertent forfeitures of important Rights, particularly fundamental Rights like **equal protection of the law**, because of any lack of formal legal training.  See <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2nd Cir. 1983); <u>Hoffman v. U.S.</u>, 244 F.2d 378, 379 (9th Cir. 1957); <u>Darr v. Burford</u>, 339 U.S. 200 (1950).  Confer at "Fundamental right" in <u>Black's Law Dictionary</u>, Sixth Edition.

Mr. Thomas is protesting <u>Black's Law Dictionary</u>, Seventh *and* Eighth Editions, because both omit definitions of the term "United States".  The term "United States" has singular importance throughout <u>all</u> State and federal constitutions, laws, rules, regulations, forms, practices, policies, procedures and customs.  Specifically, there is no way this Court can possibly hope to define or enforce "public policy" without an explicit reference to the "United States" (federal government), domiciled in the District of Columbia under authority of Article I, Section 8, Clause 17, in the Constitution for the United States of America, as lawfully amended (hereinafter "U.S. Constitution"):

All offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law 4 U.S.C. 72.

**STATE OF NEW YORK**
**COUNTY OF BRONX**                    SS:
**COUNTY CLERK'S OFFICE**

I, Luis M. Diaz, County Clerk of the County of Bronx, State of New York and also Clerk of the Supreme Court in and for said County and State, the same being a Court of Record and having a seal;

DO HEREBY CERTIFY THAT  AMANKWAA, KOFI O  AM4839742
Term 8/31/2017 to 8/31/2021

Whose name is subscribed to the annexed affidavit, deposition, certificate of acknowledgment or proof, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of their official character, and autograph signature, have been filed in my office; that as such the Notary Public was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, powers of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such Notary Public or have compared the signature on the annexed instrument with their autograph signature deposited in my office.

IN WITNESS WHERE OF, I have hereunto set my hand and affixed my official seal at Bronx, Bronx County, New York on June 24, 2020

LUIS M. DIAZ
BRONX COUNTY CLERK

## NOTARY ACKNOWLEDGEMENT

State of New York)

                            ) ss          **JURAT**

County of Bronx   )


On this _24th_ day of June 2020, before me personally appeared eugene -: thomas, to me known to be the person described in as Plaintiff regarding Civil Complaint. And who executed the foregoing instruments and acknowledged to me that eugene -: thomas executed the same as his free act and deed.

_____         _6/24/2020_____

Notary Signature                       Date


My commission expires _____8/31/2021_____

Seal

          KOFI OWUSU AMANKWAA
        Notary Public, State of New York
          No. 03-4839742
         Certified in Bronx County
      Commission Expires Aug 20 21


I Am: _Eugene Thomas_____

         Without Prejudice, Without the United States

UNITED STATES DISTRICT COURT FOR )
EASTERN DISTRICT OF NEW YORK )
------------------------------------------------------X )
THOMAS, EUGENE ex rel., )                    **PLAINTIFF'S COMPLAINT**
 )                    **FOR: BREACH OF**
              Plaintiffs )  **CONTRACT, QUIET TITLE,**
 )                    **SLANDER OF TITLE,**
      -Against- )          **INJUNCTIVE RELIEF**
 )
DEUTSCHE BANK NATIONAL TRUST )
COMPANY et al., )                    **TRIAL BY JURY DEMAND**
 )
Defendants(s) )
------------------------------------------------------X )

## <u>REGISTRATION OF MEMORIALS</u>

COMES NOW the Plaintiff, Thomas, Eugene ex rel. ("Plaintiff"), complaining of the Defendants as named above, and each of them, stating that he is familiar with the facts recited, stating that the party named in said complaint as the plaintiff is the same party as one of the owners named in the certificate of title; and that thereafter the Registrar of Titles shall treat said registered owner as having attained the age of the majority at a date 18 years.

## GENERAL ALLEGATIONS

I.   This serves as a civil action in which the plaintiff seek relief for defendant's negligence resulting in breach of contract and slander of title and for Injunctive Relief This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages.

II.  Plaintiff disputes Defendants' superior colorable claim to legal title and equitable title of the Prime Market Real Property in question (hereafter, the "Real Property"), which is the subject of this instant action.  Plaintiff is the owner of the property by Note and Deed of Trust (Exhibit A, Exhibit B).

III. Plaintiff seeks injunctive relief for defendant breach of contract pursuant to Article 3 and 9 of the Uniform Commercial Code, 18 U.S. Code § 472 – "Uttering Counterfeit Obligations or Securities", which is a "felony", 18 U.S. Code § 473 – "Dealing in Counterfeit Obligations or Securities", another "felony", 18 U.S. Code § 1341 – "Frauds and Swindles", 18 U.S.C. § 1961–1968 for Nepotism.

IV.  The defendant failed to locate and join the Real Parties who were of Interest under the Pooling & Servicing Agreements in the 424b5 Prospectuses and 8-K Current Reports, under F.R.C.P. 19 (a), there

are material, factual and legal issues as to subject matter and in

persona jurisdiction under Rules 17(a)(3) and 12b (1)(2)(6) do to the

lack of Ratification of Commencement by the Real Parties in Interest

that needs to be addressed by your organization and its trustees Sua

Sponte as a threshold issue under Article 3 § 2 of the National

Constitution and that you by law should not have granted yourself

relief of stay as a Party that seeks relief from automatic stay must be a

"real party in interest." 11 U.S.C.A. § 362(d); Fed. Rules Bankr.

Proc. Rules 4001, 7017, 9014, 11 U.S.C.A. In re Kang Jin Hwang 396

B.R. 757.

V.  U.S. Informational Tax Forms 1096 and the accompanying 1099

OID's and tax forms 8300 for any cash payments over $10,000 as

evidenced as the Certificated Security or Promissory Note is evidence

that DEUTSCHE BANK NATIONAL TRUST COMPANY

conducted an unlawful action.

VI. The **1099 OID's** issued by the Trustees of DEUTSCHE BANK

NATIONAL TRUST COMPANY will identify who the payor and the

recipient of the funds or cash proceeds were under SFAS  [Statement

of Financial Accounting Standards]  # 95 and IAS [International

Accounting Standards] # 7.6 containing the inflows and outflows of

cash and cash equivalents on the Balance Sheet FR 2046 from securitization of the off-balance- sheet receivables and payables which identify both the source or principal from which the funds or cash proceeds were derived from.

VII.   It is required by U.S. PATRIOT ACT to reveal the source of the funds allocated for the aforementioned Real Property by filing Currency Transaction Reports, Currency and Monetary Instrument Transportation Forms CMIR's under §§ 5311 et seq. of 31 U.S.C. of THE BANK SECRECY ACT and 31 CFR § 103.11 regulations et seq., under the U.S. PATRIOT ACT and SEC Rule 17a-8, which applies to all broker-dealers, incorporates the requirements of the Bank Secrecy Act to file reports and maintain records showing the source of the funds that allegedly funded and perfected the Mortgage Loan Applications, Promissory Notes and securing Beneficiaries Real Property under the subject Deeds of Trust

VIII.   From 1998 until the financial crash of 2008-2009 over 60 million purported consumer credit mortgage loan transactions were purportedly sold by Non-Depository Payor Banks to Special Purpose Vehicles (hereinafter "SPV"). The Plaintiff's purported home loan was one of the 60 million scheduled to for exchange.   (Exhibit G)

PSA for NCHEL 2006-2

https://www.sec.gov/Archives/edgar/data/1365235/000088237706002483/d525690.htm

IX.  Plaintiff is informed and believes, and thereon alleges that Defendants participated in a transactional scheme whereby a purported Tangible Note is converted/exchanged for a Payment Intangible asset to provide an alternative investment offering via Special Deposit to certificate or bond holders which were expected to be relatively safe; which, were offered by Wall Street Firms to the secondary market through purported mortgage backed securities. (Exhibit C) OCC Asset Securitization Manual 1997, Pg. 23



X.  Plaintiff is informed and believes, and thereon alleges that, certain tax laws known as the Real Estate Mortgage Investment Conduit (hereafter, REMIC) Tax Reform Act of 1986 were to be observed, and whereby the Non-Depository Payor Banks and Issuing Entities REMIC would be protected from either entity going into bankruptcy. To achieve the desired "bankruptcy remoteness," purported numerous "True Sales" of Plaintiff's Tangible Note would have had to of occurred by operation of All applicable law.

XI.  Plaintiff is informed and believes, and thereon alleges that there was no "True Sale" of Plaintiff's Tangible Note, a circumstance whereby New Century Mortgage Corporation sold Plaintiff's Tangible Note to the "buyer/seller" New Century Mortgage Corporation in an ordinary course of business by offer, acceptance, delivery and consideration given for full value of the entire instrument.  (Exhibit D) Real Estate and the Tax Reform Act of 1986.

XII.  The Original Lender, New Century Mortgage Corporation, purports to have negotiated in accordance to all applicable law the Tangible Note obligation in an ordinary course of business to successor Defendants. Plaintiff is informed and believes, and thereon alleges that New Century Mortgage Corporation has unlawfully purported to assign,

transfer, or convey its interest in Plaintiff's Note on or before closing date of NCHEL 2006-2 Trust. Plaintiff is informed and believes, and thereon alleges that New Century Mortgage Corporation never negotiated the Tangible Note by operation of law for full value in accordance with all applicable law to New Century Mortgage Corporation.

XIII.   Defendants deployed MERS as an electronic agent under the Constructive Deed of Trust as nominee/beneficiary for each successor Defendant as bailor/bailee to streamline a purportedly hypothecated security interest "Secret Liens" over the Payment Intangible after acquired collateral unlawfully construed as "Proceeds" of Plaintiff's Real Property.  Plaintiff is informed and believes, and thereon alleges that MERS only tracks and updates ownership of the Payment Intangible registered with the MERS database software system; MERS cannot transfer the beneficial right to the Tangible Accommodated Note instrument; a legitimate "True Sale" of a Tangible Note instrument can only be transferred in an ordinary course of business by proper negotiation for full value, transfer and delivery by operation of all applicable law. (Exhibit E) MERS Procedural Manual (Exhibit F) MERS Patent.

XIV.   Plaintiff is informed and believes, and thereon alleges that payment
for full value of the entire instrument was executed in an ordinary
course of business from New Century Mortgage Corporation to New
Century Mortgage Corporation.  There are no documents or records
Defendants can be produced that demonstrate that prior to the June 1,
2006 closing date for NCHEL 2006-2 Trust, the Tangible Note was
duly indorsed, transferred and delivered to NCHEL 2006-2 Trust in an
ordinary course of business by operation of all applicable law,
including all intervening transfers including any purported transfers in
the personal property Payment Intangible. Nor can any documents or
records be produced that demonstrate that prior to the June 1, 2006,
the Deed of Trust was duly assigned, transferred and delivered to
NCHEL 2006-2 Trust, via the Custodian of Records, Deutsche Bank
National Trust Company, including all Secret Liens purportedly
securing the Payment Intangible intervening transfers/assignments.

XV.   Plaintiff further alleges that any documents i.e. MERS Assignment of
Deed of Trust that purport to transfer a hypothecated beneficial
security interest over the Payment Intangible underlying collateral of
the Tangible Note or Bill of Exchange to NCHEL 2006-2 Trust after
the Closing Date June 1, 2006 are void as a matter of law; no security

interest in the Real Property was perfected in the name of any of the successor Defendants. The alleged holder of the Tangible Note is not the beneficiary of the Deed of Trust. The alleged beneficiary of Plaintiff's Deed of Trust, MERS, does not have the requisite title, perfected security interest or standing to proceed in a foreclosure; and/or is not the real party in interest as agent or nominee to any action taken or to be taken against the Real Property by successor Defendants. (Exhibit G) PSA Section 2.01 Conveyance of Mortgage Loans.  Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, any assignment of a Deed of Trust without proper transfer in an ordinary course of business of the Tangible Note that it secures is a legal nullity by operation of law. Plaintiff is informed and believes, and thereon alleges that the NCHEL 2006-2 Trust had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates of herein below. A detailed description of the purported mortgage loans which form the NCHEL 2006-2 Trust is included in Form 424B5 ("the Prospectus"), which has been duly filed with the SEC. (Exhibit H) NCHEL 2006-2 424B5 Prospectus Supplement

XVI.   https://www.sec.gov/Archives/edgar/data/1365235/000088237706002 279/p06-1001_424b5.htm

XVII.   Plaintiff alleges that Defendants, and each of them, cannot establish possession, show proper receipt, transfer, negotiations, assignment and ownership of the Tangible Note or Deed of Trust, resulting in imperfect security interests and claims; therefore, none of the Defendants have perfected any colorable claim of title or security interest in the Real Property. Defendants, and each of them, cannot establish that the Deed of Trust purportedly securing the Tangle Note, were legally or properly acquired in accordance to all applicable law. Plaintiff therefore alleges, upon information and belief, that none of the parties to transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the Real Property; and that all Defendants are equitably estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

XVIII.   Plaintiff alleges that an actual controversy has arisen and now exists between the Plaintiff and Defendants, and each of them. Plaintiff desires a judicial determination and declaration of its rights about the Real Property and the corresponding Tangible Note and Deed of Trust.

XIX.   Plaintiff also seek redress from Defendants identified herein for damages, for other injunctive relief, and for cancellation of written instruments based upon:

a. An invalid and unperfected security interest in Plaintiff's Real Property hereinafter described;

b. Void "True Sales;"

c. An incomplete and ineffectual perfection of a security interest in Plaintiff's Real Property

## THE PARTIES

XX.   Plaintiff is now, and at all times relevant to this action, a resident of the County of Bronx, State of New York.

XXI.   At all times relevant to this action, Plaintiff owned and has superior claim to the Real Property (the "Home") located at 2260 Hampden Place, Bronx, NY 10468.

XXII.   Defendant Deutsche Bank National Trust Company is a National Trust Company doing business in the City of Santa Ana, State of California.  Plaintiff is informed and believes and thereon alleges that Deutsche Bank National Trust Company is the Trustee of the New Century Home Equity Loan Trust 2006-2 Trust.

XXIII.   Plaintiff does not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 100, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiff, or claims some right, title, or interest in the Property. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained through discovery. Plaintiff is informed and believes and thereon alleges that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiff so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

XXIV.   Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## JURISDICTION

XXV.    Federal Court has jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. § 1332(a).

XXVI.   Federal jurisdiction over the proceedings will be invoked pursuant to the provisions of Title 28, United States Code Section 1343(3) and (4), with a suit in equity which is authorized by law, to be brought to redress the deprivation of rights, privileges, and immunities secured by Indentured Trust Act of 1939.

XXVII.  A notice of claim was timely filed, with respect to our cause of action which occurred on or about May 19, 2016 setting forth the time when, the place where and the manner which the incidents occurred.

XXVIII. This action is being commenced within the time limitations set forth in all applicable Federal and State laws and Statutes.

## VENUE

XXIX.   The proper venue for these claims are in a United States District Court pursuant to 28 U.S.C. Section 1391(b)(2), in that County of Bronx, City of New York, The State of California and the places at which the events occurred are in the Federal Courts jurisdiction.  A Special

Master is requested by appointment pursuant to The All Writs Act is a United States federal statute, codified at 28 U.S.C. § 1651.

## JURY DEMANDS

XXX.     Plaintiffs demand a trial by a jury against the defendant for each and every one of the claims herein.

## PROPERTY

XXXI.    The Real Property description, which is in the subject matter of this suit is commonly known as 2260 Hampden Place, Bronx, NY 10468.

## STATEMENT OF PERTINENT FACTS

XXXII.   Plaintiff had a Forensic Chain of Title Securitization Analysis completed by qualified expert in to verify the claims of this complaint.

XXXIII.  Plaintiff is the Superior Recorded owner of the Prime Market Property.  (Exhibit A) Note.

XXXIV.   Plaintiff was issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on May 19, 2006 regarding a purported loan to

(Accommodated Party) New Century Mortgage Corporation for $317,200.00.

XXXV.    Plaintiff pledged a Constructive Deed of Trust granting Legal Title to Accommodate New Century Mortgage Corporation to file against Plaintiff's Superior Claim to Title filed in the Official Records of the Bronx County Recorder's Office on June 6, 2006 as ins# 2006.313306. (Exhibit B) Deed of Trust.

XXXVI.    The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

XXXVII.    On or before June 1, 2006, the Closing Date of the NCHEL 2006-2 Trust, Plaintiff's Note was sold to the Trust.

XXXVIII.    There is no contemporaneous filing of an assignment of Plaintiff's Mortgage to the Trust as underlying security for Plaintiff's Note.

XXXIX.    Plaintiff's Note and Mortgage are irreparably separated.

XL.    On October 8, 2013, an Assignment of Deed of Trust was filed with the Bronx County Recorder's Office as ins# 2013.416281.

XLI.    The October 8, 2013 assignment was executed by Elizabeth A. Ostermann, a/k/a Betsy Osterman.

XLII.    Elizabeth A. Ostermann, a/k/a Betsy Osterman is a known robo-signer.

XLIII.    The signature of Ms. Ostermann on the October 8, 2013 assignment does not match her signature on other official documents and appears to be robo-signed or forged.

XLIV.    The October 8, 2013 assignment purports to assign to Deutsche Bank National Trust Company as Trustee, all right, title and interest in Plaintiff's Mortgage.

XLV.    The October 8, 2013 assignment occurred approximately seven years and four months after the Closing Date of the Trust and is void.

XLVI.    Any attempt to assign Plaintiff's Mortgage to the Trust after the Closing Date of the Trust is a violation of the terms of the Trust and is void.

XLVII.    Plaintiff alleges that only the Depositor, New Century Mortgage Securities, LLC, is the rightful party that can convey the asset into the trust pursuant to investor offering documents as filed with the Securities and Exchange Commission.

## AS AND FOR A FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

XLVIII.    Plaintiff repeats each and every allegation contained in paragraphs "I" through "XLVII" as if fully set forth herein.

XLIX.   The terms of the mortgage contract are clear.

L.   Pursuant to paragraph 23 – Release, New Century Mortgage Corporation and specifically MERS, their electronic agent, was obligated to satisfy, release and reconvey the beneficial security interest in Plaintiff's pledged Deed of Trust upon payment of all sums associated with the release premium to New Century Mortgage Corporation for Accommodated Party services rendered.

LI.   New Century Mortgage Corporation was paid in full for their Accommodated capacity to the Tangible Note and Deed of Trust when it sold and relinquished its interest in Plaintiff's real property to New Century Mortgage Securities, LLC

LII.   New Century Mortgage Corporation failed to satisfy, release and reconvey the security instrument, thus breaching the terms found in paragraph 23 of the Deed of Trust.

## AS AND FOR A SECOND CAUSE OF ACTION

## QUIET TITLE

LIII.   Plaintiff repeats each and every allegation contained in paragraphs "I" through "LII" as if fully set forth herein.

LIV.   Defendant named herein claims an interest and estate in the property

adverse to Plaintiff in that Defendant asserts it is the owner of the note secured by the Deed of Trust to the property the subject of this suit.

LV.     Defendant claims an interest and estate in the Real Property adverse to Plaintiff in that Defendant asserts to be the owner of Tangible Note secured by the Deed of Trust to the Real Property, the subject of this suit.

LVI.    The claims of Defendants are without any legal right whatsoever, and Defendants have no estate, title, lien or interest in or to the Real Property, or any part of the Real Property.

LVII.   The claim of Defendant herein named, claim some estate, right, title, lien or interest in or to the property adverse to Plaintiff's title, and these claims constitute a cloud on Plaintiffs' title to the Real Property.

LVIII.  Plaintiff therefore alleges upon information and belief, that the Defendant in this case hold a perfected and secured claim in the Real Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiffs' Real Property.

LIX.    Plaintiff requests the decree permanently enjoin Defendant, and each of them, and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property; and

LX.    Plaintiff requests the court award Plaintiff's costs of this action, and such other relief as the court may deem proper.

## AS AND FOR A THIRD CAUSE OF ACTION

## SLANDER OF TITLE

LXI.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

LXII.    Generally, one must prove the following to bring a legally sufficient claim of Slander of Title.

a. There was a communication to a third party of;

b. A false statement;

c. Derogatory to another's title;

d. With malice; and

e. Causing special damages

LXIII.    There are no UCC 1 Financial Statements perfecting personal property interest in the Accommodated Deed of Trust contract enforcement rights with the Secretary of State's Office where the Real Property resides, giving constructive notice to the world of the true capacity of the purported parties in the §1031 – Exchange in performance of the securities of NCHEL 2006-2. (See Asset

Securitization Comptroller's Handbook Nov. 1997

http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf)

LXIV.  Such instruments remained unrecorded as "Secret Liens" within the collateral file and was never submitted for recordation to perfect Defendant's rights to the Accommodated Tangible Note and pledged Deed of Trust lien and the right to enforce an alternate means of collection.

LXV.  Defendant by withholding such facts has potentially committed a grave error Slander of Title causing special damage.

LXVI.  The act of recording the purported October 8, 2013 Assignment of Deed of Trust into the Official Records of the Bronx County Recorder's Office is a communication to a third party of false statement derogatory to Plaintiff's title made with malice causing special damages to the Plaintiff's claim of title.


## AS AND FOR A FOURTH CAUSE OF ACTION

## FOR INJUNCTIVE RELIEF

LXVII.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

LXVIII.   Plaintiff is the record titleholder of the Property and is now being threatened with irreparable injury by the conduct of Defendant.

LXIX.   Plaintiff will continue to be in jeopardy of injury by the Defendants' wrongful conduct by the now threatened foreclosure sale, causing irreparable injury by denying them the right to maintain the status quo between the parties pending resolution of the present dispute.

LXX.   Plaintiff has no adequate remedy at law for both the factual and threatened injuries herein described.  Plaintiff's real property residence and rights involved are non-fungible and utterly unique so that it will be impossible to accurately measure in monetary terms, the damage caused by Defendants' wrongful conduct.

LXXI.   Defendants' numerous violations of federal and state statute and inability to establish a claim of right to Plaintiff's Note or Deed of Trust establishes Plaintiff's claim as more probable than not and Plaintiff will likely prevail at the time of trial.

LXXII.   Plaintiff requests that Defendants and its agents and employees be enjoined from prosecuting any continuance of a foreclosure sale pending trial.

## AS AND FOR A FIFTH CAUSE OF ACTION

### FOR DECLARATORY RELIEF

LXXIII.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

LXXIV.  An actual controversy has arisen and now exists between Plaintiff and Defendant et al. specified hereinabove regarding Plaintiff's respective rights and duties in the subject note and security instrument.  Plaintiff requests a judicial determination of the rights, obligations and interest of the parties regarding the subject property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the subject property.

LXXV.  Plaintiff should be the equitable owner of the Subject Property.

LXXVI.  Plaintiff seeks to quiet title as of the date of the filing of this Complaint. Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that the Defendant be declared to have no interest estate, right, title or interest in the subject property and that the Defendant, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property subject to Plaintiff's rights.

## PRAYER

WHEREFORE PREMISES CONSIDERED as Prayer for Relief, and for the foregoing reasons, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final hearing, Plaintiff be awarded judgment:

a. Declaring that Defendants lack any interest in the subject property which would permit them to foreclose, evict, or attempt to foreclose or evict, the trust deed and/or to sell the subject properties;

b. Declaring that the trust deed is not a lien against the subject properties, ordering the immediate release of the trust deed of record, and quieting title to the subject properties in Plaintiff and against Defendants and all claiming by, through or under them;

c. A refund of any wrongfully or improperly collected fees and payments to Defendants to which it had no right;

d. Pre- and post-judgment interest at the maximum rate allowed by law;

e. Attorney's fees;

f. Monetary relief over $100,000 (U.S. dollars) but not more than $2,000,000,00 (U.S. dollars); and

g. Such other and further relief at law and/or in equity to which Plaintiff may be justly entitled including but not limited to damages within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest as are allowed by law.

**STATE OF NEW YORK**
**COUNTY OF BRONX**                                    **SS:**
**COUNTY CLERK'S OFFICE**

I, Luis M. Diaz, County Clerk of the County of Bronx, State of New York and also Clerk of the Supreme Court in and for said County and State, the same being a Court of Record and having a seal;

DO HEREBY CERTIFY THAT  AMANKWAA, KOFI O  AM4839742
Term 8/31/2017 to 8/31/2021

Whose name is subscribed to the annexed affidavit, deposition, certificate of acknowledgment or proof, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of their official character, and autograph signature, have been filed in my office; that as such the Notary Public was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, powers of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such Notary Public or have compared the signature on the annexed instrument with their autograph signature deposited in my office,

IN WITNESS WHERE OF, I have hereunto set my hand and affixed my official seal at Bronx, Bronx County, New York on June 24, 2020

*Luis M. Diaz*

LUIS M. DIAZ
BRONX COUNTY CLERK

# NOTARY ACKNOWLEDGEMENT

State of New York)

              ) ss       **JURAT**

County of Bronx   )


On this **24ᵗʰ** day of June 2020, before me personally appeared

eugene -: thomas, to me known to be the person described in as Plaintiff

regarding Civil Complaint. And who executed the foregoing instruments

and acknowledged to me that eugene -: thomas executed the same as his

free act and deed.

_____       _____6/24/2020_____

Notary Signature                       Date


My commission expires _____8/31/2021_____

Seal

KOFI OWUSU AMANKWAA
Notary Public, State of New York
No. 03-4809742
Certified in Bronx County
Commission Expires Aug 20 2?


I Am: *Eugn Thomas* _____

           Without Prejudice, Without the United States

# EXHIBITS

Exhibit A:      Note

Exhibit B:      Mortgage

Exhibit C:      OCC Asset Securitization Manual, Pg. 23

Exhibit D:      Real Estate and the Tax Reform Act of 1986

Exhibit E:      MERS Procedural Manual

Exhibit F:      MERS Patent

Exhibit G:      PSA, Section 2.01

Exhibit H:      REMIC 424B5 Prospectus Supplement

Exhibit I:      Certified Forensic Audit by Michael Carrigan

Exhibit J:      Assumed Name Certificate (Minnesota)

Exhibit K:      Proof Of Publication Of Assumed Name

# EXHIBIT

# A

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2006052800010001001E9B71

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 5 |
|---|---|---|
| Document ID: 2006052800010001 | Document Date: 05-19-2006 | Preparation Date: 05-28-2006 |

Document Type: DEED
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| ROUND HILL TITLE AGENCY, INC. | EDWARD L. KOESTER, ESQ. |
| 315 WESTCHESTER AVE. | 1457 KNAPP STREET |
| PORT CHESTER, NY 10573 | BRONX, NY 10469 |
| 914-939-8900 | |
| DAN@ROUNDHILLTITLE.COM | |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BRONX | 3234 | 93 | Entire Lot | | 2260 HAMPDEN PLACE |

Property Type: DWELLING ONLY - 2 FAMILY

**CROSS REFERENCE DATA**

CRFN_____ or Document ID_____ or _____ Year____ Reel ___ Page _____ or File Number_____

**PARTIES**

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| MARY VAILS-EASON | EUGENE THOMAS |
| C/O EDWARD L. KOESTER, ESQ., 1457 KNAPP STREET | 2260 HAMPDEN PLACE |
| BRONX, NY 10469 | BRONX, NY 10468 |
| x  Additional Parties Listed on Continuation Page | |

**FEES AND TAXES**

| Mortgage | | | Recording Fee: $ | 52.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee:  $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 75.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 1,596.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed      06-06-2006 12:28
City Register File No.(CRFN):
**2006000313305**

*Annette M Hill*

*City Register Official Signature*

NYC HPD Affidavit in Lieu of Registration Statement

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER |  |
|---|---|

2006052800010001001C99F1

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 5 |
|---|---|

| Document ID: 2006052800010001 | Document Date: 05-19-2006 | Preparation Date: 05-28-2006 |
|---|---|---|
| Document Type: DEED | | |

**PARTIES**

| GRANTOR/SELLER: | GRANTOR/SELLER: |
|---|---|
| KENYA EASON | SHAWN T. COLEMAN |
| C/O EDWARD L. KOESTER. ESQ., 1457 KNAPP STREET | C/O EDWARD L. KOESTER. ESQ., 1457 KNAPP STREET |
| BRONX. NY 10469 | BRONX. NY 10469 |

— Warranty Deed With Full Covenants - Individual or Corporation (single sheet)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made the 19th day of          MAY  in the year   2006
BETWEEN

MARY EASON-VAILS, KENYA EASON AND SHAWN J. COLEMAN, all residing at,
2260 HAMPDEN AVENUE
BRONX, NEW YORK 10468

party of the first part, and

EUGENE THOMAS
626 RIVERSIDE DRIVE, APT. 5C
NEW YORK. NEW YORK 10031

party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the part. the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Bronx, City and State of New York, being bounded and described as follows:

BEGINNING AT a point on the southeasterly side of Hampden Place, distant 175.16 feet northerly from the corner formed by the northerly side of West 182nd Street with the Southeasterly side of Hampden Place;

RUNNING THENCE easterly at right angles to Hampden Place and part of the way through a party wall. 84.91 feet;

THENCE northerly and parallel with Hampden Place, 25 feet;

THENCE westerly again at right angles with Hampden Place and part of the way through a party wall. 84.91 feet to the Easterly side of Hampden Place;

THENCE southerly along Hampden Place, 25 feet to the point or place of BEGINNING.

SAID PREMISES BEING KNOWN AS AND BY 2260 HAMPDEN PLACE, BRONX. NEW YORK  10468

Grantors being the same as the Grantees in the deed dated July 28th, 2004, recorded August 4, 2004, in CRFN: 2004000477976.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

AND the party of the first part covenants as follows: that said party of the first part is seized of the said premises in fee simple, and has good right to convey the same, that the party of the second part shall quietly enjoy the said premises; that the said premises are free from incumbrances, except as aforesaid; that the party of the first part will execute or procure any further necessary assurance of the title to said premises; and that said party of the first part will forever warrant the title to said premises.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written

IN PRESENCE OF:

_____                    X Mary Eason - Vails
                                                    MARY EASON-VAILS

                                                    _____
                                                    KENYA EASON

                                                    _____
                                                    SHAWN T. COLEMAN

ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE

State of New York, County of  NEW YORK        , ss:

On the  19th day of  MAY        in the year 2006,
before me, the undersigned, personally appeared
MARY EASON-VAILS, KENYA EASON, Shawn Coleman
                    , personally known to me or proved to me on the
basis of satisfactory evidence to be the individual(s) whose name(s) is
(are) subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their capacity(ies), and
that by his/her/their signature(s) on the instrument, the individual(s),
or the person upon behalf of which the individual(s) acted, executed
the instrument.

WENDY L. GROGAN
Notary Public, State of New York
No. 01GR8132338
Qualified in Nassau County
Commission Expires Aug. 22, 2009

ACKNOWLEDGEMENT BY SUBSCRIBING WITNESS
TAKEN IN NEW YORK STATE

State of New York, County of        , ss:
On the       day of        in the year
before me, the undersigned, a Notary Public in and for said State,
personally appeared
                    , the
subscribing witness to the foregoing instrument, with whom I am
personally acquainted, who, being by me duly sworn, did depose and
say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number if any, thereof).
that he/she/they know(s)

to be the individual described in and who executed the foregoing
instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed
his/her/their name(s) as a witness thereto

ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE

State of New York, County of        , ss:

On the       day of        in the year
before me, the undersigned, personally appeared

                    , personally known to me or proved to me on the
basis of satisfactory evidence to be the individual(s) whose name(s) is
(are) subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their capacity(ies), and
that by his/her/their signature(s) on the instrument, the individual(s),
or the person upon behalf of which the individual(s) acted, executed
the instrument.

ACKNOWLEDGEMENT TAKEN OUTSIDE NEW YORK
STATE

*State of        , County of        , ss:
*(Or insert District of Columbia, Territory, Possession or Foreign
County)

On the       day of        in the year
, before me the undersigned  personally appeared

Personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to
the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their capacity(ies), that by his/her/their
signature(s) on the instrument, the individual(s) or the person upon
behalf of which the individual(s) acted, executed the instrument, and
that such individual make such appearance before the undersigned in
the

(add the city or political subdivision and the state or country or other
place the acknowledgement was taken)

## Warranty Deed
## with full covenants

SECTION

BLOCK  3234

LOT  93

COUNTY OF BRONX

Title No.
MARY EASON-VAILS, KENYA EASON &
SHAWN T  COLEMAN
TO
EUGENE THOMAS

**RETURN BY MAIL TO:**

DISTRIBUTED BY

EDWARD L. KOESTER, ESQ.
1457 KNAPP STREET
BRONX, NEW YORK 10469

# *Round Hill Title Agency, Inc.*

Title Number: RH-100067

## SCHEDULE A

All that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, being bounded and described as follows:

BEGINNING at a point on the Southeasterly side of Hampden Place, distant 175.16 feet Northerly from the corner formed by the Northerly side of West 182nd Street with the Southeasterly side of Hampden Place;

RUNNING THENCE Easterly at right angles to Hampden Place and part of the way through a party wall, 84.91 feet;

THENCE Northerly and parallel with Hampden Place, 25 feet;

THENCE Westerly again at right angles with Hampden Place and Part of the way through a party wall, 84.91 feet to the Easterly side of Hampden Place;

THENCE Southerly along Hampden Place, 25 feet to the point or place of BEGINNING.

Said Premises is also known as and by:

**2260 Hampden Place, Bronx, NY 10468**

Being and intending to be the same premises conveyed to the owner herein:

**By deed from Greenwich Investors XVI, LLC dated July 28th, 2004 and recorded August 04, 2004 in CRFN: 2004000477976.**

District:          Section:          Block: 3234    Lot: 93

Or

Parcel ID:

315 Westchester Ave., Port Chester, NY 10573  **PHONE 914-939-8900   FAX 914-939-8901**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2006052800010001001S55F0

| SUPPORTING DOCUMENT COVER PAGE | PAGE 1 OF 1 |
|---|---|

**Document ID:** 2006052800010001   **Document Date:** 05-19-2006   **Preparation Date:** 05-28-2006
**Document Type:** DEED

**ASSOCIATED TAX FORM ID:** 2006051700721

**SUPPORTING DOCUMENTS SUBMITTED:**

| | Page Count |
|---|---|
| RP - 5217 REAL PROPERTY TRANSFER REPORT | 2 |
| SMOKE DETECTOR AFFIDAVIT | 1 |

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES

# RP - 5217NYC
(Rev 11/2002)

| FOR CITY USE ONLY | |
|---|---|
| C1. County Code | C2. Date Deed Recorded __/__/__ Month Day Year |
| C3. Book OR | C4. Page |
| C5. CRFN | |

## PROPERTY INFORMATION

**1. Property Location**
2260 — STREET NUMBER
HAMPDEN PLACE — STREET NAME
BRONX — BOROUGH
10468 — ZIP CODE

**2. Buyer Name**
THOMAS — LAST NAME / COMPANY
EUGENE — FIRST NAME

LAST NAME / COMPANY — FIRST NAME

**3. Tax Billing Address** — Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY — FIRST NAME
STREET NUMBER AND STREET NAME — CITY OR TOWN — STATE — ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** 1 # of Parcels OR ☐ Part of a Parcel

4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

Check the boxes below as they apply:
6. Ownership Type is Condominium ☐
7. New Construction on Vacant Land ☐

**5. Deed Property Size** ___ FRONT FEET X ___ DEPTH OR ___ ACRES

**8. Seller Name**
VAILS-EASON — LAST NAME / COMPANY
MARY — FIRST NAME
EASON — LAST NAME / COMPANY
KENYA — FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

| A ☐ One Family Residential | C ☐ Residential Vacant Land | E ☐ Commercial | G ☐ Entertainment / Amusement | I ☐ Industrial |
| B ☑ 2 or 3 Family Residential | D ☐ Non-Residential Vacant Land | F ☐ Apartment | H ☐ Community Service | J ☐ Public Service |

## SALE INFORMATION

**10. Sale Contract Date** 2 / 27 / 2006 Month Day Year

**11. Date of Sale / Transfer** 5 / 19 / 2006 Month Day Year

**12. Full Sale Price** $ 3,9,8,5,5,0,0
( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) Please round to the nearest whole dollar amount.

**13. Indicate the value of personal property included in the sale**

**14. Check one or more of these conditions as applicable to transfer:**

| A ☐ Sale Between Relatives or Former Relatives |
| B ☐ Sale Between Related Companies or Partners in Business |
| C ☐ One of the Buyers is also a Seller |
| D ☐ Buyer or Seller is Government Agency or Lending Institution |
| E ☐ Deed Type not Warranty or Bargain and Sale (Specify Below ) |
| F ☐ Sale of Fractional or Less than Fee Interest ( Specify Below ) |
| G ☐ Significant Change in Property Between Taxable Status and Sale Dates |
| H ☐ Sale of Business is Included in Sale Price |
| I ☐ Other Unusual Factors Affecting Sale Price ( Specify Below ) |
| J ☑ None |

## ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class** B 3

**16. Total Assessed Value (of all parcels in transfer)**

**17. Borough, Block and Lot / Roll Identifier(s) ( If more than three, attach sheet with additional Identifier(s) )**
BRONX 3234 93

## CERTIFICATION

I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

**BUYER**
Eugene Thomas — BUYER SIGNATURE
MAY 19, 2006 — DATE
2260 HAMPDEN PL. — STREET NUMBER — STREET NAME (AFTER SALE)
Bronx — CITY OR TOWN
NY — STATE
10468 — ZIP CODE

**BUYER'S ATTORNEY**
Kammerman — LAST NAME
Joshua — FIRST NAME
212 — AREA CODE
594-4400 — TELEPHONE NUMBER

**SELLER**
Kenya Eason — SELLER SIGNATURE
5/19/06 — DATE
Mary Eason-Vails

2006051700721201

**CERTIFICATION** I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

| BUYER | | BUYER'S ATTORNEY | |
|---|---|---|---|
| BUYER SIGNATURE | DATE | LAST NAME | FIRST NAME |
| STREET NUMBER    STREET NAME (AFTER SALE) | | AREA CODE   TELEPHONE NUMBER | |

*Eugene Thomas* | *May 19, 2006*

2260 HAMPDEN PL.

212 | 594-4400

Bronx | N.Y. | 10468

CITY OR TOWN | STATE | ZIP CODE

**SELLER**

SELLER SIGNATURE | DATE

5/19/06

2006051700721201

Affidavit of Compliance with Smoke Detector Requirement for One and-Two Family Dwellings

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York  )
        ) SS.:
County of New York )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

**2260 HAMPDEN PLACE**

| Street Address | | | Unit/Apt. |
| --- | --- | --- | --- |
| **BRONX** | New York, | **3234** | **93** |
| Borough | | Block | Lot |

(the "Premises");

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

_____ _____
Name of Grantor (Type or Print)  Name of Grantee (Type or Print)

_____ _____
Signature of Grantor    Signature of Grantee

Sworn to before me     Sworn to before me
this ____ date of May ____ 2006 this ____ date of May ____ 2006

Robert D. Grogan      Robert D. Grogan
Notary Public, State of New York  Notary Public, State of New York
No. 01GR6034533      No. 01GR6034533
Qualified in Nassau County    Qualified in Nassau County
Commission Expires Jan 3, 20__  Commission Expires Jan 3, 20__

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

· 1 ·

2006051700721101

# EXHIBIT

# B

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2006052800010002001E9B35

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 26 |
|---|---|---|
| **Document ID: 2006052800010002** | Document Date: 05-19-2006 | Preparation Date: 05-28-2006 |
| Document Type: MORTGAGE | | |
| Document Page Count: 25 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| ROUND HILL TITLE AGENCY, INC. | NEW CENTURY MORTGAGE CORPORATION |
| 315 WESTCHESTER AVE. | 18400 VON KARMAN, SUITE 1000 |
| PORT CHESTER, NY 10573 | IRVINE, CA 92612 |
| 914-939-8900 | |
| DAN@ROUNDHILLTITLE.COM | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 3234 | 93 | Entire Lot | 2260 HAMPDEN PLACE |

**Property Type:** DWELLING ONLY - 2 FAMILY

### CROSS REFERENCE DATA

CRFN_____ or  Document ID_____ or _____ Year_____ Reel ____ Page _____ or File Number_____

### PARTIES

| MORTGAGER/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| EUGENE THOMAS | NEW CENTURY MORTGAGE CORPORATION |
| 626 RIVERSIDE DRIVE, 5C | 18400 VON KARMAN, SUITE 1000 |
| NEW YORK, NY 10031 | IRVINE, CA 92612 |

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 162.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 317,200.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 317,200.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 1,586.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 3,172.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 793.00 | |
| MTA: | $ | 921.60 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 6,472.60 | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed          06-06-2006 12:28
City Register File No.(CRFN):
                    **2006000313306**

*Annette M. Hill*

**City Register Official Signature**

Return To:
New Century Mortgage
Corporation
18400 Von Karman, Ste
1000
Irvine, CA 92612

Prepared By:
New Century Mortgage
Corporation
18400 Von Karman, Ste
1000
Irvine, CA 92612

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated  May 19, 2006
together with all Riders to this document. will be called the "Security Instrument."
(B) "Borrower." Eugene Thomas·

whose address is 626 Riverside Drive 5c, New York, NY 10031

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "Lender." New Century Mortgage Corporation

will be called "Lender." Lender is a corporation or association which exists under the laws of
California                          . Lender's address is 18400 Von Karman, Suite
1000, Irvine, CA 92612

| Section: | Block: | Lot: | Unit: | |
|----------|--------|------|-------|--|

1007492224

**NEW YORK** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3033 1/ 01

VMP®-6(NY) (0506)

Page · ;' · · ·       Initials: *ET*

VMP Mortgage Solutions, Inc. I800)52!-729 1

**(D) "Note."** The note signed by Borrower and dated **May 19, 2006**                , will be called the "Note." The Note shows that I owe Lender **THREE HUNDRED SEVENTEEN THOUSAND TWO HUNDRED AND 00/100**

                                Dollars (U.S. **$317,200.00**                ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by **06/01/2036**

**(E) "Property."** The property that is described below in the section titled "Description of the Property." will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | **Prepayment Rider** |

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

**DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at **2260 Hampden Place**

[Street]

**Bronx** [City, Town or Village], New York **10468** [Zip Code]. This Property is in **Bronx** County. It has the following legal description: **See Legal Description Attached Hereto and Made a Part Hereof**

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

Initials: _ET_                    1007492224

VMP®-6(NY) (0506)          Page 3 of 17          Form 3033 1/01

# *Round Hill Title Agency, Inc.*

Title Number: RH-10006⁻

## SCHEDULE A

All that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, being bounded and described as follows:

BEGINNING at a point on the Southeasterly side of Hampden Place, distant 175 16 feet Northerly from the corner formed by the Northerly side of West 182nd Street with the Southeasterly side of Hampden Place;

RUNNING THENCE Easterly at right angles to Hampden Place and part of the way through a party wall, 84 91 feet;

THENCE Northerly and parallel with Hampden Place, 25 feet;

THENCE Westerly again at right angles with Hampden Place and Part of the way through a party wall, 84 91 feet to the Easterly side of Hampden Place;

THENCE Southerly along Hampden Place, 25 feet to the point or place of BEGINNING

Said Premises is also known as and by:

### 2260 Hampden Place, Bronx, NY 10468

Being and intending to be the same premises conveyed to the owner herein:

**By deed from Greenwich Investors XVI, LLC dated July 28th, 2004 and recorded August 04, 2004 in CRFN: 2004000477976.**

District:          Section:          Block: 3234   Lot: 93

Or

Parcel ID:

*ET*

315 Westchester Ave., Port Chester, NY 10573   PHONE 914-939-8900   FAX 914-939-8901

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

Initials: _ET_    1007492224

-6(NY) (0506)    Page 4 of 17    Form 3033 1/01

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**
**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.



Initials: _ET_

1007492224

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future. unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items. for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due. but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues. Fees. and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument. the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith. I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

1007492224

Initials: _ET_

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c)

1007492224

Initials: _ET_

Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) Maintenance and Protection of the Property.

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) Lender's Inspection of Property.

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

1007492224

Initials: _ET_

-6(NY) (0506)                    Page 10 of 17                    Form 3033 1/ 01

value. the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

Initials: *ET*

1007492224

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to



the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

> (1) The promise or agreement that I failed to keep or the default that has occurred;
>
> (2) The action that I must take to correct that default;
>
> (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;
>
> (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;
>
> (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and
>
> (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. **Borrower's Statement Regarding the Property [check box as applicable].**

[x] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          Eugene Thomas                    -Borrower


_____          _____ (Seal)
                                                                           -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                        -Borrower

1007492224

STATE OF NEW YORK,                *New York*        County ss:

On the *19th* day of *May 2006*        before me, the undersigned, a notary public in and for said state, personally appeared

*Eugene Thomas*

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

WENDY L. GROGAN
Notary Public, State of New York
No. 01GR6132338
Qualified in Nassau County
Commission Expires Aug. 22, 20*29*

Tax Map Information: LOT-93 BLK-3234

Assessor's Parcel Number: LOT-93 BLK-3234

Initials: *E.T*

1007492224

Form 3033 1/ 01

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)**
**2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD**

THIS ADJUSTABLE RATE RIDER is made this **19th**          day of **May, 2006**                    .
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to
**New Century Mortgage Corporation**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2260 Hampden Place, Bronx, NY 10468**
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE
BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of                **6.875 %**. The Note provides for
changes in the interest rate and monthly payments as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**
The interest rate I will pay may change on the first day of **June, 2008**                    .
and on the same day of every 6th month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date."

**(B)  The Index**
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London
market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index
figure available as of the first business day of the month immediately preceding the month in which the
Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

NCMC
Fixed  ARM Six Month LIBOR
Interest Only Rider (Multistate)
RE-421  (051005)          Page 1 of 3                    **1007492224**

*E 7*

**(C) Calculation of Changes**

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Ninety-five Hundredth(s)** percentage points ( **5.950** %) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Interest Rate Change Date.

(i) **Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **June 1, 2011**, called the "Amortization Start Date." During the Interest-only Period, my monthly payments will only pay the interest I owe. During the Interest-only Period, the Note Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the then applicable interest rate. The result of this calculation will be the amount of my monthly payment until changed.

(ii) **Amortization Period.** Beginning on the Amortization Date my monthly payments will include principal. Starting on the Amortization Start Date and continuing until the Maturity Date, on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date at the new interest rate, assuming, for purposes of each calculation, that the interest rate did not change again. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.375** % or less than **6.875** %. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.875** % or less than **6.875** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**11. GOVERNING LAW - SECURED NOTE**

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)
RF-441  (051005)

Page 2 of 3

*E T*

1007492224

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____    _____
Eugene Thomas                                   -Borrower                                   -Borrower

_____    _____
                                                  -Borrower                                   -Borrower

_____    _____
                                                  -Borrower                                   -Borrower

_____    _____
                                                  -Borrower                                   -Borrower

*(Sign Original Only)*

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 19th        day of May, 2006                    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to New Century Mortgage
Corporation

(the
"Lender") of the same date and covering the Property described in the Security Instrument
and located at: 2260 Hampden Place, Bronx, NY  10468

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows :

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings , storm windows , storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which. including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has
agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations
and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section 5.

1007492224

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3170 1 /01

VMP®-57 R (0411)
Page 1 of 3          Initials: _E T_
VMP Mortgage Solutions, Inc.
(80 0)521 -7291

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

1007492224

Initials: _E T_

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
Eugene Thomas                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

1007492224

VMP-57 R (0411)                    Page 3 of 3                    Form 3170  1/01

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **19th** day of **May** **2006** , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

**5. BORROWERS RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full or Partial Prepayment without paying any penalty. If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full Prepayment at any time. However, if within the first twelve (12) months after the execution of the Mortgage, I make any prepayment(s), the total amount of which exceeds     **TWENTY PERCENT  (  20    %) of** the original Principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of     **Six              (   6      ) months' advance interest on the amount by** which the total of my prepayment(s) within that 12-month period exceeds **TWENTY          PERCENT (  20      %) of the original Principal amount of the loan.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_Eugene Thomas_
Eugene Thomas

_4668651_

# EXHIBIT

# C



L-Sec

Comptroller of the Currency
Administrator of National Banks

# Asset Securitization

## Comptroller's Handbook

### November 1997

# L

# Asset Securitization                Table of Contents

| | |
|---|---|
| **Introduction** | 1 |
| Background | 1 |
| Definition | 2 |
| A Brief History | 2 |
| Market Evolution | 3 |
| Benefits of Securitization | 4 |
| **Securitization Process** | 6 |
| Basic Structures of Asset-Backed Securities | 6 |
| Parties to the Transaction | 7 |
| Structuring the Transaction | 12 |
| Segregating the Assets | 13 |
| Creating Securitization Vehicles | 15 |
| Providing Credit Enhancement | 19 |
| Issuing Interests in the Asset Pool | 23 |
| The Mechanics of Cash Flow | 25 |
| Cash Flow Allocations | 25 |
| **Risk Management** | 30 |
| Impact of Securitization on Bank Issuers | 30 |
| Process Management | 30 |
| Risks and Controls | 33 |
| Reputation Risk | 34 |
| Strategic Risk | 35 |
| Credit Risk | 37 |
| Transaction Risk | 43 |
| Liquidity Risk | 47 |
| Compliance Risk | 49 |
| Other Issues | 49 |
| Risk-Based Capital | 56 |

**Examination Objectives**                                      61

**Examination Procedures**                                      62

   Overview                                      62
      Management Oversight          64
      Risk Management               68
      Management Information Systems 71
      Accounting and Risk-Based Capital 73
   Functions                                     77
      Originations                  77
      Servicing                     80
      Other Roles                   83
   Overall Conclusions                           86

**References**                                                  89

# Asset Securitization                        Introduction

## Background

Asset securitization is helping to shape the future of traditional commercial banking.  By using the securities markets to fund portions of the loan portfolio, banks can allocate capital more efficiently, access diverse and cost-effective funding sources, and better manage business risks.

But securitization markets offer challenges as well as opportunity.   Indeed, the successes of nonbank securitizers are forcing banks to adopt some of their practices.  Competition from commercial paper underwriters and captive finance companies has taken a toll on banks' market share and profitability in the prime credit and consumer loan businesses.  And the growing competition within the banking industry from specialized firms that rely on securitization puts pressure on more traditional banks to use securitization to streamline as much of their credit and originations business as possible.  Because securitization may have such a fundamental impact on banks and the financial services industry, bankers and examiners should have a clear understanding of its benefits and inherent risks.

This booklet begins with an overview of the securitization markets, followed by a discussion of the mechanics of securitization.  The discussion evolves to the risks of securitization and how, at each stage of the process, banks are able to manage those risks.

A central theme of this booklet is the bank's use of asset securitization as a means of funding, managing the balance sheet, and generating fee income.  The discussion of risk focuses on banks' roles as financial intermediaries, that is, as loan originators and servicers rather than as investors in asset-backed securities.  Although purchasing asset-backed securities as investments clearly helps to diversify assets and manage credit quality, these benefits are discussed in other OCC publications, such as the "Investment Securities" section of the *Comptroller's Handbook*.

## Definition

Asset securitization is the structured process whereby interests in loans and other receivables are packaged, underwritten, and sold in the form of "asset-backed" securities. From the perspective of credit originators, this market enables them to transfer some of the risks of ownership to parties more willing or able to manage them. By doing so, originators can access the funding markets at debt ratings higher than their overall corporate ratings, which generally gives them access to broader funding sources at more favorable rates. By removing the assets and supporting debt from their balance sheets, they are able to save some of the costs of on-balance-sheet financing and manage potential asset-liability mismatches and credit concentrations.

## Brief History

Asset securitization began with the structured financing of mortgage pools in the 1970s. For decades before that, banks were essentially portfolio lenders; they held loans until they matured or were paid off. These loans were funded principally by deposits, and sometimes by debt, which was a direct obligation of the bank (rather than a claim on specific assets).

But after World War II, depository institutions simply could not keep pace with the rising demand for housing credit. Banks, as well as other financial intermediaries sensing a market opportunity, sought ways of increasing the sources of mortgage funding. To attract investors, investment bankers eventually developed an investment vehicle that isolated defined mortgage pools, segmented the credit risk, and structured the cash flows from the underlying loans. Although it took several years to develop efficient mortgage securitization structures, loan originators quickly realized the process was readily transferable to other types of loans as well.

Since the mid 1980s, better technology and more sophisticated investors have combined to make asset securitization one of the fastest growing activities in the capital markets. The growth rate of nearly every type of securitized asset has been remarkable, as have been the increase in the types of companies using securitization and the expansion of the investor base. The business of a credit intermediary has so changed that few banks, thrifts,

or finance companies can afford to view themselves exclusively as portfolio lenders.

## Market Evolution

The market for mortgage-backed securities was boosted by the government agencies that stood behind these securities. To facilitate the securitization of nonmortgage assets, businesses substituted private credit enhancements. First, they overcollateralized pools of assets; shortly thereafter, they improved third-party and structural enhancements. In 1985, securitization techniques that had been developed in the mortgage market were applied for the first time to a class of nonmortgage assets — automobile loans. A pool of assets second only to mortgages, auto loans were a good match for structured finance; their maturities, considerably shorter than those of mortgages, made the timing of cash flows more predictable, and their long statistical histories of performance gave investors confidence.

The first significant bank credit card sale came to market in 1986 with a private placement of $50 million of bank card outstandings. This transaction demonstrated to investors that, if the yields were high enough, loan pools could support asset sales with higher expected losses and administrative costs than was true within the mortgage market. Sales of this type — with no contractual obligation by the seller to provide recourse — allowed banks to receive sales treatment for accounting and regulatory purposes (easing balance sheet and capital constraints), while at the same time allowing them to retain origination and servicing fees. After the success of this initial transaction, investors grew to accept credit card receivables as collateral, and banks developed structures to normalize the cash flows.

The next growth phase of securitization will likely involve nonconsumer assets. Most retail lending is readily "securitizable" because cash flows are predictable. Today, formula-driven credit scoring and credit monitoring techniques are widely used for such loans, and most retail programs produce fairly homogeneous loan portfolios. Commercial financing presents a greater challenge. Because a portfolio of commercial loans is typically less homogeneous than a retail portfolio, someone seeking to invest in them must often know much more about each individual credit, and the simpler tools for

measuring and managing portfolio risk are less effective.  Nonetheless, investment bankers and asset originators have proven extremely innovative at structuring cash flows and credit enhancements.  Evidence of this can be seen in the market for securitized commercial real estate mortgages.  Commercial real estate is one of the fastest-growing types of nonconsumer assets in the securitization markets, which fund approximately 10 percent of commercial mortgage debt.

## Benefits of Asset Securitization

The evolution of securitization is not surprising given the benefits that it offers to each of the major parties in the transaction.

### For Originators

Securitization improves returns on capital by converting an on-balance-sheet lending business into an off-balance-sheet fee income stream that is less capital intensive.  Depending on the type of structure used, securitization may also lower borrowing costs, release additional capital for expansion or reinvestment purposes, and improve asset/liability and credit risk management.

### For Investors

Securitized assets offer a combination of attractive yields (compared with other instruments of similar quality), increasing secondary market liquidity, and generally more protection by way of collateral overages and/or guarantees by entities with high and stable credit ratings.  They also offer a measure of flexibility because their payment streams can be structured to meet investors' particular requirements.  Most important, structural credit enhancements and diversified asset pools free investors of the need to obtain a detailed understanding of the underlying loans.  This has been the single largest factor in the growth of the structured finance market.

### For Borrowers

Borrowers benefit from the increasing availability of credit on terms that lenders may not have provided had they kept the loans on their balance

sheets. For example, because a market exists for mortgage-backed securities, lenders can now extend fixed rate debt, which many consumers prefer over variable rate debt, without overexposing themselves to interest rate risk. Credit card lenders can originate very large loan pools for a diverse customer base at lower rates than if they had to fund the loans on their balance sheet. Nationwide competition among credit originators, coupled with strong investor appetite for the securities, has significantly expanded both the availability of credit and the pool of cardholders over the past decade.

# Asset Securitization

## Securitization Process

Before evaluating how a bank manages the risks of securitization, an examiner should have a fundamental understanding of asset-backed securities and how they are structured. This section characterizes asset-backed securities, briefly discusses the roles of the major parties, and describes the mechanics of their cash flow, or how funds are distributed.

## Basic Structures of Asset-Backed Securities

A security's structure is often dictated by the kind of collateral supporting it. Installment loans dictate a quite different structure from revolving lines of credit. Installment loans, such as those made for the purchase of automobiles, trucks, recreational vehicles, and boats, have defined amortization schedules and fixed final maturity dates. Revolving loans, such as those extended to credit card holders and some home equity borrowers, have no specific amortization schedule or final maturity date. Revolving loans can be extended and repaid repeatedly over time, more or less at the discretion of the borrower.

### Installment Contract Asset-Backed Securities

Typical installment contract asset-backed securities, which bear a close structural resemblance to mortgage pass-through securities, provide investors with an undivided interest in a specific pool of assets owned by a trust. The trust is established by pooling installment loan contracts on automobiles, boats, or other assets purchased from a loan originator, often a bank.

The repayment terms for most installment contract asset-backed securities call for investors to receive a pro rata portion of all of the interest and principal received by the trust each month. Investors receive monthly interest on the outstanding balance of their certificates, including a full month's interest on any prepayments. The amount of principal included in each payment depends on the amortization and prepayment rate of the underlying collateral. Faster prepayments shorten the average life of the issue.

**Revolving Asset Transactions**

The typically short lives of receivables associated with revolving loan products (credit cards, home equity lines, etc.) require issuers to modify the structures used to securitize the assets. For example, a static portfolio of credit card receivables typically has a life of between five months and ten months. Because such a life is far too short for efficient security issuance, securities backed by revolving loans are structured in a manner to facilitate management of the cash flows. Rather than distributing principal and interest to investors as received, the securities distribute cash flow in stages — a revolving phase followed by an amortization phase. During the revolving period, only interest is paid and principal payments are reinvested in additional receivables as, for example, customers use their credit cards or take additional draws on their home equity lines. At the end of the revolving period an amortization phase begins, and principal payments are made to investors along with interest payments. Because the principal balances are repaid over a short time, the life of the security is largely determined by the length of the revolving period.

## Parties to the Transaction

The securitization process redistributes risk by breaking up the traditional role of a bank into a number of specialized roles: originator, servicer, credit enhancer, underwriter, trustee, and investor. Banks may be involved in several of the roles and often specialize in a particular role or roles to take advantage of expertise or economies of scale. The types and levels of risk to which a particular bank is exposed will depend on the organization's role in the securitization process.

With sufficient controls and the necessary infrastructure in place, securitization offers several advantages over the traditional bank lending model. These benefits, which may increase the soundness and efficiency of the credit extension process, can include a more efficient origination process, better risk diversification, and improved liquidity. A look at the roles played by the primary participants in the securitization process will help to illustrate the benefits.

**Exhibit 1:  Parties Involved in Structuring Asset-Backed Securities**



*Borrower*.  The borrower is responsible for payment on the underlying loans and therefore the ultimate performance of the asset-backed security.  Because borrowers often do not realize that their loans have been sold, the originating bank is often able to maintain the customer relationship.

From a credit risk perspective, securitization has made popular the practice of grouping borrowers by letter or categories.  At the top of the rating scale, 'A'-quality borrowers have relatively pristine credit histories.  At the bottom, 'D'-quality borrowers usually have severely blemished credit histories.  The categories are by no means rigid; in fact, credit evaluation problems exist because one originator's 'A' borrower may be another's 'A-' or 'B' borrower.  Nevertheless, the terms 'A' paper and 'B/C' paper are becoming more and more popular.

Exhibit 2 is an example of generic borrower descriptions used by Duff and Phelps Credit Rating Corporation in rating mortgage borrowers.  The borrowers' characteristics in the exhibit are generalizations of each category's standards and fluctuate over time; however, the table does provide an illustration of general standards in use today.  For example, an 'A' quality

**Exhibit 2: Borrower Credit Quality Categories**

| Generic Borrower Credit Quality Description | Mortgage Credit | Other Credit | Recency of Bankruptcy | Debt to Income Ratio | Loan-to-Value Guidelines |
|---|---|---|---|---|---|
| A: Standard agency quality | 1 x 30 last 12 months | No derogatories | 5 yrs. | 36% | 97% |
| A-: Very minor credit problems | 1 x 30 last 12 months<br>2 x 30 last 24 months | Minor derogatories explained | 5 yrs. | 42% | 90% |
| B: Minor to moderate credit problems | 4 x 30 last 12 months<br>1 x 60 last 24 months | Some prior defaults | 3 yrs. | 50% | 75% |
| C: Moderate to serious credit problems | 6 x 30 last 12 months<br>1 x 60 & 1 x 90 last 12 months | Significant credit problems | 18 months | 55% | 70% |
| D: Demonstrated unwillingness or inability to pay | 30-60 constant delinquent, 2 x 90 last 12 months | Severe credit problems | 12 months | 60% | 65% |

*(Source: Duff & Phelps)*

borrower will typically have an extensive credit history with few if any delinquencies, and a fairly strong capacity to service debt.  In contrast, a 'C' quality borrower has a poor or limited credit history, numerous instances of delinquency, and may even have had a fairly recent bankruptcy.  Segmenting borrowers by grade allows outside parties such as rating agencies to compare performance of a specific company or underwriter more readily with that of its peer group.

*Originator.*  Originators create and often service the assets that are sold or used as collateral for asset-backed securities.  Originators include captive finance companies of the major auto makers, other finance companies, commercial banks, thrift institutions, computer companies, airlines, manufacturers, insurance companies, and securities firms.  The auto finance companies dominate the securitization market for automobile loans.  Thrifts securitize primarily residential mortgages through pass-throughs, pay-throughs, or mortgage-backed bonds.  Commercial banks regularly originate and securitize auto loans, credit card receivables, trade receivables, mortgage loans, and more recently small business loans.  Computer companies, airlines, and other commercial companies often use securitization to finance receivables generated from sales of their primary products in the normal course of business.

*Servicer.* The originator/lender of a pool of securitized assets usually continues to service the securitized portfolio. (The only assets with an active secondary market for servicing contracts are mortgages.) Servicing includes customer service and payment processing for the borrowers in the securitized pool and collection actions in accordance with the pooling and servicing agreement. Servicing can also include default management and collateral liquidation. The servicer is typically compensated with a fixed normal servicing fee.

Servicing a securitized portfolio also includes providing administrative support for the benefit of the trustee (who is duty-bound to protect the interests of the investors). For example, a servicer prepares monthly informational reports, remits collections of payments to the trust, and provides the trustee with monthly instructions for the disposition of the trust's assets. Servicing reports are usually prepared monthly, with specific format requirements for each performance and administrative report. Reports are distributed to the investors, the trustee, the rating agencies, and the credit enhancer.

*Trustee.* The trustee is a third party retained for a fee to administer the trust that holds the underlying assets supporting an asset-backed security. Acting in a fiduciary capacity, the trustee is primarily concerned with preserving the rights of the investor. The responsibilities of the trustee will vary from issue to issue and are delineated in a separate trust agreement. Generally, the trustee oversees the disbursement of cash flows as prescribed by the indenture or pooling and servicing agreement, and monitors compliance with appropriate covenants by other parties to the agreement.

If problems develop in the transaction, the trustee focuses particular attention on the obligations and performance of all parties associated with the security, particularly the servicer and the credit enhancer. Throughout the life of the transaction the trustee receives periodic financial information from the originator/servicer delineating amounts collected, amounts charged off, collateral values, etc. The trustee is responsible for reviewing this information to ensure that the underlying assets produce adequate cash flow to service the securities. The trustee also is responsible for declaring an event of default or an amortization event, as well as replacing the servicer if it fails to perform in accordance with the required terms.

*Credit Enhancer.*  Credit enhancement is a method of protecting investors in the event that cash flows from the underlying assets are insufficient to pay the interest and principal due for the security in a timely manner.  Credit enhancement is used to improve the credit rating, and therefore the pricing and marketability of the security.

As a general rule, third-party credit enhancers must have a credit rating at least as high as the rating sought for the security.  Third-party credit support is often provided through a letter of credit or surety bond from a highly rated bank or insurance company.  Because there are currently few available highly rated third-party credit enhancers, internal enhancements such as the senior/subordinated structure have become popular for many asset-backed deals.  In this latter structure, the assets themselves and cash collateral accounts provide the credit support.  These cash collateral accounts and separate, junior classes of securities protect the senior classes by absorbing defaults before the senior position's cash flows are interrupted.

*Rating Agencies.*  The rating agencies perform a critical role in structured finance — evaluating the credit quality of the transactions.  Such agencies are considered credible because they possess the expertise to evaluate various underlying asset types, and because they do not have a financial interest in a security's cost or yield.  Ratings are important because investors generally accept ratings by the major public rating agencies in lieu of conducting a due diligence investigation of the underlying assets and the servicer.

Most nonmortgage asset-backed securities are rated.  The large public issues are rated because the investment policies of many corporate investors require ratings.  Private placements are typically rated because insurance companies are a significant investor group, and they use ratings to assess capital reserves against their investments.  Many regulated investors, such as life insurance companies, pension funds, and to some extent commercial banks can purchase only limited amounts of securities rated below investment grade.

The rating agencies review four major areas:

- Quality of the assets being sold,
- Abilities and strength of the originator/servicer of the assets,

- Soundness of the transaction's overall structure, and
- Quality of the credit support.

From this review, the agencies assess the likelihood that the security will pay interest and principal according to the terms of the trust agreement. The rating agencies focus solely on the credit risk of an asset-backed security. They do not express an opinion on market value risks arising from interest rate fluctuations or prepayments, or on the suitability of an investment for a particular investor.

*Underwriter.* The asset-backed securities underwriter is responsible for advising the seller on how to structure the security, and for pricing and marketing it to investors. Underwriters are often selected because of their relationships with institutional investors and for their advice on the terms and pricing required by the market. They are also generally familiar with the legal and structural requirements of regulated institutional investors.

*Investors.* The largest purchasers of securitized assets are typically pension funds, insurance companies, fund managers, and, to a lesser degree, commercial banks. The most compelling reason for investing in asset-backed securities has been their high rate of return relative to other assets of comparable credit risk. The OCC's investment securities regulations at 12 CFR 1 allow national banks to invest up to 25 percent of their capital in "Type V" securities. By definition, a Type V security:

- Is marketable,
- Is rated investment grade,
- Is fully secured by interests in a pool of loans to numerous obligors and in which a national bank could invest directly, and
- Is not rated as a mortgage-related or Type IV security.

## Structuring the Transaction

The primary difference between whole loan sales or participations and securitized credit pools is the structuring process. Before most loan pools can be converted into securities, they must be structured to modify the nature of the risks and returns to the final investors. Structuring includes the isolation

and distribution of credit risk, usually through credit enhancement techniques, and the use of trusts and special purpose entities to address tax issues and the management of cash flows.

Examiners performing a comprehensive review of a specific securitization process should read through the pooling and servicing agreement and/or a specific series supplement for explicit detail on the structure and design of the particular asset-backed security and the responsibilities of each involved party. For purposes of this booklet, the following is an overview of the structuring process and a description of what the documents usually contain.

Generally, the structure of a transaction is governed by the terms of the pooling and servicing agreement and, for master trusts, each series supplement. The pooling and servicing agreement is the primary contractual document between the seller/servicer and the trustee. This agreement documents the terms of the sale and the responsibilities of the seller/servicer. For master trusts, the pooling and servicing agreement, including the related series supplement, document the terms of the sale and responsibilities of the seller/servicer for a specific issuance. The following section describes the four major stages of the structuring process:

- Segregating the assets from the seller/originator.
- Creating a special-purpose vehicle to hold the assets and protect the various parties' interests.
- Adding credit enhancement to improve salability.
- Issuing interests in the asset pool.

## Segregating the Assets

Securitization allows investors to evaluate the quality of a security on its own (apart from the credit quality of the originator/seller). To accomplish this, the seller conveys receivables to a trust for the benefit of certificate holders. For revolving-type assets, this conveyance includes the amount of receivables in certain designated accounts on a specific cutoff date, plus the option for the trust to purchase any new receivables that arise from those designated accounts subsequent to the cutoff date. The accounts and receivables are subject to eligibility criteria and specific representations and warranties of the seller.

## Choosing Accounts — Initial Pool Selection

The seller designates which accounts' receivables will be sold to a trust. The selection is carried out with an eye to creating a portfolio whose performance is not only predictable but also consistent with the target quality of the desired security. Step one is determining which accounts will be "designated" as those from which receivables may be included in the trust. For example, past-due receivables may be left in the eligible pool, but accounts that have had a default or write-off may be excluded. Some issuers include written-off receivables, allowing the revenue from recoveries to become part of the cash flow of the trust. Other selection criteria might include data elements such as geographic location, maturity date, size of the credit line, or age of the account relationship.

Step two, asset selection, can either be random, in order to create selections that are representative of the total portfolio, or inclusive, so that all qualifying receivables are sold. In random selection, the issuer determines how many accounts are needed to meet the target value of the security; then the accounts are selected randomly (for example, every sixth account is selected from the eligible universe).

## Account Additions and Removals

For trusts with a revolving feature, such as credit cards or home equity lines of credit, the seller may be required to designate additional accounts that will be assimilated by the trust. This may be required for a variety of reasons, for example, when the seller's interest (the interest in the receivables pool retained by the seller subsequent to transfer into the trust) falls below a level specified in the pooling and servicing agreement. The seller also typically reserves the ability to withdraw some accounts previously designated for the trust.[1] Rating agencies must often be notified when account additions or removals reach certain thresholds. For example, the terms of the rating may

---

[1]    The issue of whether provisions for the removal of accounts are in-substance call options retained by the seller (which may compromise sales treatment) is under consideration by FASB at the time of this writing. A formal FASB interpretation is expected to be issued in exposure draft form. Until then, the guidance under Emerging Issues Task Force (EITF) Issue 90-18 remains in effect.

require rating agency confirmation that account additions or removals do not lower outstanding ratings when additions or removals exceed 15 percent of the balance at the beginning of the previous quarter.

## Creating Securitization Vehicles

Banks usually structure asset-backed securities using "grantor trusts," "owner trusts," or other "revolving asset trusts," each of which customarily issues different types of securities. In choosing a trust structure, banks seek to ensure that the transaction insulates the assets from the reach of the issuer's creditors and that the issuer, securitization vehicle, and investors receive favorable tax treatment.

In a *grantor trust*, the certificate holders (investors) are treated as beneficial owners of the assets sold. The net income from the trust is taxed on a pass-through basis as if the certificate holders directly owned the receivables. To qualify as a grantor trust, the structure of the deal must be passive — that is, the trust cannot engage in profitable activities for the investors, and there cannot be "multiple classes" of interest. Grantor trusts are commonly used when the underlying assets are installment loans whose interest and principal payments are reasonably predictable and fit the desired security structure.

In an *owner trust*, the assets are usually subject to a lien of indenture through which notes are issued. The beneficial ownership of the owner trust's assets (subject to the lien) is represented by certificates, which may be sold or retained by the bank. An owner trust, properly structured, will be treated as a partnership under the Internal Revenue Code of 1986. A partnership, like a grantor trust, is effectively a pass-through entity under the Internal Revenue Code and therefore does not pay federal income tax. Instead, each certificate holder (including the special-purpose corporation) must separately take into account its allocated share of income, gains, losses, deductions, and credits of the trust. Like the grantor trust, the owner trust is expressly limited in its activities by its charter, although owner trusts are typically used when the cash flows of the assets must be "managed" to create "bond-like" securities. Unlike a grantor trust, the owner trust can issue securities in multiple series with different maturities, interest rates, and cash flow priorities.

*Revolving asset trusts* may be either stand-alone or master trust structures. The stand-alone trust is simply a single group of accounts whose receivables are sold to a trust and used as collateral for a single security, although there may be several classes within that security.  When the issuer intends to issue another security, it simply designates a new group of accounts and sells their receivables to a separate trust.  As the desire for additional flexibility, efficiency, and uniformity of collateral performance for various series issued by the same originator has increased over time, the stand-alone structure evolved into the master trust structure.

Master trusts allow an issuer to sell a number of securities (and series) at different times from the same trust.  All of the securities rely on the same pool of receivables as collateral.  In a master trust, each certificate of each series represents an undivided interest in all of the receivables in the trust.  This structure provides the issuer with much more flexibility, since issuing a new series from a master trust costs less and requires less effort than creating a new trust for every issue.  In addition, credit evaluation of each series in a master trust is much easier since the pool of receivables will be larger and less susceptible to seasonal or demographic concentrations.  Credit cards, home equity lines of credit, and other revolving assets are usually best packaged in these structures. A revolving asset trust is treated as a "security arrangement" and is ignored for tax purposes.  (See following discussion under "Tax Issues.")

### Legal Issues

When banks are sellers of assets, they have two primary legal concerns.  They seek to ensure that:

- A security interest in the assets securitized is perfected.
- The security is structured so as to preclude the FDIC's voiding of the perfected security interest.

By perfecting security interests, a lender protects the trustee's property rights from third parties who may have retained rights that impair the timely payment of debt service on the securities.  Typically, a trustee requires a legal opinion to the effect that the trust has a first-priority perfected security interest in the pledged receivables.  In general, filing Uniform Commercial Code

documents (UCC-1) is sufficient for unsecured consumer loan receivables such as credit cards. For other types of receivables whose collateral is a reliable fall-back repayment source (such as automobile loans and home equity lines of credit), additional steps may be required (title amendments, mortgage liens, etc.) to perfect the trustee's security interest in the receivables and the underlying collateral.

If the seller/originator is a bank, the provisions of the U.S. Bankruptcy Code (11 USC 1 *et seq.*) do not apply to its insolvency proceedings. In the case of a bank insolvency, the FDIC would act as receiver or conservator of the financial institution.[2] Although the Federal Deposit Insurance Act does not contain an automatic stay provision that would stop the payout of securities (as does the bankruptcy code), the FDIC has the power to ask for a judicial stay of all payments or the repudiation of any contract. In order to avoid inhibiting securitization, however, the FDIC has stated[3] that it would not seek to void an otherwise legally enforceable and perfected security interest provided:

- The agreement was undertaken in the ordinary course of business, not in contemplation of insolvency, and with no intent to hinder, delay, or defraud the bank or its creditors;
- The secured obligation represents a bona fide and arm's length transaction;
- The secured party or parties are not insiders or affiliates of the bank;
- The grant of the security interest was made for adequate consideration; and
- The security agreement evidencing the security interest is in writing, was duly approved by the board of directors of the bank or its loan committee, and remains an official record of the bank.

---

[2]   A national bank may not be a "debtor" under the bankruptcy code. *See* USC 109(b)(2). The FDIC may act as receiver or conservator of a failed institution, subject to appointment by the appropriate federal banking agency. *See* 12 USC 1821.

[3]   "Statement of Policy regarding Treatment of Security Interests after Appointment of the FDIC as Conservator or Receiver." March 31, 1993, 58 FR 16833.

**Tax Issues**

Issuers ordinarily choose a structure that will minimize the impact of taxes on the security.  Federal income tax can be minimized in two principal ways — by choosing a vehicle that is not subject to tax or by having the vehicle issue "debt" the interest on which is tax deductible (for the vehicle or its owners).

In a grantor trust, each certificate holder is treated as the owner of a pro rata share of the trust's assets and the trust is ignored for tax purposes.  To receive the favorable tax treatment, each month the grantor trust must distribute all principal and interest received on the assets held by the trust.  A grantor trust is not an "entity" for federal tax purposes; rather, its beneficiaries are treated as holders of a ratable share of its assets (in contrast to partnerships, which are treated as entities, even though their income is allocated to the holders of the partnership interests).  The requirement that the trust be "passive" generally makes the grantor trust best suited for longer-term assets such as mortgages or automobile receivables.

An owner trust generally qualifies as a partnership for tax purposes.  Because the issuer usually retains an interest in the assets or a reserve account, it is usually a partner; if so, the transfer of assets to the trust is governed by tax provisions on transfers to partnerships.  Although the partnership itself would generally not be subject to tax, its income (net of deductions for interest paid to note holders) would be reportable by the partner certificate holders and the issuer.  Partnership owner trusts are commonly used in fixed pool transactions involving the same kinds of assets that are securitized through grantor trusts; assets in owner trusts typically require more management or will be issued as more than one class of security.

The cash flows for shorter-term assets, such as credit cards, require too much management for a grantor trust.  Although owner trusts are theoretically the appropriate vehicle for issuing such assets, in practice revolving asset trusts are usually used when the parties structure the transaction *for tax purposes* as a secured loan from the investors to the seller of the receivables.  The trust is simply a means of securing financing and is ignored for tax purposes.  (Such treatment — as a "security arrangement" — is like that accorded a grantor trust, which is also ignored for tax purposes, except that a grantor trust must file a tax report and a "security arrangement" does not.)

Assets requiring managed cash flows can also be structured as a special-purpose corporation (SPC), in which the asset-backed securities are debt of the issuer rather than ownership interests in the receivables. In this structure an SPC typically owns the receivables and sells debt that is backed by the assets, thus allowing the SPC to restructure the cash flows from the receivables into several debt tranches with varying maturities. The interest income from the receivables is taxable to the corporation, and this taxable income is largely offset by the tax deduction from the interest expense on the debt it issues.

Other securitization vehicles, such as real estate mortgage investment conduits (REMICs) and, more recently (effective September 1, 1997), financial asset securitization investment trusts (FASITs), are essentially statutory structures modeled after the "common law" structures described in the foregoing examples. In any event, the overriding objective remains the same: to receive the equivalent of "flow-through" treatment that minimizes the tax consequences for the cash flows. Because interpretations concerning tax treatment may change as structures evolve, banks are encouraged to consult with tax counsel on taxation issues arising from securitization.

## Providing Credit Enhancement

Securitization typically splits the credit risk into several tranches, placing it with parties that are willing or best able to absorb it. The first loss tranche is usually capped at levels approximate to the "expected" or "normal" rate of portfolio credit loss. All credit losses up to this point are effectively absorbed by the credit originator, since it typically receives portfolio cash flow after expenses (which include expected losses) in the form of excess spread.

The second tranche typically covers losses that exceed the originator's cap. This second level of exposure is usually capped at some multiple of the pool's expected losses (customarily between three times and five times these losses), depending on the desired credit ratings for the senior positions. This risk is often absorbed by a high-grade, well-capitalized credit enhancer that is able to diversify the risk (exhibit 3). The third tranche of credit risk is

**Exhibit 3:  Credit risk diversification**



undertaken by the investors that buy the asset-backed securities themselves. Although investors are exposed to other types of risk, such as prepayment or interest rate risk, senior-level classes of asset-backed securities typically have little exposure to credit loss.

Aside from the coupon rate paid to investors, the largest expense in structuring an asset-backed security is the cost of credit enhancement.  Issuers are constantly attempting to minimize the costs associated with providing credit protection to the ultimate investors.  Credit enhancement comes in several different forms, although it can generally be divided into two main types: external (third-party or seller's guarantee) or internal (structural or cash-flow-driven).  Common types of credit enhancements in use today include:

**Credit Enhancement Provided by External Parties**

- *Third-party letter of credit.* For issuers with credit ratings below the level sought for the security issued, a third party may provide a letter of credit to cover a certain amount of loss or percentage of losses.  Draws on the letter of credit protection are often repaid (if possible) from excess cash flows from the securitized portfolio.

- *Recourse to seller.* Principally used by nonbank issuers, this method uses a limited guaranty of the seller covering a specified maximum amount of losses on the pool.

- *Surety bonds.* Guarantees issued by third parties, usually AAA-rated mono-line insurance companies. Surety bond providers generally guarantee (or wrap) the principal and interest payments of 100 percent of a transaction.

Although the ratings of third-party credit enhancers are rarely lowered, such an event could lower the rating of a security. As a result, issuers are relying less and less on third-party enhancement.

**Credit Enhancement Provided by Internal Structure**

Structural features can be created to raise the credit quality of an asset-backed security. For example, a highly rated senior class of securities can be supported by one or more subordinate security classes and a cash collateral account. Senior/subordinate structures are layered so that each position benefits from the credit protection of all the positions subordinate to it. The junior positions are subordinate in the payment of both principal and interest to the senior positions in the securities.

A typical security structure may contain any of the following internal enhancements (which are presented in order from junior to senior, that is, from the first to absorb losses to the last):



1. *Excess spread.* The portfolio yield for a given month on the receivables supporting an asset-backed security is generally greater than the

coupon, servicing costs, and expected losses for the issued securities. Any remaining finance charges after funding, servicing costs, and losses is called "excess spread." (See the cash flow waterfall discussion in the "Mechanics of Cash Flow" section, which follows, for an illustration of how excess spread is determined.) This *residual* amount normally reverts to the seller as additional profit. However, it is also commonly available to the trust to cover unexpected losses.

2.  *Spread account*. Monthly finance charges from the underlying pool of receivables are available to cover unexpected losses in any given month. If not needed, this "excess spread" generally reverts to the seller. Many trusts provide that, if portfolio yield declines or losses increase, the monthly excess spread is captured, or "trapped," in a spread account (a form of cash collateral account) to provide future credit enhancement.

3.  *Cash collateral accounts*. A cash collateral account is a segregated trust account, funded at the outset of the deal, that can be drawn on to cover shortfalls in interest, principal, or servicing expense for a particular series if excess spread is reduced to zero. The account can be funded by the issuer, but is often funded by a loan from a third-party bank, which will be repaid only after holders of all classes of certificates of that series have been repaid in full.

4.  *Collateral invested amount (CIA)*. The CIA is an uncertificated, privately placed ownership interest in the trust, subordinate in payment rights to all investor certificates. Like a layer of subordination, the CIA serves the same purpose as a cash collateral account: it makes up for shortfalls if excess spread is negative. The CIA is itself often protected by a cash collateral account and available monthly excess spread. If the CIA absorbs losses, it can be reimbursed from future excess spread if available.

5.  *Subordinate security classes*. Subordinate classes are junior in claim to other debt — that is, they are repayable only after other classes of the security with a higher claim have been satisfied. Some securities contain more than one class of subordinate debt, and one subordinate class may have a higher claim than other such positions.

Most structures contain a combination of one or more of the enhancement techniques described above. For example, some issuers combine surety bond protection with senior/subordinate structures, creating "super senior" classes that are insulated from third-party risk and have higher rated subordinated classes because of the credit-wrap. The objective from an issuer's viewpoint is to find the most practical and cost-effective method of providing the credit protection necessary for the desired credit rating and pricing of the security.

Most securities also contain performance-related features designed to protect investors (and credit enhancers) against portfolio deterioration. These "performance triggers" are designed to increase the spread account available to absorb losses, to accelerate repayment of principal before pool performance would likely result in losses to investors, or both. The first (most sensitive) triggers typically capture excess spread within the trust (either additions to existing spread accounts or a separate reserve fund) to provide additional credit protection when a portfolio begins to show signs of deterioration. If delinquencies and loss levels continue to deteriorate, early amortization events may occur. Early amortization triggers are usually based on a three-month rolling average to ensure that amortization is accelerated only when performance is consistently weak.

The originator or pool sponsor will often negotiate with the rating agencies about the type and size of the internal and external credit enhancement. The size of the enhancement is dictated by the credit rating desired. For the highest triple-A rating, the rating agencies are likely to insist that the level of protection be sufficient to shield cash flows against circumstances as severe as those experienced during the Great Depression of the 1930s.

## Issuing Interests in the Asset Pool

On the closing date of the transaction, the receivables are transferred, directly or indirectly, from the seller to the special-purpose vehicle (trust). The trust issues certificates representing beneficial interests in the trust, investor certificates, and, in the case of revolving asset structures, a transferor (seller) certificate.

## Investors' Certificate

The investor certificates are sold in either public offerings or private placements, and the proceeds, net of issuance expenses, are remitted to the seller. There are two main types of investor interests in securitized assets — a discrete interest in *specific* assets and an undivided interest in a *pool* of assets. The first type of ownership interest is used for asset pools that match the maturity and cash flow characteristics of the security issued. The second type of interest is used for relatively short-term assets such as credit card receivables or advances against home equity lines of credit. For the shorter-term assets, new receivables are generated and added to the pool as the receivables liquidate, and the investor's undivided interest automatically applies to the new receivables in the pool.

## Seller's Interest

When receivables backing securities are short-term or turn over rapidly, as do trade receivables or credit cards, the cash flows associated with the receivables must be actively managed. One objective is to keep the outstanding principal balance of the investor's interest equal to the certificate amounts. To facilitate this equalization, an interest in trust structures, known as the "seller's" or "transferor's" interest, is not allocated to investors. The seller's interest serves two primary purposes: to provide a cash-flow buffer when account payments fall short of account purchases and to absorb reductions in the receivable balance attributable to dilution and noncomplying receivables.

To calculate the size of the seller's interest, subtract the amount of securities issued by the trust (liabilities) from the balance of principal receivables in the trust (assets). The seller's interest is generally not a form of credit enhancement for the investor interests.

.

# Asset Securitization                    References

### Regulations

12 CFR 3, Minimum Capital Ratios; Issuance of Directives (including Appendix A)

### Issuances

Banking Circular 177, "Corporate Contingency Planning"
*Comptroller's Handbook*, "Capital and Dividends"
*Comptroller's Handbook*, "Mortgage Banking"
*Comptroller's Handbook for National Bank Examiners*, "Funds Management," Section 405
Consolidated Reports of Condition and Income (the Call Reports)
Financial Accounting Standard 125, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities"
OCC 96-52, "Securitization — Guidelines for National Banks"

# EXHIBIT

# D

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2085

Public Law 99–514
99th Congress

## An Act

To reform the internal revenue laws of the United States.

Oct. 22, 1986
[H.R. 3838]

Tax Reform Act
of 1986.
26 USC 1 *et seq.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Tax Reform Act of 1986".

(b) TABLE OF CONTENTS.—

### TITLE I—INDIVIDUAL INCOME TAX PROVISIONS

Subtitle A—Rate Reductions; Increase in Standard Deduction and Personal Exemptions

Sec. 101. Rate reductions.
Sec. 102. Increase in standard deduction.
Sec. 103. Increase in personal exemptions.
Sec. 104. Technical amendments.

Subtitle B—Provisions Related to Tax Credits

Sec. 111. Increase in earned income credit.
Sec. 112. Repeal of credit for contributions to candidates for public office.

Subtitle C—Provisions Related to Exclusions

Sec. 121. Taxation of unemployment compensation.
Sec. 122. Prizes and awards.
Sec. 123. Scholarships.

Subtitle D—Provisions Related to Deductions

Sec. 131. Repeal of deduction for 2-earner married couples.
Sec. 132. 2-percent floor on miscellaneous itemized deductions.
Sec. 133. Medical expense deduction limitation increased.
Sec. 134. Repeal of deduction for State and local sales tax.
Sec. 135. Repeal of deduction for adoption expenses.

Subtitle E—Miscellaneous Provisions

Sec. 141. Repeal of income averaging.
Sec. 142. Limitations on deductions for meals, travel, and entertainment.
Sec. 143. Changes in treatment of hobby loss, etc.
Sec. 144. Deduction for mortgage interest and real property taxes allowable where parsonage allowance or military housing allowance received.

Subtitle F—Effective Dates

Sec. 151. Effective dates.

### TITLE II—PROVISIONS RELATING TO CAPITAL COST

Subtitle A—Depreciation Provisions

Sec. 201. Modification of accelerated cost recovery system.
Sec. 202. Expensing of depreciable assets.
Sec. 203. Effective dates; general transitional rules.

Subtitle B—Repeal of Regular Investment Tax Credit

Sec. 211. Repeal of regular investment tax credit.
Sec. 212. Effective 15-year carryback of existing carryforwards of steel companies.
Sec. 213. Effective 15-year carryback of existing carryforwards of qualified farmers.

Subtitle C—General Business Credit Reduction

Sec. 221. Reduction in tax liability which may be offset by business credit from 85 percent to 75 percent.

Subtitle D—Research and Development Provisions

Sec. 231. Amendments relating to credit for increasing research activities.
Sec. 232. Extension of credit for clinical testing expenses for certain drugs.

Subtitle E—Changes in Certain Amortization Provisions

Sec. 241. Repeal of 5-year amortization of trademark and trade name expenditures.
Sec. 242. Repeal of amortization of railroad grading and tunnel bores.
Sec. 243. Deduction for bus and freight forwarder operating authority.
Sec. 244. Treatment of expenditures for removal of architectural barriers to the handicapped and elderly made permanent.

Subtitle F—Provisions Relating to Real Estate

Sec. 251. Modification of investment tax credit for rehabilitation expenditures.
Sec. 252. Low-income housing credit.

Subtitle G—Merchant Marine Capital Construction Funds

Sec. 261. Provisions relating to merchant marine capital construction funds.

TITLE III—CAPITAL GAINS

Subtitle A—Individual Capital Gains

Sec. 301. Repeal of exclusion for long-term capital gains of individuals.
Sec. 302. 28-percent capital gains rate for taxpayers other than corporations.

Subtitle B—Repeal of Corporate Capital Gains Treatment

Sec. 311. Repeal of corporate capital gains treatment.

Subtitle C—Incentive Stock Options

Sec. 321. Repeal of requirement that incentive stock options are exercisable only in chronological order; modification of $100,000 limitation.

Subtitle D—Straddles

Sec. 331. Year-end rule expanded.

TITLE IV—AGRICULTURE, ENERGY, AND NATURAL RESOURCES

Subtitle A—Agriculture

Sec. 401. Limitation on expensing of soil and water conservation expenditures.
Sec. 402. Repeal of special treatment for expenditures for clearing land.
Sec. 403. Treatment of dispositions of converted wetlands or highly erodible croplands.
Sec. 404. Limitation on certain prepaid farming expenses.
Sec. 405. Tax treatment of discharge of certain indebtedness of solvent farmers.

Subtitle B—Treatment of Oil, Gas, Geothermal, and Hard Minerals

Sec. 411. Treatment of intangible drilling costs and mineral exploration and development costs.
Sec. 412. Modification of percentage depletion rules.
Sec. 413. Gain from disposition of interests in oil, gas, geothermal, or other mineral properties.

Subtitle C—Other Provisions

Sec. 421. Extension of energy investment credit for solar, geothermal, ocean thermal, and biomass property.
Sec. 422. Provisions relating to excise tax on fuels.
Sec. 423. Ethyl alcohol and mixtures thereof for fuel use.

TITLE V—TAX SHELTER LIMITATIONS; INTEREST LIMITATIONS

Subtitle A—Limitations on Tax Shelters

Sec. 501. Limitations on losses and credits from passive activities.
Sec. 502. Transitional rule for low-income housing.
Sec. 503. Extension of at risk limitations to real property.

PUBLIC LAW 99–514—OCT. 22, 1986       100 STAT. 2087

Subtitle B—Interest Expense
Sec. 511. Limitations on deduction for nonbusiness interest.

TITLE VI—CORPORATE PROVISIONS

Subtitle A—Corporate Rate Reductions
Sec. 601. Corporate rate reductions.

Subtitle B—Treatment of Stock and Stock Dividends
Sec. 611. Reduction in dividends received deduction.
Sec. 612. Repeal of partial exclusion of dividends received by individuals.
Sec. 613. Nondeductibility of stock redemption expenses.
Sec. 614. Reduction in stock basis for nontaxed portion of extraordinary dividends.

Subtitle C—Limitation on Net Operating Loss Carryforwards and Excess Credit Carryforwards
Sec. 621. Limitation on net operating loss carryforwards.

Subtitle D—Recognition of Gain and Loss on Distributions of Property in Liquidation
Sec. 631. Recognition of gain and loss on distributions of property in liquidation.
Sec. 632. Treatment of C corporations electing subchapter S status.
Sec. 633. Effective dates.
Sec. 634. Study of corporate provisions.

Subtitle E—Other Corporate Provisions
Sec. 641. Special allocation rules for certain asset acquisitions.
Sec. 642. Modification of definition of related party.
Sec. 643. Treatment of amortizable bond premium as interest.
Sec. 644. Provisions relating to cooperative housing corporations.
Sec. 645. Special rules relating to personal holding company tax.
Sec. 646. Certain entitles not treated as corporations.
Sec. 647. Special rule for disposition of stock of subsidiary.

Subtitle F—Regulated Investment Companies
Sec. 651. Excise tax on undistributed income of regulated investment companies.
Sec. 652. Treatment of business development companies.
Sec. 653. Amendments to qualification rules.
Sec. 654. Treatment of series funds as separate corporations.
Sec. 655. Extension of period for mailing notices to shareholders.
Sec. 656. Protection of mutual funds receiving third-party summonses.
Sec. 657. Certain distributions not treated as preferential dividends.

Subtitle G—Real Estate Investment Trusts
Sec. 661. General qualification requirements.
Sec. 662. Asset and income requirements.
Sec. 663. Definition of rents.
Sec. 664. Distribution requirements.
Sec. 665. Treatment of capital gains.
Sec. 666. Modifications of prohibited transaction rules.
Sec. 667. Deficiency dividends of real estate investment trusts not subject to penalty under section 6697.
Sec. 668. Excise tax on undistributed income of real estate investment trusts.
Sec. 669. Effective dates.

Subtitle H—Taxation of Interests in Entities Holding Real Estate Mortgages
Sec. 671. Taxation of real estate mortgage investment conduits.
Sec. 672. Rules for accruing original issue discount on regular interests and similar debt instruments.
Sec. 673. Treatment of taxable mortgage pools.
Sec. 674. Compliance provisions.
Sec. 675. Effective dates.

TITLE VII—ALTERNATIVE MINIMUM TAX

Sec. 701. Alternative minimum tax for individuals and corporations.
Sec. 702. Study of book and earnings and profits adjustments.

PUBLIC LAW 99–514—OCT. 22, 1986

## TITLE VIII—ACCOUNTING PROVISIONS

### Subtitle A—General Provisions

Sec. 801. Limitation on use of cash method of accounting.
Sec. 802. Simplified dollar-value LIFO method for certain small businesses.
Sec. 803. Capitalization and inclusion in inventory costs of certain expenses.
Sec. 804. Modifications of method of accounting for long-term contracts.
Sec. 805. Repeal of reserve for bad debts of taxpayers other than financial institutions.
Sec. 806. Taxable years of certain entities.

### Subtitle B—Treatment of Installment Obligations

Sec. 811. Allocation of indebtedness as payment on installment obligation.
Sec. 812. Disallowance of use of installment method for certain obligations.

### Subtitle C—Other Provisions

Sec. 821. Income attributable to utility services.
Sec. 822. Repeal of application of discharge of indebtedness rules to qualified business indebtedness.
Sec. 823. Repeal of deduction for qualified discount coupons.
Sec. 824. Inclusion in gross income of contributions in aid of construction.

## TITLE IX—FINANCIAL INSTITUTIONS

Sec. 901. Limitations on bad debt reserves.
Sec. 902. Interest incurred to carry tax-exempt bonds.
Sec. 903. Termination of special 10-year carryback rules for certain financial institutions; new special carryover rules for certain losses.
Sec. 904. Repeal of special reorganization rules for financial institutions.
Sec. 905. Treatment of losses on deposits or accounts in insolvent financial institutions.

## TITLE X—INSURANCE PRODUCTS AND COMPANIES

### Subtitle A—Policyholder Issues

Sec. 1001. Repeal of exclusion for interest on installment payments of life insurance proceeds.
Sec. 1002. Exclusion from income with respect to structured settlements limited to cases involving physical injury.
Sec. 1003. Denial of deduction for interest on loans from certain life insurance contracts.
Sec. 1004. Deduction for nonbusiness casualty losses covered by insurance allowable only if claim filed.

### Subtitle B—Life Insurance Companies

Sec. 1011. Repeal of special life insurance company deduction.
Sec. 1012. Repeal of tax-exempt status for certain organizations providing commercial-type insurance.
Sec. 1013. Operations loss deduction of insolvent companies may offset distributions from policyholders surplus account.

### Subtitle C—Property and Casualty Insurance Companies

Sec. 1021. Inclusion in income of 20 percent of unearned premium reserve.
Sec. 1022. Treatment of certain dividends and tax-exempt interest.
Sec. 1023. Discounting of unpaid losses and certain unpaid expenses.
Sec. 1024. Repeal of protection against loss account; revision of special treatment for small companies; combination of parts II and III.
Sec. 1025. Study of treatment of property and casualty insurance companies.

### Subtitle D—Miscellaneous Provisions

Sec. 1031. Physicians' and surgeons' mutual protection and interindemnity arrangements or associations.

PUBLIC LAW 99–514—OCT. 22, 1986     100 STAT. 2089

TITLE XI—PENSIONS AND DEFERRED COMPENSATION; EMPLOYEE
BENEFITS; EMPLOYEE STOCK OWNERSHIP PLANS

Subtitle A—Pensions and Deferred Compensation

PART I—LIMITATIONS ON TAX-DEFERRED SAVINGS

SUBPART A—RULES APPLICABLE TO IRAS

Sec. 1101. Limitations on IRA deductions for active participants in certain pension plans.
Sec. 1102. Nondeductible contributions may be made to individual retirement plans.
Sec. 1103. Spousal deduction allowed where spouse has small amount of earned income.

SUBPART B—OTHER PROVISIONS

Sec. 1105. $7,000 limitation on elective deferrals.
Sec. 1106. Adjustments to limitations on contributions and benefits under qualified plans.
Sec. 1107. Modifications of section 457.
Sec. 1108. Special rules for simplified employee pensions.
Sec. 1109. Deductible contributions permitted under section 501(c)(18) plan.

PART II—NONDISCRIMINATION REQUIREMENTS

SUBPART A—GENERAL REQUIREMENTS

Sec. 1111. Application of nondiscrimination rules to integrated plans.
Sec. 1112. Minimum coverage requirements for qualified plans.
Sec. 1113. Minimum vesting standards.
Sec. 1114. Definition of highly compensated employee.
Sec. 1115. Separate lines of business; compensation.

SUBPART B—OTHER PROVISIONS

Sec. 1116. Cash or deferred arrangements.
Sec. 1117. Nondiscrimination requirements for employer matching contributions and employee contributions.
Sec. 1118. Benefits treated as accruing ratably for purposes of determining whether plan is top-heavy.
Sec. 1119. Modification of rules for benefit forfeitures.
Sec. 1120. Nondiscrimination requirements for tax-sheltered annuities.

PART III—TREATMENT OF DISTRIBUTIONS

Sec. 1121. Minimum distribution requirements.
Sec. 1122. Taxation of distributions.
Sec. 1123. Uniform additional tax on early distributions from qualified retirement plans.
Sec. 1124. Election to treat certain lump sum distributions received during 1987 as received during 1986.

PART IV—MISCELLANEOUS PROVISIONS

Sec. 1131. Adjustments to section 404 limitations.
Sec. 1132. Excise tax on reversion of qualified plan assets to employer.
Sec. 1133. Tax on excess distributions.
Sec. 1134. Treatment of loans.
Sec. 1135. Deferred annuities available only to natural persons.
Sec. 1136. Profits not required for profit-sharing plans.
Sec. 1137. Requirement that collective bargaining agreements be bona fide.
Sec. 1138. Penalty on underpayments attributable to overstatement of pension liabilities.
Sec. 1139. Interest rate assumptions.
Sec. 1140. Plan amendments not required under January 1, 1989.
Sec. 1141. Issuance of final regulations.
Sec. 1142. Secretary to accept applications with respect to section 401(k) plans.
Sec. 1143. Treatment of certain fishermen as self-employed individuals.
Sec. 1144. Acquisition of gold and silver coins by individual retirement accounts.
Sec. 1145. Requirement of joint and survivor annuities and preretirement survivor annuities not to apply to certain plan.
Sec. 1146. Treatment of leased employees.
Sec. 1147. Tax treatment of Federal Thrift Savings Fund.

Subtitle B—Employee Benefit Provisions

PART I—NONDISCRIMINATION RULES FOR CERTAIN STATUTORY EMPLOYEE BENEFIT PLANS

Sec. 1151. Nondiscrimination rules for coverage and benefits under certain statutory employee benefit plans.

PART II—OTHER PROVISIONS

Sec. 1161. Deductibility of health insurance costs of self-employed individuals.
Sec. 1162. 2-year extension of exclusions for educational assistance programs and group legal plans.
Sec. 1163. $5,000 limit on dependent care assistance exclusion.
Sec. 1164. Tax treatment of faculty housing.
Sec. 1165. Limitation on accrual of vacation pay.
Sec. 1166. Treatment of certain full-time life insurance salesmen.
Sec. 1167. Extension of due date for study of welfare benefit plans.
Sec. 1168. Exclusion from gross income of certain military benefits.

Subtitle C—Changes Relating to Employee Stock Ownership Plans

Sec. 1171. Repeal of employee stock ownership credit.
Sec. 1172. Estate tax deduction for proceeds from sales of employer securities.
Sec. 1173. Provisions relating to loans used to acquire employer securities.
Sec. 1174. Requirements for employee stock ownership plans.
Sec. 1175. Additional qualification requirements.
Sec. 1176. Special ESOP requirements.
Sec. 1177. Transition rules.

TITLE XII—FOREIGN TAX PROVISIONS

Subtitle A—Foreign Tax Credit Modifications

Sec. 1201. Separate application of section 904 with respect to certain categories of income.
Sec. 1202. Deemed paid credit under sections 902 and 960 determined on accumulated basis.
Sec. 1203. Clarification of treatment of separate limitation losses.
Sec. 1204. Foreign taxes used to provide subsidies.
Sec. 1205. Limitation on carryback of foreign tax credits to taxable years beginning before 1987.

Subtitle B—Source Rules

Sec. 1211. Determination of source in case of sales of personal property.
Sec. 1212. Special rules for transportation income.
Sec. 1213. Source rule for space and certain ocean activities.
Sec. 1214. Limitations on special treatment of 80–20 corporations.
Sec. 1215. Rules for allocating interest, etc., to foreign source income.
Sec. 1216. 1-year modification in regulations providing for allocation of research and experimental expenditures.

Subtitle C—Taxation of Income Earned Through Foreign Corporations

Sec. 1221. Income subject to current taxation.
Sec. 1222. Testing controlled foreign corporations and foreign personal holding companies by value and voting power.
Sec. 1223. Subpart F de minimis rule.
Sec. 1224. Repeal of special treatment of possessions corporations.
Sec. 1225. Only effectively connected capital gains and losses of foreign corporations taken into account for purposes of accumulated earnings tax and personal holding company provisions.
Sec. 1226. Deductions for dividends received from certain foreign corporations.
Sec. 1227. Special rule for application of section 954 to certain dividends.

Subtitle D—Special Tax Provisions for United States Persons

Sec. 1231. Modifications to section 936.
Sec. 1232. Treatment of certain persons in Panama.
Sec. 1233. Provisions relating to section 911 exclusion.
Sec. 1234. Foreign compliance provisions.
Sec. 1235. Treatment of certain passive foreign investment companies.
Sec. 1236. Treatment of interest on obligations of the United States received by banks organized in Guam.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2091

Subtitle E—Treatment of Foreign Taxpayers

Sec. 1241. Branch profits tax.
Sec. 1242. Treatment of deferred payments and appreciation arising out of business conducted within the United States.
Sec. 1243. Treatment under section 877 of property received in tax-free exchanges, etc.
Sec. 1244. Study of United States reinsurance industry.
Sec. 1245. Information with respect to certain foreign-owned corporations.
Sec. 1246. Withholding tax on amounts paid by partnerships to foreign partners.
Sec. 1247. Income of foreign governments.
Sec. 1248. Limitation on cost of property imported from related persons.
Sec. 1249. Treatment of dual residence corporations.

Subtitle F—Foreign Currency Transactions

Sec. 1261. Treatment of foreign currency transactions.

Subtitle G—Tax Treatment of Possessions

PART I—TREATMENT OF GUAM, AMERICAN SAMOA, AND THE NORTHERN MARIANA ISLANDS

Sec. 1271. Authority of Guam, American Samoa, and the Northern Mariana Islands to enact revenue laws.
Sec. 1272. Exclusion of possession source income from the gross income of certain individuals.
Sec. 1273. Treatment of corporations organized in Guam, American Samoa, or the Northern Mariana Islands.

PART II—TREATMENT OF THE VIRGIN ISLANDS

Sec. 1274. Coordination of United States and Virgin Islands income taxes.
Sec. 1275. Virgin Islands corporations allowed possession tax credit.

PART III—COVER OVER OF INCOME TAXES

Sec. 1276. Cover over of income taxes.

PART IV—EFFECTIVE DATE

Sec. 1277. Effective date.

TITLE XIII—TAX-EXEMPT BONDS

Subtitle A—Amendments of Internal Revenue Code of 1954

Sec. 1301. State and local bonds.
Sec. 1302. Repeal of provisions relating to general stock ownership corporations.

Subtitle B—Effective Dates and Transitional Rules

Sec. 1311. General effective dates.
Sec. 1312. Transitional rules for construction or binding agreements, etc.
Sec. 1313. Transitional rules relating to refundings.
Sec. 1314. Special rules for certain bonds issued before August 16, 1986.
Sec. 1315. Transitional rules relating to volume cap.
Sec. 1316. Provisions relating to bonds provided special rules under prior revenue acts.
Sec. 1317. Other transitional rules.
Sec. 1318. Transitional rules for specific facilities.
Sec. 1319. Definitions, etc., relating to effective dates and transitional rules.

TITLE XIV—TRUSTS AND ESTATES; UNEARNED INCOME OF CERTAIN MINOR CHILDREN; GIFT AND ESTATE TAXES; GENERATION-SKIPPING TRANSFER TAX

Subtitle A—Income Taxation of Trusts and Estates

Sec. 1401. Grantor treated as holding any power or interest of grantor's spouse.
Sec. 1402. Limitations to reversionary interest rule exceptions.
Sec. 1403. Taxable year of trusts to be calendar year.
Sec. 1404. Trusts and certain estates to make estimated payments of income taxes.

Subtitle B—Unearned Income of Certain Minor Children

Sec. 1411. Unearned income of certain minor children.

PUBLIC LAW 99–514—OCT. 22, 1986

Subtitle C—Gift and Estate Taxes

Sec. 1421. Information necessary for valid special use valuation election.
Sec. 1422. Gift and estate tax deductions for certain conservation easement dona-
tions.
Sec. 1423. Conveyance of certain real and personal property of decedent to charita-
ble foundation treated as charitable contribution.

Subtitle D—Generation Skipping Transfers

Sec. 1431. New tax on generation-skipping transfers.
Sec. 1432. Related amendments.
Sec. 1433. Effective dates.

TITLE XV—COMPLIANCE AND TAX ADMINISTRATION

Subtitle A—Revision of Certain Penalties, Etc.

Sec. 1501. Penalty for failure to file information returns or statements.
Sec. 1502. Increase in penalty for failure to pay tax.
Sec. 1503. Amendments to penalty for negligence and fraud.
Sec. 1504. Increase in penalty for substantial understatement of liability.

Subtitle B—Interest Provisions

Sec. 1511. Differential interest rate.
Sec. 1512. Interest on accumulated earnings tax to accrue beginning on date return
is due.

Subtitle C—Information Reporting Provisions

Sec. 1521. Requirement of reporting for real estate transactions.
Sec. 1522. Information reporting on persons receiving contracts from certain
Federal agencies.
Sec. 1523. Returns regarding payments of royalties.
Sec. 1524. TINS required for dependents claimed on tax returns.
Sec. 1525. Tax-exempt interest required to be shown on return.

Subtitle D—Provisions Relating to Tax Shelters

Sec. 1531. Modification of tax shelter ratio test for registration of tax shelters.
Sec. 1532. Increased penalty for failure to register tax shelters.
Sec. 1533. Penalty for failure to include tax shelter identification number on return
increased to $250.
Sec. 1534. Increased penalty for failure to maintain lists of investors in potentially
abusive tax shelters.
Sec. 1535. Clarification of treatment of sham or fraudulent transactions under sec-
tion 6621(c).

Subtitle E—Estimated Tax Provisions

Sec. 1541. Current year liability test increased from 80 to 90 percent for estimated
tax payments by individuals.
Sec. 1542. Certain tax-exempt organizations subject to corporate estimated tax
rules.
Sec. 1543. Waiver of estimated penalties for 1986 underpayments attributable to
this Act.

Subtitle F—Provisions Regarding Judicial Proceedings

Sec. 1551. Limitations on awarding of court costs and certain fees modified.
Sec. 1552. Failure to pursue administrative remedies.
Sec. 1553. Tax Court practice fee.
Sec. 1554. Clarification of jurisdiction over addition to tax for failure to pay amount
of tax shown on return.
Sec. 1555. Authority to require attendance of United States marshals at Tax Court
sessions.
Sec. 1556. Changes in certain provisions relating to special trial judges.
Sec. 1557. Effect on retired pay by election to practice law, etc., after retirement.
Sec. 1558. Authorization for appeals from interlocutory orders of the Tax Court.
Sec. 1559. Changes relating to annuities for surviving spouses and dependent chil-
dren of Tax Court judges.

Subtitle G—Tax Administration Provisions

Sec. 1561. Suspension of statute of limitations if third-party records not produced
within 6 months after service of summons.
Sec. 1562. Authority to rescind notice of deficiency with taxpayer's consent.

PUBLIC LAW 99–514—OCT. 22, 1986     100 STAT. 2093

Sec. 1563. Authority to abate interest due to errors or delays by the Internal Revenue Service.
Sec. 1564. Suspension of compounding where interest on deficiency suspended.
Sec. 1565. Certain service-connected disability payments exempt from levy.
Sec. 1566. Increase in value of personal property subject to certain listing and notice procedures.
Sec. 1567. Certain recordkeeping requirements.
Sec. 1568. Disclosure of returns and return information to certain cities.
Sec. 1569. Treatment of certain forfeitures.

Subtitle H—Miscellaneous Provisions

Sec. 1571. Withholding allowances to reflect new rate schedules.
Sec. 1572. Report on return-free system.

TITLE XVI—EXEMPT AND NONPROFIT ORGANIZATIONS

Sec. 1601. Certain distributions of low cost articles and exchanges and rentals of member lists by certain organizations not to be treated as unrelated trade or business.
Sec. 1602. Educational activities at convention and trade shows.
Sec. 1603. Tax exemption for certain title-holding companies.
Sec. 1604. Exception to membership organization deduction rules.
Sec. 1605. Tax-exempt status for an organization introducing into public use technology developed by qualified organizations.
Sec. 1606. Definition of government official.
Sec. 1607. Transition rule for acquisition indebtedness with respect to certain land.
Sec. 1608. Treatment of certain amounts paid to or for the benefit of certain institutions of higher education.

TITLE XVII—MISCELLANEOUS PROVISIONS

Sec. 1701. Extension and modification of targeted jobs credit.
Sec. 1702. Certain diesel fuel taxes may be imposed on sales to retailers.
Sec. 1703. Gasoline tax generally collected at terminal level.
Sec. 1704. Exemption from social security coverage for certain clergy.
Sec. 1705. Applicability of unemployment compensation tax to certain services performed for certain Indian tribal governments.
Sec. 1706. Treatment of certain technical personnel.
Sec. 1707. Exclusion for certain foster care payments.
Sec. 1708. Extension of rules for spouses of individuals missing in action.
Sec. 1709. Amendment to the Reindeer Industry Act of 1937.
Sec. 1710. Quality control studies.
Sec. 1711. Adoption assistance agreements under adoption assistance program: payment of nonrecurring expenses related to adoptions of children with special needs.

TITLE XVIII—TECHNICAL CORRECTIONS

Sec. 1800. Coordination with other titles.

Subtitle A—Amendments Related to the Tax Reform Act of 1984

Chapter 1—Amendments Related to Title I of the Act

Sec. 1801. Amendments related to deferral of certain tax reductions.
Sec. 1802. Amendments related to tax-exempt entity leasing provisions.
Sec. 1803. Amendments related to treatment of bonds and other debt instruments.
Sec. 1804. Amendments related to corporate provisions.
Sec. 1805. Amendments related to partnership provisions.
Sec. 1806. Amendments related to trust provisions.
Sec. 1807. Amendments related to accounting changes.
Sec. 1808. Amendments related to tax straddle provisions.
Sec. 1809. Amendments related to depreciation provisions.
Sec. 1810. Amendments related to foreign provisions.
Sec. 1811. Amendments related to reporting, penalty, and other provisions.
Sec. 1812. Amendments related to miscellaneous provisions.

Chapter 2—Amendments Related to Title II of the Act

Sec. 1821. Amendments related to section 211 of the Act.
Sec. 1822. Amendments related to section 216 of the Act.
Sec. 1823. Amendment related to section 217 of the Act.
Sec. 1824. Amendment related to section 218 of the Act.
Sec. 1825. Amendments related to section 221 of the Act.
Sec. 1826. Amendments related to section 222 of the Act.

Sec. 1827. Amendments related to section 223 of the Act.
Sec. 1828. Amendment related to section 224 of the Act.
Sec. 1829. Waiver of interest on certain underpayments of tax.
Sec. 1830. Scope of section 255 of the Tax Equity and Fiscal Responsibility Act of 1982.

CHAPTER 3—AMENDMENTS RELATED TO TITLE III OF THE ACT

Sec. 1831. Amendment related to section 301 of the Act.
Sec. 1832. Amendment related to section 303 of the Act.
Sec. 1833. Amendment related to section 305 of the Act.
Sec. 1834. Amendment related to section 311 of the Act.

CHAPTER 4—AMENDMENTS RELATED TO TITLE IV OF THE ACT

Sec. 1841. Amendment related to section 311 of the Act.
Sec. 1842. Amendments related to section 421 of the Act.
Sec. 1843. Amendments related to section 422 of the Act.
Sec. 1844. Amendments related to section 431 of the Act.
Sec. 1845. Amendment related to section 452 of the Act.
Sec. 1846. Amendments related to section 473 of the Act.
Sec. 1847. Amendments related to section 474 of the Act.
Sec. 1848. Amendments related to section 491 of the Act.

CHAPTER 5—AMENDMENTS RELATED TO SECTION 216 OF THE ACT

Sec. 1851. Amendments related to welfare benefit plan provisions.
Sec. 1852. Amendments related to pension plan provisions.
Sec. 1853. Amendments related to fringe benefit provisions.
Sec. 1854. Amendments related to employee stock ownership plans.
Sec. 1855. Amendments related to miscellaneous employee benefit provisions.

CHAPTER 6—AMENDMENTS RELATED TO TITLE VI OF THE ACT

Sec. 1861. Amendments related to section 611 of the Act.
Sec. 1862. Amendment related to section 612 of the Act.
Sec. 1863. Amendment related to section 613 of the Act.
Sec. 1864. Amendments related to section 621 of the Act.
Sec. 1865. Amendment related to section 622 of the Act.
Sec. 1866. Transitional rule for limit on small issue exception.
Sec. 1867. Amendments related to section 624 of the Act.
Sec. 1868. Amendment related to section 625 of the Act.
Sec. 1869. Amendments related to section 626 of the Act.
Sec. 1870. Amendment related to section 627 of the Act.
Sec. 1871. Amendments related to section 628 of the Act.
Sec. 1872. Amendments related to section 631 of the Act.
Sec. 1873. Amendments related to section 632 of the Act.

CHAPTER 7—MISCELLANEOUS PROVISIONS

Sec. 1875. Amendments related to title VII of the Act.
Sec. 1876. Amendments related to title VIII of the Act.
Sec. 1877. Amendments related to title IX of the Act.
Sec. 1878. Amendments related to title X of the Act.
Sec. 1879. Miscellaneous provisions.

CHAPTER 8—EFFECTIVE DATE

Sec. 1881. Effective date.

Subtitle B—Related to Other Programs Affected by the Deficit Reduction Act of 1984

CHAPTER 1—AMENDMENTS RELATED TO SOCIAL SECURITY ACT PROGRAMS

Sec. 1882. Amendments related to coverage of church employees (section 2603 of the Deficit Reduction Act).
Sec. 1883. Technical corrections in other provisions related to Social Security Act programs.

CHAPTER 2—AMENDMENTS RELATED TO UNEMPLOYMENT COMPENSATION PROGRAM

Sec. 1884. Technical corrections in Federal Unemployment Tax Act.

CHAPTER 3—AMENDMENTS RELATED TO TRADE AND TARIFF PROGRAMS

Sec. 1885. Amendments to the tariff schedules.
Sec. 1886. Technical corrections to countervailing and antidumping duty provisions.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2095

Sec. 1887. Amendments to the Trade Act of 1974.
Sec. 1888. Amendments to the Tariff Act of 1930.
Sec. 1890. Amendments to the Caribbean Basin Economic Recovery Act.
Sec. 1891. Conforming amendments regarding customs brokers.
Sec. 1892. Special effective date provisions for certain articles given duty-free treatment under the Trade and Tariff Act of 1984.
Sec. 1893. Technical amendments relating to customs user fees.

Subtitle C—Miscellaneous

CHAPTER 1—AMENDMENTS RELATED TO THE CONSOLIDATED OMNIBUS BUDGET
RECONCILIATION ACT OF 1985

Sec. 1895. COBRA technical corrections relating to Social Security Act programs.
Sec. 1896. Extension of time for filing for credit or refund with respect to certain changes involving insolvent farmers.
Sec. 1897. Correction of clerical error in amendments to coal tax.

CHAPTER 2—AMENDMENTS RELATED TO THE RETIREMENT EQUITY ACT OF 1984

Sec. 1898. Technical corrections to the Retirement Equity Act of 1984.

CHAPTER 3—AMENDMENT RELATED TO THE CHILD SUPPORT ENFORCEMENT
AMENDMENTS OF 1984

Sec. 1899. Amendment related to the Child Support Enforcement Amendments of 1984.

CHAPTER 4—MISCELLANEOUS AMENDMENTS CORRECTING ERRORS OF SPELLING,
PUNCTUATION, ETC.

Sec. 1899A. Miscellaneous amendments correcting errors of spelling, punctuation, etc.

**SEC. 2. INTERNAL REVENUE CODE OF 1986.**

(a) REDESIGNATION OF 1954 CODE.—The Internal Revenue Title enacted August 16, 1954, as heretofore, hereby, or hereafter amended, may be cited as the "Internal Revenue Code of 1986".

(b) REFERENCES IN LAWS, ETC.—Except when inappropriate, any reference in any law, Executive order, or other document—

(1) to the Internal Revenue Code of 1954 shall include a reference to the Internal Revenue Code of 1986, and

(2) to the Internal Revenue Code of 1986 shall include a reference to the provisions of law formerly known as the Internal Revenue Code of 1954.

**SEC. 3. AMENDMENT OF 1986 CODE; COORDINATION WITH SECTION 15.**

(a) AMENDMENT OF 1986 CODE.—Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.

(b) COORDINATION WITH SECTION 15.—

(1) IN GENERAL.—Except as provided in paragraph (2), for purposes of section 15 of the Internal Revenue Code of 1986, no amendment or repeal made by this Act shall be treated as a change in the rate of a tax imposed by chapter 1 of such Code.

(2) EXCEPTION.—Paragraph (1) shall not apply to the amendment made by section 601 (relating to corporate rate reductions).

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 118 of 247 PageID #: 118

# TITLE I—INDIVIDUAL INCOME TAX PROVISIONS

## Subtitle A—Rate Reductions; Increase in Standard Deduction and Personal Exemptions

SEC. 101. RATE REDUCTIONS.

(a) GENERAL RULE.—Section 1 (relating to tax imposed on individuals) is amended to read as follows:

"SECTION 1. TAX IMPOSED.

"(a) MARRIED INDIVIDUALS FILING JOINT RETURNS AND SURVIVING SPOUSES.—There is hereby imposed on the taxable income of—

"(1) every married individual (as defined in section 7703) who makes a single return jointly with his spouse under section 6013, and

"(2) every surviving spouse (as defined in section 2(a)), a tax determined in accordance with the following table:

| "If taxable income is | The tax is: |
| --- | --- |
| Not over $29,750 | 15% of taxable income. |
| Over $29,750 | $4,462.50, plus 28% of the excess over $29,750. |

"(b) HEADS OF HOUSEHOLDS.—There is hereby imposed on the taxable income of every head of a household (as defined in section 2(b)) a tax determined in accordance with the following table:

| "If taxable income is | The tax is: |
| --- | --- |
| Not over $23,900 | 15% of taxable income. |
| Over $23,900 | $3,585, plus 28% of the excess over $23,900. |

"(c) UNMARRIED INDIVIDUALS (OTHER THAN SURVIVING SPOUSES AND HEADS OF HOUSEHOLDS).—There is hereby imposed on the taxable income of every individual (other than a surviving spouse as defined in section 2(a) or the head of a household as defined in section 2(b)) who is not a married individual (as defined in section 7703) a tax determined in accordance with the following table:

| "If taxable income is | The tax is: |
| --- | --- |
| Not over $17,850 | 15% of taxable income. |
| Over $17,850 | $2,677.50, plus 28% of the excess over $17,850. |

"(d) MARRIED INDIVIDUALS FILING SEPARATE RETURNS.—There is hereby imposed on the taxable income of every married individual (as defined in section 7703) who does not make a single return jointly with his spouse under section 6013, a tax determined in accordance with the following table:

| "If taxable income is | The tax is: |
| --- | --- |
| Not over $14,875 | 15% of taxable income. |
| Over $14,875 | $2,231.25, plus 28% of the excess over $14,875. |

"(e) ESTATES AND TRUSTS.—There is hereby imposed on the taxable income of—

"(1) every estate, and

"(2) every trust,

taxable under this subsection a tax determined in accordance with the following table:

| "If taxable income is | The tax is: |
|---|---|
| Not over $5,000 ................................ | 15% of taxable income. |
| Over $5,000 ..................................... | $750, plus 28% of the excess over $5,000. |

"(f) ADJUSTMENTS IN TAX TABLES SO THAT INFLATION WILL NOT RESULT IN TAX INCREASES.—

"(1) IN GENERAL.—Not later than December 15 of 1988, and each subsequent calendar year, the Secretary shall prescribe tables which shall apply in lieu of the tables contained in subsections (a), (b), (c), (d), and (e) with respect to taxable years beginning in the succeeding calendar year.

"(2) METHOD OF PRESCRIBING TABLES.—The table which under paragraph (1) is to apply in lieu of the table contained in subsection (a), (b), (c), (d), or (e), as the case may be, with respect to taxable years beginning in any calendar year shall be prescribed—

"(A) by increasing the minimum and maximum dollar amounts for each rate bracket for which a tax is imposed under such table by the cost-of-living adjustment for such calendar year,

"(B) by not changing the rate applicable to any rate bracket as adjusted under subparagraph (A), and

"(C) by adjusting the amounts setting forth the tax to the extent necessary to reflect the adjustments in the rate brackets.

"(3) COST-OF-LIVING ADJUSTMENT.—For purposes of paragraph (2), the cost-of-living adjustment for any calendar year is the percentage (if any) by which—

"(A) the CPI for the preceding calendar year, exceeds

"(B) the CPI for the calendar year 1987.

"(4) CPI FOR ANY CALENDAR YEAR.—For purposes of paragraph (3), the CPI for any calendar year is the average of the Consumer Price Index as of the close of the 12-month period ending on August 31 of such calendar year.

"(5) CONSUMER PRICE INDEX.—For purposes of paragraph (4), the term 'Consumer Price Index' means the last Consumer Price Index for all-urban consumers published by the Department of Labor. For purposes of the preceding sentence, the revision of the Consumer Price Index which is most consistent with the Consumer Price Index for calendar year 1986 shall be used.

"(6) ROUNDING.—

"(A) IN GENERAL.—If any increase determined under paragraph (2)(A), subsection (g)(4), section 63(c)(4), or section 151(d)(3) is not a multiple of $50, such increase shall be rounded to the next lowest multiple of $50.

"(B) TABLE FOR MARRIED INDIVIDUALS FILING SEPARATELY.—In the case of a married individual filing a separate return, subparagraph (A) (other than with respect to section 63(c)(4)) shall be applied by substituting '$25' for '$50' each place it appears.

"(g) PHASEOUT OF 15-PERCENT RATE AND PERSONAL EXEMPTIONS.—

"(1) IN GENERAL.—The amount of tax imposed by this section (determined without regard to this subsection) shall be increased by 5 percent of the excess (if any) of—

"(A) taxable income, over
"(B) the applicable dollar amount.
"(2) LIMITATION.—The increase determined under paragraph (1) with respect to any taxpayer for any taxable year shall not exceed the sum of—

"(A) 13 percent of the maximum amount of taxable income to which the 15-percent rate applies under the table contained in subsection (a), (b), (c), or (e) (whichever applies), and

"(B) 28 percent of the deductions for personal exemptions allowable to the taxpayer for the taxable year under section 151.

In the case of any individual taxable under subsection (d), subparagraph (A) shall apply as if such individual were taxable under subsection (a).

"(3) APPLICABLE DOLLAR AMOUNT.—For purposes of paragraph (1), the applicable dollar amount shall be determined under the following table:

| "In the case of a taxpayer to which the following subsection of this section applies: | The applicable dollar amount is: |
|---|---|
| Subsection (a)...................................................................... | $71,900 |
| Subsection (b)...................................................................... | 61,650 |
| Subsection (c)...................................................................... | 43,150 |
| Subsection (d)...................................................................... | 35,950 |
| Subsection (e)...................................................................... | 13,000. |

"(4) ADJUSTMENT FOR INFLATION.—In the case of any taxable year beginning in a calendar year after 1988, each dollar amount contained in paragraph (3) shall be increased by an amount equal to—

"(A) such dollar amount, multiplied by
"(B) the cost-of-living adjustment determined under subsection (f)(3) for the calendar year in which the taxable year begins.

"(h) TAX SCHEDULES FOR TAXABLE YEARS BEGINNING IN 1987.—In the case of any taxable year beginning in 1987—
"(1) subsection (g) shall not apply, and
"(2) the following tables shall apply in lieu of the tables set forth in subsections (a), (b), (c), (d), and (e):

"(A) MARRIED INDIVIDUALS FILING JOINT RETURNS AND SURVIVING SPOUSES.—The table to apply for purposes of subsection (a) is as follows:

| "If taxable income is | The tax is: |
|---|---|
| Not over $3,000 ......................................... | 11% of taxable income. |
| Over $3,000 but not over $28,000........ | $330, plus 15% of the excess over $3,000. |
| Over $28,000 but not over $45,000...... | $4,080, plus 28% of the excess over $28,000. |
| Over $45,000 but not over $90,000...... | $8,840, plus 35% of the excess over $45,000. |
| Over $90,000 ........................................... | $24,590, plus 38.5% of the excess over $90,000. |

"(B) HEADS OF HOUSEHOLDS.—The table to apply for purposes of subsection (b) is as follows:

| "If taxable income is | The tax is: |
|---|---|
| Not over $2,500 ......................................... | 11% of taxable income. |
| Over $2,500 but not over $23,000........ | $275, plus 15% of the excess over $2,500. |
| Over $23,000 but not over $38,000...... | $3,350, plus 28% of the excess over $23,000. |

PUBLIC LAW 99–514—OCT. 22, 1986        100 STAT. 2099

| "If taxable income is | The tax is: |
|---|---|
| Over $38,000 but not over $80,000...... | $7,550, plus 35% of the excess over $38,000. |
| Over $80,000 ......................................... | $22,250, plus 38.5% of the excess over $80,000. |

"(C) UNMARRIED INDIVIDUALS OTHER THAN SURVIVING SPOUSES AND HEADS OF HOUSEHOLDS.—The table to apply for purposes of subsection (c) is as follows:

| "If taxable income is | The tax is: |
|---|---|
| Not over $1,800 ..................................... | 11% of taxable income. |
| Over $1,800 but not over $16,800........ | $198, plus 15% of the excess over $1,800. |
| Over $16,800 but not over $27,000........ | $2,448, plus 28% of the excess over $16,800. |
| Over $27,000 but not over $54,000...... | $5,304, plus 35% of the excess over $27,000. |
| Over $54,000 ......................................... | $14,754, plus 38.5% of the excess over $54,000. |

"(D) MARRIED INDIVIDUALS FILING SEPARATE RETURNS.— The table to apply for purposes of subsection (d) is as follows:

| "If taxable income is | The tax is: |
|---|---|
| Not over $1,500 ..................................... | 11% of taxable income. |
| Over $1,500 but not over $14,000........ | $165, plus 15% of the excess over $1,500. |
| Over $14,000 but not over $22,500........ | $2,040, plus 28% of the excess over $14,000. |
| Over $22,500 but not over $45,000...... | $4,420, plus 35% of the excess over $22,500. |
| Over $45,000 ......................................... | $12,295, plus 38.5% of the excess over $45,000. |

"(E) ESTATES AND TRUSTS.—The table to apply for purposes of subsection (e) is as follows:

| "If taxable income is | The tax is: |
|---|---|
| Not over $500 ......................................... | 11% of taxable income. |
| Over $500 but not over $4,700............ | $55, plus 15% of the excess over $500. |
| Over $4,700 but not over $7,550........ | $685, plus 28% of the excess over $4,700. |
| Over $7,550 but not over $15,150........ | $1,483, plus 35% of the excess over $7,550. |
| Over $15,150 ......................................... | $4,143, plus 38.5% of the excess over $15,150." |

(b) AMENDMENT OF SECTION 15.—Subsection (d) of section 15 (relating to effect of changes in rates during a taxable year) is amended to read as follows:

"(d) SECTION NOT TO APPLY TO INFLATION ADJUSTMENTS.—This section shall not apply to any change in rates under subsection (f) of section 1 (relating to adjustments in tax tables so that inflation will not result in tax increases)."

SEC. 102. INCREASE IN STANDARD DEDUCTION.

(a) GENERAL RULE.—Section 63 (defining taxable income) is amended to read as follows:

"SEC. 63. TAXABLE INCOME DEFINED.

"(a) IN GENERAL.—Except as provided in subsection (b), for purposes of this subtitle, the term 'taxable income' means gross income minus the deductions allowed by this chapter (other than the standard deduction).

"(b) INDIVIDUALS WHO DO NOT ITEMIZE THEIR DEDUCTIONS.—In the case of an individual who does not elect to itemize his deductions for

PUBLIC LAW 99–514—OCT. 22, 1986

the taxable year, for purposes of this subtitle, the term 'taxable income' means adjusted gross income, minus—

"(1) the standard deduction, and

"(2) the deduction for personal exemptions provided in section 151.

"(c) STANDARD DEDUCTION.—For purposes of this subtitle—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, the term 'standard deduction' means the sum of—

"(A) the basic standard deduction, and

"(B) the additional standard deduction.

"(2) BASIC STANDARD DEDUCTION.—For purposes of paragraph (1), the basic standard deduction is—

"(A) $5,000 in the case of—

"(i) a joint return, or

"(ii) a surviving spouse (as defined in section 2(a)),

"(B) $4,400 in the case of a head of household (as defined in section 2(b)),

"(C) $3,000 in the case of an individual who is not married and who is not a surviving spouse or head of household, or

"(D) $2,500 in the case of a married individual filing a separate return.

"(3) ADDITIONAL STANDARD DEDUCTION FOR AGED AND BLIND.—For purposes of paragraph (1), the additional standard deduction is the sum of each additional amount to which the taxpayer is entitled under subsection (f).

"(4) ADJUSTMENTS FOR INFLATION.—In the case of any taxable year beginning in a calendar year after 1988, each dollar amount contained in paragraph (2) or (5)(A) or subsection (f) shall be increased by an amount equal to—

"(A) such dollar amount, multiplied by

"(B) the cost-of-living adjustment determined under section 1(f)(3) for the calendar year in which the taxable year begins.

"(5) LIMITATION ON STANDARD DEDUCTION IN THE CASE OF CERTAIN DEPENDENTS.—In the case of an individual with respect to whom a deduction under section 151 is allowable to another taxpayer for a taxable year beginning in the calendar year in which the individual's taxable year begins, the standard deduction applicable to such individual for such individual's taxable year shall not exceed the greater of—

"(A) $500, or

"(B) such individual's earned income.

"(6) CERTAIN INDIVIDUALS, ETC., NOT ELIGIBLE FOR STANDARD DEDUCTION.—In the case of—

"(A) a married individual filing a separate return where either spouse itemizes deductions,

"(B) a nonresident alien individual,

"(C) a citizen of the United States entitled to the benefits of section 931 (relating to income from sources within possessions of the United States),

"(D) an individual making a return under section 443(a)(1) for a period of less than 12 months on account of a change in his annual accounting period, or

"(E) an estate or trust, common trust fund, or partnership,

the standard deduction shall be zero.

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 123 of 247 PageID #: 123

"(d) ITEMIZED DEDUCTIONS.—For purposes of this subtitle, the term 'itemized deductions' means the deductions allowable under this chapter other than—

"(1) the deductions allowable in arriving at adjusted gross income, and

"(2) the deduction for personal exemptions provided by section 151.

"(e) ELECTION TO ITEMIZE.—

"(1) IN GENERAL.—Unless an individual makes an election under this subsection for the taxable year, no itemized deduction shall be allowed for the taxable year. For purposes of this subtitle, the determination of whether a deduction is allowable under this chapter shall be made without regard to the preceding sentence.

"(2) TIME AND MANNER OF ELECTION.—Any election under this subsection shall be made on the taxpayer's return, and the Secretary shall prescribe the manner of signifying such election on the return.

"(3) CHANGE OF ELECTION.—Under regulations prescribed by the Secretary, a change of election with respect to itemized deductions for any taxable year may be made after the filing of the return for such year. If the spouse of the taxpayer filed a separate return for any taxable year corresponding to the taxable year of the taxpayer, the change shall not be allowed unless, in accordance with such regulations—

"(A) the spouse makes a change of election with respect to itemized deductions, for the taxable year covered in such separate return, consistent with the change of treatment sought by the taxpayer, and

"(B) the taxpayer and his spouse consent in writing to the assessment (within such period as may be agreed on with the Secretary) of any deficiency, to the extent attributable to such change of election, even though at the time of the filing of such consent the assessment of such deficiency would otherwise be prevented by the operation of any law or rule of law.

This paragraph shall not apply if the tax liability of the taxpayer's spouse for the taxable year corresponding to the taxable year of the taxpayer has been compromised under section 7122.

"(f) AGED OR BLIND ADDITIONAL AMOUNTS.—

"(1) ADDITIONAL AMOUNTS FOR THE AGED.—The taxpayer shall be entitled to an additional amount of $600—

"(A) for himself if he has attained age 65 before the close of his taxable year, and

"(B) for the spouse of the taxpayer if the spouse has attained age 65 before the close of the taxable year and an additional exemption is allowable to the taxpayer for such spouse under section 151(b).

"(2) ADDITIONAL AMOUNT FOR BLIND.—The taxpayer shall be entitled to an additional amount of $600—

"(A) for himself if he is blind at the close of the taxable year, and

"(B) for the spouse of the taxpayer if the spouse is blind as of the close of the taxable year and an additional exemption is allowable to the taxpayer for such spouse under section 151(b).

For purposes of subparagraph (B), if the spouse dies during the taxable year the determination of whether such spouse is blind shall be made as of the time of such death.

"(3) HIGHER AMOUNT FOR CERTAIN UNMARRIED INDIVIDUALS.— In the case of an individual who is not married and is not a surviving spouse, paragraphs (1) and (2) shall be applied by substituting '$750' for '$600'.

"(4) BLINDNESS DEFINED.—For purposes of this subsection, an individual is blind only if his central visual acuity does not exceed 20/200 in the better eye with correcting lenses, or if his visual acuity is greater than 20/200 but is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees.

"(g) MARITAL STATUS.—For purposes of this section, marital status shall be determined under section 7703.

"(h) TRANSITIONAL RULE FOR TAXABLE YEARS BEGINNING IN 1987.—In the case of any taxable year beginning in 1987, paragraph (2) of subsection (c) shall be applied—

"(1) by substituting '$3,760' for '$5,000',

"(2) by substituting '$2,540' for '$4,400',

"(3) by substituting '$2,540' for '$3,000', and

"(4) by substituting '$1,880' for '$2,500'.

The preceding sentence shall not apply if the taxpayer is entitled to an additional amount determined under subsection (f) (relating to additional amount for aged and blind) for the taxable year."

(b) TAX TABLES.—Section 3 (relating to tax tables for individuals) is amended by striking out subsection (a) and inserting in lieu thereof the following:

"(a) IMPOSITION OF TAX TABLE TAX.—

"(1) IN GENERAL.—In lieu of the tax imposed by section 1, there is hereby imposed for each taxable year on the taxable income of every individual—

"(A) who does not itemize his deductions for the taxable year, and

"(B) whose taxable income for such taxable year does not exceed the ceiling amount,

a tax determined under tables, applicable to such taxable year, which shall be prescribed by the Secretary and which shall be in such form as he determines appropriate. In the table so prescribed, the amounts of the tax shall be computed on the basis of the rates prescribed by section 1.

"(2) CEILING AMOUNT DEFINED.—For purposes of paragraph (1), the term 'ceiling amount' means, with respect to any taxpayer, the amount (not less than $20,000) determined by the Secretary for the tax rate category in which such taxpayer falls.

"(3) AUTHORITY TO PRESCRIBE TABLES FOR TAXPAYERS WHO ITEMIZE DEDUCTIONS.—The Secretary may provide that this section shall apply also for any taxable year to individuals who itemize their deductions. Any tables prescribed under the preceding sentence shall be on the basis of taxable income."

SEC. 103. INCREASE IN PERSONAL EXEMPTIONS.

(a) GENERAL RULE.—Subsection (f) of section 151 (defining exemption amount) is amended to read as follows:

"(f) EXEMPTION AMOUNT.—For purposes of this section—

"(1) IN GENERAL.—Except as provided in paragraph (2), the term 'exemption amount' means—

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 125 of 247 PageID #: 125

"(A) $1,900 for taxable years beginning during 1987,

"(B) $1,950 for taxable years beginning during 1988, and

"(C) $2,000 for taxable years beginning after December 31, 1988.

"(2) EXEMPTION AMOUNT DISALLOWED IN THE CASE OF CERTAIN DEPENDENTS.—In the case of an individual with respect to whom a deduction under this section is allowable to another taxpayer for a taxable year beginning in the calendar year in which the individual's taxable year begins, the exemption amount applicable to such individual for such individual's taxable year shall be zero.

"(3) INFLATION ADJUSTMENT FOR YEARS AFTER 1989.—In the case of any taxable year beginning in a calendar year after 1989, the dollar amount contained in paragraph (1)(C) shall be increased by an amount equal to—

"(A) such dollar amount, multiplied by

"(B) the cost-of-living adjustment determined under section 1(f)(3), for the calendar year in which the taxable year begins, by substituting 'calendar year 1988' for 'calendar year 1987' in subparagraph (B) thereof."

(b) REPEAL OF ADDITIONAL EXEMPTIONS FOR TAXPAYERS OVER AGE 65 OR BLIND.—Section 151 is amended by striking out subsections (c) and (d) and by redesignating subsections (e) and (f) as subsections (c) and (d), respectively.

## SEC. 104. TECHNICAL AMENDMENTS.

(a) FILING REQUIREMENTS.—

(1) SECTION 6012.—

(A) Paragraph (1) of section 6012(a) (relating to persons required to make returns of income) is amended to read as follows:

"(1)(A) Every individual having for the taxable year gross income which equals or exceeds the exemption amount, except that a return shall not be required of an individual—

"(i) who is not married (determined by applying section 7703), is not a surviving spouse (as defined in section 2(a)), is not a head of a household (as defined in section 2(b)), and for the taxable year has gross income of less than the sum of the exemption amount plus the basic standard deduction applicable to such an individual,

"(ii) who is a head of a household (as so defined) and for the taxable year has gross income of less than the sum of the exemption amount plus the basic standard deduction applicable to such an individual,

"(iii) who is a surviving spouse (as so defined) and for the taxable year has gross income of less than the sum of the exemption amount plus the basic standard deduction applicable to such an individual, or

"(iv) who is entitled to make a joint return and whose gross income, when combined with the gross income of his spouse, is, for the taxable year, less than the sum of twice the exemption amount plus the basic standard deduction applicable to a joint return, but only if such individual and his spouse, at the close of the taxable year, had the same household as their home.

Clause (iv) shall not apply if for the taxable year such spouse makes a separate return or any other taxpayer is entitled to an exemption for such spouse under section 151(c).

"(B) The amount specified in clause (i), (ii), or (iii) of subparagraph (A) shall be increased by the amount of 1 additional standard deduction (within the meaning of section 63(c)(3)) in the case of an individual entitled to such deduction by reason of section 63(f)(1)(A) (relating to individuals age 65 or more), and the amount specified in clause (iv) of subparagraph (A) shall be increased by the amount of the additional standard deduction for each additional standard deduction to which the individual or his spouse is entitled by reason of section 63(f)(1).

"(C) The exception under subparagraph (A) shall not apply to any individual—

"(i) who is described in section 63(c)(5) and who has—

"(I) income (other than earned income) in excess of the amount in effect under section 63(c)(5)(A) (relating to limitation on standard deduction in the case of certain dependents), or

"(II) total gross income in excess of the standard deduction, or

"(ii) for whom the standard deduction is zero under section 63(c)(6).

"(D) For purposes of this subsection—

"(i) The terms 'standard deduction', 'basic standard deduction' and 'additional standard deduction' have the respective meanings given such terms by section 63(c).

"(ii) The term 'exemption amount' has the meaning given such term by section 151(d). In the case of an individual described in section 151(d)(2), the exemption amount shall be zero."

(B) Paragraph (9) of section 6012(a) is amended by striking out "$2,700 or more" and inserting in lieu thereof "not less than the sum of the exemption amount plus the basic standard deduction under section 63(c)(2)(D)".

(2) SECTION 6013.—Subparagraph (A) of section 6013(b)(3) (relating to when return deemed filed) is amended—

(A) by striking out "(twice the exemption amount in case such spouse was 65 or over)" each place it appears,

(B) by striking out "section 151(f)" and inserting in lieu thereof "section 151(d)", and

(C) by adding at the end thereof the following new sentence: "For purposes of clauses (ii) and (iii), if the spouse whose gross income is being compared to the exemption amount is 65 or over, such clauses shall be applied by substituting 'the sum of the exemption amount and the additional standard deduction under section 63(c)(2) by reason of section 63(f)(1)(A)' for 'the exemption amount'."

(b) OTHER AMENDMENTS.—

(1) SECTION 21, ETC.—

(A) Sections 21(b)(1)(A), 21(e)(6)(A), and 129(c)(1) are each amended by striking out "section 151(e)" and inserting in lieu thereof "section 151(c)".

(B) Sections 21(e)(6)(B), 32(c)(1)(A)(i), 129(c)(2), and 152(e)(1)(A) are each amended by striking out "section 151(e)(3)" and inserting in lieu thereof "section 151(c)(3)".

PUBLIC LAW 99–514—OCT. 22, 1986      100 STAT. 2105

(2) SECTION 108.—Subparagraph (B) of section 108(b)(3) is amended by striking out "50 cents" and inserting in lieu thereof "33⅓ cents".

(3) SECTION 152, ETC.—Sections 152(d)(2) and 2032A(c)(7)(D) are each amended by striking out "section 151(e)(4)" and inserting in lieu thereof "section 151(c)(4)".

(4) SECTION 172.—Subsection (d) of section 172 (relating to modifications) is amended by striking out paragraph (7).

(5) SECTION 402.—Subparagraph (B) of section 402(e)(1), as amended by section 1222(b), is amended by striking out "the zero bracket amount applicable to such individual for the taxable year plus".

(6) SECTION 441.—Clause (iii) of section 441(f)(2)(B) (relating to change in accounting period) is amended by striking out "and by adding the zero bracket amount,".

(7) SECTION 443.—
(A) Paragraph (1) of section 443(b) (relating to computation of tax on change of annual accounting period) is amended by striking out ", and adding the zero bracket amount".

(B) Clause (ii) of section 443(b)(2)(A) (relating to computation based on 12-month period) is amended to read as follows:

"(ii) the tax computed on the modified taxable income for the short period."

(8) SECTION 541.—Section 541 is amended by striking out "50 percent" and inserting in lieu thereof "28 percent (38.5 percent in the case of taxable years beginning in 1987)".

(9) SECTION 613A.—Paragraph (1) of section 613A(d) (relating to limitation on percentage depletion based on taxable income) is amended by striking out "(reduced in the case of an individual by the zero bracket amount)".

(10) SECTION 667.—Paragraph (2) of section 667(b) (relating to tax on amount deemed distributed by trust in preceding years) is amended to read as follows:

"(2) TREATMENT OF LOSS YEARS.—For purposes of paragraph (1), the taxable income of the beneficiary for any taxable year shall be deemed to be not less than zero."

(11) SECTION 861.—Subsection (b) of section 861 (relating to taxable income from sources within the United States) is amended by striking out "the zero bracket amount" and inserting in lieu thereof "the standard deduction".

(12) SECTION 862.—Subsection (b) of section 862 (relating to taxable income from sources without the United States) is amended by striking out "the zero bracket amount" and inserting in lieu thereof "the standard deduction".

(13) SECTION 904.—Subsection (a) of section 904 (relating to limitation on foreign tax credit) is amended by striking out the last sentence.

(14) SECTION 1398.—Subsection (c) of section 1398 (relating to computation and payment of tax; zero bracket amount) is amended—

(A) by striking out "ZERO BRACKET AMOUNT" in the subsection heading and inserting in lieu thereof "BASIC STANDARD DEDUCTION", and

(B) by striking out paragraph (3) and inserting in lieu thereof the following:

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 128 of 247 PageID #: 128

"(3) BASIC STANDARD DEDUCTION.—In the case of an estate which does not itemize deductions, the basic standard deduction for the estate for the taxable year shall be the same as for a married individual filing a separate return for such year."

(15) SECTION 3402.—

(A) Paragraph (1) of section 3402(f) (relating to withholding exemptions) is amended by striking out subparagraphs (B) and (C) and by redesignating subparagraphs (D), (E), (F), and (G) as subparagraphs (B), (C), (D), and (E), respectively.

(B) Subparagraph (A) of section 3402(f)(1) is amended by inserting "unless he is an individual described in section 151(d)(2)" after "himself".

(C) Subparagraph (B) of section 3402(f)(1), as redesignated by subparagraph (A), is amended by striking out "subparagraph (A), (B), (C), or (F)" and inserting in lieu thereof "subparagraph (A) or (D)".

(D) Subparagraph (C) of section 3402(f)(1), as redesignated by subparagraph (A), is amended by striking out "section 151(e)" and inserting in lieu thereof "section 151(c)".

(E) Subparagraph (E) of section 3402(f)(1), as redesignated by subparagraph (A), is amended by striking out "zero bracket" and inserting in lieu thereof "standard deduction".

(F) The last sentence of paragraph (1) of section 3402(f) is amended—

(i) by striking out "subparagraph (G)" and inserting in lieu thereof "subparagraph (E)", and

(ii) by striking out "zero bracket" and inserting in lieu thereof "standard deduction".

(G) Paragraph (3) of section 3402(m) is amended by inserting "(including the additional standard deduction under section 63(c)(3) for the aged and blind)" after "deductions".

(16) SECTION 6014.—

(A) Subsection (a) of section 6014 (relating to income tax return—tax not computed by taxpayer) is amended by striking out "who does not have an unused zero bracket amount (determined under section 63(e))" and inserting in lieu thereof "who is not described in section 6012(a)(1)(C)(i)".

(B) Paragraph (4) of section 6014(b) is amended to read as follows:

"(4) to cases where the taxpayer itemizes his deductions or where the taxpayer claims a reduced standard deduction by reason of section 63(c)(5)."

(17) SECTION 6212.—Subparagraph (A) of section 6212(c)(2) (relating to cross references) is amended to read as follows:

"(A) Deficiency attributable to change of treatment with respect to itemized deductions, see section 63(e)(3)."

(18) SECTION 6504.—Paragraph (2) of section 6504 (relating to cross references) is amended to read as follows:

"(2) Change of treatment with respect to itemized deductions where taxpayer and his spouse make separate returns, see section 63(e)(3)."

PUBLIC LAW 99–514—OCT. 22, 1986     100 STAT. 2107

# Subtitle B—Provisions Related to Tax Credits

**SEC. 111. INCREASE IN EARNED INCOME CREDIT.**

(a) INCREASE IN AMOUNT OF CREDIT.—Subsection (a) of section 32 (relating to earned income credit) is amended—

(1) by striking out "11 percent" and inserting in lieu thereof "14 percent", and

(2) by striking out "$5,000" and inserting in lieu thereof "$5,714".

(b) INCREASE IN INCOME LEVEL AT WHICH PHASEOUT BEGINS.—Subsection (b) of section 32 is amended to read as follows:

"(b) LIMITATION.—The amount of the credit allowable to a taxpayer under subsection (a) for any taxable year shall not exceed the excess (if any) of—

"(1) the maximum credit allowable under subsection (a) to any taxpayer, over

"(2) 10 percent of so much of the adjusted gross income (or, if greater, the earned income) of the taxpayer for the taxable year as exceeds $9,000.

In the case of any taxable year beginning in 1987, paragraph (2) shall be applied by substituting '$6,500' for '$9,000'."

(c) INFLATION ADJUSTMENTS.—Section 32 is amended by adding at the end thereof the following new subsection:

"(i) INFLATION ADJUSTMENTS.—

"(1) IN GENERAL.—In the case of any taxable year beginning after the applicable calendar year, each dollar amount referred to in paragraph (2)(B) shall be increased by an amount equal to—

"(A) such dollar amount, multiplied by

"(B) the cost-of-living adjustment determined under section 1(f)(3), for the calendar year in which the taxable year begins, by substituting 'calendar year 1984' for 'calendar year 1987' in subparagraph (B) thereof.

"(2) DEFINITIONS, ETC.—For purposes of paragraph (1)—

"(A) APPLICABLE CALENDAR YEAR.—The term 'applicable calendar year' means—

"(i) 1986 in the case of the dollar amounts referred to in clause (i) or (ii) of subparagraph (B), and

"(ii) 1987 in the case of the dollar amount referred to in clause (iii) of subparagraph (B).

"(B) DOLLAR AMOUNTS.—The dollar amounts referred to in this subparagraph are—

"(i) the $5,714 amount contained in subsection (a),

"(ii) the $6,500 amount contained in the last sentence of subsection (b), and

"(iii) the $9,000 amount contained in subsection (b)(2).

"(3) ROUNDING.—If any increase determined under paragraph (1) is not a multiple of $10, such increase shall be rounded to the nearest multiple of $10 (or, if such increase is a multiple of $5, such increase shall be increased to the next higher multiple of $10)."

(d) CONFORMING AMENDMENTS.—

(1) Paragraph (2) of section 32(f) (relating to amount of credit to be determined under tables) is amended by striking out subparagraphs (A) and (B) and inserting in lieu thereof the following:

"(A) for earned income between $0 and the amount of earned income at which the credit is phased out under subsection (b), and

"(B) for adjusted gross income between the dollar amount at which the phaseout begins under subsection (b) and the amount of adjusted gross income at which the credit is phased out under subsection (b)."

(2) Subparagraph (B) of section 3507(c)(2) (relating to earned income advance amount) is amended by striking out clauses (i) and (ii) and inserting in lieu thereof the following:

"(i) of not more than 14 percent of earned income not in excess of the amount of earned income taken into account under section 32(a), which

"(ii) phases out between the amount of earned income at which the phaseout begins under subsection (b) of section 32 and the amount of earned income at which the credit under section 32 is phased out under such subsection, or".

(3) Subparagraph (C) of section 3507(c)(2) is amended by striking out clauses (i) and (ii) and inserting in lieu thereof the following:

"(i) of not more than 14 percent of earned income not in excess of ½ of the amount of earned income taken into account under section 32(a), which

"(ii) phases out between amounts of earned income which are ½ of the amounts of earned income described in subparagraph (B)(ii)."

(e) EMPLOYEE NOTIFICATION.—The Secretary of the Treasury is directed to require, under regulations, employers to notify any employee who has not had any tax withheld from wages (other than an employee whose wages are exempt from withholding pursuant to section 3402(n) of the Internal Revenue Code of 1986) that such employee may be eligible for a refund because of the earned income credit.

## SEC. 112. REPEAL OF CREDIT FOR CONTRIBUTIONS TO CANDIDATES FOR PUBLIC OFFICE.

(a) GENERAL RULE.—Section 24 (relating to contributions to candidates for public office) is hereby repealed.

(b) TECHNICAL AMENDMENTS.—

(1) Subsection (g) of section 527 (relating to treatment of newsletter funds) is amended—

(A) by striking out "section 24(c)(2)" in paragraph (1) and inserting in lieu thereof "paragraph (3)", and

(B) by adding at the end thereof the following new paragraph:

"(3) CANDIDATE.—For purposes of paragraph (1), the term 'candidate' means, with respect to any Federal, State, or local elective public office, an individual who—

"(A) publicly announces that he is a candidate for nomination or election to such office, and

"(B) meets the qualifications prescribed by law to hold such office."

(2) Subsection (a) of section 642 (relating to credits against tax for estates and trusts) is amended to read as follows:

"(a) FOREIGN TAX CREDIT ALLOWED.—An estate or trust shall be allowed the credit against tax for taxes imposed by foreign countries

and possessions of the United States, to the extent allowed by section 901, only in respect of so much of the taxes described in such section as is not properly allocable under such section to the beneficiaries."

(3) Paragraph (3) of section 901(i) (relating to cross references) is amended by striking out "section 642(a)(1)" and inserting in lieu thereof "section 642(a)".

(4) Paragraph (6) of section 7871(a) (relating to Indian tribal governments treated as States for certain purposes) is amended by striking out subparagraph (A) and by redesignating subparagraphs (B), (C), (D), (E), and (F) as subparagraphs (A), (B), (C), (D), and (E), respectively.

(5) The table of sections for subpart A of part IV of subchapter A of chapter 1 is amended by striking out the item relating to section 24.

## Subtitle C—Provisions Related to Exclusions

### SEC. 121. TAXATION OF UNEMPLOYMENT COMPENSATION.

Section 85 (relating to unemployment compensation) is amended to read as follows:

### "SEC. 85. UNEMPLOYMENT COMPENSATION.

"(a) GENERAL RULE.—In the case of an individual, gross income includes unemployment compensation.

"(b) UNEMPLOYMENT COMPENSATION DEFINED.—For purposes of this section, the term 'unemployment compensation' means any amount received under a law of the United States or of a State which is in the nature of unemployment compensation."

### SEC. 122. PRIZES AND AWARDS.

(a) EXCLUSION FROM GROSS INCOME.—

(1) IN GENERAL.—Section 74 (relating to prizes and awards) is amended—

(A) by striking out "Except as provided in subsection (b) and" in subsection (a) and inserting in lieu thereof "Except as otherwise provided in this section or",

(B) by striking out "EXCEPTION" in the heading for subsection (b) and inserting in lieu thereof "EXCEPTION FOR CERTAIN PRIZES AND AWARDS TRANSFERRED TO CHARITIES",

(C) by striking out "and" at the end of subsection (b)(1), by striking out the period at the end of subsection (b)(2) and inserting in lieu thereof "; and", and by adding after subsection (b)(2) the following new paragraph:

"(3) the prize or award is transferred by the payor to a governmental unit or organization described in paragraph (1) or (2) of section 170(c) pursuant to a designation made by the recipient.", and

(D) by adding at the end thereof the following new subsection:

"(c) EXCEPTION FOR CERTAIN EMPLOYEE ACHIEVEMENT AWARDS.—

"(1) IN GENERAL.—Gross income shall not include the value of an employee achievement award (as defined in section 274(j)) received by the taxpayer if the cost to the employer of the employee achievement award does not exceed the amount

allowable as a deduction to the employer for the cost of the employee achievement award.

"(2) EXCESS DEDUCTION AWARD.—If the cost to the employer of the employee achievement award received by the taxpayer exceeds the amount allowable as a deduction to the employer, then gross income includes the greater of—

"(A) an amount equal to the portion of the cost to the employer of the award that is not allowable as a deduction to the employer (but not in excess of the value of the award), or

"(B) the amount by which the value of the award exceeds the amount allowable as a deduction to the employer. The remaining portion of the value of such award shall not be included in the gross income of the recipient.

"(3) TREATMENT OF TAX-EXEMPT EMPLOYERS.—In the case of an employer exempt from taxation under this subtitle, any reference in this subsection to the amount allowable as a deduction to the employer shall be treated as a reference to the amount which would be allowable as a deduction to the employer if the employer were not exempt from taxation under this subtitle.

"(4) CROSS REFERENCE.—

"For provisions excluding certain de minimis fringes from gross income, see section 132(e)."

(2) CONFORMING AMENDMENTS.—

(A) Clause (i) of section 4941(d)(2)(G) is amended by striking out "section 74(b)" and inserting in lieu thereof "section 74(b) (without regard to paragraph (3) thereof)".

(B) Paragraph (2) of section 4945(g) is amended by striking out "section 74(b)" and inserting in lieu thereof "section 74(b) (without regard to paragraph (3) thereof)".

(b) AMOUNTS TRANSFERRED BY EMPLOYER NOT EXCLUDABLE AS GIFTS.—Section 102 (relating to gifts and inheritances) is amended by adding at the end thereof the following new subsection:

"(c) EMPLOYEE GIFTS.—

"(1) IN GENERAL.—Subsection (a) shall not exclude from gross income any amount transferred by or for an employer to, or for the benefit of, an employee.

"(2) CROSS REFERENCES.—

"For provisions excluding certain employee achievement awards from gross income, see section 74(c).

"For provisions excluding certain de minimis fringes from gross income, see section 132(e)."

(c) GIFTS.—Section 274(b) (relating to gifts) is amended—

(1) by adding "or" at the end of subparagraph (A) of paragraph (1),

(2) by striking out "or" at the end of subparagraph (B) of paragraph (1), and inserting in lieu thereof a period,

(3) by striking out subparagraph (C) of paragraph (1), and

(4) by striking out paragraph (3).

(d) DEDUCTION FOR COST OF EMPLOYEE ACHIEVEMENT AWARDS.—Section 274 (relating to certain entertainment, etc., expenses) is amended by redesignating subsection (j) as subsection (k) and by inserting after subsection (i) the following new subsection:

"(j) EMPLOYEE ACHIEVEMENT AWARDS.—

"(1) GENERAL RULE.—No deduction shall be allowed under section 162 or section 212 for the cost of an employee achieve-

ment award except to the extent that such cost does not exceed the deduction limitations of paragraph (2).

"(2) DEDUCTION LIMITATIONS.—The deduction for the cost of an employee achievement award made by an employer to an employee—

"(A) which is not a qualified plan award, when added to the cost to the employer for all other employee achievement awards made to such employee during the taxable year which are not qualified plan awards, shall not exceed $400, and

"(B) which is a qualified plan award, when added to the cost to the employer for all other employee achievement awards made to such employee during the taxable year (including employee achievement awards which are not qualified plan awards), shall not exceed $1,600.

"(3) DEFINITIONS.—For purposes of this subsection—

"(A) EMPLOYEE ACHIEVEMENT AWARD.—The term 'employee achievement award' means an item of tangible personal property which is—

"(i) transferred by an employer to an employee for length of service achievement or safety achievement,

"(ii) awarded as part of a meaningful presentation, and

"(iii) awarded under conditions and circumstances that do not create a significant likelihood of the payment of disguised compensation.

"(B) QUALIFIED PLAN AWARD.—

"(i) IN GENERAL.—The term 'qualified plan award' means an employee achievement award awarded as part of an established written plan or program of the taxpayer which does not discriminate in favor of highly compensated employees (within the meaning of section 414(q)) as to eligibility or benefits.

"(ii) LIMITATION.—An employee achievement award shall not be treated as a qualified plan award for any taxable year if the average cost of all employee achievement awards which are provided by the employer during the year, and which would be qualified plan awards but for this subparagraph, exceeds $400. For purposes of the preceding sentence, average cost shall be determined by including the entire cost of qualified plan awards, without taking into account employee achievement awards of nominal value.

"(4) SPECIAL RULES.—For purposes of this subsection—

"(A) PARTNERSHIPS.—In the case of an employee achievement award made by a partnership, the deduction limitations contained in paragraph (2) shall apply to the partnership as well as to each member thereof.

"(B) LENGTH OF SERVICE AWARDS.—An item shall not be treated as having been provided for length of service achievement if the item is received during the recipient's 1st 5 years of employment or if the recipient received a length of service achievement award (other than an award excludable under section 132(e)(1)) during that year or any of the prior 4 years.

"(C) Safety achievement awards.—An item provided by an employer to an employee shall not be treated as having been provided for safety achievement if—

"(i) during the taxable year, employee achievement awards (other than awards excludable under section 132(e)(1)) for safety achievement have previously been awarded by the employer to more than 10 percent of the employees of the employer (excluding employees described in clause (ii)), or

"(ii) such item is awarded to a manager, administrator, clerical employee, or other professional employee.".

(e) Treatment for Purposes of Employment Taxes.—Each of the following provisions are amended by striking out "117 or" and inserting in lieu thereof "74(c), 117, or":

(1) Section 3121(a)(20).
(2) Section 3231(e)(5).
(3) Section 3306(b)(16).
(4) Section 3401(a)(20).
(5) Section 209(s) of the Social Security Act.

## SEC. 123. SCHOLARSHIPS.

(a) In General.—Section 117 (relating to scholarship and fellowship grants) is amended to read as follows:

### "SEC. 117. QUALIFIED SCHOLARSHIPS.

"(a) General Rule.—Gross income does not include any amount received as a qualified scholarship by an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii).

"(b) Qualified Scholarship.—For purposes of this section—

"(1) In general.—The term 'qualified scholarship' means any amount received by an individual as a scholarship or fellowship grant to the extent the individual establishes that, in accordance with the conditions of the grant, such amount was used for qualified tuition and related expenses.

"(2) Qualified tuition and related expenses.—For purposes of paragraph (1), the term 'qualified tuition and related expenses' means—

"(A) tuition and fees required for the enrollment or attendance of a student at an educational organization described in section 170(b)(1)(A)(ii), and

"(B) fees, books, supplies, and equipment required for courses of instruction at such an educational organization.

"(c) Limitation.—Subsections (a) and (d) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship or qualified tuition reduction.

"(d) Qualified Tuition Reduction.—

"(1) In general.—Gross income shall not include any qualified tuition reduction.

"(2) Qualified tuition reduction.—For purposes of this subsection, the term 'qualified tuition reduction' means the amount of any reduction in tuition provided to an employee of an organization described in section 170(b)(1)(A)(ii) for the edu-

cation (below the graduate level) at such organization (or another organization described in section 170(b)(1)(A)(ii)) of—

"(A) such employee, or

"(B) any person treated as an employee (or whose use is treated as an employee use) under the rules of section 132(f).

"(3) REDUCTION MUST NOT DISCRIMINATE IN FAVOR OF HIGHLY COMPENSATED, ETC.—Paragraph (1) shall apply with respect to any qualified tuition reduction provided with respect to any officer, owner, or highly compensated employee only if such reduction is available on substantially the same terms to each member of a group of employees which is defined under a reasonable classification set up by the employer which does not discriminate in favor of officers, owners, or highly compensated employees (within the meaning of section 414(q))."

(b) TECHNICAL AMENDMENTS.—

(1) Subsection (a) of section 74 is amended by striking out "(relating to scholarship and fellowship grants)" and inserting in lieu thereof "(relating to qualified scholarships)".

(2) The second sentence of section 1441(b) (relating to income items) is amended to read as follows: "The items of income referred to in subsection (a) from which tax shall be deducted and withheld at the rate of 14 percent are amounts which are received by a nonresident alien individual who is temporarily present in the United States as a nonimmigrant under subparagraph (F) or (J) of section 101(a)(15) of the Immigration and Nationality Act and which are incident to a qualified scholarship to which section 117(a) applies, but only to the extent such amounts are includible in gross income."

(3) Paragraph (6) of section 7871(a) (relating to Indian tribal governments treated as States for certain purposes), as amended by section 112, is amended by striking out subparagraph (B) and by redesignating subparagraphs (C), (D), and (E) as subparagraphs (B), (C), and (D), respectively.

(4) The table of sections for part III of subchapter B of chapter 1 is amended by striking out the item relating to section 117 and inserting in lieu thereof the following new item:

"Sec. 117. Qualified scholarships."

# Subtitle D—Provisions Related to Deductions

### SEC. 131. REPEAL OF DEDUCTION FOR 2-EARNER MARRIED COUPLES.

(a) GENERAL RULE.—Section 221 (relating to deduction for 2-earner married couples) is hereby repealed.

(b) CONFORMING AMENDMENTS.—

(1) Section 62 is amended by striking out paragraph (16).

(2) Subparagraph (A) of section 86(b)(2) is amended by striking out "sections 221," and inserting in lieu thereof "sections".

(3) The table of sections for part VII of subchapter B of chapter 1 is amended by striking out the item relating to section 221.

### SEC. 132. 2-PERCENT FLOOR ON MISCELLANEOUS ITEMIZED DEDUCTIONS.

(a) GENERAL RULE.—Part I of subchapter B of chapter 1 (defining gross income, adjusted gross income, etc.) is amended by adding at the end thereof the following new section:

"SEC. 67. 2-PERCENT FLOOR ON MISCELLANEOUS ITEMIZED DEDUCTIONS.

"(a) GENERAL RULE.—In the case of an individual, the miscellaneous itemized deductions for any taxable year shall be allowed only to the extent that the aggregate of such deductions exceeds 2 percent of adjusted gross income.

"(b) MISCELLANEOUS ITEMIZED DEDUCTIONS.—For purposes of this section, the term 'miscellaneous itemized deductions' means the itemized deductions other than—

"(1) the deduction under section 163 (relating to interest),

"(2) the deduction under section 164 (relating to taxes),

"(3) the deduction under section 165(a) for losses described in subsection (c)(3) or (d) of section 165,

"(4) the deduction under section 170 (relating to charitable, etc., contributions and gifts),

"(5) the deduction under section 213 (relating to medical, dental, etc., expenses),

"(6) the deduction under section 217 (relating to moving expenses),

"(7) any deduction allowable for impairment-related work expenses,

"(8) the deduction under section 691(c) (relating to deduction for estate tax in case of income in respect of the decedent),

"(9) any deduction allowable in connection with personal property used in a short sale,

"(10) the deduction under section 1341 (relating to computation of tax where taxpayer restores substantial amount held under claim of right),

"(11) the deduction under section 72(b)(3) (relating to deduction where annuity payments cease before investment recovered),

"(12) the deduction under section 171 (relating to deduction for amortizable bond premium), and

"(13) the deduction under section 216 (relating to deductions in connection with cooperative housing corporations).

"(c) DISALLOWANCE OF INDIRECT DEDUCTION THROUGH PASS-THRU ENTITY.—The Secretary shall prescribe regulations which prohibit the indirect deduction through pass-thru entities of amounts which are not allowable as a deduction if paid or incurred directly by an individual and which contain such reporting requirements as may be necessary to carry out the purposes of this subsection. The preceding sentence shall not apply with respect to estates, trusts, cooperatives, and real estate investment trusts.

"(d) IMPAIRMENT-RELATED WORK EXPENSES.—For purposes of this section, the term 'impairment-related work expenses' means expenses—

"(1) of a handicapped individual (as defined in section 190(b)(3)) for attendant care services at the individual's place of employment and other expenses in connection with such place of employment which are necessary for such individual to be able to work, and

"(2) with respect to which a deduction is allowable under section 162 (determined without regard to this section).

"(e) DETERMINATION OF ADJUSTED GROSS INCOME IN CASE OF ESTATES AND TRUSTS.—For purposes of this section, the adjusted gross income of an estate or trust shall be computed in the same manner as in the case of an individual, except that the deductions for osts

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 137 of 247 PageID #: 137

which are paid or incurred in connection with the administration of the estate or trust and would not have been incurred if the property were not held in such trust or estate shall be treated as allowable in arriving at adjusted gross income.

(b) TREATMENT OF TRADE AND BUSINESS DEDUCTIONS OF EMPLOY-EES.—

(1) IN GENERAL.—Paragraph (2) of section 62 (defining adjusted gross income) is amended to read as follows:

"(2) CERTAIN TRADE AND BUSINESS DEDUCTIONS OF EMPLOY-EES.—

"(A) REIMBURSED EXPENSES OF EMPLOYEES.—The deductions allowed by part VI (section 161 and following) which consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer.

"(B) CERTAIN EXPENSES OF PERFORMING ARTISTS.—The deductions allowed by section 162 which consist of expenses paid or incurred by a qualified performing artist in connection with the performances by him of services in the performing arts as an employee."

(2) DEFINITION OF QUALIFIED PERFORMING ARTIST.—Section 62 is amended—

(A) by striking out "For purposes of this subtitle" and inserting in lieu thereof "(a) GENERAL RULE.—For purposes of this subtitle", and

(B) by adding at the end thereof the following new subsection:

"(b) QUALIFIED PERFORMING ARTIST.—

"(1) IN GENERAL.—For purposes of subsection (a)(2)(B), the term 'qualified performing artist' means, with respect to any taxable year, any individual if—

"(A) such individual performed services in the performing arts as an employee during the taxable year for at least 2 employers,

"(B) the aggregate amount allowable as a deduction under section 162 in connection with the performance of such services exceeds 10 percent of such individual's gross income attributable to the performance of such services, and

"(C) the adjusted gross income of such individual for the taxable year (determined without regard to subsection (a)(2)(B)) does not exceed $16,000.

"(2) NOMINAL EMPLOYER NOT TAKEN INTO ACCOUNT.—An individual shall not be treated as performing services in the performing arts as an employee for any employer during any taxable year unless the amount received by such individual from such employer for the performance of such services during the taxable year equals or exceeds $200.

"(3) SPECIAL RULES FOR MARRIED COUPLES.—

"(A) IN GENERAL.—Except in the case of a husband and wife who lived apart at all times during the taxable year, if the taxpayer is married at the close of the taxable year, subsection (a)(2)(B) shall apply only if the taxpayer and his spouse file a joint return for the taxable year.

"(B) APPLICATION OF PARAGRAPH (1).—In the case of a joint return—

PUBLIC LAW 99-514—OCT. 22, 1986

"(i) paragraph (1) (other than subparagraph (C) thereof) shall be applied separately with respect to each spouse, but

"(ii) paragraph (1)(C) shall be applied with respect to their combined adjusted gross income.

"(C) DETERMINATION OF MARITAL STATUS.—For purposes of this subsection, marital status shall be determined under section 7703(a).

"(D) JOINT RETURN.—For purposes of this subsection, the term 'joint return' means the joint return of a husband and wife made under section 6013."

(c) MOVING EXPENSE DEDUCTION NOT ALLOWABLE IN COMPUTING ADJUSTED GROSS INCOME.—Subsection (a) of section 62 (as amended by subsection (b)) is amended by striking out paragraph (8).

(d) CLERICAL AMENDMENT.—The table of sections for part I of subchapter B of chapter 1 is amended by adding at the end thereof the following new item:

"Sec. 67. 2-percent floor on miscellaneous itemized deductions."

### SEC. 133. MEDICAL EXPENSE DEDUCTION LIMITATION INCREASED.

Subsection (a) of section 213 (relating to deduction for medical, dental, etc., expenses) is amended by striking out "5 percent" and inserting in lieu thereof "7.5 percent".

### SEC. 134. REPEAL OF DEDUCTION FOR STATE AND LOCAL SALES TAXES.

(a) GENERAL RULE.—Subsection (a) of section 164 (relating to deduction for taxes) is amended—

(1) by striking out paragraph (4) and by redesignating paragraph (5) as paragraph (4), and

(2) by adding at the end thereof the following new sentence: "Notwithstanding the preceding sentence, any tax (not described in the first sentence of this subsection) which is paid or accrued by the taxpayer in connection with an acquisition or disposition of property shall be treated as part of the cost of the acquired property or, in the case of a disposition, as a reduction in the amount realized on the disposition."

(b) CONFORMING AMENDMENTS.—Subsection (b) of section 164 is amended—

(1) by striking out paragraphs (2) and (5), and

(2) by redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively.

### SEC. 135. REPEAL OF DEDUCTION FOR ADOPTION EXPENSES.

(a) GENERAL RULE.—Section 222 (relating to deduction for adoption expenses) is hereby repealed.

(b) CONFORMING AMENDMENTS.—

(1) Section 223 is redesignated as section 220.

(2) The table of sections for part VII of subchapter B of chapter 1 is amended by striking out the items relating to sections 222 and 223 and inserting in lieu thereof the following:

"Sec. 220. Cross references."

## Subtitle E—Miscellaneous Provisions

**SEC. 141. REPEAL OF INCOME AVERAGING.**

(a) GENERAL RULE.—Part I of subchapter Q of chapter 1 (relating to income averaging) is hereby repealed.

(b) TECHNICAL AMENDMENTS.—

(1) Subsection (b) of section 3 (relating to section inapplicable to certain individuals) is amended by striking out paragraph (1) and by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively.

(2) Subsection (b) of section 5 (relating to cross references relating to tax on individuals) is amended by striking out paragraph (2) and by redesignating paragraph (3) as paragraph (2).

(3) Subparagraph (B) of section 6511(d)(2) (relating to special rules applicable to income taxes) is amended to read as follows:

"(B) APPLICABLE RULES.—

"(i) IN GENERAL.—If the allowance of a credit or refund of an overpayment of tax attributable to a net operating loss carryback or a capital loss carryback is otherwise prevented by the operation of any law or rule of law other than section 7122 (relating to compromises), such credit or refund may be allowed or made, if claim therefor is filed within the period provided in subparagraph (A) of this paragraph.

"(ii) TENTATIVE CARRYBACK ADJUSTMENTS.—If the allowance of an application, credit, or refund of a decrease in tax determined under section 6411(b) is otherwise prevented by the operation of any law or rule of law other than section 7122, such application, credit, or refund may be allowed or made if application for a tentative carryback adjustment is made within the period provided in section 6411(a).

"(iii) DETERMINATIONS BY COURTS TO BE CONCLUSIVE.— In the case of any such claim for credit or refund or any such application for a tentative carryback adjustment, the determination by any court, including the Tax Court, in any proceeding in which the decision of the court has become final, shall be conclusive except with respect to—

"(I) the net operating loss deduction and the effect of such deduction, and

"(II) the determination of a short-term capital loss and the effect of such short-term capital loss, to the extent that such deduction or short-term capital loss is affected by a carryback which was not an issue in such proceeding."

(c) CLERICAL AMENDMENT.—The table of parts for subchapter Q of chapter 1 is amended by striking out the item relating to part I.

**SEC. 142. LIMITATIONS ON DEDUCTIONS FOR MEALS, TRAVEL, AND ENTERTAINMENT.**

(a) BUSINESS MEALS.—

(1) IN GENERAL.—Section 274 (relating to disallowance of certain entertainment, etc. expenses), as amended by section 122(d), is amended by redesignating subsection (k) as subsection

(o) and by inserting after subsection (j) the following new subsection:

"(k) BUSINESS MEALS.—

"(1) IN GENERAL.—No deduction shall be allowed under this chapter for the expense of any food or beverages unless—

"(A) such expense is not lavish or extravagant under the circumstances, and

"(B) the taxpayer (or an employee of the taxpayer) is present at the furnishing of such food or beverages.

"(2) EXCEPTIONS.—Paragraph (1) shall not apply to any expense if subsection (a) does not apply to such expense by reason of paragraph (2), (3), (4), (7), (8), or (9) of subsection (e)."

(2) TECHNICAL AMENDMENTS.—

(A) Subsection (e) of section 274 (relating to specific exceptions to application of subsection (a)) is amended by striking out paragraph (1) and by redesignating paragraphs (2) through (10) as paragraphs (1) through (9), respectively.

(B) Paragraph (3) of section 274(e), as redesignated by subparagraph (A), is amended by striking out "paragraph (3)" and inserting in lieu thereof "paragraph (2)".

(b) ADDITIONAL RESTRICTIONS ON EXPENSES FOR MEALS, TRAVEL, AND ENTERTAINMENT.—Section 274 is amended by inserting after the subsection added by subsection (a) the following new subsections:

"(l) ADDITIONAL LIMITATIONS ON ENTERTAINMENT TICKETS.—

"(1) ENTERTAINMENT TICKETS.—

"(A) IN GENERAL.—In determining the amount allowable as a deduction under this chapter for any ticket for any activity or facility described in subsection (d)(2), the amount taken into account shall not exceed the face value of such ticket.

"(B) EXCEPTION FOR CERTAIN CHARITABLE SPORTS EVENTS.— Subparagraph (A) shall not apply to any ticket for any sports event—

"(i) which is organized for the primary purpose of benefiting an organization which is described in section 501(c)(3) and exempt from tax under section 501(a),

"(ii) all of the net proceeds of which are contributed to such organization, and

"(iii) which utilizes volunteers for substantially all of the work performed in carrying out such event.

"(2) SKYBOXES, ETC.—

"(A) IN GENERAL.—In the case of a skybox or other private luxury box leased for more than 1 event, the amount allowable as a deduction under this chapter with respect to such events shall not exceed the sum of tbe face value of non-luxury box seat tickets for the seats in such box covered by the lease. For purposes of the preceding sentence, 2 or more related leases shall be treated as 1 lease.

"(B) PHASEIN.—In the case of—

"(i) a taxable year beginning in 1987, the amount disallowed under subparagraph (A) shall be ⅓ of the amount which would be disallowed without regard to this subparagrapb, and

"(ii) in the case of a taxable year beginning in 1988, the amount disallowed under subparagraph (A) shall be ⅔ of the amount which would have been disallowed without regard to this subparagraph."

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2119

"(m) ADDITIONAL LIMITATIONS ON TRAVEL EXPENSES.—

"(1) LUXURY WATER TRANSPORTATION.—

"(A) IN GENERAL.—No deduction shall be allowed under this chapter for expenses incurred for transportation by water to the extent such expenses exceed twice the aggregate per diem amounts for days of such transportation. For purposes of the preceding sentence, the term 'per diem amounts' means the highest amount generally allowable with respect to a day to employees of the executive branch of the Federal Government for per diem while away from home but serving in the United States.

"(B) EXCEPTIONS.—Subparagraph (A) shall not apply to—

"(i) any expense allocable to a convention, seminar, or other meeting which is held on any cruise ship, and

"(ii) any expense to which subsection (a) does not apply by reason of paragraph (2), (3), (4), (7), (8), or (9) of subsection (e).

"(2) TRAVEL AS FORM OF EDUCATION.—No deduction shall be allowed under this chapter for expenses for travel as a form of education.

"(n) ONLY 80 PERCENT OF MEAL AND ENTERTAINMENT EXPENSES ALLOWED AS DEDUCTION.—

"(1) IN GENERAL.—The amount allowable as a deduction under this chapter for—

"(A) any expense for food or beverages, and

"(B) any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such activity,

shall not exceed 80 percent of the amount of such expense or item which would (but for this paragraph) be allowable as a deduction under this chapter.

"(2) EXCEPTIONS.—Paragraph (1) shall not apply to any expense if—

"(A) subsection (a) does not apply to such expense by reason of paragraph (2), (3), (4), (7), (8), or (9) of subsection (e),

"(B) in the case of an expense for food or beverages, such expense is excludable from the gross income of the recipient under section 132 by reason of subsection (e) thereof (relating to de minimis fringes),

"(C) such expense is covered by a package involving a ticket described in subsection (l)(1)(B), or

"(D) in the case of an expense for food or beverages before January 1, 1989, such expense is an integral part of a qualified meeting.

"(3) QUALIFIED MEETING.—For purposes of paragraph (2)(D), the term 'qualified meeting' means any convention, seminar, annual meeting, or similar business program with respect to which—

"(A) an expense for food or beverages is not separately stated,

"(B) more than 50 percent of the participants are away from home,

"(C) at least 40 individuals attend, and

"(D) such food and beverages are part of a program which includes a speaker."

(c) NO DEDUCTION ALLOWED FOR SEMINARS, ETC., FOR SECTION 212 PURPOSES.—

(1) IN GENERAL.—Subsection (h) of section 274 (relating to attendance at conventions, etc.) is amended by adding at the end thereof the following new paragraph:

"(7) SEMINARS, ETC. FOR SECTION 212 PURPOSES.—No deduction shall be allowed under section 212 for expenses allocable to a convention, seminar, or similar meeting."

(2) TECHNICAL AMENDMENTS.—Paragraphs (1), (2), (4), and (5) of section 274(h) are each amended—

(A) by striking out "or 212" each place it appears, and

(B) by striking out "or to an activity described in section 212 and" each place it appears.

(d) DENIAL OF CHARITABLE CONTRIBUTION FOR CERTAIN TRAVEL EXPENSES.—Section 170 (relating to charitable, etc., contributions and gifts) is amended by redesignating subsections (k) and (l) as subsections (l) and (m), respectively, and by inserting after subsection (j) the following new subsection:

"(k) DENIAL OF DEDUCTION FOR CERTAIN TRAVEL EXPENSES.—No deduction shall be allowed under this section for traveling expenses (including amounts expended for meals and lodging) while away from home, whether paid directly or by reimbursement, unless there is no significant element of personal pleasure, recreation, or vacation in such travel."

SEC. 143. CHANGES IN TREATMENT OF HOBBY LOSS, ETC.

(a) HOBBY LOSS.—Subsection (d) of section 183 (relating to presumption) is amended—

(1) by striking out "2 or more of the taxable years in the period of 5 consecutive taxable years" and inserting in lieu thereof "3 or more of the taxable years in the period of 5 consecutive taxable years", and

(2) by striking out the last sentence and inserting in lieu thereof the following: "In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting '2' for '3' and '7' for '5'."

(b) TREATMENT OF RENTAL TO EMPLOYER UNDER SECTION 280A.—Subsection (c) of section 280A (relating to exceptions for certain business or rental use; limitation on deductions for such use) is amended by adding at the end thereof the following new paragraph:

"(6) TREATMENT OF RENTAL TO EMPLOYER.—Paragraphs (1) and (3) shall not apply to any item which is attributable to the rental of the dwelling unit (or any portion thereof) by the taxpayer to his employer during any period in which the taxpayer uses the dwelling unit (or portion) in performing services as an employee of the employer."

(c) REVISION OF LIMITATION ON DEDUCTION FOR BUSINESS USE OF HOME.—Paragraph (5) of section 280A(c) (relating to exceptions for certain business or rental use; limitation on deductions for such use) is amended by striking out subparagraph (B) and inserting in lieu thereof the following:

"(B) the sum of—

"(i) the deductions allocable to such use which are allowable under this chapter for the taxable year

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2121

whether or not such unit (or portion thereof) was so used, and

"(ii) the deductions allocable to the trade or business in which such use occurs (but which are not allocable to such use) for such taxable year.

Any amount not allowable as a deduction under this chapter by reason of the preceding sentence shall be taken into account as a deduction (allocable to such use) under this chapter for the succeeding taxable year."

**SEC. 144. DEDUCTION FOR MORTGAGE INTEREST AND REAL PROPERTY TAXES ALLOWABLE WHERE PARSONAGE ALLOWANCE OR MILITARY HOUSING ALLOWANCE RECEIVED.**

Section 265 (relating to expenses and interest relating to tax-exempt income) is amended by adding at the end thereof the following new paragraph:

"(6) SECTION NOT TO APPLY WITH RESPECT TO PARSONAGE AND MILITARY HOUSING ALLOWANCES.—No deduction shall be denied under this section for interest on a mortgage on, or real property taxes on, the home of the taxpayer by reason of the receipt of an amount as—

"(A) a military housing allowance, or

"(B) a parsonage allowance excludable from gross income under section 107."

# Subtitle F—Effective Dates

**SEC. 151. EFFECTIVE DATES.**

(a) GENERAL RULE.—Except as otherwise provided in this section, the amendments made by this title shall apply to taxable years beginning after December 31, 1986.

(b) UNEMPLOYMENT COMPENSATION.—The amendment made by section 121 shall apply to amounts received after December 31, 1986, in taxable years ending after such date.

(c) PRIZES AND AWARDS.—The amendments made by section 122 shall apply to prizes and awards granted after December 31, 1986.

(d) SCHOLARSHIPS.—The amendments made by section 123 shall apply to taxable years beginning after December 31, 1986, but only in the case of scholarships and fellowships granted after August 16, 1986.

(e) PARSONAGE AND MILITARY HOUSING ALLOWANCES.—The amendment made by section 144 shall apply to taxable years beginning before, on, or after, December 31, 1986.

# TITLE II—PROVISIONS RELATING TO CAPITAL COST

## Subtitle A—Depreciation Provisions

**SEC. 201. MODIFICATION OF ACCELERATED COST RECOVERY SYSTEM.**

(a) GENERAL RULE.—Section 168 (relating to accelerated cost recovery system) is amended to read as follows:

"SEC. 168. ACCELERATED COST RECOVERY SYSTEM.

"(a) GENERAL RULE.—Except as otherwise provided in this section, the depreciation deduction provided by section 167(a) for any tangible property shall be determined by using—

"(1) the applicable depreciation method,

"(2) the applicable recovery period, and

"(3) the applicable convention.

"(b) APPLICABLE DEPRECIATION METHOD.—For purposes of this section—

"(1) IN GENERAL.—Except as provided in paragraphs (2) and (3), the applicable depreciation method is—

"(A) the 200 percent declining balance method,

"(B) switching to the straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

"(2) 15-YEAR AND 20-YEAR PROPERTY.—In the case of 15-year and 20-year property, paragraph (1) shall be applied by substituting '150 percent' for '200 percent'.

"(3) PROPERTY TO WHICH STRAIGHT LINE METHOD APPLIES.—The applicable depreciation method shall be the straight line method in the case of the following property:

"(A) Nonresidential real property.

"(B) Residential rental property.

"(C) Property with respect to which the taxpayer elects under paragraph (5) to have the provisions of this paragraph apply.

"(4) SALVAGE VALUE TREATED AS ZERO.—Salvage value shall be treated as zero.

"(5) ELECTION.—An election under paragraph (3)(C) may be made with respect to 1 or more classes of property for any taxable year and once made with respect to any class shall apply to all property in such class placed in service during such taxable year. Such an election, once made, shall be irrevocable.

"(c) APPLICABLE RECOVERY PERIOD.—For purposes of this section, the applicable recovery period shall be determined in accordance with the following table:

| "In the case of: | The applicable recovery period is: |
|---|---|
| 3-year property | 3 years |
| 5-year property | 5 years |
| 7-year property | 7 years |
| 10-year property | 10 years |
| 15-year property | 15 years |
| 20-year property | 20 years |
| Residential rental property | 27.5 years |
| Nonresidential real property | 31.5 years. |

"(d) APPLICABLE CONVENTION.—For purposes of this section—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, the applicable convention is the half-year convention.

"(2) REAL PROPERTY.—In the case of—

"(A) nonresidential real property, and

"(B) residential rental property,

the applicable convention is the mid-month convention.

"(3) SPECIAL RULE WHERE SUBSTANTIAL PROPERTY PLACED IN SERVICE DURING LAST 3 MONTHS OF TAXABLE YEAR.—

"(A) IN GENERAL.—Except as provided in regulations, if during any taxable year—

"(i) the aggregate bases of property to which this section applies and which are placed in service during the last 3 months of the taxable year, exceed

"(ii) 40 percent of the aggregate bases of property to which this section applies placed in service during such taxable year,

the applicable convention for all property to which this section applies placed in service during such taxable year shall be the mid-quarter convention.

"(B) CERTAIN REAL PROPERTY NOT TAKEN INTO ACCOUNT.—For purposes of subparagraph (A), nonresidential real property and residential rental property shall not be taken into account.

"(4) DEFINITIONS.—

"(A) HALF-YEAR CONVENTION.—The half-year convention is a convention which treats all property placed in service during any taxable year (or disposed of during any taxable year) as placed in service (or disposed of) on the mid-point of such taxable year.

"(B) MID-MONTH CONVENTION.—The mid-month convention is a convention which treats all property placed in service during any month (or disposed of during any month) as placed in service (or disposed of) on the mid-point of such month.

"(C) MID-QUARTER CONVENTION.—The mid-quarter convention is a convention which treats all property placed in service during any quarter of a taxable year (or disposed of during any quarter of a taxable year) as placed in service (or disposed of) on the mid-point of such quarter.

"(e) CLASSIFICATION OF PROPERTY.—For purposes of this section—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, property shall be classified under the following table:

| "Property shall be treated as: | If such property has a class life (in years) of: |
|---|---|
| 3-year property | 4 or less |
| 5-year property | More than 4 but less than 10 |
| 7-year property | 10 or more but less than 16 |
| 10-year property | 16 or more but less than 20 |
| 15-year property | 20 or more but less than 25 |
| 20-year property | 25 or more. |

"(2) RESIDENTIAL RENTAL OR NONRESIDENTIAL REAL PROPERTY.—

"(A) RESIDENTIAL RENTAL PROPERTY.—The term 'residential rental property' has the meaning given such term by section 167(j)(2)(B).

"(B) NONRESIDENTIAL REAL PROPERTY.—The term 'nonresidential real property' means section 1250 property which is not—

"(i) residential rental property, or

"(ii) property with a class life of less than 27.5 years.

"(3) CLASSIFICATION OF CERTAIN PROPERTY.—

"(A) 3-YEAR PROPERTY.—The term '3-year property' includes—

"(i) any race horse which is more than 2 years old at the time it is placed in service, and

"(ii) any horse other than a race horse which is more than 12 years old at the time it is placed in service.

"(B) 5-YEAR PROPERTY.—The term '5-year property' includes—

"(i) any automobile or light general purpose truck,

"(ii) any semi-conductor manufacturing equipment,

"(iii) any computer-based telephone central office switching equipment,

"(iv) any qualified technological equipment,

"(v) any property used in connection with research and experimentation, and

"(vi) any property which—

"(I) is described in paragraph (3)(A)(viii), (3)(A)(ix), or (4) of section 48(l), or

"(II) is described in paragraph (15) of section 48(l) and is a qualifying small power production facility within the meaning of section 3(17)(C) of the Federal Power Act (16 U.S.C. 796(17)(C)), as in effect on September 1, 1986.

"(C) 7-YEAR PROPERTY.—The term '7-year property' includes—

"(i) any railroad track,

"(ii) any single-purpose agricultural or horticultural structure (within the meaning of section 48(p)), and

"(iii) any property which—

"(I) does not have a class life, and

"(II) is not otherwise classified under paragraph (2) or this paragraph.

"(D) 15-YEAR PROPERTY.—The term '15-year property' includes—

"(i) any municipal wastewater treatment plant, and

"(ii) any telephone distribution plant and comparable equipment used for 2-way exchange of voice and data communications.

"(E) 20-YEAR PROPERTY.—The term '20-year property' includes any municipal sewers.

"(f) PROPERTY TO WHICH SECTION DOES NOT APPLY.—This section shall not apply to—

"(1) CERTAIN METHODS OF DEPRECIATION.—Any property if—

"(A) the taxpayer elects to exclude such property from the application of this section, and

"(B) for the 1st taxable year for which a depreciation deduction would be allowable with respect to such property in the hands of the taxpayer, the property is properly depreciated under the unit-of-production method or any method of depreciation not expressed in a term of years (other than the retirement-replacement-betterment method or similar method).

"(2) CERTAIN PUBLIC UTILITY PROPERTY.—Any public utility property (within the meaning of section 167(l)(3)(A)) if the taxpayer does not use a normalization method of accounting.

"(3) FILMS AND VIDEO TAPE.—Any motion picture film or video tape.

"(4) SOUND RECORDINGS.—Any sound recording described in section 48(r)(5).

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2125

"(5) Certain property placed in service in churning trans-actions.—

"(A) In general.—Property—

"(i) described in paragraph (4) of section 168(e) (as in effect before the amendments made by the Tax Reform Act of 1986), or

"(ii) which would be described in such paragraph if such paragraph were applied by substituting '1987' for '1981' and '1986' for '1980' each place such terms appear.

"(B) Subparagraph (a) (ii) not to apply.—Clause (ii) of subparagraph (A) shall not apply to—

"(i) any residential rental property or nonresidential real property, or

"(ii) any property if, for the 1st full taxable year in which such property is placed in service—

"(I) the amount allowable as a deduction under this section (as in effect before the date of the enactment of this paragraph) with respect to such property is greater than,

"(II) the amount allowable as a deduction under this section (as in effect on or after such date and using the half-year convention) for such taxable year.

"(g) Alternative Depreciation System for Certain Property.—

"(1) In general.—In the case of—

"(A) any tangible property which during the taxable year is used predominantly outside the United States,

"(B) any tax-exempt use property,

"(C) any tax-exempt bond financed property,

"(D) any imported property covered by an Executive order under paragraph (6), and

"(E) any property to which an election under paragraph (7) applies,

the depreciation deduction provided by section 167(a) shall be determined under the alternative depreciation system.

"(2) Alternative depreciation system.—For purposes of paragraph (1), the alternative depreciation system is depreciation determined by using—

"(A) the straight line method (without regard to salvage value),

"(B) the applicable convention determined under subsection (d), and

"(C) a recovery period determined under the following table:

| "In the case of: | The recovery period shall be: |
|---|---|
| (i) Property not described in clause (ii) or (iii) | The class life. |
| (ii) Personal property with no class life | 12 years. |
| (iii) Nonresidential real and residential rental property | 40 years. |

"(3) Special rules for determining class life.—

"(A) Tax-exempt use property subject to lease.—In the case of any tax-exempt use property subject to a lease, the recovery period used for purposes of paragraph (2) shall in no event be less than 125 percent of the lease term.

PUBLIC LAW 99–514—OCT. 22, 1986

"(B) SPECIAL RULE FOR CERTAIN PROPERTY ASSIGNED TO CLASSES.—For purposes of paragraph (2), in the case of property described in any of the following subparagraphs of subsection (e)(3), the class life shall be determined as follows:

| "If property is described in subparagraph: | The class life is: |
| --- | --- |
| (B)(ii) | 5 |
| (B)(iii) | 9.5 |
| (C)(i) | 10 |
| (C)(ii) | 15 |
| (D)(i) | 24 |
| (D)(xii) | 24 |
| (E) | 50. |

"(C) QUALIFIED TECHNOLOGICAL EQUIPMENT.—In the case of any qualified technological equipment, the recovery period used for purposes of paragraph (2) shall be 5 years.

"(D) AUTOMOBILES, ETC.—In the case of any automobile or light general purpose truck, the recovery period used for purposes of paragraph (2) shall be 5 years.

"(E) CERTAIN REAL PROPERTY.—In the case of any section 1245 property which is real property with no class life, the recovery period used for purposes of paragraph (2) shall be 40 years.

"(4) PROPERTY USED PREDOMINANTLY OUTSIDE THE UNITED STATES.—For purposes of this subsection, rules similar to the rules under section 48(a)(2) (including the exceptions contained in subparagraph (B) thereof) shall apply in determining whether property is used predominantly outside the United States. In addition to the exceptions contained in such subparagraph (B), there shall be excepted any satellite or other spacecraft (or any interest therein) held by a United States person if such satellite or spacecraft was launched from within the United States.

"(5) TAX-EXEMPT BOND FINANCED PROPERTY.—For purposes of this subsection—

"(A) IN GENERAL.—Except as otherwise provided in this paragraph, the term 'tax-exempt bond financed property' means any property to the extent such property is financed (directly or indirectly) by an obligation the interest on which is exempt from tax under section 103(a).

"(B) ALLOCATION OF BOND PROCEEDS.—For purposes of subparagraph (A), the proceeds of any obligation shall be treated as used to finance property acquired in connection with the issuance of such obligation in the order in which such property is placed in service.

"(C) QUALIFIED RESIDENTIAL RENTAL PROJECTS.—The term 'tax-exempt bond financed property' shall not include any qualified residential rental project (within the meaning of section 142(a)(7)).

"(6) IMPORTED PROPERTY.—

"(A) COUNTRIES MAINTAINING TRADE RESTRICTIONS OR ENGAGING IN DISCRIMINATORY ACTS.—If the President determines that a foreign country—

"(i) maintains nontariff trade restrictions, including variable import fees, which substantially burden United States commerce in a manner inconsistent with provisions of trade agreements, or

PUBLIC LAW 99–514—OCT. 22, 1986      100 STAT. 2127

"(ii) engages in discriminatory or other acts (including tolerance of international cartels) or policies unjustifiably restricting United States commerce,
the President may by Executive order provide for the application of paragraph (1)(D) to any article or class of articles manufactured or produced in such foreign country for such period as may be provided by such Executive order. Any period specified in the preceding sentence shall not apply to any property ordered before (or the construction, reconstruction, or erection of which began before) the date of the Executive order unless the President determines an earlier date to be in the public interest and specifies such date in the Executive order.

"(B) IMPORTED PROPERTY.—For purposes of this subsection, the term 'imported property' means any property if—

"(i) such property was completed outside the United States, or

"(ii) less than 50 percent of the basis of such property is attributable to value added within the United States.
For purposes of this subparagraph, the term 'United States' includes the Commonwealth of Puerto Rico and the possessions of the United States.

"(7) ELECTION TO USE ALTERNATIVE DEPRECIATION SYSTEM.—

"(A) IN GENERAL.—If the taxpayer makes an election under this paragraph with respect to any class of property for any taxable year, the alternative depreciation system under this subsection shall apply to all property in such class placed in service during such taxable year. Notwithstanding the preceding sentence, in the case of nonresidential real property or residential rental property, such election may be made separately with respect to each property.

"(B) ELECTION IRREVOCABLE.—An election under subparagraph (A), once made, shall be irrevocable.

"(h) TAX-EXEMPT USE PROPERTY.—

"(1) IN GENERAL.—For purposes of this section—

"(A) PROPERTY OTHER THAN NONRESIDENTIAL REAL PROPERTY.—Except as otherwise provided in this subsection, the term 'tax-exempt use property' means that portion of any tangible property (other than nonresidential real property) leased to a tax-exempt entity.

"(B) NONRESIDENTIAL REAL PROPERTY.—

"(i) IN GENERAL.—In the case of nonresidential real property, the term 'tax-exempt use property' means that portion of the property leased to a tax-exempt entity in a disqualified lease.

"(ii) DISQUALIFIED LEASE.—For purposes of this subparagraph, the term 'disqualified lease' means any lease of the property to a tax-exempt entity, but only if—

"(I) part or all of the property was financed (directly or indirectly) by an obligation the interest on which is exempt from tax under section 103(a) and such entity (or a related entity) participated in such financing,

"(II) under such lease there is a fixed or determinable price purchase or sale option which in-

volves such entity (or a related entity) or there is the equivalent of such an option,

"(III) such lease has a lease term in excess of 20 years, or

"(IV) such lease occurs after a sale (or other transfer) of the property by, or lease of the property from, such entity (or a related entity) and such property has been used by such entity (or a related entity) before such sale (or other transfer) or lease.

"(iii) 35-PERCENT THRESHOLD TEST.—Clause (i) shall apply to any property only if the portion of such property leased to tax-exempt entities in disqualified leases is more than 35 percent of the property.

"(iv) TREATMENT OF IMPROVEMENTS.—For purposes of this subparagraph, improvements to a property (other than land) shall not be treated as a separate property.

"(v) LEASEBACKS DURING 1ST 3 MONTHS OF USE NOT TAKEN INTO ACCOUNT.—Subclause (IV) of clause (ii) shall not apply to any property which is leased within 3 months after the date such property is first used by the tax-exempt entity (or a related entity).

"(C) EXCEPTION FOR SHORT-TERM LEASES.—

"(i) IN GENERAL.—Property shall not be treated as tax-exempt use property merely by reason of a short-term lease.

"(ii) SHORT-TERM LEASE.—For purposes of clause (i), the term 'short-term lease' means any lease the term of which is—

"(I) less than 3 years, and

"(II) less than the greater of 1 year or 30 percent of the property's present class life.

In the case of nonresidential real property and property with no present class life, subclause (II) shall not apply.

"(D) EXCEPTION WHERE PROPERTY USED IN UNRELATED TRADE OR BUSINESS.—The term 'tax-exempt use property' shall not include any portion of a property if such portion is predominantly used by the tax-exempt entity (directly or through a partnership of which such entity is a partner) in an unrelated trade or business the income of which is subject to tax under section 511. For purposes of subparagraph (B)(iii), any portion of a property so used shall not be treated as leased to a tax-exempt entity in a disqualified lease.

"(E) NONRESIDENTIAL REAL PROPERTY DEFINED.—For purposes of this paragraph, the term 'nonresidential real property' includes residential rental property.

"(2) TAX-EXEMPT ENTITY.—

"(A) IN GENERAL.—For purposes of this subsection, the term 'tax-exempt entity' means—

"(i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing,

"(ii) an organization (other than a cooperative described in section 521) which is exempt from tax imposed by this chapter, and

"(iii) any foreign person or entity.

"(B) EXCEPTIONS FOR CERTAIN PROPERTY SUBJECT TO UNITED STATES TAX AND USED BY FOREIGN PERSON OR ENTITY.—

"(i) INCOME FROM PROPERTY SUBJECT TO UNITED STATES TAX.—Clause (iii) of subparagraph (A) shall not apply with respect to any property if more than 50 percent of the gross income for the taxable year derived by the foreign person or entity from the use of such property is—

"(I) subject to tax under this chapter, or

"(II) included under section 951 in the gross income of a United States shareholder for the taxable year with or within which ends the taxable year of the controlled foreign corporation in which such income was derived.

For purposes of the preceding sentence, any exclusion or exemption shall not apply for purposes of determining the amount of the gross income so derived, but shall apply for purposes of determining the portion of such gross income subject to tax under this chapter.

"(ii) MOVIES AND SOUND RECORDINGS.—Clause (iii) of subparagraph (A) shall not apply with respect to any qualified film (as defined in section 48(k)(1)(B)) or any sound recording (as defined in section 48(r)(5)).

"(C) FOREIGN PERSON OR ENTITY.—For purposes of this paragraph, the term 'foreign person or entity' means—

"(i) any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, and

"(ii) any person who is not a United States person. Such term does not include any foreign partnership or other foreign pass-thru entity.

"(D) TREATMENT OF CERTAIN TAXABLE INSTRUMENTALITIES.—For purposes of this subsection, a corporation shall not be treated as an instrumentality of the United States or of any State or political subdivision thereof if—

"(i) all of the activities of such corporation are subject to tax under this chapter, and

"(ii) a majority of the board of directors of such corporation is not selected by the United States or any State or political subdivision thereof.

"(E) CERTAIN PREVIOUSLY TAX-EXEMPT ORGANIZATIONS.—

"(i) IN GENERAL.—For purposes of this subsection, an organization shall be treated as an organization described in subparagraph (A)(ii) with respect to any property (other than property held by such organization) if such organization was an organization (other than a cooperative described in section 521) exempt from tax imposed by this chapter at any time during the 5-year period ending on the date such property was first used by such organization. The preceding sentence and subparagraph (D)(ii) shall not apply to the Federal Home Loan Mortgage Corporation.

"(ii) ELECTION NOT TO HAVE CLAUSE (I) APPLY.—

"(I) IN GENERAL.—In the case of an organization formerly exempt from tax under section 501(a) as an organization described in section 501(c)(12),

clause (i) shall not apply to such organization with respect to any property if such organization elects not to be exempt from tax under section 501(a) during the tax-exempt use period with respect to such property.

"(II) TAX-EXEMPT USE PERIOD.—For purposes of subclause (I), the term 'tax-exempt use period' means the period beginning with the taxable year in which the property described in subclause (I) is first used by the organization and ending with the close of the 15th taxable year following the last taxable year of the applicable recovery period of such property.

"(III) ELECTION.—Any election under subclause (I), once made, shall be irrevocable.

"(iii) TREATMENT OF SUCCESSOR ORGANIZATIONS.—Any organization which is engaged in activities substantially similar to those engaged in by a predecessor organization shall succeed to the treatment under this subparagraph of such predecessor organization.

"(iv) FIRST USED.—For purposes of this subparagraph, property shall be treated as first used by the organization—

"(I) when the property is first placed in service under a lease to such organization, or

"(II) in the case of property leased to (or held by) a partnership (or other pass-thru entity) in which the organization is a member, the later of when such property is first used by such partnership or pass-thru entity or when such organization is first a member of such partnership or pass-thru entity.

"(3) SPECIAL RULES FOR CERTAIN HIGH TECHNOLOGY EQUIPMENT.—

"(A) EXEMPTION WHERE LEASE TERM IS 5 YEARS OR LESS.—For purposes of this section, the term 'tax-exempt use property' shall not include any qualified technological equipment if the lease to the tax-exempt entity has a lease term of 5 years or less.

"(B) EXCEPTION FOR CERTAIN PROPERTY.—

"(i) IN GENERAL.—For purposes of subparagraph (A), the term 'qualified technological equipment' shall not include any property leased to a tax-exempt entity if—

"(I) part or all of the property was financed (directly or indirectly) by an obligation the interest on which is exempt from tax under section 103(a),

"(II) such lease occurs after a sale (or other transfer) of the property by, or lease of such property from, such entity (or related entity) and such property has been used by such entity (or a related entity) before such sale (or other transfer) or lease, or

"(III) such tax-exempt entity is the United States or any agency or instrumentality of the United States.

"(ii) LEASEBACKS DURING 1ST 3 MONTHS OF USE NOT TAKEN INTO ACCOUNT.—Subclause (II) of clause (i) shall not apply to any property which is leased within 3

months after the date such property is first used by the tax-exempt entity (or a related entity).

"(4) RELATED ENTITIES.—For purposes of this subsection—

"(A)(i) Each governmental unit and each agency or instrumentality of a governmental unit is related to each other such unit, agency, or instrumentality which directly or indirectly derives its powers, rights, and duties in whole or in part from the same sovereign authority.

"(ii) For purposes of clause (i), the United States, each State, and each possession of the United States shall be treated as a separate sovereign authority.

"(B) Any entity not described in subparagraph (A)(i) is related to any other entity if the 2 entities have—

"(i) significant common purposes and substantial common membership, or

"(ii) directly or indirectly substantial common direction or control..

"(C)(i) An entity is related to another entity if either entity owns (directly or through 1 or more entities) a 50 percent or greater interest in the capital or profits of the other entity.

"(ii) For purposes of clause (i), entities treated as related under subparagraph (A) or (B) shall be treated as 1 entity.

"(D) An entity is related to another entity with respect to a transaction if such transaction is part of an attempt by such entities to avoid the application of this subsection.

"(5) TAX-EXEMPT USE OF PROPERTY LEASED TO PARTNERSHIPS, ETC., DETERMINED AT PARTNER LEVEL.—For purposes of this subsection—

"(A) IN GENERAL.—In the case of any property which is leased to a partnership, the determination of whether any portion of such property is tax-exempt use property shall be made by treating each tax-exempt entity partner's proportionate share (determined under paragraph (6)(C)) of such property as being leased to such partner.

"(B) OTHER PASS-THRU ENTITIES; TIERED ENTITIES.—Rules similar to the rules of subparagraph (A) shall also apply in the case of any pass-thru entity other than a partnership and in the case of tiered partnerships and other entities.

"(C) PRESUMPTION WITH RESPECT TO FOREIGN ENTITIES.—Unless it is otherwise established to the satisfaction of the Secretary, it shall be presumed that the partners of a foreign partnership (and the beneficiaries of any other foreign pass-thru entity) are persons who are not United States persons.

"(6) TREATMENT OF PROPERTY OWNED BY PARTNERSHIPS, ETC.—

"(A) IN GENERAL.—For purposes of this subsection, if—

"(i) any property which (but for this subparagraph) is not tax-exempt use property is owned by a partnership which has both a tax-exempt entity and a person who is not a tax-exempt entity as partners, and

"(ii) any allocation to the tax-exempt entity of partnership items is not a qualified allocation,

an amount equal to such tax-exempt entity's proportionate share of such property shall (except as provided in paragraph (1)(D)) be treated as tax-exempt use property.

"(B) QUALIFIED ALLOCATION.—For purposes of subparagraph (A), the term 'qualified allocation' means any allocation to a tax-exempt entity which—

"(i) is consistent with such entity's being allocated the same distributive share of each item of income, gain, loss, deduction, credit, and basis and such share remains the same during the entire period the entity is a partner in the partnership, and

"(ii) has substantial economic effect within the meaning of section 704(b)(2).

For purposes of this subparagraph, items allocated under section 704(c) shall not be taken into account.

"(C) DETERMINATION OF PROPORTIONATE SHARE.—

"(i) IN GENERAL.—For purposes of subparagraph (A), a tax-exempt entity's proportionate share of any property owned by a partnership shall be determined on the basis of such entity's share of partnership items of income or gain (excluding gain allocated under section 704(c)), whichever results in the largest proportionate share.

"(ii) DETERMINATION WHERE ALLOCATIONS VARY.—For purposes of clause (i), if a tax-exempt entity's share of partnership items of income or gain (excluding gain allocated under section 704(c)) may vary during the period such entity is a partner in the partnership, such share shall be the highest share such entity may receive.

"(D) DETERMINATION OF WHETHER PROPERTY USED IN UNRELATED TRADE OR BUSINESS.—For purposes of this subsection, in the case of any property which is owned by a partnership which has both a tax-exempt entity and a person who is not a tax-exempt entity as partners, the determination of whether such property is used in an unrelated trade or business of such an entity shall be made without regard to section 514.

"(E) OTHER PASS-THRU ENTITIES; TIERED ENTITIES.—Rules similar to the rules of subparagraphs (A), (B), (C), and (D) shall also apply in the case of any pass-thru entity other than a partnership and in the case of tiered partnerships and other entities.

"(F) TREATMENT OF CERTAIN TAXABLE ENTITIES.—

"(i) IN GENERAL.—For purposes of this paragraph and paragraph (5), except as otherwise provided in this subparagraph, any tax-exempt controlled entity shall be treated as a tax-exempt entity.

"(ii) ELECTION.—If a tax-exempt controlled entity makes an election under this clause—

"(I) such entity shall not be treated as a tax-exempt entity for purposes of this paragraph and paragraph (5), and

"(II) any gain recognized by a tax-exempt entity on any disposition of an interest in such entity (and any dividend or interest received or accrued by a tax-exempt entity from such tax-exempt controlled entity) shall be treated as unrelated business taxable income for purposes of section 511.

Any such election shall be irrevocable and shall bind all tax-exempt entities holding interests in such tax-exempt controlled entity. For purposes of subclause (II), there shall only be taken into account dividends which are properly allocable to income of the tax-exempt controlled entity which was not subject to tax under this chapter.

"(iii) TAX-EXEMPT CONTROLLED ENTITY.—

"(I) IN GENERAL.—The term 'tax-exempt controlled entity' means any corporation (which is not a tax-exempt entity determined without regard to this subparagraph and paragraph (2)(E)) if 50 percent or more (in value) of the stock in such corporation is held by 1 or more tax-exempt entities (other than a foreign person or entity).

"(II) ONLY 5-PERCENT SHAREHOLDERS TAKEN INTO ACCOUNT IN CASE OF PUBLICLY TRADED STOCK.—For purposes of subclause (I), in the case of a corporation the stock of which is publicly traded on an established securities market, stock held by a tax-exempt entity shall not be taken into account unless such entity holds at least 5 percent (in value) of the stock in such corporation. For purposes of this subclause, related entities (within the meaning of paragraph (4)) shall be treated as 1 entity.

"(III) SECTION 318 TO APPLY.—For purposes of this clause, a tax-exempt entity shall be treated as holding stock which it holds through application of section 318 (determined without regard to the 50-percent limitation contained in subsection (a)(2)(C) thereof).

"(G) REGULATIONS.—For purposes of determining whether there is a qualified allocation under subparagraph (B), the regulations prescribed under paragraph (8) for purposes of this paragraph—

"(i) shall set forth the proper treatment for partnership guaranteed payments, and

"(ii) may provide for the exclusion or segregation of items.

"(7) LEASE.—For purposes of this subsection, the term 'lease' includes any grant of a right to use property.

"(8) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection.

"(i) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

"(1) CLASS LIFE.—

"(A) IN GENERAL.—Except as provided in this section, the term 'class life' means the class life (if any) which would be applicable with respect to any property as of January 1, 1986, under subsection (m) of section 167 (determined without regard to paragraph (4) thereof and as if the taxpayer had made an election under such subsection).

"(B) SECRETARIAL AUTHORITY.—The Secretary, through an office established in the Treasury—

PUBLIC LAW 99–514—OCT. 22, 1986

"(i) shall monitor and analyze actual experience with respect to all depreciable assets, and

"(ii) except in the case of residential rental property or nonresidential real property—

"(I) may prescribe a new class life for any property,

"(II) in the case of assigned property, may modify any assigned item, or

"(III) may prescribe a class life for any property which does not have a class life within the meaning of subparagraph (A).

Any class life or assigned item prescribed or modified under the preceding sentence shall reasonably reflect the anticipated useful life, and the anticipated decline in value over time, of the property to the industry or other group.

"(C) EFFECT OF MODIFICATION.—Any class life or assigned item with respect to any property prescribed or modified under subparagraph (B) shall be used in classifying such property under subsection (e) and in applying subsection (g).

"(D) NO MODIFICATION OF ASSIGNED PROPERTY BEFORE JANUARY 1, 1992.—

"(i) IN GENERAL.—Except as otherwise provided in this subparagraph, the Secretary may not modify an assigned item under subparagraph (B)(ii)(II) for any assigned property which is placed in service before January 1, 1992.

"(ii) EXCEPTION FOR SHORTER CLASS LIFE.—In the case of assigned property which is placed in service before January 1, 1992, and for which the assigned item reflects a class life which is shorter than the class life under subparagraph (A), the Secretary may modify such assigned item under subparagraph (B)(ii)(II) if such modification results in an item which reflects a shorter class life than such assigned item.

"(E) ASSIGNED PROPERTY AND ITEM.—For purposes of this paragraph—

"(i) ASSIGNED PROPERTY.—The term 'assigned property' means property for which a class life, classification, or recovery period is assigned under subsection (e)(3) or subparagraph (B), (C), or (D) of subsection (g)(3).

"(ii) ASSIGNED ITEM.—The term 'assigned item' means the class life, classification, or recovery period assigned under subsection (e)(3) or subparagraph (B), (C), or (D) of subsection (g)(3).

"(2) QUALIFIED TECHNOLOGICAL EQUIPMENT.—

"(A) IN GENERAL.—The term 'qualified technological equipment' means—

"(i) any computer or peripheral equipment,

"(ii) any high technology telephone station equipment installed on the customer's premises, and

"(iii) any high technology medical equipment.

"(B) COMPUTER OR PERIPHERAL EQUIPMENT DEFINED.—For purposes of this paragraph—

"(i) IN GENERAL.—The term 'computer or peripheral equipment' means—

"(I) any computer, and

"(II) any related peripheral equipment.

"(ii) COMPUTER.—The term 'computer' means a programmable electronically activated device which—

"(I) is capable of accepting information, applying prescribed processes to the information, and supplying the results of these processes with or without human intervention, and

"(II) consists of a central processing unit containing extensive storage, logic, arithmetic, and control capabilities.

"(iii) RELATED PERIPHERAL EQUIPMENT.—The term 'related peripheral equipment' means any auxiliary machine (whether on-line or off-line) which is designed to be placed under the control of the central processing unit of a computer.

"(iv) EXCEPTIONS.—The term 'computer or peripheral equipment' shall not include—

"(I) any equipment which is an integral part of other property which is not a computer,

"(II) typewriters, calculators, adding and accounting machines, copiers, duplicating equipment, and similar equipment, and

"(III) equipment of a kind used primarily for amusement or entertainment of the user.

"(C) HIGH TECHNOLOGY MEDICAL EQUIPMENT.—For purposes of this paragraph, the term 'high technology medical equipment' means any electronic, electromechanical, or computer-based high technology equipment used in the screening, monitoring, observation, diagnosis, or treatment of patients in a laboratory, medical, or hospital environment.

"(3) LEASE TERM.—

"(A) IN GENERAL.—In determining a lease term—

"(i) there shall be taken into account options to renew, and

"(ii) 2 or more successive leases which are part of the same transaction (or a series of related transactions) with respect to the same or substantially similar property shall be treated as 1 lease.

"(B) SPECIAL RULE FOR FAIR RENTAL OPTIONS ON NONRESIDENTIAL REAL PROPERTY OR RESIDENTIAL RENTAL PROPERTY.—For purposes of clause (i) of subparagraph (A), in the case of nonresidential real property or residential rental property, there shall not be taken into account any option to renew at fair market value, determined at the time of renewal.

"(4) GENERAL ASSET ACCOUNTS.—Under regulations, a taxpayer may maintain 1 or more general asset accounts for any property to which this section applies. Except as provided in regulations, all proceeds realized on any disposition of property in a general asset account shall be included in income as ordinary income.

"(5) CHANGES IN USE.—The Secretary shall, by regulations, provide for the method of determining the deduction allowable under section 167(a) with respect to any tangible property for any taxable year (and the succeeding taxable years) during which such property changes status under this section but continues to be held by the same person.

"(6) TREATMENTS OF ADDITIONS OR IMPROVEMENTS TO PROPERTY.—In the case of any addition to (or improvement of) any property—

"(A) any deduction under subsection (a) for such addition or improvement shall be computed in the same manner as the deduction for such property would be computed if such property had been placed in service at the same time as such addition or improvement, and

"(B) the applicable recovery period for such addition or improvement shall begin on the later of—

"(i) the date on which such addition (or improvement) is placed in service, or

"(ii) the date on which the property with respect to which such addition (or improvement) was made is placed in service.

"(7) TREATMENT OF CERTAIN TRANSFEREES.—

"(A) IN GENERAL.—In the case of any property transferred in a transaction described in subparagraph (B), the transferee shall be treated as the transferor for purposes of computing the depreciation deduction determined under this section with respect to so much of the basis in the hands of the transferee as does not exceed the adjusted basis in the hands of the transferor.

"(B) TRANSACTIONS COVERED.—The transactions described in this subparagraph are any transaction described in section 332, 351, 361, 371(a), 374(a), 721, or 731. Subparagraph (A) shall not apply in the case of a termination of a partnership under section 708(b)(1)(B).

"(C) PROPERTY REACQUIRED BY THE TAXPAYER.—Under regulations, property which is disposed of and then reacquired by the taxpayer shall be treated for purposes of computing the deduction allowable under subsection (a) as if such property had not been disposed of.

"(D) EXCEPTION.—This paragraph shall not apply to any transaction to which subsection (f)(5) applies (relating to churning transactions).

"(8) TREATMENT OF LEASEHOLD IMPROVEMENTS.—In the case of any building erected (or improvements made) on leased property, if such building or improvement is property to which this section applies, the depreciation deduction shall be determined under the provisions of this section.

"(9) NORMALIZATION RULES.—

"(A) IN GENERAL.—In order to use a normalization method of accounting with respect to any public utility property for purposes of subsection (f)(2)—

"(i) the taxpayer must, in computing its tax expense for purposes of establishing its cost of service for rate-making purposes and reflecting operating results in its regulated books of account, use a method of depreciation with respect to such property that is the same as, and a depreciation period for such property that is no shorter than, the method and period used to compute its depreciation expense for such purposes; and

"(ii) if the amount allowable as a deduction under this section with respect to such property differs from the amount that would be allowable as a deduction under section 167 (determined without regard to sec-

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2137

tion 167(l)) using the method (including the period, first and last year convention, and salvage value) used to compute regulated tax expense under clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from such difference.

"(B) USE OF INCONSISTENT ESTIMATES AND PROJECTIONS, ETC.—

"(i) IN GENERAL.—One way in which the requirements of subparagraph (A) are not met is if the taxpayer, for ratemaking purposes, uses a procedure or adjustment which is inconsistent with the requirements of subparagraph (A).

"(ii) USE OF INCONSISTENT ESTIMATES AND PROJECTIONS.—The procedures and adjustments which are to be treated as inconsistent for purposes of clause (i) shall include any procedure or adjustment for ratemaking purposes which uses an estimate or projection of the taxpayer's tax expense, depreciation expense, or reserve for deferred taxes under subparagraph (A)(ii) unless such estimate or projection is also used, for ratemaking purposes, with respect to the other 2 such items and with respect to the rate base.

"(iii) REGULATORY AUTHORITY.—The Secretary may by regulations prescribe procedures and adjustments (in addition to those specified in clause (ii)) which are to be treated as inconsistent for purposes of clause (i).

"(C) PUBLIC UTILITY PROPERTY WHICH DOES NOT MEET NORMALIZATION RULES.—In the case of any public utility property to which this section does not apply by reason of subsection (f)(2), the allowance for depreciation under section 167(a) shall be an amount computed using the method and period referred to in subparagraph (A)(i).

"(10) PUBLIC UTILITY PROPERTY.—The term 'public utility property' has the meaning given such term by section 167(l)(3)(A).

"(11) RESEARCH AND EXPERIMENTATION.—The term 'research and experimentation' has the same meaning as the term research and experimental has under section 174.

"(12) SECTION 1245 AND 1250 PROPERTY.—The terms 'section 1245 property' and 'section 1250 property' have the meanings given such terms by sections 1245(a)(3) and 1250(c), respectively."

(b) SYSTEM USED FOR PURPOSES OF EARNINGS AND PROFITS.—Paragraph (3) of section 312(k) is amended to read as follows:

"(3) EXCEPTION FOR TANGIBLE PROPERTY.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), in the case of tangible property to which section 168 applies, the adjustment to earnings and profits for depreciation for any taxable year shall be determined under the alternative depreciation system (within the meaning of section 168(g)(2)).

"(B) TREATMENT OF AMOUNTS DEDUCTIBLE UNDER SECTION 179.—For purposes of computing the earnings and profits of a corporation, any amount deductible under section 179 shall be allowed as a deduction ratably over the period of 5 taxable years (beginning with the taxable year for which such amount is deductible under section 179)."

(c) CONTINUATION OF RULES RELATING TO MOTOR VEHICLE OPERATING LEASES.—Section 7701 is amended by redesignating subsection (h) as subsection (i) and by inserting after subsection (g) the following new subsection:

"(h) MOTOR VEHICLE OPERATING LEASES.—

"(1) IN GENERAL.—For purposes of this title, in the case of a qualified motor vehicle operating agreement which contains a terminal rental adjustment clause—

"(A) such agreement shall be treated as a lease if (but for such terminal rental adjustment clause) such agreement would be treated as a lease under this title, and

"(B) the lessee shall not be treated as the owner of the property subject to an agreement during any period such agreement is in effect.

"(2) QUALIFIED MOTOR VEHICLE OPERATING AGREEMENT DEFINED.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'qualified motor vehicle operating agreement' means any agreement with respect to a motor vehicle (including a trailer) which meets the requirements of subparagraphs (B), (C), and (D) of this paragraph.

"(B) MINIMUM LIABILITY OF LESSOR.—An agreement meets the requirements of this subparagraph if under such agreement the sum of—

"(i) the amount the lessor is personally liable to repay, and

"(ii) the net fair market value of the lessor's interest in any property pledged as security for property subject to the agreement,

equals or exceeds all amounts borrowed to finance the acquisition of property subject to the agreement. There shall not be taken into account under clause (ii) any property pledged which is property subject to the agreement or property directly or indirectly financed by indebtedness secured by property subject to the agreement.

"(C) CERTIFICATION BY LESSEE; NOTICE OF TAX OWNERSHIP.—An agreement meets the requirements of this subparagraph if such agreement contains a separate written statement separately signed by the lessee—

"(i) under which the lessee certifies, under penalty of perjury, that it intends that more than 50 percent of the use of the property subject to such agreement is to be in a trade or business of the lessee, and

"(ii) which clearly and legibly states that the lessee has been advised that it will not be treated as the owner of the property subject to the agreement for Federal income tax purposes.

"(D) LESSOR MUST HAVE NO KNOWLEDGE THAT CERTIFICATION IS FALSE.—An agreement meets the requirements of this subparagraph if the lessor does not know that the certification described in subparagraph (C)(i) is false.

"(3) TERMINAL RENTAL ADJUSTMENT CLAUSE DEFINED.—

"(A) IN GENERAL.—For purposes of this subsection, the term 'terminal rental adjustment clause' means a provision of an agreement which permits or requires the rental price to be adjusted upward or downward by reference to the

amount realized by the lessor under the agreement upon sale or other disposition of such property.

"(B) SPECIAL RULE FOR LESSEE DEALERS.—The term 'terminal rental adjustment clause' also includes a provision of an agreement which requires a lessee who is a dealer in motor vehicles to purchase the motor vehicle for a predetermined price and then resell such vehicle where such provision achieves substantially the same results as a provision described in subparagraph (A)."

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) SECTION 167.—Paragraph (4) of section 167(m) (relating to termination of class lives) is amended to read as follows:

"(4) TERMINATION.—This subsection shall not apply with respect to any property to which section 168 applies."

(2) SECTION 178.—

(A) Section 178 is amended to read as follows:

"SEC. 178. AMORTIZATION OF COST OF ACQUIRING A LEASE.

"(a) GENERAL RULE.—In determining the amount of the deduction allowable to a lessee of a lease for any taxable year for amortization under section 167, 169, 179, 185, 190, 193, or 194 in respect of any cost of acquiring the lease, the term of the lease shall be treated as including all renewal options (and any other period for which the parties reasonably expect the lease to be renewed) if less than 75 percent of such cost is attributable to the period of the term of the lease remaining on the date of its acquisition.

"(b) CERTAIN PERIODS EXCLUDED.—For purposes of subsection (a), in determining the period of the term of the lease remaining on the date of acquisition, there shall not be taken into account any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee."

(B) The table of sections for part VI of subchapter B of chapter 1 is amended by striking out the item relating to section 178 and inserting in lieu thereof the following new item:

"Sec. 178. Amortization of cost of acquiring a lease."

(3) SECTION 179.—Paragraph (8) of section 179(d) is amended to read as follows:

"(8) TREATMENT OF PARTNERSHIPS AND S CORPORATIONS.—In the case of a partnership, the limitations of subsection (b) shall apply with respect to the partnership and with respect to each partner. A similar rule shall apply in the case of an S corporation and its shareholders."

(4) SECTION 280F.—

(A) Paragraph (2) of section 280F(a) (relating to depreciation) is amended—

(i) by striking out clauses (i) and (ii) of subparagraph (A) thereof and inserting in lieu thereof the following new clauses:

"(i) $2,560 for the 1st taxable year in the recovery period,

"(ii) $4,100 for the 2nd taxable year in the recovery period,

"(iii) $2,450 for the 3rd taxable year in the recovery period, and

"(iv) $1,475 for each succeeding taxable year in the recovery period.", and

(ii) by striking out "$4,800" each place it appears in subparagraph (B) thereof and inserting in lieu thereof "$1,475".

(B) Subparagraph (A) of section 280F(b)(3) (relating to recapture) is amended by striking out "the straight line method over the earnings and profits life" and inserting in lieu thereof "section 168(g) (relating to alternative depreciation system)".

(C) Paragraph (4) of section 280F(b) (relating to definitions) is amended to read as follows:

"(4) PROPERTY PREDOMINANTLY USED IN QUALIFIED BUSINESS USE.—For purposes of this subsection, property shall be treated as predominantly used in a qualified business use for any taxable year if the business use percentage for such taxable year exceeds 50 percent."

(D) Paragraph (4) of section 280F(c) is amended by striking out "section 168(j)(6)(B)" and inserting in lieu thereof "section 168(i)(3)(A)".

(E) Paragraph (1) of section 280F(d) is amended by striking out "recovery deduction" and inserting in lieu thereof "depreciation deduction".

(F) Paragraph (2) of section 280F(d) is amended—

(i) by striking out "recovery deduction" and inserting in lieu thereof "depreciation deduction", and

(ii) by striking out "use described in section 168(c)(1) (defining recovery property)" and inserting in lieu thereof "use in a trade or business (including the holding for the production of income)".

(G) Clause (iv) of section 280F(d)(4)(A) is amended by striking out "section 168(j)(5)(D)" and inserting in lieu thereof "section 168(i)(2)(B)".

(H) Paragraph (8) of section 280F(d) (defining unrecovered basis) is amended to read as follows:

"(8) UNRECOVERED BASIS.—For purposes of subsection (a)(2), the term 'unrecovered basis' means the adjusted basis of the passenger automobile determined after the application of subsection (a) and as if all use during the recovery period were use in a trade or business (including the holding of property for the production of income)."

(I) Paragraph (10) of section 280F(d) is amended by striking out ", notwithstanding any regulations prescribed under section 168(f)(7),".

(J) Paragraph (2) of section 280F(b) is amended by striking out "the straight line method over the earnings and profits life for such property" and inserting in lieu thereof "section 168(g) (relating to alternative depreciation system)".

(K) Subsections (a) and (b) of section 280F are amended by striking out "recovery deduction" each place it appears and inserting in lieu thereof "depreciation deduction".

(5) SECTION 291.—

(A) Subparagraph (A) of section 291(a)(1) is amended by striking out "or section 1245 recovery property".

(B) Paragraph (1) of section 291(c) is amended to read as follows:

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2141

"(1) ACCELERATED COST RECOVERY DEDUCTION.—Section 168 shall apply with respect to that portion of the basis of any property not taken into account under section 169 by reason of subsection (a)(5)."

(C) Section 291(e)(2) is amended by striking out ", 'section 1245 recovery property'," and ", section 1245(a)(5),".

(6) SECTION 312.—Paragraph (4) of section 312(k) is amended by striking out the last sentence.

(7) SECTION 465.—

(A) Subparagraph (C) of section 465(b)(3) is amended to read as follows:

"(C) RELATED PERSON.—For purposes of this subsection, a person (hereinafter in this paragraph referred to as the 'related person') is related to any person if—

"(i) the related person bears a relationship to such person specified in section 267(b) or section 707(b)(1), or

"(ii) the related person and such person are engaged in trades or business under common control (within the meaning of subsections (a) and (b) of section 52).

For purposes of clause (i), in applying section 267(b) or 707(b)(1), '10 percent' shall be substituted for '50 percent'."

(B) Section 46(c)(8)(D)(v) is amended by striking out "section 168(e)(4)" and inserting in lieu thereof "section 465(b)(3)(C)".

(C) Section 4162(c)(3) is amended by striking out "section 168(e)(4)(D)" and inserting in lieu thereof "section 465(b)(3)(C)".

(8) SECTION 467.—

(A) Paragraph (3) of section 467(e) is amended to read as follows:

"(3) STATUTORY RECOVERY PERIOD.—

"(A) IN GENERAL.—

| "In the case of: | The statutory recovery period is: |
|---|---|
| 3-year property | 3 years |
| 5-year property | 5 years |
| 7-year property | 7 years |
| 10-year property | 10 years |
| 15-year and 20-year property | 15 years |
| Residential rental property and nonresidential real property | 19 years. |

"(B) SPECIAL RULE FOR PROPERTY NOT DEPRECIABLE UNDER SECTION 168.—In the case of property to which section 168 does not apply, subparagraph (A) shall be applied as if section 168 applies to such property."

(B) Paragraph (5) of section 467(e) (defining related person) is amended by striking out "section 168(e)(4)(D)" and inserting in lieu thereof "section 465(b)(3)(C)".

(9) SECTION 514.—Subclause (II) of section 514(c)(9)(B)(vi) (relating to real property acquired by a qualified organization) is amended by striking out "section 168(j)(9)" and inserting in lieu thereof "section 168(h)(6)".

(10) SECTION 751.—Subsection (c) of section 751 (defining unrealized receivables) is amended by striking out "section 1245 recovery property (as defined in section 1245(a)(5)),".

(11) SECTION 1245.—

(A) Paragraph (1) of section 1245(a) (relating to gain from dispositions of certain depreciable property) is amended by striking out "during a taxable year beginning after December 31, 1962, or section 1245 recovery property is disposed of after December 31, 1980,".

(B) Paragraph (2) of section 1245(a) (defining recomputed basis) is amended to read as follows:

"(2) RECOMPUTED BASIS.—For purposes of this section—

"(A) IN GENERAL.—The term 'recomputed basis' means, with respect to any property, its adjusted basis recomputed by adding thereto all adjustments reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation or amortization.

"(B) TAXPAYER MAY ESTABLISH AMOUNT ALLOWED.—For purposes of subparagraph (A), if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation or amortization for any period was less than the amount allowable, the amount added for such period shall be the amount allowed.

"(C) CERTAIN DEDUCTIONS TREATED AS AMORTIZATION.—Any deduction allowable under section 179, 190, or 193 shall be treated as if it were a deduction allowable for amortization."

(C) Paragraph (3) of section 1245(a) (defining section 1245 property) is amended by striking out subparagraph (C) and by redesignating subparagraphs (D), (E), and (F) as subparagraphs (C), (D), and (E), respectively.

(D) Subsection (a) of section 1245 is amended by striking out paragraphs (5) and (6).

(12) SECTION 4162.—Paragraph (3) of section 4162(c) (defining related person) is amended by striking out "section 168(e)(4)(D)" and inserting in lieu thereof "section 465(b)(3)(C)".

(13) SECTION 6111.—Clause (ii) of section 6111(c)(3)(B) (relating to certain borrowed amounts excluded) is amended by striking out "section 168(e)(4)" and inserting in lieu thereof "section 465(b)(3)(C)".

(14) SECTION 7701.—

(A) Subparagraph (A) of section 7701(e)(4) is amended by striking out "section 168(j)" and inserting in lieu thereof "section 168(h)".

(B) Paragraph (5) of section 7701(e) (relating to exception for certain low-income housing) is amended by striking out "low-income housing (section 168(c)(2)(F))" and inserting in lieu thereof "property described in clause (i), (ii), (iii), or (iv) of section 1250(a)(1)(B) (relating to low-income housing)".

## SEC. 202. EXPENSING OF DEPRECIABLE ASSETS.

(a) LIMITATIONS ON EXPENSING.—Subsection (b) of section 179 (relating o election to expense certain depreciable assets) is amended to read as follows:

"(b) LIMITATIONS.—

"(1) DOLLAR LIMITATION.—The aggregate cost which may be taken into account under subsection (a) for any taxable year shall not exceed $10,000.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2143

"(2) REDUCTION IN LIMITATION.—The limitation under paragraph (1) for any taxable year shall be reduced (but not below zero) by the amount by which the cost of section 179 property placed in service during such taxable year exceeds $200,000.

"(3) LIMITATION BASED ON INCOME FROM TRADE OR BUSINESS.—

"(A) IN GENERAL.—The aggregate cost of section 179 property taken into account under subsection (a) for any taxable year shall not exceed the aggregate amount of taxable income of the taxpayer for such taxable year which is derived from the active conduct by the taxpayer of any trade or business during such taxable year.

"(B) CARRYOVER OF UNUSED COST.—The amount of any cost which (but for subparagraph (A)) would have been allowed as a deduction under subsection (a) for any taxable year shall be carried to the succeeding taxable year and added to the amount allowable as a deduction under subsection (a) for such succeeding taxable year.

"(C) COMPUTATION OF TAXABLE INCOME.—For purposes of this paragraph, taxable income derived from the conduct of a trade or business shall be computed without regard to the cost of any section 179 property.

"(4) MARRIED INDIVIDUALS FILING SEPARATELY.—In the case of a husband and wife filing separate returns for the taxable year—

"(A) such individuals shall be treated as 1 taxpayer for purposes of paragraphs (1) and (2), and

"(B) unless such individuals elect otherwise, 50 percent of the cost which may be taken into account under subsection (a) for such taxable year (before application of paragraph (3)) shall be allocated to each such individual."

(b) SECTION 179 PROPERTY.—Paragraph (1) of section 179(d) (defining section 179 property) is amended by inserting "in the active conduct of" after "purchase for use".

(c) RECAPTURE.—Section 179(d)(10) (relating to recapture in certain cases) is amended by striking out all that follows "at any time" and inserting in lieu thereof a period.

SEC. 203. EFFECTIVE DATES; GENERAL TRANSITIONAL RULES.

(a) GENERAL EFFECTIVE DATES.—

(1) SECTION 201.—

(A) IN GENERAL.—Except as provided in this section, section 204, and section 251(d), the amendments made by section 201 shall apply to property placed in service after December 31, 1986, in taxable years ending after such date.

(B) ELECTION TO HAVE AMENDMENTS MADE BY SECTION 201 APPLY.—A taxpayer may elect (at such time and in such manner as the Secretary of the Treasury or his delegate may prescribe) to have the amendments made by section 201 apply to any property placed in service after July 31, 1986, and before January 1, 1987.

(2) SECTION 202.—The amendments made by section 202 shall apply to property placed in service after December 31, 1986, in taxable years ending after such date.

(b) GENERAL TRANSITIONAL RULE.—

(1) IN GENERAL.—The amendments made by section 201 shall not apply to—

(A) any property which is constructed, reconstructed, or acquired by the taxpayer pursuant to a written contract which was binding on March 1, 1986,

(B) property which is constructed or reconstructed by the taxpayer if—

(i) the lesser of (I) $1,000,000, or (II) 5 percent of the cost of such property has been incurred or committed by March 1, 1986, and

(ii) the construction or reconstruction of such property began by such date, or

(C) an equipped building or plant facility if construction has commenced as of March 1, 1986, pursuant to a written specific plan and more than one-half of the cost of such equipped building or facility has been incurred or committed by such date.

(2) REQUIREMENT THAT CERTAIN PROPERTY BE PLACED IN SERVICE BEFORE CERTAIN DATE.—

(A) IN GENERAL.—Paragraph (1) and section 204(a) (other than paragraph (8) or (12) thereof) shall not apply to any property unless such property has a class life of at least 7 years and is placed in service before the applicable date determined under the following table:

| In the case of property with a class life of: | The applicable date is: |
|---|---|
| At least 7 but less than 20 years | January 1, 1989 |
| 20 years or more | January 1, 1991. |

(B) RESIDENTIAL RENTAL AND NONRESIDENTIAL REAL PROPERTY.—In the case of residential rental property and nonresidential real property, the applicable date is January 1, 1991.

(C) CLASS LIVES.—For purposes of subparagraph (A)—

(i) the class life of property to which section 168(g)(3)(B) of the Internal Revenue Code of 1986 (as added by section 201) shall be the class life in effect on January 1, 1986, except that computer-based telephone central office switching equipment described in section 168(e)(3)(B)(iii) of such Code shall be treated as having a class life of 6 years,

(ii) property described in section 204(a) shall be treated as having a class life of 20 years, and

(iii) property with no class life shall be treated as having a class life of 12 years.

(D) SUBSTITUTION OF APPLICABLE DATES.—If any provision of this Act substitutes a date for an applicable date, this paragraph shall be applied by using such date.

(3) PROPERTY QUALIFIES IF SOLD AND LEASED BACK IN 3 MONTHS.—Property shall be treated as meeting the requirements of paragraphs (1) and (2) or section 204(a) with respect to any taxpayer if such property is acquired by the taxpayer from a person—

(A) in whose hands such property met the requirements of paragraphs (1) and (2) or section 204(a), or

(B) who placed the property in service before January 1, 1987,

and such property is leased back by the taxpayer to such person not later than the earlier of the applicable date under para-

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 167 of 247 PageID #: 167

graph (2) or the day which is 3 months after such property was placed in service.

(4) PLANT FACILITY.—For purposes of paragraph (1), the term "plant facility" means a facility which does not include any building (or with respect to which buildings constitute an insignificant portion) and which is—

(A) a self-contained single operating unit or processing operation,

(B) located on a single site, and

(C) identified as a single unitary project as of March 1, 1986.

(c) PROPERTY FINANCED WITH TAX-EXEMPT BONDS.—

(1) IN GENERAL.—Subparagraph (C) of section 168(g)(1) of the Internal Revenue Code of 1986 (as added by this Act) shall apply to property placed in service after December 31, 1986, in taxable years ending after such date, to the extent such property is financed by the proceeds of an obligation (including a refunding obligation) issued after March 1, 1986.

(2) EXCEPTIONS.—

(A) CONSTRUCTION OR BINDING AGREEMENTS.—Subparagraph (C) of section 168(g)(1) of such Code (as so added) shall not apply to obligations with respect to a facility—

(i)(I) the original use of which commences with the taxpayer, and the construction, reconstruction, or rehabilitation of which began before March 2, 1986, and was completed on or after such date,

(II) with respect to which a binding contract to incur significant expenditures for construction, reconstruction, or rehabilitation was entered into before March 2, 1986, and some of such expenditures are incurred on or after such date, or

(III) acquired on or after March 2, 1986, pursuant to a binding contract entered into before such date, and

(ii) described in an inducement resolution or other comparable preliminary approval adopted by the issuing authority (or by a voter referendum) before March 2, 1986.

(B) REFUNDING.—

(i) IN GENERAL.—Except as provided in clause (ii), in the case of property placed in service after December 31, 1986, which is financed by the proceeds of an obligation which is issued solely to refund another obligation which was issued before March 2, 1986, subparagraph (C) of section 168(g)(1) of such Code (as so added) shall apply only with respect to an amount equal to the basis in such property which has not been recovered before the date such refunded obligation is issued.

(ii) SIGNIFICANT EXPENDITURES.—In the case of facilities the original use of which commences with the taxpayer and with respect to which significant expenditures are made before January 1, 1987, subparagraph (C) of section 168(g)(1) of such Code (as so added) shall not apply with respect to such facilities to the extent such facilities are financed by the proceeds of an obligation issued solely to refund another obligation which was issued before March 2, 1986.

(C) Facilities.—In the case of an inducement resolution or other comparable preliminary approval adopted by an issuing authority before March 2, 1986, for purposes of subparagraphs (A) and (B)(ii) with respect to obligations described in such resolution, the term "facilities" means the facilities described in such resolution.

(D) Significant expenditures.—For purposes of this paragraph, the term "significant expenditures" means expenditures greater than 10 percent of the reasonably anticipated cost of the construction, reconstruction, or rehabilitation of the facility involved.

(d) Mid-Quarter Convention.—In the case of any taxable year in which property to which the amendments made by section 201 do not apply is placed in service, such property shall be taken into account in determining whether section 168(d)(3) of the Internal Revenue Code of 1986 (as added by section 201) applies for such taxable year to property to which such amendments apply.

(e) Normalization Requirements.—

(1) In general.—A normalization method of accounting shall not be treated as being used with respect to any public utility property for purposes of section 167 or 168 of the Internal Revenue Code of 1986 if the taxpayer, in computing its cost of service for ratemaking purposes and reflecting operating results in its regulated books of account, reduces the excess tax reserve more rapidly or to a greater extent than such reserve would be reduced under the average rate assumption method.

(2) Definitions.—For purposes of this subsection—

(A) Excess tax reserve.—The term "excess tax reserve" means the excess of—

(i) the reserve for deferred taxes (as described in section 167(l)(3)(G)(ii) or 168(e)(3)(B)(ii) of the Internal Revenue Code of 1954 as in effect on the day before the date of the enactment of this Act), over

(ii) the amount which would be the balance in such reserve if the amount of such reserve were determined by assuming that the corporate rate reductions provided in this Act were in effect for all prior periods.

(B) Average rate assumption method.—The average rate assumption method is the method under which the excess in the reserve for deferred taxes is reduced over the remaining lives of the property as used in its regulated books of account which gave rise to the reserve for deferred taxes. Under such method, if timing differences for the property reverse, the amount of the adjustment to the reserve for the deferred taxes is calculated by multiplying—

(i) the ratio of the aggregate deferred taxes for the property to the aggregate timing differences for the property as of the beginning of the period in question, by

(ii) the amount of the timing differences which reverse during such period.

## SEC. 204. ADDITIONAL TRANSITIONAL RULES.

(a) Other Transitional Rules.—

(1) Urban renovation projects.—

(A) In general.—The amendments made by section 201 shall not apply to any property which is an integral part of any qualified urban renovation project.

(B) Qualified urban renovation project.—For purposes of subparagraph (A), the term "qualified urban renovation project" means any project—

(i) described in subparagraph (C), (D), (E), or (G) which before March 1, 1986, was publicly announced by a political subdivision of a State for a renovation of an urban area within its jurisdiction,

(ii) described in subparagraph (C), (D) or (G) which before March 1, 1986, was identified as a single unitary project in the internal financing plans of the primary developer of the project, and

(iii) described in subparagraph (C) or (D), which is not substantially modified on or after March 1, 1986.

(C) Project where agreement on December 19, 1984.—A project is described in this subparagraph if—

(i) a political subdivision granted on July 11, 1985, development rights to the primary developer-purchaser of such project, and

(ii) such project was the subject of a development agreement between a political subdivision and a bridge authority on December 19, 1984.

For purposes of this subparagraph, subsection (b)(2) shall be applied by substituting "January 1, 1994" for "January 1, 1991".

(D) Certain additional projects.—A project is described in this subparagraph if it is described in any of the following clauses of this subparagraph and the primary developer of all such projects is the same person:

(i) A project is described in this clause if the development agreement with respect thereto was entered into during April 1984 and the estimated cost of the project is approximately $194,000,000.

(ii) A project is described in this clause if the development agreement with respect thereto was entered into during May 1984 and the estimated cost of the project is approximately $190,000,000.

(iii) A project is described in this clause if the project has an estimated cost of approximately $92,000,000 and at least $7,000,000 was spent before September 26, 1985, with respect to such project.

(iv) A project is described in this clause if the estimated project cost is approximately $39,000,000 and at least $2,000,000 of construction cost for such project were incurred before September 26, 1985.

(v) A project is described in this clause if the development agreement with respect thereto was entered into before September 26, 1985, and the estimated cost of the project is approximately $150,000,000.

(vi) A project is described in this clause if the board of directors of the primary developer approved such project in December 1982, and the estimated cost of such project is approximately $107,000,000.

(vii) A project is described in this clause if the board of directors of the primary developer approved such

project in December 1982, and the estimated cost of such project is approximately $59,000,000.

(viii) A project is described in this clause if the Board of Directors of the primary developer approved such project in December 1983, following selection of the developer by a city council on September 26, 1983, and the estimated cost of such project is approximately $107,000,000."

(E) Project where plan confirmed on October 4, 1984.—A project is described in this subparagraph if—

(i) a State or an agency, instrumentality, or political subdivision thereof approved the filing of a general project plan on June 18, 1981, and on October 4, 1984, a State or an agency, instrumentality, or political subdivision thereof confirmed such plan,

(ii) the project plan as confirmed on October 4, 1984, included construction or renovation of office buildings, a hotel, a trade mart, theaters, and a subway complex, and

(iii) significant segments of such project were the subject of one or more conditional designations granted by a State or an agency, instrumentality, or political subdivision thereof to one or more developers before January 1, 1985.

The preceding sentence shall apply with respect to a property only to the extent that a building on such property site was identified as part of the project plan before September 26, 1985, and only to the extent that the size of the building on such property site was not substantially increased by reason of a modification to the project plan with respect to such property on or after such date. For purposes of this subparagraph, subsection (b)(2) shall be applied by substituting "January 1, 1998" for "January 1, 1991".

(F) A project is described in this paragraph if it is a sports and entertainment facility which—

(i) is to be used by both a National Hockey League team and a National Basketball Association team;

(ii) is to be constructed on a platform utilizing air rights over land acquired by a State authority and identified as site B in a report dated May 30, 1984, prepared for a State urban development corporation; and

(iii) is eligible for real property tax, and power and energy benefits pursuant to the provisions of State legislation approved and effective July 7, 1982, or

(iv) the mixed-use development is—

(I) to be constructed above a public railroad station utilized by the national railroad passenger corporation and commuter railroads serving two States; and

(II) will include the reconstruction of such station so as to make it a more efficient transportation center and to better integrate the station with the development above, such reconstruction plans to be prepared in cooperation with a State transportation authority.

PUBLIC LAW 99–514—OCT. 22, 1986      100 STAT. 2149

For purposes of this subparagraph, subsection (b)(2) shall be applied by substituting "January 1, 1993" for the applicable date that would otherwise apply.

(G) A project is described in this subparagraph if—

(i) an inducement resolution was passed on March 9, 1984, for the issuance of obligations with respect to such project,

(ii) such resolution was extended by resolutions passed on August 14, 1984, April 2, 1985, August 13, 1985, and July 8, 1986,

(iii) an application was submitted on January 31, 1984, for an Urban Development Action Grant with respect to such project, and

(iv) an Urban Development Action Grant was preliminarily approved for all or part of such project on July 3, 1986.

(H) A project is described in this subparagraph if it is a redevelopment project, with respect to which $10,000,000 in industrial revenue bonds were approved by a State Development Finance Authority on January 15, 1986, a village transferred approximately $4,000,000 of bond volume authority to the State in June 1986, and a binding Redevelopment Agreement was executed between a city and the development team on July 1, 1986.

(2) CERTAIN PROJECTS GRANTED FERC LICENSES, ETC.—The amendments made by section 201 shall not apply to any property which is part of a project—

(A) which is certified by the Federal Energy Regulatory Commission before March 2, 1986, as a qualifying facility for purposes of the Public Utility Regulatory Policies Act of 1978,

(B) which was granted before March 2, 1986, a hydroelectric license for such project by the Federal Energy Regulatory Commission, or

(C) which is a hydroelectric project of less than 80 megawatts that filed an application for a permit, exemption, or license with the Federal Energy Regulatory Commission before March 2, 1986.

(3) SUPPLY OR SERVICE CONTRACTS.—The amendments made by section 201 shall not apply to any property which is readily identifiable with and necessary to carry out a written supply or service contract, or agreement to lease, which was binding on March 1, 1986.

(4) PROPERTY TREATED UNDER PRIOR TAX ACTS.—The amendments made by section 201 shall not apply to property described in section 12(c)(2) or 31(g)(5) and 31(g)(17)(j) of the Tax Reform Act of 1984, to property described in section 209(d)(1)(B) of the Tax Equity and Fiscal Responsibility Act of 1982, as amended by the Tax Reform Act of 1984 and to property described in section 216(b)(3) of the Tax Equity and Fiscal Responsibility Act of 1982.

(5) SPECIAL RULES FOR PROPERTY INCLUDED IN MASTER PLANS OF INTEGRATED PROJECTS.—The amendments made by section 201 shall not apply to any property placed in service pursuant to a master plan which is clearly identifiable as of March 1, 1986, for any project described in any of the following subparagraphs of this paragraph:

(A) A project is described in this subparagraph if—

PUBLIC LAW 99–514—OCT. 22, 1986

(i) the project involves production platforms for off-shore drilling, oil and gas pipeline to shore, process and storage facilities, and a marine terminal, and

(ii) at least $900,000,000 of the costs of such project were incurred before September 26, 1985.

(B) A project is described in this subparagraph if—

(i) such project involves a fiber optic network of at least 20,000 miles, and

(ii) before September 26, 1985, construction commenced pursuant to the master plan and at least $85,000,000 was spent on construction.

(C) A project is described in this subparagraph if—

(i) such project passes through at least 10 States and involves intercity communication links (including one or more repeater sites, terminals and junction stations for microwave transmissions, regenerators or fiber optics and other related equipment),

(ii) the lesser of $150,000,000 or 5 percent of the total project cost has been expended, incurred, or committed before March 2, 1986, by one or more taxpayers each of which is a member of the same affiliated group (as defined in section 1504(a)), and

(iii) such project consists of a comprehensive plan for meeting network capacity requirements as encompassed within either:

(I) a November 5, 1985, presentation made to and accepted by the Chairman of the Board and the president of the taxpayer, or

(II) the approvals by the Board of Directors of the parent company of the taxpayer on May 3, 1985, and September 22, 1985, and of the executive committee of said board on December 23, 1985.

(D) A project is described in this subparagraph if—

(i) such project is part of a flat rolled product modernization plan which was initially presented to the Board of Directors of the taxpayer on July 8, 1983,

(ii) such program will be carried out at 3 locations, and

(iii) such project will involve a total estimated minimum capital cost of at least $250,000,000.

(E) A project is described in this subparagraph if the project is being carried out by a corporation engaged in the production of paint, chemicals, fiberglass, and glass, and if—

(i) the project includes a production line which applies a thin coating to glass in the manufacture of energy efficient residential products, if approved by the management committee of the corporation on January 29, 1986,

(ii) the project is a turbogenerator which was approved by the president of such corporation and at least $1,000,000 of the cost of which was incurred or committed before such date,

(iii) the project is a waste-to-energy disposal system which was initially approved by the management committee of the corporation on March 29, 1982, and at

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2151

least $5,000,000 of the cost of which was incurred before September 26, 1985,

(iv) the project, which involves the expansion of an existing service facility and the addition of new lab facilities needed to accommodate topcoat and undercoat production needs of a nearby automotive assembly plant, was approved by the corporation's management committee on March 5, 1986, or

(v) the project is part of a facility to consolidate and modernize the silica production of such corporation and the project was approved by the president of such corporation on August 19, 1985.

(F) A project is described in this subparagraph if—

(i) such project involves a port terminal and oil pipeline extending generally from the area of Los Angeles, California, to the area of Midland, Texas, and

(ii) before September 26, 1985, there is a binding contract for dredging and channeling with respect thereto and a management contract with a construction manager for such project.

(G) A project is described in this subparagraph if—

(i) the project is a newspaper printing and distribution plant project with respect to which a contract for the purchase of 8 printing press units and related equipment to be installed in a single press line was entered into on January 8, 1985, and

(ii) the contract price for such units and equipment represents at least 50 percent of the total cost of such project.

(H) A project is described in this subparagraph if it is the second phase of a project involving direct current transmission lines spanning approximately 190 miles from the United States-Canadian border to Ayer, Massachusetts, alternating current transmission lines in Massachusetts from Ayers to Millbury to West Medway, DC–AC converted terminals to Monroe, New Hampshire, and Ayer, Massachusetts, and other related equipment and facilities.

(I) A project is described in this subparagraph if it involves not more than two natural gas-fired combined cycle electric generating units each having a net electrical capability of approximately 233 megawatts, and a sales contract for approximately one-half of the output of the 1st unit was entered into in December 1985.

(J) A project is described in this subparagraph if—

(i) the project involves an automobile manufacturing facility (including equipment and incidental appurtenances) to be located in the United States, and

(ii) either—

(I) the project was the subject of a memorandum of understanding between 2 automobile manufacturers that was signed before September 25, 1985, the automobile manufacturing facility (including equipment and incidental appurtenances) will involve a total estimated cost of approximately $750,000,000, and will have an annual production capacity of approximately 240,000 vehicles or

PUBLIC LAW 99–514—OCT. 22, 1986

(II) the Board of Directors of an automobile manufacturer approved a written plan for the conversion of an existing facility to produce a new model of a vehicle currently not produced in the United States, such facility will be placed in service by July 1, 1987, and such Board action occurred in July 1985, with respect to a $523,000,000 expenditure, in June 1983, with respect to a $475,000,000 expenditure, or in July 1984, with respect to a $312,000,000 expenditure.

(K) A project is described in this subparagraph if either—

(i) the project involves a joint venture between a utility company and a paper company for a super calendar paper mill, and at least $50,000,000 were incurred or committed with respect to such project before March 1, 1986, or

(ii) the project involves a paper mill for the manufacture of newsprint (including a cogeneration facility) is generally based on a written design and feasibility study that was completed on December 15, 1981, and will be placed in service before January 1, 1991, or

(iii) the project is undertaken by a Maine corporation and involves the modernization of pulp and paper mills in Millinocket and/or East Millinocket, Maine, or

(iv) the project involves the installation of a paper machine for production of coated publication papers, the modernization of a pulp mill, and the installation of machinery and equipment with respect to related processes, as of December 31, 1985, in excess of $50,000,000 was incurred for the project, as of July 1986, in excess of $150,000,000 was incurred for the project, and the project is located in Pine Bluff, Arkansas, or

(v) involves property of a type described in ADR classes 26.1, 26.2, 25, 00.3 and 00.4 included in a paper plant which will manufacture and distribute tissue, towel or napkin products; is located in Effingham County, Georgia; and is generally based upon a written General Description which was submitted to the Georgia Department of Revenue on or about June 13, 1985.

(L) A project is described in this subparagraph if—

(i) a letter of intent with respect to such project was executed on June 4, 1985, and

(ii) a 5-percent downpayment was made in connection with such project for 2 10-unit press lines and related equipment.

(M) A project is described in this subparagraph if—

(i) the project involves the retrofit of ammonia plants,

(ii) as of March 1, 1986, more than $390,000 had been expended for engineering and equipment, and

(iii) more than $170,000 was expensed in 1985 as a portion of preliminary engineering expense.

(N) A project is described in this subparagraph if the project involves bulkhead intermodal flat cars which are placed in service before January 1, 1987, and either—

(i) more than $2,290,000 of expenditures were made before March 1, 1986, with respect to a project involving up to 300 platforms, or

(ii) more than $95,000 of expenditures were made before March 1, 1986, with respect to a project involving up to 850 platforms.

(O) A project is described in this subparagraph if—

(i) the project involves the production and transportation of oil and gas from a well located north of the Arctic Circle, and

(ii) more than $200,000,000 of cost had been incurred or committed before September 26, 1985.

(P) A project is described in this subparagraph if—

(i) a commitment letter was entered into with a financial institution on January 23, 1986, for the financing of the project,

(ii) the project involves intercity communication links (including microwave and fiber optics communications systems and related property),

(iii) the project consists of communications links between—

(I) Omaha, Nebraska, and Council Bluffs, Iowa,

(II) Waterloo, Iowa and Sioux City, Iowa,

(III) Davenport, Iowa and Springfield, Illinois, and

(iv) the estimated cost of such project is approximately $13,000,000.

(Q) A project is described in this subparagraph if—

(i) such project is a mining modernization project involving mining, transport, and milling operations,

(ii) before September 26, 1985, at least $20,000,000 was expended for engineering studies which were approved by the Board of Directors of the taxpayer on January 27, 1983, and

(iii) such project will involve a total estimated minimum cost of $350,000,000.

(R) A project is described in this subparagraph if—

(i) such project is a dragline acquired in connection with a 3-stage program which began in 1980 to increase production from a coal mine,

(ii) at least $35,000,000 was spent before September 26, 1985, on the 1st 2 stages of the program, and

(iii) at least $4,000,000 was spent to prepare the mine site for the dragline.

(S) A project is described in this subparagraph if—it is a project consisting of a mineral processing facility using a heap leaching system (including waste dumps, low-grade dumps, a leaching area, and mine roads) and if—

(i) convertible subordinated debentures were issued in August 1985, to finance the project,

(ii) construction of the project was authorized by the Board of Directors of the taxpayer on or before December 31, 1985,

(iii) at least $750,000 was paid or incurred with respect to the project on or before December 31, 1985, and

(iv) the project is placed in service on or before December 31, 1986.

PUBLIC LAW 99–514—OCT. 22, 1986

(T) A project is described in this subparagraph if it is a plant facility on Alaska's North Slope and—

(i) the approximate cost is $575,000,000 of which approximately $100,000,000 was spent on off-site construction or

(ii) the approximate cost of which is $450,000,000, of which approximately $100,000,000 was spent on off-site construction, more than 50 percent of the project cost was spent prior to December 31, 1985, and which will be placed in service in 1987.

(U) A project is described in this subparagraph if it involves the connecting of existing retail stores in the downtown area of a city to a new covered area, the total project will be 250,000 square feet, a formal Memorandum of Understanding relating to development of the project was executed with the city on July 2, 1986, and the estimated cost of the project is $18,186,424.

(V) A project is described in this subparagraph if it includes a 200,000 square foot office tower, a 200-room hotel, a 300,000 square foot retail center, an 800-space parking facility, the total cost is projected to be $60,000,000, and $1,250,000 was expended with respect to the site before August 25, 1986.

(W) A project is described in this subparagraph if it is a joint use and development project including an integrated hotel, convention center, office, related retail facilities and public mass transportation terminal, and vehicle parking facilities which satisfies the following conditions:

(i) is developed within certain air space rights and upon real property exchanged for such joint use and development project which is owned or acquired by a state department of transportation, a regional mass transit district in a county with a population of at least 5,000,000 and a community redevelopment agency;

(ii) such project affects an existing, approximately 40 acre public mass transportation bus-way terminal facility located adjacent to an interstate highway;

(iii) a memorandum of understanding with respect to such joint use and development joint use and development project is executed by a state department of transportation, such a county regional mass transit district and a community redevelopment agency on or before December 31, 1986, and

(iv) a major portion of such joint use and development project is placed in service by December 31, 1990.

(X) A project is described in this subparagraph if—

(i) it is an $8,000,000 project to provide advanced control technology for adipic acid at a plant, which was authorized by the company's Board of Directors in October 1985, at December 31, 1985, $1,400,000 was committed and $400,000 expended with respect to such project, or

(ii) it is an $8,300,000 project to achieve compliance with State and Federal regulations for particulates emissions, which was authorized by the company's Board of Directors in December 1985, by March 31, 1986, $250,000 was committed and $250,000 was expended with respect to such project, or

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2155

(iii) it is a $22,000,000 project for the retrofit of a plant that makes a raw material for aspartame, which was approved in the company's December 1985 capital budget, if approximately $3,000,000 of the $22,000,000 was spent before August 1, 1986.

(Y) A project is described in this subparagraph if such project passes through at least 9 States and involves an intercity communication link (including multiple repeater sites and junction stations for microwave transmissions and amplifiers for fiber optics); the link from Buffalo to New York/Elizabeth was completed in 1984; the link from Buffalo to Chicago was completed in 1985; and the link from New York to Washington is completed in 1986.

(6) NATURAL GAS PIPELINE.—The amendments made by section 201 shall not apply to any interstate natural gas pipeline (and related equipment) if—

(A) 3 applications for the construction of such pipeline were filed with the Federal Energy Regulatory Commission before November 22, 1985 (and 2 of which were filed before September 26, 1985), and

(B) such pipeline has 1 of its terminal points near Bakersfield, California.

(7) CERTAIN LEASEHOLD IMPROVEMENTS.—The amendments made by section 201 shall not apply to any reasonable leasehold improvements, equipment and furnishings placed in service by a lessee or its affiliates if—

(A) the lessee or an affiliate is the original lessee of each building in which such property is to be used,

(B) such lessee is obligated to lease the building under an agreement to lease entered into before September 26, 1985, and such property is provided for such building, and

(C) such buildings are to serve as world headquarters of the lessee and its affiliates.

For purposes of this paragraph, a corporation is an affiliate of another corporation if both corporations are members of a controlled group of corporations within the meaning of section 1563(a) of the Internal Revenue Code of 1954 without regard to section 1563(b)(2) of such Code. Such lessee shall include a securities firm that meets the requirements of subparagraph (A), except the lessee is obligated to lease the building under a lease entered into on June 18, 1986.

(8) SOLID WASTE DISPOSAL FACILITIES.—The amendments made by section 201, and section 203(c), shall not apply to the taxpayer who originally places in service any qualified solid waste disposal facility (as defined in section 7701(e)(3)(B) of the Internal Revenue Code of 1986) if before March 2, 1986—

(A) there is a binding written contract between a service recipient and a service provider with respect to the operation of such facility to pay for the services to be provided by such facility,

(B) a service recipient or governmental unit (or any entity related to such recipient or unit) made a financial commitment of at least $200,000 for the financing or construction of such facility,

(C) such facility is the Tri-Cities Solid Waste Recovery Project involving Fremont, Newark, and Union City, California, and has received an authority to construct from

the Environmental Protection Agency or from a State or local agency authorized by the Environmental Protection Agency to issue air quality permits under the Clean Air Act.

(9) CERTAIN SUBMERSIBLE DRILLING UNITS.—In the case of a binding contract entered into on October 30, 1984, for the purchase of 6 semi-submersible drilling units at a cost of $425,000,000, such units shall be treated as having an applicable date under subsection 203(b)(2) of January 1, 1991.

(10) WASTEWATER OR SEWAGE TREATMENT FACILITY.—The amendments made by section 201 shall not apply to any property which is part of a wastewater or sewage treatment facility if either—

(A) site preparation for such facility commenced before September 1985, and a parish council approved a service agreement with respect to such facility on December 4, 1985;

(B) a city-parish advertised in September 1985, for bids for construction of secondary treatment improvements for such facility, in May 1985, the city-parish received statements from 16 firms interested in privatizing the wastewater treatment facilities, and the metropolitan council selected a privatizer at its meeting on November 20, 1985, and adopted a resolution authorizing the Mayor to enter into contractual negotiation with the selected privatizer;

(C) the property is part of a wastewater treatment facility with respect to which a binding service agreement between a privatizer and the Western Carolina Regional Sewer Authority with respect to such facility was signed before January 1, 1986; or

(D) such property is part of a wastewater treatment facility (located in Cameron County, Texas, within one mile of the City of Harlingen), an application for a wastewater discharge permit was filed with respect to such facility on December 4, 1985, and a City Commission approved a letter of intent relating to a service agreement with respect to such facility on August 7, 1986; or a wastewater facility (located in Harlingen, Texas) which is a subject of the letter of intent and service agreement described in subparagraph (A)(2) of this paragraph and the design of which was contracted for in a letter of intent dated January 23, 1986.

(11) CERTAIN AIRCRAFT.—The amendments made by section 201 shall not apply to any new aircraft with 19 or fewer passenger seats if—

(A) the aircraft is manufactured in Kansas, Florida, Georgia, or Texas. For purposes of this subparagraph, an aircraft is "manufactured" at the point of its final assembly,

(B) the aircraft was in inventory or in the planned production schedule of the final assembly manufacturer, with orders placed for the engine(s) on or before August 16, 1986, and

(C) the aircraft is purchased or subject to a binding contract on or before December 31, 1986, and is delivered and placed in service by the purchase, before July 1, 1987. Section 211(d)(2)(B) shall not apply to aircraft which meet the requirements of this subparagraph.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2157

(12) CERTAIN SATELLITES.—The amendments made by section 201 shall not apply to any satellite with respect to which—

(A) on or before January 28, 1986, there was a binding contract to construct or acquire a satellite, and

(i) an agreement to launch was in existence on that date, or

(ii) on or before August 5, 1983, the Federal Communications Commission had authorized the construction and for which the authorized party has a specific although undesignated agreement to launch in existence on January 28, 1986;

(B) by order adopted on July 25, 1985, the Federal Communications Commission granted the taxpayer an orbital slot and authorized the taxpayer to launch and operate 2 satellites with a cost of approximately $300,000,000; or

(C) the International Telecommunications Satellite Organization or the International Maritime Satellite Organization entered into written binding contracts before May 1, 1985.

(13) CERTAIN NONWIRE LINE CELLULAR TELEPHONE SYSTEMS.—The amendments made by section 201 shall not apply to property that is part of a nonwire line system in the Domestic Public Cellular Radio Telecommunications Service for which the Federal Communications Commission has issued a construction permit before September 26, 1985, but only if such property is placed in service before January 1, 1987.

(14) CERTAIN COGENERATION FACILITIES.—The amendments made by section 201 shall not apply to projects consisting of 1 or more facilities for the cogeneration and distribution of electricity and steam or other forms of thermal energy if—

(A) at least $100,000 was paid or incurred with respect to the project before March 1, 1986, a memorandum of understanding was executed on September 13, 1985, and the project is placed in service before January 1, 1989,

(B) at least $500,000 was paid or incurred with respect to the projects before May 6, 1986, the projects involve a 22-megawatt combined cycle gas turbine plant and a 45-megawatt coal waste plant, and applications for qualifying facility status were filed with the Federal Energy Regulatory Commission on March 5, 1986,

(C) the project cost approximates $125,000,000 to $140,000,000 and an application was made to the Federal Energy Regulatory Commission in July 1985,

(D) an inducement resolution for such facility was adopted on September 10, 1985, a development authority was given an inducement date of September 10, 1985, for a loan not to exceed $80,000,000 with respect to such facility, and such facility is expected to have a capacity of approximately 30 megawatts of electric power and 70,000 pounds of steam per hour,

(E) at least $1,000,000 was incurred with respect to the project before May 6, 1986, the project involves a 52-megawatt combined cycle gas turbine plant and a petition was filed with the Connecticut Department of Public Utility Control to approve a power sales agreement with respect to the project on March 27, 1986.

(15) CERTAIN ELECTRIC GENERATING STATIONS.—The amendments made by section 201 shall not apply to a project consisting of a coal-fired electric generating station (including multiple generating units, coal mine equipment, and transmission facilities) if—

(A) a tax-exempt entity will own an equity interest in all property included in the project (except the coal mine equipment), and

(B) at least $72,000 was expended in the acquisition of coal leases, land and water rights, engineering studies, and other development costs before May 6, 1986.

For purposes of this subparagraph, subsection (b)(2) shall be applied by substituting "January 1, 1986" for "January 1, 1991."

(16) SPORTS ARENAS.—

(A) INDOOR SPORTS FACILITY.—The amendments made by section 201 shall not apply to up to $20,000,000 of improvements made by a lessee of any indoor sports facility pursuant to a lease from a State commission granting the right to make limited and specified improvements (including planned seat explanations), if architectural renderings of the project were commissioned and received before December 22, 1985.

(B) METROPOLITAN SPORTS ARENA.—The amendments made by section 201 shall not apply to any property which is part of an arena constructed for professional sports activities in a metropolitan area, provided that such arena is capable of seating no less than 18,000 spectators and a binding contract to incur significant expenditures for its construction was entered into before June 1, 1986.

(17) CERTAIN WASTE-TO-ENERGY FACILITIES.—The amendments made by section 201 shall not apply to 2 agricultural waste-to-energy powerplants (and required transmission facilities), in connection with which a contract to sell 100 megawatts of electricity to a city was executed in October 1984.

(18) CERTAIN COAL-FIRED PLANTS.—The amendments made by section 201 shall not apply to one of three 540 megawatt coal-fired plants that are placed in service after a sale leaseback occurring after January 1, 1986, if—

(A) the Board of Directors of an electric power cooperation authorized the investigation of a sale leaseback of a nuclear generation facility by resolution dated January 22, 1985, and

(B) a loan was extended by the Rural Electrification Administration on February 20, 1986, which contained a covenant with respect to used property leasing from unit II.

(19) CERTAIN RAIL SYSTEMS.—

(A) The amendments made by section 201 shall not apply to a light rail transit system, the approximate cost of which is $235,000,000, if, with respect to which, the board of directers of a corporation (formed in September 1984 for the purpose of developing, financing, and operating the system) authorized a $300,000 expenditure for a feasibility study in April 1985.

(B) The amendments made by section 201 shall not apply to any project for rehabilitation of regional railroad rights of way and properties including grade crossings which was

PUBLIC LAW 99-514—OCT. 22, 1986     100 STAT. 2159

authorized by the Board of Directors of such company prior to October 1985; and/or was modified, altered or enlarged as a result of termination of company contracts, but approved by said Board of Directors no later than January 30, 1986, and which is in the public interest, and which is subject to binding contracts or substantive commitments by December 31, 1987.

(20) CERTAIN DETERGENT MANUFACTURING FACILITY.—The amendments made by section 201 shall not apply to a laundry detergent manufacturing facility, the approximate cost of which is $13,200,000, with respect to which a project agreement was fully executed on March 17, 1986.

(21) CERTAIN RESOURCE RECOVERY FACILITY.—The amendments made by section 201 shall not apply to any of 3 resource recovery plants, the aggregate cost of which approximates $300,000,000, if an industrial development authority adopted a bond resolution with respect to such facilities on December 17, 1984, and the projects were approved by the department of commerce of a Commonwealth on December 27, 1984.

(22) The amendments made by section 201 shall not apply to a computer and office support center building in Minneapolis, with respect to which the first contract, with an architecture firm, was signed on April 30, 1985, and a construction contract was signed on March 12, 1986.

(23) CERTAIN DISTRICT HEATING AND COOLING FACILITIES.—The amendments made by section 201 shall not apply to pipes, mains, and related equipment included in district heating and cooling facilities, with respect to which the development authority of a State approved the project through an inducement resolution adopted on October 8, 1985, and in connection with which approximately $11,000,000 of tax-exempt bonds are to be issued.

(24) CERTAIN VESSELS.—

(A) CERTAIN OFFSHORE VESSELS.—The amendments made by section 201 shall not apply to any offshore vessel the construction contract for which was signed on February 28, 1986, and the approximate cost of which is $9,000,000.

(B) CERTAIN INLAND RIVER VESSEL.—The amendments made by section 201 shall not apply to a project involving the reconstruction of an inland river vessel docked on the Mississippi River at St. Louis, Missouri, on July 14, 1986, and with respect to which:

(i) the estimated cost of reconstruction is approximately $39,000,000;

(ii) reconstruction was commenced prior to December 1, 1985;

(iii) at least $17,000,000 was expended before December 31, 1985; and

(C) SPECIAL AUTOMOBILE CARRIER VESSELS.—The amendments made by section 201 shall not apply to two new automobile carrier vessels which will cost approximately $47,000,000 and will be constructed by a United States-flag carrier to operate, under the United States-flag and with an American crew, to transport foreign automobiles to the United States, in a case where negotiations for such transportation arrangements commenced in April 1985, formal contract bids were submitted prior to the end of

1985, and definitive transportation contracts were awarded in May 1986.

(D) The amendments made by section 201 shall not apply to a 562-foot passenger cruise ship, which was purchased in 1980 for the purpose of returning the vessel to United States service, the approximate cost of refurbishment of which is approximately $47,000,000.

(25) CERTAIN WOOD ENERGY PROJECTS.—The amendments made by section 201 shall not apply to two wood energy products for which applications with the Federal Energy Regulatory Commission were filed before January 1, 1986, which are described as follows:

(A) a 26.5 megawatt plant in Fresno, California, and

(B) a 26.5 megawatt plant in Rocklin, California.

(26) The amendments made by section 201 shall not apply to property which is a geothermal project of less than 20 megawatts that was certified by the Federal Energy Regulatory Commission on July 14, 1986, as a qualifying small power production facility for purposes of the Public Utility Regulatory Policies Act of 1978 pursuant to an application filed with the Federal Energy Regulatory Commission on April 17, 1986.

(27) CERTAIN ECONOMIC DEVELOPMENT PROJECTS.—The amendments made by section 201 shall not apply to any of the following projects:

(A) A mixed use development on the East River the total cost of which is approximately $400,000,000, with respect to which a letter of intent was executed on January 24, 1984, and with respect to which approximately $2.5 million had been spent by March 1, 1986.

(B) A 356-room hotel, banquet, and conference facility (including 525,000 square feet of office space) the approximate cost of which is $158,000,000, with respect to which a letter of intent was executed on June 1, 1984, and with respect to which an inducement resolution and bond resolution was adopted on August 20, 1985.

(C) Phase 1 of a 4-phase project involving the construction of laboratory space and ground-floor retail space the estimated cost of which is $32,000,000 and with respect to which a memoradum of understanding was made before August 29, 1983.

(D) A project involving the development of a 490,000 square foot mixed-use building at 152 W. 57th Street and 7th Avenue, New York, New York, the estimated cost of which is $100,000,000, and with respect to which a building permit application was filed in May 1986.

(E) A mixed-use project containing a 300 unit, 12-story hotel, garage, two multi-rise office buildings, and also included a park, renovated riverboat, and barge with festival marketplace, the capital outlays for which approximate $68,000,000.

(F) The construction of a three-story office building that will serve as the home office for an insurance group and its affiliated companies, with respect to which a city agreed to transfer its ownership of the land for the project in a Redevelopment Agreement executed on September 18, 1985, once certain conditions are met.

(G) A commercial bank formed under the laws of the State of New York which entered into an agreement on September 5, 1985, to construct its headquarters at 60 Wall Street, New York, New York, with respect to such headquarters.

(H) Any property which is part of a commercial and residential project, the first phase of which is currently under construction, to be developed on land which is the subject of an ordinance passed on July 20, 1981, by the city council of the city in which such land is located, designating such land and the improvements to be placed thereon as a residential-business planned development, which development is being financed in part by the proceeds of industrial development bonds in the amount of $62,000 issued on December 4, 1985.

(28) The amendments made by section 201 shall not apply to an $80,000,000 capital project steel seamless tubular casings minimill and melting facility located in Youngstown, Ohio, which was purchased by the taxpayer in April 1985, and—

(A) the purchase and renovation of which was approved by a committee of the Board of Directors on February 22, 1985, and

(B) as of December 31, 1985, more than $20,000,000 was incurred or committed with respect to the renovation.

(29) The amendments made by section 201 shall not apply to any project for residential rental property if—

(A) an inducement resolution with respect to such project was adopted by the State housing development authority on January 18, 1985, and

(B) such project was the subject of law suits filed on June 22, 1984, and November 21, 1985.

(30) The amendments made by section 201 shall not apply to a 30 megawatt electric generating facility fueled by geothermal and wood waste, the approximate cost of which is $55,000,000, and with respect to which a 30-year power sales contract was executed on March 22, 1985.

(31) The amendments made by section 201 shall not apply to railroad maintenance-of-way equipment, with respect to which a Boston bank entered into a firm binding contract with a major northeastern railroad before March 2, 1986, to finance $10,200,000 of such equipment, if all of the equipment was placed in service before August 1, 1986.

(32) The amendment made by section 201 shall not apply to—

(A) a facility constructed on approximately seven acres of land located on Ogle's Poso Creek Oil field, the primary fuel of which will be bituminous coal from Utah or Wyoming, with respect to which an application for an authority to construct was filed on July 30, 1984, an authority to construct was issued on February 28, 1985, and a prevention of significant deterioration permit application was submitted on June 17, 1985,

(B) a facility constructed on approximately seven acres of land located on Teorco's Jasmin oil field, the primary fuel of which will be bituminous coal from Utah or Wyoming, with respect to which an authority to construct was filed on August 30, 1984, an authority to construct was issued on

May 4, 1985, and a prevention of significant deterioration permit application was submitted on July 3, 1985,

(C) the Mountain View Apartments, in Hadley, Massachusetts,

(D) a facility expected to have a capacity of not less than 65 megawatts of electricity, the steam from which is to be sold to a pulp and paper mill, with respect to which application was made to the Federal Regulatory Commission for certification as a qualified facility on November 1, 1985, and received such certification on January 24, 1986,

(E) $2,200,000 of equipment ordered on January 27, 1986, in connection with a 60,000 square foot plant that was completed in 1983,

(F) a magnetic resonance imaging machine, with respect to which a binding contract to purchase was entered into in April 1986, in connection with the construction of a magnetic resonance imaging clinic with respect to which a Determination of Need certification was obtained from a State Department of Public Health on October 22, 1985, if such property is placed in service before December 31, 1986,

(G) a company located in Salina, Kansas, which has been engaged in the construction of highways and city streets since 1946, but only to the extent of $1,410,000 of investment in new section 38 property,

(H) a $300,000 project undertaken by a small metal finishing company located in Minneapolis, Minnesota, the first parts of which were received and paid for in January 1986, with respect to which the company received Board approval to purchase the largest piece of machinery it has ever ordered in 1985,

(I) A $1,200,000 finishing machine that was purchased on April 2, 1986 and placed into service in September 1986 by a company located in Davenport, Iowa,

(J) A 25 megawatt small power production facility, with respect to which Qualifying Facility status numbered QF86–593–000 was granted on March 5, 1986,

(K) A $600,000,000, 250 megawatt plant placed in service by the Sierra Pacific Power Company,

(L) 128 units of rental housing the Point Gloria Limited Partnership,

(M) Kenosha Harbor, in Kenosha, Wisconsin,

(N) Lakeland Park Phase II, in Baton Rouge, Louisiana,

(O) the Santa Rosa Hotel, in New Orleans, Louisiana,

(P) the Sheraton Baton Rouge, in Baton Rouge, Louisiana,

(Q) $300,000 of equipment placed in service in 1986, in connection with the renovation of the Best Western Townhouse Convention Center in Cedar Rapids, Iowa,

(R) the segment of a nationwide fiber optics telecommunications network placed in service by SouthernNet, the total estimated cost of which is $37,000,000,

(S) two cogeneration facilities, placed in service by the Reading Anthracite Company, costing approximately $110,000,000 each, with respect to which filings were made with the Federal Energy Regulatory Commission on December 31, 1985, and which are located in Pennsylvania,

(T) a fiber optics network placed in service by Kansas City Southern Industries, the total estimated cost of which is $25,000,000,

(U) 3 newly constructed fishing vessels, and one vessel that is overhauled, placed in service by Mid Coast Marine, but only to the extent of $6,700,000 of investment,

(V) $350,000 of equipment acquired in connection with the reopening of a plant in Bristol, Rhode Island, which plant was purchased by Buttonwoods, Ltd., Associates on February 7, 1986,

(W) $4,046,000 of equipment placed in service by Brendle's Incorporated, acquired in connection with a Distribution Center,

(X) a multi-family mixed-use housing project located in a home rule city, the zoning for which was changed to residential business planned development on November 26, 1985, and with respect to which hoth the home rule city and the State housing finance agency adopted inducement resolutions on December 20, 1985,

(Y) the Myrtle Beach Convention Center, in South Carolina, to the extent of $25,000,000 of investment, and

(Z) railroad cars placed in service by the Pullman Leasing Company, pursuant to an April 3, 1986 purchase order, costing approximately $10,000,000.

(33) The amendments made by section 201 shall not apply to—

(A) $400,000 of equipment placed in service by Super Key Market, if such equipment is placed in service before January 1, 1987,

(B) the Trolley Square project, the total project cost of which is $24,500,000, and the amount of depreciable real property of which is $14,700,000.

(C) a waste-to-energy project in Derry, New Hampshire, costing approximtely $60,000,000,

(D) the City of Los Angeles Co-composting project, the estimated cost of which is $62,000,000, with respect to which, on July 17, 1985, the California Pollution Control Financing Authority issued an initial resolution in the maximum amount of $75,000,000 to finance this project,

(E) the St. Charles, Missouri Mixed-Use Center,

(F) Oxford Place in Tulsa, Oklahoma,

(G) an amount of investment generating $20,000,000 of investment tax credits attributable to property used on the Illinois Diversatech Campus,

(H) $25,000,000 of equipment used in the Melrose Park Engine Plant that is sold and leased back by Navistar,

(I) 80,000 vending machines, for a cost approximating $3,400,000 placed into service by Folz Vending Co.,

(J) a 24 megawatt alternative energy facility placed in service by Peat Products, with respect to which certification by the Federal Energy Regulatory Commission on April 3, 1986, and

(K) Burbank Manors, in Illinois.

(b) SPECIAL RULE FOR CERTAIN PROPERTY.—The provisions of section 168(f)(8) of the Internal Revenue Code of 1954 (as amended by section 209 of the Tax Equity and Fiscal Responsibility Act of 1982) shall continue to apply to any transaction permitted by reason of

section 12(c)(2) of the Tax Reform Act of 1984 or section 209(d)(1)(B) of the Tax Equity and Fiscal Responsibility Act of 1982.

(c) APPLICABLE DATE IN CERTAIN CASES.—

(1) Section 203(b)(2) shall be applied by substituting "January 1, 1992" for January 1, 1991" in the following cases.

(A) in the case of a 2-unit nuclear powered electric generating plant (and equipment and incidental appurtenances), constructed pursuant to contracts entered into by the owner operator of the facility before December 31, 1975, including contracts with the engineer/constructor and the nuclear steam system supplier, such contracts shall be treated as contracts described in section 203(b)(1)(A),

(B) a cogeneration facility with respect to which an application with the Federal Energy Regulatory Commission was filed on August 2, 1985, and approved October 15, 1985.

(C) in the case of a 1,300 megawatt coal-fired steam powered electric generating plant (and related equipment and incidental appurtenances), which the three owners determined in 1984 to convert from nuclear power to coal power and for which more than $600,000,000 had been incurred or committed for construction before September 25, 1985, except that no investment tax credit will be allowable under section 49(d)(3) added by section 211(a) of this Act for any qualified progress expenditures made after December 31, 1990.

(2) Section 203(b)(2) shall be applied by substituting "April 1, 1992" for the applicable date that would otherwise apply, in the case of the second unit of a twin steam electric generating facility and related equipment which was granted a certificate of public convenience and necessity by a public service commission prior to January 1, 1982, if the first unit of the facility was placed in service prior to January 1, 1985, and before September 26, 1985, more than $100,000,000 had been expended toward the construction of the second unit.

(3) Section 203(b)(2) shall be applied by substituting "January 1, 1990" for the applicable date that would otherwise apply in the case of—

(A) new commercial passenger aircraft used by a domestic airline, if a binding contract with respect to such aircraft was entered into before April 1, 1986, and such aircraft has a present class life of 12 years,

(B) a pumped storage hydroelectric project with respect to which an application was made to the Federal Energy Regulatory Commission for a license on February 4, 1974, and license was issued August 1, 1977, the project number of which is 2740,

(C) a facility for the manufacture of an improved particleboard, if—a binding contract to purchase such equipment was executed March 3, 1986, such equipment will be placed in service by January 1, 1988, and such facility is located in or near Moncure, North Carolina, and

(D) a newsprint mill in Pend Oreille county, Washington, costing about $290,000,000.

(4) The amendments made by section 201 shall not apply to a limited amount of the following property or a limited amount of property set forth in submission before September 16, 1986, by the following taxpayers—

PUBLIC LAW 99-514—OCT. 22, 1986          100 STAT. 2165

(A) Arena project, Michigan,
(B) Campbell Soup Company, Pennsylvania and California,
(C) Overton, Florida,
(D) Legett and Platt,
(E) East Bank Housing Project,
(F) Standard Telephone Company,
(G) Presidential Air,
(H) Ann Arbor Railroad,
(I) Ada, Michigan Cogeneration,
(J) Anchor Store Project, Michigan,
(K) Biogen Power,
(L) $14,000,000 of television transmitting towers placed in service by Media General, Inc., which were subject to binding contracts as of January 21, 1986, and will be placed in service before January 1, 1988,
(M) Hardage Company,
(N) Mesa Airlines,
(O) Yarn-spinning equipment used at Spring Cotton Mills, and
(P) 328 units of low-income housing at Angelus Plaza.
(d) RAILROAD GRADING AND TUNNEL BORES.—
(1) IN GENERAL.—In the case of expenditures for railroad grading and tunnel bores which were incurred by a common carrier by railroad to replace property destroyed in a disaster occurring on or about April 17, 1983, near Thistle, Utah, such expenditures, to the extent not in excess of $15,000,000, shall be treated as recovery property which is 5-year property under section 168 of the Internal Revenue Code of 1954 (as in effect before the amendments made by this Act) and which is placed in service at the time such expenditures were incurred.
(2) BUSINESS INTERRUPTION PROCEEDS.—Business interruption proceeds received for loss of use, revenues, or profits in connection with the disaster described in paragraph (1) and devoted by the taxpayer described in paragraph (1) to the construction of replacement track and related grading and tunnel bore expenditures shall be treated as constituting an amount received from the involuntary conversion of property under section 1033(a)(2) of such Code.
(3) EFFECTIVE DATE.—This subsection shall apply to taxable years ending after April 17, 1983.
(e) TREATMENT OF CERTAIN DISASTER LOSSES.—
(1) IN GENERAL.—In the case of a disaster described in paragraph (2), at the election of the taxpayer, the amendments made by section 201 of this Act—
(A) shall not apply to any property placed in service during 1987 or 1988, or
(B) shall apply to any property placed in service during 1985 or 1986,
which is property to replace property lost, damaged, or destroyed in such disaster.
(2) DISASTER TO WHICH SECTION APPLIES.—This section shall apply to a flood which occurred on November 3 through 7, 1985, and which was declared a natural disaster area by the President of the United States.

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 188 of 247 PageID #: 188

# Subtitle B—Repeal of Regular Investment Tax Credit

### SEC. 211. REPEAL OF REGULAR INVESTMENT TAX CREDIT.

"(a) GENERAL RULE.—Subpart E of part IV of subchapter A of chapter 1 (relating to investment tax credit) is amended by adding at the end thereof the following new section:

"SEC. 49. TERMINATION OF REGULAR PERCENTAGE.

"(a) GENERAL RULE.—For purposes of determining the amount of the investment tax credit determined under section 46, the regular percentage shall not apply to any property placed in service after December 31, 1985.

"(b) EXCEPTIONS.—Subject to the provisions of subsections (c) and (d), subsection (a) shall not apply to the following:

"(1) TRANSITION PROPERTY.—Property which is transition property (within the meaning of subsection (e)).

"(2) QUALIFIED PROGRESS EXPENDITURE FOR PERIODS BEFORE JANUARY 1, 1986.—In the case of any taxpayer who has made an election under section 46(d)(6), the portion of the adjusted basis of any progress expenditure property attributable to qualified progress expenditures for periods before January 1, 1986.

"(3) QUALIFIED TIMBER PROPERTY.—The portion of the adjusted basis of qualified timber property which is treated as section 38 property under section 48 (a)(1)(F).

"(c) 35-PERCENT REDUCTION IN CREDIT FOR TAXABLE YEARS AFTER 1986.—

"(1) REDUCTION IN CURRENT YEAR INVESTMENT CREDIT.—Any portion of the current year business credit under section 38(b) for any taxable year beginning after June 30, 1987, which is attributable to the regular investment credit shall be reduced by 35 percent.

"(2) UNEXPIRED CARRYFORWARDS TO 1ST TAXABLE YEAR BEGINNING AFTER JUNE 30, 1987.—Any portion of the business credit carryforward under section 38(a)(1) attributable to the regular investment credit which has not expired as of the close of the taxable year preceding the 1st taxable year of the taxpayer beginning after June 30, 1987, shall be reduced by 35 percent.

"(3) SPECIAL RULE FOR TAXABLE YEARS BEGINNING BEFORE AND ENDING AFTER JULY 1, 1987.—In the case of any taxable year beginning before and ending after July 1, 1987—

"(A) any portion of the current year business credit under section 38(b) for such taxable year, or

"(B) any portion of the business credit carryforward under section 38(a)(1) to such year,

which is attributable to the regular investment credit shall be reduced by the applicable percentage.

"(4) TREATMENT OF DISALLOWED CREDIT.—

"(A) IN GENERAL.—The amount of the reduction of the regular investment credit under paragraphs (1) and (2) shall not be allowed as a credit for any taxable year.

"(B) NO CARRYBACK FOR YEAR STRADDLING JULY 1, 1987; GROSS UP OF CARRYFORWARDS.—The amount of the reduction of the regular investment credit under paragraph (3)—

"(i) may not be carried back to any taxable year, but

"(ii) shall be added to the carryforwards from the taxable year before applying paragraph (2).

"(5) DEFINITIONS AND SPECIAL RULES.—For purposes of this subsection—

"(A) APPLICABLE PERCENTAGE.—The term 'applicable percentage' means, with respect to a taxable year beginning before and ending after July 1, 1987, the percentage which bears the same ratio to 35 percent as—

"(i) the number of months in such taxable year after June 30, 1987, bears to

"(ii) the number of months in such taxable year.

"(B) REGULAR INVESTMENT CREDIT.—

"(i) IN GENERAL.—The term 'regular investment credit' has the meaning given such term by section 48(o).

"(ii) EXCEPTION FOR TIMBER PROPERTY.—The term 'regular investment credit' shall not include any portion of the regular investment credit which is attributable to section 38 property described in section 48(a)(1)(F).

"(C) PORTION OF CREDITS ATTRIBUTABLE TO REGULAR INVESTMENT CREDIT.—The portion of any current year business credit or business credit carryforward which is attributable to the regular investment credit shall be determined on the basis that the regular investment credit is used first.

"(d) FULL BASIS ADJUSTMENT.—

"(1) IN GENERAL.—In the case of periods after December 31, 1985, section 48(q) (relating to basis adjustment to section 38 property) shall be applied with respect to transaction property—

"(A) by substituting '100 percent' for '50 percent' in paragraph (1), and

"(B) without regard to paragraph (4) thereof (relating to election of reduced credit in lieu of basis adjustment).

"(2) SPECIAL RULE FOR QUALIFIED PROGRESS EXPENDITURES.—If the taxpayer made an election under section 48(q)(4) with respect to any qualified progress expenditures for periods before January 1, 1986—

"(A) paragraph (1) shall not apply to the portion of the adjusted basis attributable to such expenditures, and

"(B) such election shall not apply to such expenditures for periods after December 31, 1985.

"(e) TRANSITION PROPERTY.—For purposes of this section—

"(1) TRANSITION PROPERTY.—The term 'transition property' means any property placed in service after December 31, 1985, and to which the amendments made by section 201 of the Tax Reform Act of 1986 do not apply, except that in making such determination—

"(A) section 203(a)(1)(A) of such Act shall be applied by substituting '1985' for '1986',

"(B) sections 203(b)(1) and 204(a)(3) of such Act shall be applied by substituting 'December 31, 1985' for 'March 1, 1986',

"(C) in the case of transition property with a class life of less than 7 years—

"(i) section 203(b)(2) of such Act shall apply, and

"(ii) in the case of property with a class life—

"(I) of less than 5 years, the applicable date shall be July 1, 1986, and

"(II) at least 5 years, but less than 7 years, the applicable date shall be January 1, 1987, and

"(D) section 203(b)(3) shall be applied by substituting '1986' for '1987'.

"(2) TREATMENT OF PROGRESS EXPENDITURES.—No progress expenditures for periods after December 31, 1985, with respect to any property shall be taken into account for purposes of applying the regular percentage unless it is reasonable to expect that such property will be transition property when placed in service. If any progress expenditures are taken into account by reason of the preceding sentence and subsequently there is not a reasonable expectation that such property would be transition property when placed in service, the credits attributable to progress expenditures with respect to such property shall be recaptured under section 47."

(b) NORMALIZATION RULES.—If, for any taxable year beginning after December 31, 1985, the requirements of paragraph (1) or (2) of section 46(f) of the Internal Revenue Code of 1986 are not met with respect to public utility property to which the regular percentage applied for purposes of determining the amount of the investment tax credit—

(1) all credits for open taxable years as of the time of the final determination referred to in section 46(f)(4)(A) of such Code shall be recaptured, and

(2) if the amount of the taxpayer's unamortized credits (or the credits not previously restored to rate base) with respect to such property (whether or not for open years) exceeds the amount referred to in paragraph (1), the taxpayer's tax for the taxable year shall be increased by the amount of such excess.

If any portion of the excess described in paragraph (2) is attributable to a credit which is allowable as a carryover to a taxable year beginning after December 31, 1985, in lieu of applying paragraph (2) with respect to such portion, the amount of such carryover shall be reduced by the amount of such portion. Rules similar to the rules of this subsection shall apply in the case of any property with respect to which the requirements of section 46(f)(9) of such Code are met.

(c) CONFORMING AMENDMENT.—The table of sections for subpart E of part IV of subchapter A of chapter 1 is amended by adding at the end thereof the following new item:

"Sec. 49. Termination of regular percentage."

(d) EXCEPTION FOR CERTAIN AIRCRAFT USED IN ALASKA.—

(1) The amendments made by subsection (a) shall not apply to property originally placed in service after December 29, 1982, and before August 1, 1985, by a corporation incorporated in Alaska on May 21, 1953, and used by it—

(A) in part, for the transportation of mail for the United States Postal Service in the State of Alaska, and

(B) in part, to provide air service in the State of Alaska on routes which had previously been served by an air carrier that received compensation from the Civil Aeronautics Board for providing service.

(2) In the case of property described in subparagraph (A)—

Case 1:20-cv-03087-AMD-LB    Document 1    Filed 07/09/20    Page 191 of 247 PageID #: 191

(A) such property shall be treated as recovery property described in section 208(d)(5) of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA");

(B) "48 months" shall be substituted for "3 months" each place it appears in applying—

(i) section 48(b)(2)(B) of the Code, and

(ii) section 168(f)(8)(D) of the Code (as in effect after the amendments made by the Technical Corrections Act of 1982 but before the amendments made by TEFRA); and

(C) the limitation of section 168(f)(8)(D)(ii)(III) (as then in effect) shall be read by substituting "the lessee's original cost basis.", for "the adjusted basis of the lessee at the time of the lease.".

(3) The aggregate amount of property to which this paragraph shall apply shall not exceed $60,000,000.

(e) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in this subsection, the amendments made by this section shall apply to property placed in service after December 31, 1985, in taxable years ending after such date.

(2) EXCEPTIONS FOR CERTAIN FILMS.—For purposes of determining whether any property is transition property within the meaning of section 49(e) of the Internal Revenue Code of 1986—

(A) in the case of any motion picture or television film, construction shall be treated as including production for purposes of section 203(b)(1) of this Act, and written contemporary evidence of an agreement (in accordance with industry practice) shall be treated as a written binding contract for such purposes,

(B) in the case of any television film, a license agreement or agreement for production services between a television network and a producer shall be treated as a binding contract for purposes of section 203(b)(1)(A) of this Act, and

(C) a motion picture film shall be treated as described in section 203(b)(1)(A) of this Act if—

(i) funds were raised pursuant to a public offering before September 26, 1985, for the production of such film,

(ii) 40 percent of the funds raised pursuant to such public offering are being spent on films the production of which commenced before such date, and

(iii) all of the films funded by such public offering are required to be distributed pursuant to distribution agreements entered into before September 26, 1985.

(3) NORMALIZATION RULES.—The provisions of subsection (b) shall apply to any violation of the normalization requirements under paragraph (1) or (2) of section 46(f) of the Internal Revenue Code of 1986 occurring in taxable years ending after December 31, 1985.

(4) ADDITIONAL EXCEPTIONS.—

(A) Paragraphs (c) and (d) of section 49 of the Internal Revenue Code of 1954 shall not apply to any continuous caster facility for slabs and blooms which is subject to a lease and which is part of a project the second phase of which is a continuous slab caster which was placed in service before December 31, 1935.

PUBLIC LAW 99–514—OCT. 22, 1986

(B) For purposes of determining whether an automobile manufacturing facility (including equipment and incidental appurtenances) is transition property within the meaning of section 49(e), property with respect to which the Board of Directors of an automobile manufacturer formally approved the plan for the project on January 7, 1985 shall be treated as transition property, but only with respect to $70,000,000 of regular investment tax credits.

**SEC. 212. EFFECTIVE 15-YEAR CARRYBACK OF EXISTING CARRY-FORWARDS OF STEEL COMPANIES.**

(a) GENERAL RULE.—If a qualified corporation makes an election under this section for its 1st taxable year beginning after December 31, 1986, with respect to any portion of its existing carryforwards, the amount determined under subsection (b) shall be treated as a payment against the tax imposed by chapter 1 of the Internal Revenue Code of 1986 made by such corporation on the last day prescribed by law (without regard to extensions) for filing its return of tax under chapter 1 of such Code for such 1st taxable year.

(b) AMOUNT.—For purposes of subsection (a), the amount determined under this subsection shall be the lesser of—

(1) 50 percent of the portion of the corporation's existing carryforwards to which the election under subsection (a) applies, or

(2) the corporation's net tax liability for the carryback period.

(c) CORPORATION MAKING ELECTION MAY NOT USE SAME AMOUNTS UNDER SECTION 38.—In the case of a qualified corporation which makes an election under subsection (a), the portion of such corporation's existing carryforwards to which such an election applies shall not be taken into account under section 38 of the Internal Revenue Code of 1986 for any taxable year beginning after December 31, 1986.

(d) NET TAX LIABILITY FOR CARRYBACK PERIOD.—For purposes of this section—

(1) IN GENERAL.—A corporation's net tax liability for the carryback period is the aggregate of such corporation's net tax liability for taxable years in the carryback period.

(2) NET TAX LIABILITY.—The term "net tax liability" means, with respect to any taxable year, the amount of the tax imposed by chapter 1 of the Internal Revenue Code of 1954 for such taxable year, reduced by the sum of the credits allowable under part IV of subchapter A of such chapter 1 (other than section 34 thereof). For purposes of the preceding sentence, any tax treated as not imposed by chapter 1 of such Code under section 26(b)(2) of such Code shall not be treated as tax imposed by such chapter 1.

(3) CARRYBACK PERIOD.—The term "carryback period" means the period—

(A) which begins with the corporation's 15th taxable year preceding the 1st taxable year from which there is an unused credit included in such corporation's existing carryforwards (but in no event shall such period begin before the corporation's 1st taxable year ending after December 31, 1961), and

(B) which ends with the corporation's last taxable year beginning before January 1, 1986.

PUBLIC LAW 99–514—OCT. 22, 1986     100 STAT. 2171

(e) NO RECOMPUTATION OF MINIMUM TAX, ETC.—Nothing in this section shall be construed to affect—

(1) the amount of the tax imposed by section 56 of the Internal Revenue Code of 1986, or

(2) the amount of any credit allowable under such Code, for any taxable year in the carryback period.

(f) REINVESTMENT REQUIREMENT.—

(1) IN GENERAL.—Any amount determined under this section must be committed to reinvestment in, and modernization of the steel industry through investment in modern plant and equipment, research and development, and other appropriate projects, such as working capital for steel operations and programs for the retraining of steel workers.

(2) GENERAL RULE.—If this section applies to LTV Corporation, then, in lieu of the requirements of paragraph (1)—

(A) such corporation shall place such refund in a separate account; and

(B) amounts in such separate account—

(i) shall only be used by the corporation—

(I) to purchase an insurance policy which provides that, in the event the corporation becomes involved in a title 11 or similar case (as defined in section 368(a)(3)(A) of the Internal Revenue Code of 1954), the insurer will provide life and health insurance coverage during the 1-year period beginning on the date such involvement begins to any individual with respect to whom the corporation would (but for such involvement) have been obligated to provide such coverage the coverage provided by the insurer will be identical to the coverage which the corporation would (but for such involvement) have been obligated to provide, and provides that the payment of insurance premiums will not be required during such 1-year period to keep such policy in force, or

(II) directly in connection with the trade or business of the corporation in the manufacturer or production of steel; and

(ii) shall be used (or obligated) for purposes described in clause (i) not later than 3 months after the corporation receives the refund.

(g) DEFINITIONS.—For purposes of this section—

(1) QUALIFIED CORPORATION.—

(A) IN GENERAL.—The term "qualified corporation" means any corporation which is described in section 806(b) of the Steel Import Stabilization Act and a company which was incorporated on February 11, 1983, in Michigan.

(B) CERTAIN PREDECESSORS INCLUDED.—In the case of any qualified corporation which has carryforward attributable to a predecessor corporation described in such section 806(b), the qualified corporation and the predecessor corporation shall be treated as 1 corporation for purposes of subsections (d) and (e).

(2) EXISTING CARRYFORWARDS.—The term "existing carryforward" means the aggregate of the amounts which—

(A) are unused business credit carryforwards to the taxpayer's 1st taxable year beginning after December 31, 1986

PUBLIC LAW 99-514—OCT. 22, 1986

(determined without regard to the limitations of section 38(c) and any reduction under section 49 of the Internal Revenue Code of 1986), and

(B) are attributable to the amount of the regular investment credit determined under section 46(a)(1) of such Code (relating to regular percentage), or any corresponding provision of prior law, determined on the basis that the regular investment credit was used first.

## SEC. 213. EFFECTIVE 15-YEAR CARRYBACK OF EXISTING CARRYFORWARDS OF QUALIFIED FARMERS.

(a) GENERAL RULE.—If a taxpayer who is a qualified farmer makes an election under this section for its 1st taxable year beginning after December 31, 1986, with respect to any portion of its existing carryforwards, the amount determined under subsection (b) shall be treated as a payment against the tax imposed by chapter 1 of the Internal Revenue Code of 1986 made by such taxpayer on the last day prescribed by law (without regard to extensions) for filing its return of tax under chapter 1 of such Code for such 1st taxable year.

(b) AMOUNT.—For purposes of subsection (a), the amount determined under this subsection shall be equal to the smallest of—

(1) 50 percent of the portion of the taxpayer's existing carryforwards to which the election under subsection (a) applies,

(2) the taxpayer's net tax liability for the carryback period (within the meaning of section 212(d) of this Act), or

(3) $750.

(c) TAXPAYER MAKING ELECTION MAY NOT USE SAME AMOUNTS UNDER SECTION 38.—In the case of a qualified farmer who makes an election under subsection (a), the portion of such farmer's existing carryforwards to which such an election applies shall not be taken into account under section 38 of the Internal Revenue Code of 1986 for any taxable year beginning after December 31, 1986.

(d) NO RECOMPUTATION OF MINIMUM TAX, ETC.—Nothing in this section shall be construed to affect—

(1) the amount of the tax imposed by section 56 of the Internal Revenue Code of 1954, or

(2) the amount of any credit allowable under such Code, for any taxable year in the carryback period (within the meaning of section 212(d)(3) of this Act).

(e) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

(1) QUALIFIED FARMER.—The term "qualified farmer" means any taxpayer who, during the 3-taxable year period preceding the taxable year for which an election is made under subsection (a), derived 50 percent or more of the taxpayer's gross income from the trade or business of farming.

(2) EXISTING CARRYFORWARD.—The term "existing carryforward" means the aggregate of the amounts which—

(A) are unused business credit carryforwards to the taxpayer's 1st taxable year beginning after December 31, 1986 (determined without regard to the limitations of section 38(c) of the Internal Revenue Code of 1986), and

(B) are attributable to the amount of the investment credit determined under section 46(a) of such Code (or any corresponding provision of prior law) with respect to section 38 property which was used by the taxpayer in the trade or

business of farming, determined on the basis that such credit was used first.

(3) FARMING.—The term "farming" has the meaning given such term by section 2032A(e) (4) and (5) of such Code.

## Subtitle C—General Business Credit Reduction

### SEC. 221. REDUCTION IN TAX LIABILITY WHICH MAY BE OFFSET BY BUSINESS CREDIT FROM 85 PERCENT TO 75 PERCENT.

(a) IN GENERAL.—Subparagraph (B) of section 38(c)(1) (relating to limitation based on amount of tax) is amended by striking out "85 percent" and inserting in lieu thereof "75 percent".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to taxable years beginning after December 31, 1985.

## Subtitle D—Research and Development Provisions

### SEC. 231. AMENDMENTS RELATING TO CREDIT FOR INCREASING RESEARCH ACTIVITIES.

(a) 3-YEAR EXTENSION OF THE RESEARCH CREDIT.—

(1) IN GENERAL.—Section 30 (relating to credit for increasing research activities) is amended by adding at the end thereof the following new subsection:

"(h) TERMINATION.—

"(1) IN GENERAL.—This section shall not apply to any amount paid or incurred after December 31, 1988.

"(2) COMPUTATION OF BASE PERIOD EXPENSES.—In the case of any taxable year which begins before January 1, 1989, and ends after December 31, 1988, any amount for any base period with respect to such taxable year shall be the amount which bears the same ratio to such amount for such base period as the number of days in such taxable year before January 1, 1989, bears to the total number of days in such taxable year."

(2) CONFORMING AMENDMENT.—Subsection (d) of section 221 of the Economic Recovery Tax Act of 1981 is amended—

(A) by striking out ", and before January 1, 1986" in paragraph (1), and

(B) by striking out the last sentence of paragraph (2)(A).

(b) DEFINITION OF QUALIFIED RESEARCH; CERTAIN RESEARCH NOT ELIGIBLE FOR CREDIT.—Subsection (d) of section 30 (defining qualified research) is amended to read as follows:

"(d) QUALIFIED RESEARCH DEFINED.—For purposes of this section—

"(1) IN GENERAL.—The term 'qualified research' means research—

"(A) with respect to which expenditures may be treated as expenses under section 174,

"(B) which is undertaken for the purpose of discovering information—

"(i) which is technological in nature, and

"(ii) the application of which is intended to be useful in the development of a new or improved business component of the taxpayer, and

"(C) substantially all of the activities of which constitute elements of a process of experimentation for a purpose described in paragraph (3).

Such term does not include any activity described in paragraph (4).

"(2) TESTS TO BE APPLIED SEPARATELY TO EACH BUSINESS COMPONENT.—For purposes of this subsection—

"(A) IN GENERAL.—Paragraph (1) shall be applied separately with respect to each business component of the taxpayer.

"(B) BUSINESS COMPONENT DEFINED.—The term 'business component' means any product, process, computer software, technique, formula, or invention which is to be—

"(i) held for sale, lease, or license, or

"(ii) used by the taxpayer in a trade or business of the taxpayer.

"(C) SPECIAL RULE FOR PRODUCTION PROCESSES.—Any plant process, machinery, or technique for commercial production of a business component shall be treated as a separate business component (and not as part of the business component being produced).

"(3) PURPOSES FOR WHICH RESEARCH MAY QUALIFY FOR CREDIT.—For purposes of paragraph (1)(C)—

"(A) IN GENERAL.—Research shall be treated as conducted for a purpose described in this paragraph if it relates to—

"(i) a new or improved function,

"(ii) performance, or

"(iii) reliability or quality.

"(B) CERTAIN PURPOSES NOT QUALIFIED.—Research shall in no event be treated as conducted for a purpose described in this paragraph if it relates to style, taste, cosmetic, or seasonal design factors.

"(4) ACTIVITIES FOR WHICH CREDIT NOT ALLOWED.—The term 'qualified research' shall not include any of the following:

"(A) RESEARCH AFTER COMMERCIAL PRODUCTION.—Any research conducted after the beginning of commercial production of the business component.

"(B) ADAPTATION OF EXISTING BUSINESS COMPONENTS.—Any research related to the adaptation of an existing business component to a particular customer's requirement or need.

"(C) DUPLICATION OF EXISTING BUSINESS COMPONENT.—Any research related to the reproduction of an existing business component (in whole or in part) from a physical examination of the business component itself or from plans, blueprints, detailed specifications, or publicly available information with respect to such business component.

"(D) SURVEYS, STUDIES, ETC.—Any—

"(i) efficiency survey,

"(ii) activity relating to management function or technique,

"(iii) market research, testing, or development (including advertising or promotions),

"(iv) routine data collection, or

"(v) routine or ordinary testing or inspection for quality control.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2175

"(E) COMPUTER SOFTWARE.—Except to the extent provided in regulations, any research with respect to computer software which is developed by (or for the benefit of) the taxpayer primarily for internal use by the taxpayer, other than for use in—

"(i) an activity which constitutes qualified research (determined with regard to this subparagraph), or

"(ii) a production process with respect to which the requirements of paragraph (1) are met.

"(F) FOREIGN RESEARCH.—Any research conducted outside the United States.

"(G) SOCIAL SCIENCES, ETC.—Any research in the social sciences, arts, or humanities.

"(H) FUNDED RESEARCH.—Any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)."

(c) REDUCTION IN CREDIT; CREDIT FOR BASIC RESEARCH PAYMENTS TO QUALIFIED ORGANIZATIONS.—

(1) IN GENERAL.—Subsection (a) of section 30 is amended to read as follows:

"(a) GENERAL RULE.—For purposes of section 38, the research credit determined under this section for the taxable year shall be an amount equal to the sum of—

"(1) 20 percent of the excess (if any) of—

"(A) the qualified research expenses for the taxable year, over

"(B) the base period research expenses, and

"(2) 20 percent of the basic research payments determined under subsection (e)(1)(A)."

(2) DEFINITIONS AND SPECIAL RULES RELATING TO PAYMENTS FOR BASIC RESEARCH.—Subsection (e) of section 30 (relating to credit available with respect to certain basic research by colleges, universities, and certain research organizations) is amended to read as follows:

"(e) CREDIT ALLOWABLE WITH RESPECT TO CERTAIN PAYMENTS TO QUALIFIED ORGANIZATIONS FOR BASIC RESEARCH.—For purposes of this section—

"(1) IN GENERAL.—In the case of any taxpayer who makes basic research payments for any taxable year—

"(A) the amount of basic research payments taken into account under subsection (a)(2) shall be equal to the excess of—

"(i) such basic research payments, over

"(ii) the qualified organization base period amount, and

"(B) that portion of such basic research payments which does not exceed the qualified organization base period amount shall be treated as contract research expenses for purposes of subsection (a)(1).

"(2) BASIC RESEARCH PAYMENTS DEFINED.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'basic research payment' means, with respect to any taxable year, any amount paid in cash during such taxable year by a corporation to any qualified organization for basic research but only if—

"(i) such payment is pursuant to a written agreement between such corporation and such qualified organization, and

"(ii) such basic research is to be performed by such qualified organization.

"(B) EXCEPTION TO REQUIREMENT THAT RESEARCH BE PERFORMED BY THE ORGANIZATION.—In the case of a qualified organization described in subparagraph (C) or (D) of paragraph (6), clause (ii) of subparagraph (A) shall not apply.

"(3) QUALIFIED ORGANIZATION BASE PERIOD AMOUNT.—For purposes of this subsection, the term 'qualified organization base period amount' means an amount equal to the sum of—

"(A) the minimum basic research amount, plus

"(B) the maintenance-of-effort amount.

"(4) MINIMUM BASIC RESEARCH AMOUNT.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'minimum basic research amount' means an amount equal to the greater of—

"(i) 1 percent of the average of the sum of amounts paid or incurred during the base period for—

"(I) any in-house research expenses, and

"(II) any contract research expenses, or

"(ii) the amounts treated as contract research expenses during the base period by reason of this subsection (as in effect during the base period).

"(B) FLOOR AMOUNT.—Except in the case of a taxpayer which was in existence during a taxable year (other than a short taxable year) in the base period, the minimum basic research amount for any base period shall not be less than 50 percent of the basic research payments for the taxable year for which a determination is being made under this subsection.

"(5) MAINTENANCE-OF-EFFORT AMOUNT.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'maintenance-of-effort amount' means, with respect to any taxable year, an amount equal to the excess (if any) of—

"(i) an amount equal to—

"(I) the average of the nondesignated university contributions paid by the taxpayer during the base period, multiplied by

"(II) the cost-of-living adjustment for the calendar year in which such taxable year begins, over

"(ii) the amount of nondesignated university contributions paid by the taxpayer during such taxable year.

"(B) NONDESIGNATED UNIVERSITY CONTRIBUTIONS.—For purposes of this paragraph, the term 'nondesignated university contribution' means any amount paid by a taxpayer to any qualified organization described in paragraph (6)(A)—

"(i) for which a deduction was allowable under section 170, and

"(ii) which was not taken into account—

"(I) in computing the amount of the credit under this section (as in effect during the base period) during any taxable year in the base period, or

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 199 of 247 PageID #: 199

"(II) as a basic research payment for purposes of this section.

"(C) COST-OF-LIVING ADJUSTMENT DEFINED.—

"(i) IN GENERAL.—The cost-of-living adjustment for any calendar year is the cost-of-living adjustment for such calendar year determined under section 1(f)(3).

"(ii) SPECIAL RULE WHERE BASE PERIOD ENDS IN A CALENDAR YEAR OTHER THAN 1983 OR 1984.—If the base period of any taxpayer does not end in 1983 or 1984, section 1(f)(3)(B) shall, for purposes of this paragraph, be applied by substituting the calendar year in which such base period ends for 1987.

"(6) QUALIFIED ORGANIZATION.—For purposes of this subsection, the term 'qualified organization' means any of the following organizations:

"(A) EDUCATIONAL INSTITUTIONS.—Any educational organization which—

"(i) is an institution of higher education (within the meaning of section 3304(f)), and

"(ii) is described in section 170(b)(1)(A)(ii).

"(B) CERTAIN SCIENTIFIC RESEARCH ORGANIZATIONS.—Any organization not described in subparagraph (A) which—

"(i) is described in section 501(c)(3) and is exempt from tax under section 501(a),

"(ii) is organized and operated primarily to conduct scientific research, and

"(iii) is not a private foundation.

"(C) SCIENTIFIC TAX-EXEMPT ORGANIZATIONS.—Any organization which—

"(i) is described in—

"(I) section 501(c)(3) (other than a private foundation), or

"(II) section 501(c)(6),

"(ii) is exempt from tax under section 501(a),

"(iii) is organized and operated primarily to promote scientific research by qualified organizations described in subparagraph (A) pursuant to written research agreements, and

"(iv) currently expends—

"(I) substantially all of its funds, or

"(II) substantially all of the basic research payments received by it,

for grants to, or contracts for basic research with, an organization described in subparagraph (A).

"(D) CERTAIN GRANT ORGANIZATIONS.—Any organization not described in subparagraph (B) or (C) which—

"(i) is described in section 501(c)(3) and is exempt from tax under section 501(a) (other than a private foundation),

"(ii) is established and maintained by an organization established before July 10, 1981, which meets the requirements of clause (i),

"(iii) is organized and operated exclusively for the purpose of making grants to organizations described in subparagraph (A) pursuant to written research agreements for purposes of basic research, and

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 200 of 247 PageID #: 200

"(iv) makes an election, revocable only with the consent of the Secretary, to be treated as a private foundation for purposes of this title (other than section 4940, relating to excise tax based on investment income).

"(7) DEFINITIONS AND SPECIAL RULES.—For purposes of this subsection—

"(A) BASIC RESEARCH.—The term 'basic research' means any original investigation for the advancement of scientific knowledge not having a specific commercial objective, except that such term shall not include—

"(i) basic research conducted outside of the United States, and

"(ii) basic research in the social sciences, arts, or humanities.

"(B) BASE PERIOD.—The term 'base period' means the 3-taxable-year period ending with the taxable year immediately preceding the 1st taxable year of the taxpayer beginning after December 31, 1983.

"(C) EXCLUSION FROM INCREMENTAL CREDIT CALCULATION.—For purposes of determining the amount of credit allowable under subsection (a)(1) for any taxable year, the amount of the basic research payments taken into account under subsection (a)(2)—

"(i) shall not be treated as qualified research expenses under subsection (a)(1)(A), and

"(ii) shall not be included in the computation of base period research expenses under subsection (a)(1)(B).

"(D) TRADE OR BUSINESS QUALIFICATION.—For purposes of applying subsection (b)(1) to this subsection, any basic research payments shall be treated as an amount paid in carrying on a trade or business of the taxpayer in the taxable year in which it is paid (without regard to the provisions of subsection (b)(3)(B)).

"(E) CERTAIN CORPORATIONS NOT ELIGIBLE.—The term 'corporation' shall not include—

"(i) an S corporation,

"(ii) a personal holding company (as defined in section 542), or

"(iii) a service organization (as defined in section 414(m)(3))."

(d) RESEARCH CREDIT TREATED AS OTHER BUSINESS CREDITS.—

(1) IN GENERAL.—Section 38(b) (relating to current year business credit), as amended by this Act, is amended by striking out "plus" at the end of paragraph (2), by striking out the period at the end of paragraph (3) and inserting in lieu thereof ", plus", and by adding at the end thereof the following new paragraph:

"(4) the research credit determined under section 41(a)."

(2) TRANSFER OF RESEARCH CREDIT TO SUBPART RELATING TO BUSINESS CREDITS.—Section 30 (relating to credit for increasing research activities) is hereby transferred to subpart D of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 (as amended by this Act), inserted after section 40 of such Code, and redesignated as section 41 of such Code.

(3) TECHNICAL AND CONFORMING AMENDMENTS.—

(A)(i) Subsections (b) and (c) of section 28 are each amended by striking out "section 30" each place it appears and inserting in lieu thereof "section 41".

(ii) Paragraph (2) of section 28(c) is amended by striking out "section 30(b)" and inserting in lieu thereof "section 41(b)".

(iii) Paragraph (4) of section 28(d) is amended by striking out "section 30(f)" and inserting in lieu thereof "section 41(f)".

(iv) Subparagraph (D) of section 28(b)(1) is amended by striking out "1985" and inserting in lieu thereof "1988".

(B) Subsection (d) of section 38, as amended by this Act, is amended by inserting "41(a)," after "40(a),".

(C)(i) Subsection (d) of section 39 (relating to carryback and carry forward of unused credits) is amended by adding at the end thereof the following new paragraph:

"(3) SIMILAR RULES FOR RESEARCH CREDIT.—Rules similar to the rules of paragraphs (1) and (2) shall apply to the credit allowable under section 30 (as in effect before the date of the enactment of the Tax Reform Act of 1986) except that—

"(A) 'December 31, 1985' shall be substituted for 'December 31, 1983' each place it appears, and

"(B) 'January 1, 1986' shall be substituted for 'January 1, 1984'."

(ii) Subsection (g) of section 41 (relating to limitation based on amount of tax), as redesignated by this section, is amended to read as follows:

"(g) SPECIAL RULE FOR PASS-THRU OF CREDIT.—In the case of an individual who—

"(1) owns an interest in an unincorporated trade or business,

"(2) is a partner in a partnership,

"(3) is a beneficiary of an estate or trust, or

"(4) is a shareholder in an S corporation,

the amount determined under subsection (a) for any taxable year shall not exceed an amount (separately computed with respect to such person's interest in such trade or business or entity) equal to the amount of tax attributable to that portion of a person's taxable income which is allocable or apportionable to the person's interest in such trade or business or entity."

(D) Subparagraph (B) of section 108(b)(2) (relating to reduction of tax attributes in title 11 case or insolvency), as amended by this Act, is amended to read as follows:

"(B) GENERAL BUSINESS CREDIT.—Any carryover to or from the taxable year of a discharge of an amount for purposes for determining the amount allowable as a credit under section 38 (relating to general business credit)."

(E) Paragraph (3) of section 280C(b) is amended—

(i) by striking out "section 30(f)(5)" and inserting in lieu thereof "section 41(f)(5)",

(ii) by striking out "section 30(f)(1)(B)" and inserting in lieu thereof "section 41(f)(1)(B)", and

(iii) by striking out "section 30(f)(1)" and inserting in lieu thereof "section 41(f)(1)".

(F) Subsection (c) of section 381 is amended by striking out paragraph (25) and by redesignating paragraph (26) as paragraph (25).

(G) Section 936(h)(5)(C)(i)(I)(a) (defining product area research) is amended by striking out "section 30(b)" and inserting in lieu thereof "section 41(b)".

(H) Section 6411 (relating to tentative carryback and refund adjustments) is amended—

    (i) by striking out "by a research credit carryback provided in section 30(g)(2)" in subsection (a),

    (ii) by striking out "a research credit carryback or" in subsection (a),

    (iii) by striking out "(or, with respect to any portion of a business credit carryback attributable to a research credit carryback from a subsequent taxable year within a period of 12 months from the end of such subsequent taxable year)" in subsection (a), and

    (iv) by striking out "unused research credit," each place it appears in subsections (a) and (b).

(I) Subparagraph (C) of section 6511(d)(6) (defining credit carryback) is amended by striking out "and any research credit carryback under section 30(g)(2)".

(J) The table of sections for subpart B of part IV of subchapter A of chapter 1 is amended by striking out the item relating to section 30.

(K) The table of sections for subpart D of such part is amended by inserting after the item relating to section 40 the following new item:

"Sec. 41. Credit for increasing research activities."

(e) DENIAL OF CREDIT WITH RESPECT TO AMOUNTS FOR CERTAIN LEASED PERSONAL PROPERTY.—Clause (iii) of section 41(b)(2)(A) (defining in-house research expenses), as redesignated by subsection (d), is amended to read as follows:

    "(iii) under regulations prescribed by the Secretary, any amount paid or incurred to another person for the right to use computers in the conduct of qualified research."

(f) DEDUCTION FOR CERTAIN CONTRIBUTIONS OF SCIENTIFIC RESEARCH PROPERTY.—Clause (i) of section 170(e)(4)(B) (relating to special rule for contributions of scientific property used for research) is amended to read as follows:

    "(i) the contribution is to an organization described in subparagraph (A) or subparagraph (B) of section 41(e)(6),".

(g) EFFECTIVE DATE.—

    (1) IN GENERAL.—Except as provided in this subsection (2), the amendments made by this section shall apply to taxable years beginning after December 31, 1985.

    (2) SUBSECTION (a).—The amendments made by subsection (a) shall apply to taxable years ending after December 31, 1985.

    (3) BASIC RESEARCH.—Section 41(a)(2) of the Internal Revenue Code of 1986 (as added by this section), and the amendments made by subsection (c)(2), shall apply to taxable years beginning after December 31, 1986.

**SEC. 232. EXTENSION OF CREDIT FOR CLINICAL TESTING EXPENSES FOR CERTAIN DRUGS.**

Subsection (e) of section 28 (relating to termination) is amended by striking out "1987" and inserting in lieu thereof "1990".

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 203 of 247 PageID #: 203

# Subtitle E—Changes in Certain Amortization Provisions

### SEC. 241. REPEAL OF 5-YEAR AMORTIZATION OF TRADEMARK AND TRADE NAME EXPENDITURES.

(a) IN GENERAL.—Section 177 (relating to trademark and trade name expenditures) is hereby repealed.

(b) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) Paragraph (3) of section 312(n) is amended by striking out ", 177,".

(2) Subsection (a) of section 1016 (relating to adjustments to basis) is amended by striking out paragraph (16) and by redesignating paragraphs (17) through (27) as paragraphs (16) through (26), respectively.

(3) The table of sections for part VI of subchapter B of chapter 1 is amended by striking out the item relating to section 177.

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section shall apply to expenditures paid or incurred after December 31, 1986.

(2) TRANSITIONAL RULE.—The amendments made by this section shall not apply to any expenditure incurred—

(A) pursuant to a binding contract entered into before March 2, 1986, or

(B) with respect to the development, protection, expansion, registration, or defense of a trademark or trade name commenced before March 2, 1986, but only if not less than the lesser of $1,000,000 or 5 percent of the aggregate cost of such development, protection, expansion, registration, or defense has been incurred or committed before such date.

The preceding sentence shall not apply to any expenditure with respect to a trademark or trade name placed in service after December 31, 1987.

### SEC. 242. REPEAL OF AMORTIZATION OF RAILROAD GRADING AND TUNNEL BORES.

(a) IN GENERAL.—Section 185 (relating to amortization of railroad grading and tunnel bores) is hereby repealed.

(b) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) Subparagraph (B) of section 1082(a)(2) is amended by striking out ", 185,".

(2) Paragraph (3) of section 1250(b) (defining additional depreciation) is amended by inserting "(as in effect before its repeal by the Tax Reform Act of 1986)" after "185".

(3) The table of sections for part VI of subchapter B of chapter 1 is amended by striking out the item relating to section 185.

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section shall apply to that portion of the basis of any property which is attributable to expenditures paid or incurred after December 31, 1986.

(2) TRANSITIONAL RULE.—The amendments made by this section shall not apply to any expenditure incurred—

(A) pursuant to a binding contract entered into before March 2, 1986, or

(B) with respect to any improvement commenced before March 2, 1986, but only if not less than the lesser of $1,000,000 or 5 percent of the aggregate cost of such improvement has been incurred or committed before such date.

The preceding sentence shall not apply to any expenditure with respect to an improvement placed in service after December 31, 1987.

## SEC. 243. DEDUCTION FOR BUS AND FREIGHT FORWARDER OPERATING AUTHORITY.

(a) BUS OPERATING AUTHORITY.—

(1) IN GENERAL.—Subject to the modifications contained in paragraph (2), section 266 of the Economic Recovery Tax Act of 1981 shall be applied as if the term "motor carrier operating authority" included a bus operating authority.

(2) MODIFICATIONS.—For purposes of paragraph (1), section 266 of such Act shall be applied—

(A) by substituting "November 19, 1982" for "July 1, 1980" each place it appears, and

(B) by substituting "November 1982" for "July 1980" in subsection (a) thereof.

(3) BUS OPERATING AUTHORITY DEFINED.—For purposes of this subsection and section 266 of such Act, the term "bus operating authority" means—

(A) a certificate or permit held by a motor common or contract carrier of passengers which was issued pursuant to subchapter II of chapter 109 of title 49, United States Code, and

(B) a certificate or permit held by a motor carrier authorizing the transportation of passengers, as a common carrier, over regular routes in intrastate commerce which was issued by the appropriate State agency.

(b) FREIGHT FORWARDER OPERATING AUTHORITY.—

(1) IN GENERAL.—Subject to the modifications contained in paragraph (2), section 266 of the Economic Recovery Tax Act of 1981 shall be applied as if subsection (b) thereof contained "or a freight forwarder" after "contract carrier of property".

(2) MODIFICATIONS.—The modifications referred to in this paragraph are:

(A) 60-MONTH PERIOD TO BEGIN IN 1987.—The 60-month period referred te in section 266(a) of such Act shall begin with the later of—

(i) the deregulation month, or

(ii) at the election of the taxpayer, the 1st month of the taxpayer's 1st taxable year beginning after the deregulation month.

(B) AUTHORITY MUST BE HELD AS OF BEGINNING OF 60-MONTH PERIOD.—A motor carrier operating authority shall not be taken into account unless such authority is held by the taxpayer at the beginning of the 60-month peried applicable to the taxpayer under subparagraph (A).

(C) ADJUSTED BASIS NOT TO EXCEED ADJUSTED BASIS AT BEGINNING OF 60-MONTH PERIOD.—The adjusted basis taken into account with respect to any motor carrier operating authority shall not exceed the adjusted basis of such

authority as of the beginning of the 60-month period applicable to the taxpayer under subparagraph (A).

(3) DEREGULATION MONTH.—For purposes of this section, the term "deregulation month" means the month in which the Secretary of the Treasury or his delegate determines that a Federal law has been enacted which deregulates the freight forwarding industry.

(c) SPECIAL RULE FOR MOTOR CARRIER OPERATING AUTHORITY.—In the case of a corporation which was incorporated on December 29, 1969, in the State of Delaware, notwithstanding any other provision of law, there shall be allowed as a deduction for the taxable year of the taxpayer beginning in 1980 an amount equal to $2,705,188 for its entire loss due to a decline in value of its motor carrier operating authority by reason of deregulation.

(d) EFFECTIVE DATES.—

(1) BUS OPERATING AUTHORITY.—

(A) IN GENERAL.—Subsection (a) shall apply to taxable years ending after November 18, 1982.

(B) STATUTE OF LIMITATIONS.—If refund or credit of any overpayment of tax resulting from subsection (a) is prevented at any time on or before the date which is 1 year after the date of the enactment of this Act by the operation of any law or rule of law (including res judicata), refund or credit of such overpayment (to the extent attributable to the application of such subsection) may, notwithstanding such law or rule of law, be made or allowed if claim therefore is filed on or before the date which is 18 months after such date of enactment.

(2) FREIGHT FORWARDER OPERATING AUTHORITY.—Subsection (b) shall apply to taxable years ending after the month preceding the deregulation month.

**SEC. 244. TREATMENT OF EXPENDITURES FOR REMOVAL OF ARCHITECTURAL BARRIERS TO THE HANDICAPPED AND ELDERLY MADE PERMANENT.**

Paragraph (2) of section 190(d) (relating to expenditures to remove architectural and transportation barriers to the handicapped and elderly) is amended by striking out "1983, and before January 1, 1986" and inserting in lieu thereof "1983"

# Subtitle F—Provisions Relating to Real Estate

**SEC. 251. MODIFICATION OF INVESTMENT TAX CREDIT FOR REHABILITATION EXPENDITURES.**

(a) REDUCTION IN PERCENTAGE.—Paragraph (4) of section 46(b) (relating to rehabilitation percentage) is amended to read as follows:

"(4) REHABILITATION PERCENTAGE.—

"(A) IN GENERAL.—The term 'rehabilitation percentage' means—

"(i) 10 percent in the case of qualified rehabilitation expenditures with respect to a qualified rehabilitated building other than a certified historic structure, and

"(ii) 20 percent in the case of such expenditure with respect to a certified historic structure.

"(B) REGULAR AND ENERGY PERCENTAGES NOT TO APPLY.—The regular percentage and the energy percentages shall

not apply to that portion of the basis of any property which is attributable to qualified rehabilitation expenditures."

(b) SPECIAL RULES FOR QUALIFIED REHABILITATED BUILDINGS.—Subsection (g) of section 48 (relating to special rules for qualified rehabilitated buildings) is amended to read as follows:

"(g) SPECIAL RULES FOR QUALIFIED REHABILITATED BUILDINGS.—For purposes of this subpart—

"(1) QUALIFIED REHABILITATED BUILDING.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'qualified rehabilitated building' means any building (and its structural components) if—

"(i) such building has been substantially rehabilitated,

"(ii) such building was placed in service before the beginning of the rehabilitation, and

"(iii) in the case of any building other than a certified historic structure, in the rehabilitation process—

"(I) 50 percent or more of the existing external walls of such building are retained in place as external walls,

"(II) 75 percent or more of the existing external walls of such building are retained in place as internal or external walls, and

"(III) 75 percent or more of the existing internal structural framework of such building is retained in place.

"(B) BUILDING MUST BE FIRST PLACED IN SERVICE BEFORE 1936.—In the case of a building other than a certified historic structure, a building shall not be a qualified rehabilitated building unless the building was first placed in service before 1936.

"(C) SUBSTANTIALLY REHABILITATED DEFINED.—

"(i) IN GENERAL.—For purposes of subparagraph (A)(i), a building shall be treated as having been substantially rehabilitated only if the qualified rehabilitation expenditures during the 24-month period selected by the taxpayer (at the time and in the manner prescribed by regulations) and ending with or within the taxable year exceed the greater of—

"(I) the adjusted basis of such building (and its structural components), or

"(II) $5,000.

The adjusted basis of the building (and its structural components) shall be determined as of the beginning of the 1st day of such 24-month period, or of the holding period of the building, whichever is lator. For purposes of the preceding sentence, the determination of the beginning of the holding period shall be made without regard to any reconstruction by the taxpayer in connection with the rehabilitation.

"(ii) SPECIAL RULE FOR PHASED REHABILITATION.—In the case of any rehabilitation which may reasonably be expected to be completed in phases set forth in architectural plans and specifications completed before the rehabilitation begins, clause (i) shall be applied by substituting '60-month period' for '24-month period'.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2185

"(iii) LESSEES.—The Secretary shall prescribe by regulation rules for applying this subparagraph to lessees.

"(D) RECONSTRUCTION.—Rehabilitation includes reconstruction.

"(2) QUALIFIED REHABILITATION EXPENDITURE DEFINED.—For purposes of this section—

"(A) IN GENERAL.—The term 'qualified rehabilitation expenditure' means any amount properly chargeable to capital account—

"(i) for property for which depreciation is allowable under section 168 and whicb is—

"(I) nonresidential real property,

"(II) residential rental property,

"(III) real property which has a class life of more than 12.5 years, or

"(IV) an addition or improvement to property or housing described in subclause (I), (II), or (III), and

"(ii) in connection with the rehabilitation of a qualified rehabilitated building.

"(B) CERTAIN EXPENDITURES NOT INCLUDED.—The term 'qualified rehabilitation expenditure' does not include—

"(i) STRAIGHT LINE DEPRECIATION MUST BE USED.—Any expenditure with respect to which the taxpayer does not use the straight line method over a recovery period determined under subsection (c) or (g) of section 168. The preceding sentence shall not apply to any expenditure to the extent the alternative depreciation system of section 168(g) applies to such expenditure by reason of subparagraph (B) or (C) of section 168(g)(1).

"(ii) COST OF ACQUISITION.—The cost of acquiring any building or interest therein.

"(iii) ENLARGEMENTS.—Any expenditure attributable to the enlargement of an existing building.

"(iv) CERTIFIED HISTORIC STRUCTURE, ETC.—Any expenditure attributable to the rehabilitation of a certified historic structure or a building in a registered historic district, unless the rehabilitation is a certified rehabilitation (within the meaning of subparagraph (C)). The preceding sentence shall not apply to a building in a registered historic district if—

"(I) such building was not a certified historic structure,

"(II) the Secretary of the Interior certified to the Secretary that such building is not of historic significance to the district, and

"(III) if the certification referred to in subclause (II) occurs after the beginning of the rehabilitation of such building, the taxpayer certifies to the Secretary that, at the beginning of such rehabilitation, he in good faith was not aware of the requirement of subclause (II).

"(v) TAX-EXEMPT USE PROPERTY.—

"(I) IN GENERAL.—Any expenditure in connection with the rehabilitation of a building which is allocable to that portion of such building which is

(or may reasonably be expected to be) tax-exempt use property (within the meaning of section 168(h)).

"(II) CLAUSE NOT TO APPLY FOR PURPOSES OF PARAGRAPH (1) (C).—This clause shall not apply for purposes of determining under paragraph (1)(C) whether a building has been substantially rehabilitated.

"(vi) EXPENDITURES OF LESSEE.—Any expenditure of a lessee of a building if, on the date the rehabilitation is completed, the remaining term of the lease (determined without regard to any renewal periods) is less than the recovery period determined under section 168(c).

"(C) CERTIFIED REHABILITATION.—For purposes of subparagraph (B), the term 'certified rehabilitation' means any rehabilitation of a certified historic structure which the Secretary of the Interior has certified to the Secretary as being consistent with the historic character of such property or the district in which such property is located.

"(D) NONRESIDENTIAL REAL PROPERTY; RESIDENTIAL RENTAL PROPERTY; CLASS LIFE.—For purposes of subparagraph (A), the terms 'nonresidential real property', 'residential rental property', and 'class life' have the respective meanings given such terms by section 168.

"(3) CERTIFIED HISTORIC STRUCTURE DEFINED.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'certified historic structure' means any building (and its structural components) which—

"(i) is listed in the National Register, or

"(ii) is located in a registered historic district and is certified by the Secretary of the Interior to the Secretary as being of historic significance to the district.

"(B) REGISTERED HISTORIC DISTRICT.—The term 'registered historic district' means—

"(i) any district listed in the National Register, and

"(ii) any district—

"(I) which is designated under a statute of the appropriate State or local government, if such statute is certified by the Secretary of the Interior to the Secretary as containing criteria which will substantially achieve the purpose of preserving and rehabilitating buildings of historic significance to the district, and

"(II) which is certified by the Secretary of the Interior to the Secretary as meeting substantially all of the requirements for the listing of districts in the National Register.

"(4) PROPERTY TREATED AS NEW SECTION 38 PROPERTY.—Property which is treated as section 38 property by reason of subsection (a)(1)(E) shall be treated as new section 38 property."

(c) BASIS ADJUSTMENT FOR CERTIFIED HISTORIC STRUCTURES.—Paragraph (3) of section 48(q) (relating to special rule for qualified rehabilitated buildings) is amended by striking out "other than a certified historic structure".

(d) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the amendments made by this section shall apply to

PUBLIC LAW 99-514—OCT. 22, 1986          100 STAT. 2187

property placed in service after December 31, 1986, in taxable years ending after such date.

(2) GENERAL TRANSITIONAL RULE.—The amendments made by this section and section 201 shall not apply to any property placed in service before January 1, 1994, if such property is placed in service as part of—

(A) a rehabilitation which was completed pursuant to a written contract which was binding on March 1, 1986, or

(B) a rehabilitation incurred in connection with property (including any leasehold interest) acquired before March 2, 1986, or acquired on or after such date pursuant to a written contract that was binding on March 1, 1986, if—

(i) the rehabilitation was completed pursuant to a written contract that was binding on March 1, 1986,

(ii) parts 1 and 2 of the Historic Preservation Certification Application were filed with the Department of the Interior (or its designee) before March 2, 1986, or

(iii) the lesser of $1,000,000 or 5 percent of the cost of the rehabilitation is incurred before March 2, 1986, or is required to be incurred pursuant to a written contract which was binding on March 1, 1986.

(3) CERTAIN ADDITIONAL REHABILITATIONS.—The amendments made by this section and section 201 shall not apply to—

(A) the rehabilitation of 8 bathhouses within the Hot Springs National Park or of buildings in the Central Avenue Historic District at such Park,

(B) the rehabilitation of the Upper Pontabla Building in New Orleans, Louisiana,

(C) the rehabilitation of at least 60 buildings listed on the National Register at the Frankford Arsenal,

(D) the rehabilitation of De Baliveriere Arcade, St. Louis Centre, and Drake Apartments in Missouri,

(E) the rehabilitation of The Tides in Bristol, Rhode Island,

(F) the rehabilitation and renovation of the Outlet Company building and garage in Providence, Rhode Island,

(G) the rehabilitation of 10 structures in Harrisburg, Pennsylvania, with respect to which the Harristown Development Corporation was designated redeveloper and received an option to acquire title to the entire project site for $1 on June 27, 1984,

(H) the rehabilitation of a project involving the renovation of 3 historic structures on the Minneapolis riverfront, with respect to which the developer of the project entered into a redevelopment agreement with a municipality datod January 4, 1985, and industrial development bonds were sold in 3 separate issues in May, July, and October 1985,

(I) the rehabilitation of a bank's main office facilities of approximately 120,000 square feet, in connection with which the bank's board of directors authorized a $3,300,000 expenditure for the renovation and retrofit on March 20, 1984,

(J) the rehabilitation of 10 warehouse buildings built between 1906 and 1910 and purchased under a contract dated February 17, 1986,

(K) the rehabilitation of a facility which is customarily used for conventions and sporting events if an analysis of

operations and recommendations of utilization of such facility was prepared by a certified public accounting firm pursuant to an engagement authorized on March 6, 1984, and presented on June 11, 1984, to officials of the city in which such facility is located,

(L) Mount Vernon Mills in Columbia, South Carolina,

(M) the Barbara Jordan II Apartments,

(N) the rehabilitation of the Federal Building and Post Office, 120 Hanover Street, Manchester, New Hampshire,

(O) the rehabilitation of the Charleston Waterfront project in South Carolina,

(P) the Hayes Mansion in San Francisco,

(Q) the renovation of a facility owned by the National Railroad Passenger Corporation ("Amtrak") for which project Amtrak engaged a development team by letter agreement dated August 23, 1985, as modified by letter agreement dated September 9, 1985,

(R) the rehabilitation of a structure or its components which is listed in the National Register of Historic Places, is located in Allegheny County, Pennsylvania, will be substantially rehabilitated (as defined in section 48(g)(1)(C) prior to amendment by this Act), prior to December 31, 1989; and was previously utilized as a market and an auto dealership,

(S) The Bellevue Stratford Hotel in Philadelphia, Pennsylvania,

(T) the Dixon Mill Housing project in Jersey City, New Jersey,

(U) Motor Square Garden,

(V) the Blackstone Apartments, and the Shriver-Johnson building, in Sioux Falls, South Dakota,

(W) the Holy Name Academy in Spokane, Washington,

(X) the Nike/Clemson Mill in Exeter, New Hampshire,

(Y) the Central Bank Building in Grand Rapids, Michigan, and

(Z) the Heritage Hotel, in the City of Marquette, Michigan.

(4) ADDITIONAL REHABILITATIONS.—The amendments made by this section and section 201 shall not apply to—

(A) the Fort Worth Town Square Project in Texas,

(B) the American Youth Hostel in New York, New York,

(C) The Riverwest Loft Development (including all three phases, two of which do not involve rehabilitations),

(D) the Gaslamp Quarter Historic District in California,

(E) the Eberhardt & Ober Brewery, in Pennsylvania,

(F) the Captain's Walk Limited Partnership-Harris Place Development, in Connecticut,

(G) the Velvet Mills in Connecticut,

(H) the Roycroft Inn, in New York,

(I) Old Main Village, in Mankato, Minnesota,

(J) the Washburn-Crosby A Mill, in Minneapolis, Minnesota,

(K) the Lakeland marbel Arcade in Lakeland, Florida,

(L) the Willard Hotel, in Washington, D.C.,

(M) the H. P. Lau Building in Lincoln, Nebraska,

(N) the Starks Building, in Louisville, Kentucky,

(O) the Bellevue High School, in Bellevue, Kentucky,

(P) the Major Hampden Smith House, in Owensboro, Kentucky,

(Q) the Doe Run Inn, in Brandenburg, Kentucky,

(R) the State National Bank, in Frankfort, Kentucky,

(S) the Captain Jack House, in Fleming, Kentucky,

(T) the Elizabeth Arlinghaus House, in Louisville, Kentucky,

(U) Limerick Shamrock, in Louisville, Kentucky,

(V) the Robert Mills Project, in South Carolina,

(W) the 620 Project, consisting of 3 buildings, in Kentucky,

(X) the Warrior Hotel, Ltd., the first two floors of the Martin Hotel, and the 105,000 square foot warehouse constructed in 1910, all in Sioux City, Iowa,

(Y) the waterpark condominium residential project, to the extent of $2 million of expenditures, and

(Z) the Apollo and Bishop Building Complex on 125th Street, the Bigelow-Hartford Carpet Mill in New York, New York.

(5) REDUCTION IN CREDIT FOR PROPERTY UNDER TRANSITIONAL RULES.—In the case of property placed in service after December 31, 1986, and to which the amendments made by this section do not apply, subparagraph (A) of section 46(b)(4) of the Internal Revenue Code of 1954 (as in effect before the enactment of this Act) shall be applied—

(A) by substituting "10 percent" for "15 percent", and

(B) by substituting "13 percent" for "20 percent".

(6) EXPENSING OF REHABILITATION EXPENDITURES FOR THE FRANKFORD ARSENAL.—In the case of any expenditures paid or incurred in connection with the rehabilitation of the Frankford Arsenal during the 8-year period beginning on January 1, 1987, such expenditures (including expenditures for repair and maintenance of the building and property) shall be allowable as a deduction in the taxable year in which paid or incurred in an amount not in excess of the submissions made by the taxpayer before September 16, 1986.

### SEC. 252. LOW-INCOME HOUSING CREDIT.

(a) IN GENERAL.—Subpart D of part IV of subchapter A of chapter 1 (relating to business credits) is amended by adding at the end thereof the following new section:

### "SEC. 42. LOW-INCOME HOUSING CREDIT.

"(a) IN GENERAL.—For purposes of section 38, the amount of the low-income housing credit determined under this section for any taxable year in the credit period shall be an amount equal to—

"(1) the applicable percentage of

"(2) the qualified basis of each qualified low-income building.

"(b) APPLICABLE PERCENTAGE: 70 PERCENT PRESENT VALUE CREDIT FOR CERTAIN NEW BUILDINGS; 30 PERCENT PRESENT VALUE CREDIT FOR CERTAIN OTHER BUILDINGS.—For purposes of this section—

"(1) BUILDING PLACED IN SERVICE DURING 1987.—In the case of any qualified low-income building placed in service by the taxpayer during 1987, the term 'applicable percentage' means—

"(A) 9 percent for new buildings which are not federally subsidized for the taxable year, or

"(B) 4 percent for—

PUBLIC LAW 99–514—OCT. 22, 1986

"(i) new buildings which are federally subsidized for the taxable year, and

"(ii) existing buildings.

"(2) BUILDINGS PLACED IN SERVICE AFTER 1987.—

"(A) IN GENERAL.—In the case of any qualified low-income building placed in service by the taxpayer after 1987, the term 'applicable percentage' means the appropriate percentage prescribed by the Secretary for the month in which such building is placed in service.

"(B) METHOD OF PRESCRIBING PERCENTAGES.—The percentages prescribed by the Secretary for any month shall be percentages which will yield over a 10-year period amounts of credit under subsection (a) which have a present value equal to—

"(i) 70 percent of the qualified basis of a building described in paragraph (1)(A), and

"(ii) 30 percent of the qualified basis of a building described in paragraph (1)(B).

"(C) METHOD OF DISCOUNTING.—The present value under subparagraph (B) shall be determined—

"(i) as of the last day of the 1st year of the 10-year period referred to in subparagraph (B),

"(ii) by using a discount rate equal to 72 percent of the average of the annual Federal mid-term rate and the annual Federal long-term rate applicable under section 1274(d)(1) to the month in which the building was placed in service and compounded annually, and

"(iii) by assuming that the credit allowable under this section for any year is received on the last day of such year.

"(3) CROSS REFERENCE.—

"For treatment of certain rehabilitation expenditures as separate new buildings, see subsection (e).—

"(c) QUALIFIED BASIS; QUALIFIED LOW-INCOME BUILDING.—For purposes of this section—

"(1) QUALIFIED BASIS.—

"(A) DETERMINATION.—The qualified basis of any qualified low-income building for any taxable year is an amount equal to—

"(i) the applicable fraction (determined as of the close of such taxable year) of

"(ii) the eligible basis of such building (determined under subsection (d)(5)).

"(B) APPLICABLE FRACTION.—For purposes of subparagraph (A), the term 'applicable fraction' means the smaller of the unit fraction or the floor space fraction.

"(C) UNIT FRACTION.—For purposes of subparagraph (B), the term 'unit fraction' means the fraction—

"(i) the numerator of which is the number of low-income units in the building, and

"(ii) the denominator of which is the number of residential rental units (whether or not occupied) in such building.

"(D) FLOOR SPACE FRACTION.—For purposes of subparagraph (B), the term 'floor space fraction' means the fraction—

"(i) the numerator of which is the total floor space of the low-income units in such building, and

"(ii) the denominator of which is the total floor space of the residential rental units (whether or not occupied) in such building.

"(2) QUALIFIED LOW-INCOME BUILDING.—The term 'qualified low-income building' means any building—

"(A) which at all times during the compliance period with respect to such building is part of a qualified low-income housing project, and

"(B) to which the amendments made by section 201(a) of the Tax Reform Act of 1986 apply.

"(d) ELIGIBLE BASIS.—For purposes of this section—

"(1) NEW BUILDINGS.—The eligible basis of a new building is its adjusted basis.

"(2) EXISTING BUILDINGS.—

"(A) IN GENERAL.—The eligible basis of an existing building is—

"(i) in the case of a building which meets the requirements of subparagraph (B), the sum of—

"(I) the portion of its adjusted basis attributable to its acquisition cost, plus

"(II) amounts chargeable to capital account and incurred by the taxpayer (before the close of the 1st taxable year of the credit period for such building) for property (or additions or improvements to property) of a character subject to the allowance for depreciation, and

"(ii) zero in any other case.

"(B) REQUIREMENTS.—A building meets the requirements of this subparagraph if—

"(i) the building is acquired by purchase (as defined in section 179(d)(2)),

"(ii) there is a period of at least 10 years between the date of its acquisition by the taxpayer and the later of—

"(I) the date the building was last placed in service, or

"(II) the date of the most recent nonqualified substantial improvement of the building, and

"(iii) the building was not previously placed in service by the taxpayer or by any person who was a related person with respect to the taxpayer as of the time previously placed in service.

"(C) ACQUISITION COST.—For purposes of subparagraph (A), the cost of any building shall not include so much of the basis of such building as is determined by reference to the basis of other property held at any time by the person acquiring the building.

"(D) SPECIAL RULES FOR SUBPARAGRAPH (B).—

"(i) NONQUALIFIED SUBSTANTIAL IMPROVEMENT.—For purposes of subparagraph (B)(ii)—

"(I) IN GENERAL.—The term 'nonqualified substantial improvement' means any substantial improvement if section 167(k) was elected with respect to such improvement or section 168 (as in effect on the day before the date of the enactment of the Tax Reform Act of 1986) applied to such improvement.

"(II) DATE OF SUBSTANTIAL IMPROVEMENT.—The date of a substantial improvement is the last day of the 24-month period referred to in subclause (III).

"(III) SUBSTANTIAL IMPROVEMENT.—The term 'substantial improvement' means the improvements added to capital account with respect to the building during any 24-month period, but only if the sum of the amounts added to such account during such period equals or exceeds 25 percent of the adjusted basis of the building (determined without regard to paragraphs (2) and (3) of section 1016(a)) as of the 1st day of such period.

"(ii) SPECIAL RULE FOR NONTAXABLE EXCHANGES.—For purposes of determining under subparagraph (B)(ii) when a building was last placed in service, there shall not be taken into account any placement in service in connection with the acquisition of the building in a transaction in which the basis of the building in the hands of the person acquiring it is determined in whole or in part hy reference to the adjusted basis of such building in the hands of the person from whom aquired.

"(iii) RELATED PERSON, ETC.—

"(I) APPLICATION OF SECTION 179.—For purposes of subparagraph (B)(i), section 179(d) shall be applied by substituting '10 percent' for '50 percent' in section 267(b) and 707(b) and in section 179(b)(7).

"(II) RELATED PERSON.—For purposes of subparagraph (B)(iii), a person (hereinafter in this subclause referred to as the 'related person') is related to any person if the related person bears a relationship to such person specified in section 267(b) or 707(b)(1), or the related person and such person are engaged in trades or businesses under common control (within the meaning of subsections (a) and (b) of section 52). For purposes of the preceding sentence, in applying section 267(b) or 707(b)(1), '10 percent' shall be substituted for '50 percent'.

"(3) ELIGIBLE BASIS REDUCED WHERE DISPROPORTIONATE STANDARDS FOR UNITS.—The eligible basis of any huilding shall be reduced by an amount equal to the portion of the adjusted basis of the building which is attributable to residential rental units in the building which are not low-income units and which are above the average quality standard of the low-income units in the building.

"(4) SPECIAL RULES RELATING TO DETERMINATION OF ADJUSTED BASIS.—For purposes of this subsection—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the adjusted basis of any building shall be determined without regard to the adjusted basis of any property which is not residential rental property.

"(B) BASIS OF PROPERTY IN COMMON AREAS, ETC., INCLUDED.—The adjusted basis of any building shall be determined by taking into account the adjusted basis of property (of a character subject to the allowance for depreciation) used in common areas or provided as comparable amenities to all residential rental units in such building.

"(C) No REDUCTION FOR DEPRECIATION.—The adjusted basis of any building shall be determined without regard to paragraphs (2) and (3) of section 1016(a).

"(5) ELIGIBLE BASIS DETERMINED WHEN BUILDING PLACED IN SERVICE.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the eligible basis of any building for the entire compliance period for such compliance period shall be its eligible basis on the date such building is placed in service.

"(B) ELIGIBLE BASIS REDUCED BY FEDERAL GRANTS.—If, during any taxable year of the compliance period, a grant is made with respect to any building or the operation thereof and any portion of such grant is funded with Federal funds (whether or not includible in gross income), the eligible basis of such building for such taxable year and all succeeding taxable years shall be reduced by the portion of such grant which is so funded.

"(6) CREDIT ALLOWABLE FOR CERTAIN FEDERALLY-ASSISTED BUILDINGS ACQUIRED DURING 10-YEAR PERIOD DESCRIBED IN PARAGRAPH (2) (B) (ii).—

"(A) IN GENERAL.—On application by the taxpayer, the Secretary (after consultation with the appropriate Federal official) may waive paragraph (2)(B)(ii) with respect to any federally-assisted building if the Secretary determines that such waiver is necessary—

"(i) to avert an assignment of the mortgage secured by property in the project (of which such building is a part) to the Department of Housing and Urban Development or the Farmers' Home Administration,

"(ii) to avert a claim against a Federal mortgage insurance fund (or such Department or Administration) with respect to a mortgage which is so secured, or

"(iii) to the extent provided in regulations, by reason of other circumstances of financial distress.

The preceding sentence shall not apply to any building described in paragraph (7)(B).

"(B) FEDERALLY-ASSISTED BUILDING.—For purposes of subparagraph (A), the term 'federally-assisted building' means any building which is substantially assisted, financed, or operated under—

"(i) section 8 of the United States Housing Act of 1937,

"(ii) section 221(d)(3) or 236 of the National Housing Act of 1934, or

"(iii) section 515 of the Housing Act of 1949,

as such Acts are in effect on the date of the enactment of the Tax Reform Act of 1986.

"(C) APPROPRIATE FEDERAL OFFICIAL.—For purposes of subparagraph (A), the term 'appropriate Federal official' means—

"(i) the Secretary of Housing and Urban Development in the case of any building described in subparagraph (B) by reason of clause (i) or (ii) thereof, and

"(ii) the Secretary of Agriculture in the case of any building described in subparagraph (B) by reason of clause (iii) thereof.

"(7) ACQUISITION OF BUILDING BEFORE END OF PRIOR COMPLIANCE PERIOD.—

"(A) IN GENERAL.—Under regulations prescribed by the Secretary, in the case of a building described in subparagraph (B) which is acquired by the taxpayer—

"(i) paragraph (2)(B) shall not apply, but

"(ii) the credit allowable by reason of subsection (a) to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable under sebsection (a) for such period to the prior owner referred to in subparagraph (B) had such owner not disposed of the building.

"(B) DESCRIPTION OF BUILDING.—A building is described in this subparagraph if—

"(i) a credit was allowed by reason of subsection (a) to any prior owner of such building, and

"(ii) the taxpayer acquired such building before the end of the compliance period for such building with respect to such prior owner (determined without regard to any disposition by such prior owner).

"(e) REHABILITATION EXPENDITURES TREATED AS SEPARATE NEW BUILDING.—

"(1) IN GENERAL.—Rehabilitation expenditures paid or incurred by the taxpayer with respect to any building shall be treated for purposes of this section as a separate new building.

"(2) REHABILITATION EXPENDITURES.—For purposes of paragraph (1)—

"(A) IN GENERAL.—The term 'rehabilitation expenditures' means amounts chargeable to captial account and incurred for property (or additions or improvements to property) of a character subject to the allowance for depreciation in connection with the rehabilitation of a building.

"(B) COST OF ACQUISITION, ETC, NOT INCLUDED.—Such term does not include the cost of acquiring any building (or interest therein) or any amount not permitted to be taken into account under paragraph (3) or (4) of subsection (d).

"(3) AVERAGE OF REHABILITATION EXPENDITURES MUST BE $2,000 OR MORE.—

"(A) IN GENERAL.—Paragraph (1) shall apply to rehabilitation expenditures with respect to any building only if the qualified basis attributable to such expenditures incurred during any 24-month period, when divided by the low-income units in the building, is $2,000 or more.

"(B) DATE OF DETERMINATION.—The determination under subparagraph (A) shall be made as of the close of the 1st taxable year in the credit period with respect to such expenditures.

"(4) SPECIAL RULES.—For purposes of applying this section with respect to expenditures which are treated as a separate building by reason of this subsection—

"(A) such expenditures shall be treated as placed in service at the close of the 24-month period referred to in paragraph (3)(A), and

"(B) the applicable fraction under subsection (c)(1) shall be the applicable fraction for the building (without regard to paragraph (1)) with respect to which the expenditures were incurred.

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 217 of 247 PageID #: 217

Nothing in subsection (d)(2) shall prevent a credit from being allowed by reason of this subsection.

"(5) No DOUBLE COUNTING.—Rehabilitation expenditures may, at the election of the taxpayer, be taken into account under this subsection or subsection (d)(2)(A)(i)(II) but not under both such subsections.

"(6) REGULATIONS TO APPLY SUBSECTION WITH RESPECT TO GROUP OF UNITS IN BUILDING.—The Secretary may prescribe regulations, consistent with the purposes of this subsection, treating a group of units with respect to which rehabilitation expenditures are incurred as a separate new building.

"(f) DEFINITION AND SPECIAL RULES RELATING TO CREDIT PERIOD.—

"(1) CREDIT PERIOD DEFINED.—For purposes of this section, the term 'credit period' means, with respect to any building, the period of 10 taxable years beginning with the taxable year in which the building is placed in service or, at the election of the taxpayer, the succeeding taxable year. Such an election, once made, shall be irrevocable.

"(2) SPECIAL RULE FOR 1ST YEAR OF CREDIT PERIOD.—

"(A) IN GENERAL.—The credit allowable under subsection (a) with respect to any building for the 1st taxable year of the credit period shall be determined by substituting for the applicable fraction under subsection (c)(1) the fraction—

"(i) the numerator of which is the sum of the applicable fractions determined under subsection (c)(1) as of the close of each full month of such year during which such building was in service, and

"(ii) the denominator of which is 12.

"(B) DISALLOWED 1ST YEAR CREDIT ALLOWED IN 11TH YEAR.—Any reduction by reason of suhparagraph (A) in the credit allowahle (without regard to subparagraph (A)) for the 1st taxable year of the credit period shall be allowable under subsection (a) for the 1st taxable year following the credit period.

"(3) SPECIAL RULE WHERE INCREASE IN QUALIFIED BASIS AFTER 1ST YEAR OF CREDIT PERIOD.—

"(A) CREDIT INCREASED.—If—

"(i) as of the close of any taxable year in the compliance period (after the 1st year of the credit period) the qualified basis of any building exceeds

"(ii) the qualified basis of such building as of the close of the 1st year of the credit period,

the credit allowable under subsection (a) for the taxable year (determined without regard to this paragraph) shall be increased by an amount equal to the product of such excess and the percentage equal to ⅔ of the applicable percentage for such building.

"(B) 1ST YEAR COMPUTATION APPLIES.—A rule similar to the rule of paragraph (2)(A) shall apply to the additional credit allowable by reason of this paragraph for the 1st year in which such additional credit is allowable.

"(g) QUALIFIED LOW-INCOME HOUSING PROJECT.—For purposes oɪ this section—

"(1) IN GENERAL.—The term 'qualified low-income housing project' means any project for residential rental property if the project meets the requirements of subparagraph (A) or (B) whichever is elected by the taxpayer:

"(A) 20–50 TEST.—The project meets the requirements of this subparagraph if 20 percent or more of the residential units in such project are both rent-restricted and occupied by individuals whose income is 50 percent or less of area median gross income.

"(B) 40–60 TEST.—The project meets the requirements of this subparagraph if 40 percent or more of the residential units in such project are both rent-restricted and occupied by individuals whose income is 60 percent or less of area median gross income.

Any election under this paragraph, once made, shall be irrevocable. For purposes of this paragraph, any property shall not be treated as failing to be residential rental property merely because part of the building in which such property is located is used for purposes other than residential rental purposes.

"(2) RENT-RESTRICTED UNITS.—

"(A) IN GENERAL.—For purposes of paragraph (1), a residential unit is rent-restricted if the gross rent with respect to such unit does not exceed 30 percent of the income limitation under paragraph (1) applicable to individuals occupying such unit.

"(B) GROSS RENT.—For purposes of subparagraph (A), gross rent—

"(i) does not include any payment under section 8 of the United States Housing Act of 1937 or any comparable Federal rental assistance program (with respect to such unit or occupants thereof), and

"(ii) includes any utility allowance determined by the Secretary after taking into account such determinations under section 8 of the United States Housing Act of 1937.

"(3) DATE FOR MEETING REQUIREMENTS.—

"(A) PROJECTS CONSISTING OF 1 BUILDING.—In the case of a project which does not have any other building in service, such project shall not be treated as meeting the requirements of paragraph (1) unless it meets such requirements not later than the date which is 12 months after the date such project is placed in service.

"(B) PROJECTS CONSISTING OF MORE THAN 1 BUILDING.—In the case of a project which has a building in service when a later building is placed in service as part of such project, such project shall not be treated as meeting the requirements of paragraph (1) with respect to such later building unless—

"(i) such project meets such requirements without regard te such later building on the date such later building is placed in service, and

"(ii) such project meets such requirements with regard to such later building not later than the date which is 12 months after the date such later building is placed in service.

"(4) CERTAIN RULES MADE APPLICABLE.—Paragraphs (2) (other than subparagraph (A) thereof), (3), (4), (5), (6), and (7) of section 142(d), and section 6652(j), shall apply for purposes of determining whether any project is a qualified low-income housing project and whether any unit is a low-income unit.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2197

"(5) ELECTION TO TREAT BUILDING AFTER COMPLIANCE PERIOD AS NOT PART OF A PROJECT.—For purposes of this section, the taxpayer may elect to treat any building as not part of a qualified low-income housing project for any period beginning after the compliance period for such building.

"(h) LIMITATION ON AGGREGATE CREDIT ALLOWABLE WITH RESPECT TO PROJECTS LOCATED IN A STATE.—

"(1) CREDIT MAY NOT EXCEED CREDIT AMOUNT ALLOCATED TO BUILDING.—No credit shall be allowed by reason of this section for any taxable year with respect to any building in excess of the housing credit dollar amount allocated to such building under this subsection. An allocation shall be taken into account under the preceding sentence only if it occurs not later than the earlier of—

"(A) the 60th day after the close of the taxable year, or

"(B) the close of the calendar year in which such taxable year ends.

"(2) ALLOCATED CREDIT AMOUNT TO APPLY TO ALL TAXABLE YEARS ENDING DURING OR AFTER CREDIT ALLOCATION YEAR.—Any housing credit dollar amount allocated to any building for any calendar year—

"(A) shall apply to such building for all taxable years in the compliance period ending during or after such calendar year, and

"(B) shall reduce the aggregate housing credit dollar amount of the allocating agency only for such calendar year.

"(3) HOUSING CREDIT DOLLAR AMOUNT FOR AGENCIES.—

"(A) IN GENERAL.—The aggregate housing credit dollar amount which a housing credit agency may allocate for any calendar year is the portion of the State housing credit ceiling allocated under this paragraph for such calendar year to such agency.

"(B) STATE CEILING INITIALLY ALLOCATED TO STATE HOUSING CREDIT AGENCIES.—Except as provided in subparagraphs (D) and (E), the State housing credit ceiling for each calendar year shall be allocated to the housing credit agency of such State. If there is more than 1 housing credit agency of a State, all such agencies shall be treated as a single agency.

"(C) STATE HOUSING CREDIT CEILING.—The State housing credit ceiling applicable to any State for any calendar year shall be an amount equal to $1.25 multiplied by the State population.

"(D) SPECIAL RULE FOR STATES WITH CONSTITUTIONAL HOME RULE CITIES.—For purposes of this subsection—

"(i) IN GENERAL.—The aggregate housing credit dollar amount for any constitutional home rule city for any calendar year shall be an amount which bears the same ratio to the State housing credit ceiling for such calendar year as—

"(I) the population of such city, bears to

"(II) the population of the entire State.

"(ii) COORDINATION WITH OTHER ALLOCATIONS.—In the case of any State which contains 1 or more constitutional home rule cities, for purposes of applying this paragraph with respect to housing credit agencies in

such State other than constitutional home rule cities, the State housing credit ceiling for any calendar year shall be reduced by the aggregate housing credit dollar amounts determined for such year for all constitutional home rule cities in such State.

"(iii) CONSTITUTIONAL HOME RULE CITY.—For purposes of this paragraph, the term 'constitutional home rule city' has the meaning given such term by section 146(d)(3)(C).

"(E) STATE MAY PROVIDE FOR DIFFERENT ALLOCATION.— Rules similar to the rules of section 146(e) (other than paragraph (2)(B) thereof) shall apply for purposes of this paragraph.

"(F) POPULATION.—For purposes of this paragraph, population shall be determined in accordance with section 146(j).

"(4) CREDIT FOR BUILDINGS FINANCED BY TAX-EXEMPT BONDS SUBJECT TO VOLUME CAP NOT TAKEN INTO ACCOUNT.—

"(A) IN GENERAL.—Paragraph (1) shall not apply to the portion of any credit allowable under subsection (a) which is attributable to eligible basis financed by any obligation the interest on which is exempt from tax under section 103 and which is taken into account under section 146.

"(B) SPECIAL RULE WHERE 70 PERCENT OR MORE OF BUILDING IS FINANCED WITH TAX-EXEMPT BONDS SUBJECT TO VOLUME CAP.—For purposes of subparagraph (A), if 70 percent or more of the aggregate basis of any building and the land on which the building is located is financed by any obligation described in subparagraph (A), paragraph (1) shall not apply to any portion of the credit allowable under subsection (a) with respect to such building.

"(5) PORTION OF STATE CEILING SET-ASIDE FOR CERTAIN PROJECTS INVOLVING QUALIFIED NONPROFIT ORGANIZATIONS.—

"(A) IN GENERAL.—Not more than 90 percent of the State housing credit ceiling for any State for any calendar year shall be allocated to projects other than qualified low-income housing projects described in subparagraph (B).

"(B) PROJECTS INVOLVING QUALIFIED NONPROFIT ORGANIZATIONS.—For purposes of subparagraph (A), a qualified low-income housing project is described in this subparagraph if a qualified nonprofit organization is to materially participate (within the meaning of section 469(h)) in the development and operation of the project throughout the compliance period.

"(C) QUALIFIED NONPROFIT ORGANIZATION.—For purposes of this paragraph, the term 'qualified nonprofit organization' means any organization if—

"(i) such organization is described in paragraph (3) or (4) of section 501(c) and is exempt from tax under section 501(a), and

"(ii) 1 of the exempt purposes of such organization includes the fostering of low-income housing.

"(D) STATE MAY NOT OVERRIDE SET-ASIDE.—Nothing in subparagraph (E) of paragraph (3) shall be construed to permit a State not to comply with subparagraph (A) of this paragraph.

"(6) SPECIAL RULES.—

"(A) Building must be located within jurisdiction of credit agency.—A housing credit agency may allocate its aggregate housing credit dollar amount only to buildings located in the jurisdiction of the governmental unit of which such agency is a part.

"(B) Housing credit dollar amount may not be carried over, etc.—

"(i) No carryover.—The portion of the aggregate housing credit dollar amount of any housing credit agency which is not allocated for any calendar year may not be carried over to any other calendar year.

"(ii) Allocation may not be earlier than year in which building placed in service.—A housing credit agency may allocate its housing credit dollar amount for any calendar year only to buildings placed in service before the close of such calendar year.

"(C) Agency allocations in excess of limit.—If the aggregate housing credit dollar amounts allocated by a housing credit agency for any calendar year exceed the portion of the State housing credit ceiling allocated to such agency for such calendar year, the housing credit dollar amounts so allocated shall be reduced (to the extent of such excess) for buildings in the reverse of the order in which the allocations of such amounts were made.

"(D) Credit allowable determined without regard to averaging convention, etc.—For purposes of this subsection, the credit allowable under subsection (a) with respect to any building shall be determined—

"(i) without regard to paragraphs (2)(A) and (3)(B) of subsection (f), and

"(ii) by applying subsection (f)(3)(A) without regard to 'the percentage equal to ⅔ of'.

"(7) Other definitions.—For purposes of this subsection—

"(A) Housing credit agency.—The term 'housing credit agency' means any agency authorized to carry out this subsection.

"(B) Possessions treated as states.—The term 'State' includes a possession of the United States.

"(i) Definitions and Special Rules.—For purposes of this section—

"(1) Compliance period.—The term 'compliance period' means, with respect to any building, the period of 15 taxable years beginning with the 1st taxable year of the credit period with respect thereto.

"(2) Determination of whether building is federally subsidized.—

"(A) In general.—Except as otherwise provided in this paragraph, for purposes of subsection (b)(1), a new building shall be treated as federally subsidized for any taxable year if, at any time during such taxable year, there is outstanding any obligation the interest on which is exempt from tax under section 103, or any below market Federal loan, the proceeds of which are used (directly or indirectly) with respect to such building or the operation thereof.

"(B) Election to reduce eligible basis by outstanding balance of loan.—A loan shall not be taken into account under subparagraph (A) if the taxpayer elects to exclude an

amount equal to the outstanding balance of such loan from the eligible basis of the building for purposes of subsection (d).

"(C) BELOW MARKET FEDERAL LOAN.—For purposes of subparagraph (A), the term 'below market Federal loan' means any loan funded in whole or in part with Federal funds if the interest rate payable on such loan is less than the applicable Federal rate in effect under section 1274(d)(1) (as of the date on which the loan was made).

"(3) LOW-INCOME UNIT.—

"(A) IN GENERAL.—The term 'low-income unit' means any unit in a building if—

"(i) such unit is rent-restricted (as defined in subsection (g)(2)), and

"(ii) the individuals occupying such unit meet the income limitation applicable under subsection (g)(1) to the project of which such building is a part.

"(B) EXCEPTIONS.—A unit shall not be treated as a low-income unit unless the unit is suitable for occupancy and used other than on a transient basis.

"(C) SPECIAL RULE FOR BUILDINGS HAVING 4 OR FEWER UNITS.—In the case of any building which has 4 or fewer residential rental units, no unit in such building shall be treated as a low-income unit if the units in such building are owned by—

"(i) any individual who occupies a residential unit in such building, or

"(ii) any person who is related (as defined in subsection (d)(2)(D)(iii)) to such individual.

"(4) NEW BUILDING.—The term 'new building' means a building the original use of which begins with the taxpayer.

"(5) EXISTING BUILDING.—The term 'existing building' means any building which is not a new building.

"(j) RECAPTURE OF CREDIT.—

"(1) IN GENERAL.—If—

"(A) as of the close of any taxable year in the compliance period, the amount of the qualified basis of any building with respect to the taxpayer is less than

"(B) the amount of such basis as of the close of the preceding taxable year,

then the taxpayer's tax under this chapter for the taxable year shall be increased by the credit recapture amount.

"(2) CREDIT RECAPTURE AMOUNT.—For purposes of paragraph (1), the credit recapture amount is an amount equal to the sum of—

"(A) the aggregate decrease in the credits allowed to the taxpayer under section 38 for all prior taxable years which would have resulted if the accelerated portion of the credit allowable by reason of this section were not allowed for all prior taxable years with respect to the excess of the amount described in paragraph (1)(B) over the amount described in paragraph (1)(A), plus

"(B) interest at the overpayment rate established under section 6621 on the amount determined under subparagraph (A) for each prior taxable year for the period beginning on the due date for filing the return for the prior taxable year involved.

No deduction shall be allowed under this chapter for interest described in subparagraph (B).

"(3) ACCELERATED PORTION OF CREDIT.—For purposes of paragraph (2), the accelerated portion of the credit for the prior taxable years with respect to any amount of basis is the excess of—

"(A) the aggregate credit allowed by reason of this section (without regard to this subsection) for such years with respect to such basis, over

"(B) the aggregate credit which would be allowable by reason of this section for such years with respect to such basis if the aggregate credit which would (but for this subsection) have been allowable for the entire compliance period were allowable ratably over 15 years.

"(4) SPECIAL RULES.—

"(A) TAX BENEFIT RULE.—The tax for the taxable year shall be increased under paragraph (1) only with respect to credits allowed by reason of this section which were used to reduce tax liability. In the case of credits not so used to reduce tax liability, the carryforwards and carrybacks under section 39 shall be appropriately adjusted.

"(B) ONLY BASIS FOR WHICH CREDIT ALLOWED TAKEN INTO ACCOUNT.—Qualified basis shall be taken into account under paragraph (1)(B) only to the extent such basis was taken into account in determining the credit under subsection (a) for the preceding taxable year referred to in such paragraph.

"(C) NO RECAPTURE OF ADDITIONAL CREDIT ALLOWABLE BY REASON OF SUBSECTION (f) (3).—Paragraph (1) shall apply to a decrease in qualified basis only to the extent such decrease exceeds the amount of qualified basis with respect to which a credit was allowable for the taxable year referred to in paragraph (1)(B) by reason of subsection (f)(3).

"(D) NO CREDITS AGAINST TAX.—Any increase in tax under this subsection shall not be treated as a tax imposed by this chapter for purposes of determining the amount of any credit under subpart A, B, or D of this part.

"(E) NO RECAPTURE BY REASON OF CASUALTY LOSS.—The increase in tax under this subsection shall not apply to a reduction in qualified basis by reason of a casualty loss to the extent such loss is restored by reconstruction or replacement within a reasonable period established by the Secretary.

"(5) CERTAIN PARTNERSHIPS TREATED AS THE TAXPAYER.—

"(A) IN GENERAL.—For purposes of applying this subsection to a partnership to which this paragraph applies—

"(i) such partnership shall be treated as the taxpayer to which the credit allowable under subsection (a) was allowed,

"(ii) the amount of such credit allowed shall be treated as the amount which would have been allowed to the partnership were such credit allowable to such partnership,

"(iii) paragraph (4)(A) shall not apply, and

"(iv) the amount of the increase in tax under this subsection for any taxable year shall be allocated among the partners of such partnership in the same

PUBLIC LAW 99–514—OCT. 22, 1986

manner as such partnership's taxable income for such year is allocated among such partners.

"(B) PARTNERSHIPS TO WHICH PARAGRAPH APPLIES.—This paragraph shall apply to any partnership—

"(i) which has 35 or more partners each of whom is a natural person or an estate, and

"(ii) which elects the application of this paragraph.

"(C) SPECIAL RULES.—

"(i) HUSBAND AND WIFE TREATED AS 1 PARTNER.—For purposes of subparagraph (B)(i), a husband and wife (and their estates) shall he treatod as 1 partner.

"(ii) ELECTION IRREVOCABLE.—Any election under subparagraph (B), once made, shall be irrevocable.

"(6) NO RECAPTURE ON DISPOSITION OF BUILDING WHERE BOND POSTED.—In the case of a disposition of a building, the taxpayer shall be discharged from liability for any additional tax under this subsection by reason of such disposition if—

"(A) the taxpayer furnishes to the Secretary a bond in an amount satifactory to the Secretary and for the period required by the Secretary, and

"(B) it is reasonably expected that such building will continue to be operated as a qualified low-income building for the remaining compliance period with respect to such building.

"(k) APPLICATION OF AT-RISK RULES.—For purposes of this section—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, rules similar to the rules of section 46(c)(8) (other than subparagraph (D)(iv)(I) thereof), section 46(c)(9), and section 47(d)(1) shall apply in determining the qualified basis of any building in the same manner as such sections apply in determining the credit base of property.

"(2) SPECIAL RULES FOR DETERMINING QUALIFIED PERSON.—For purposes of paragraph (1)—

"(A) IN GENERAL.—If the requirements of subparagraphs (B), (C), and (D) are met with respect to any financing borrowed from a qualified nonprofit organization (as defined in subsection (h)(5)), the determination of whether such financing is qualified commercial financing with respect to any qualified low-income building shall be made without regard to whether such organization—

"(i) is actively and regularly engaged in the business of lending money, or

"(ii) is a person described in section 46(c)(8)(D)(iv)(II).

"(B) FINANCING SECURED BY PROPERTY.—The requirements of this subparagraph are met with respect to any financing if such financing is secured by the qualified low-income building.

"(C) PORTION OF BUILDING ATTRIBUTABLE TO FINANCING.—The requirements of this subparagraph are met with respect to any financing for any taxable year in the compliance period if, as of the close of such taxable year, not more than 60 percent of the eligible basis of the qualified low-income building is attributable to such financing (reduced by the principal and interest of any governmental financing which is part of a wrap-around mortgage involving such financing).

"(D) REPAYMENT OF PRINCIPAL AND INTEREST.—The requirements of this subparagraph are met with respect to any financing if such financing is fully repaid on or before the earliest of—

"(i) the date on which such financing matures,

"(ii) the 90th day after the close of the compliance period with respect to the qualified low-income building, or

"(iii) the date of its refinancing or the sale of the building to which such financing relates.

"(3) PRESENT VALUE OF FINANCING.—If the rate of interest on any financing described in paragraph (2)(A) is less than the rate which is 1 percentage point below the applicable Federal rate as of the time such financing is incurred, then the qualified basis (to which such financing relates) of the qualified low-income building shall be the present value of the amount of such financing, using as the discount rate such applicable Federal rate. For purposes of the preceding sentence, the rate of interest on any financing shall be determined by treating interest to the extent of government subsidies as not payable.

"(4) FAILURE TO FULLY REPAY.—

"(A) IN GENERAL.—To the extent that the requirements of paragraph (2)(D) are not met, then the taxpayer's tax under this chapter for the taxable year in which such failure occurs shall be increased by an amount equal to the applicable portion of the credit under this section with respect to such building, increased by an amount of interest for the period—

"(i) beginning with the due date for the filing of the return of tax imposed by chapter 1 for the 1st taxable year for which such credit was allowable, and

"(ii) ending with the due date for the taxable year in which such failure occurs,

determined by using the underpayment rate and method under section 6621.

"(B) APPLICABLE PORTION.—For purposes of subparagraph (A), the term 'applicable portion' means the aggregate decrease in the credits allowed to a taxpayer under section 38 for all prior taxable years which would have resulted if the eligible basis of the building were reduced by the amount of financing which does not meet requirements of paragraph (2)(D).

"(C) CERTAIN RULES TO APPLY.—Rules similar to the rules of subparagraphs (A) and (D) of subsection (j)(4) shall apply for purposes of this subsection.

"(l) CERTIFICATIONS TO SECRETARY.—

"(1) CERTIFICATION WITH RESPECT TO 1ST YEAR OF CREDIT PERIOD.—Not later than the 90th day following the close of the 1st taxable year in the credit period with respect to any qualified low-income building, the taxpayer shall certify to the Secretary (in such form and in such manner as the Secretary prescribes)—

"(A) the taxable year, and calendar year, in which such building was placed in service,

"(B) the adjusted basis and eligible basis of such building as of the close of the 1st year of the credit period,

"(C) the maximum applicable percentage and qualified basis permitted to be taken into account by the appropriate housing credit agency under subsection (h),

"(D) the election made under subsection (g) with respect to the qualified low-income housing project of which such building is a part, and

"(E) such other information as the Secretary may require. In the case of a failure to make the certification required by the preceding sentence on the date prescribed therefor, unless it is shown that such failure is due to reasonable cause and not to willful neglect, no credit shall be allowable by reason of subsection (a) with respect to such building for any taxable year ending before such certification is made.

"(2) ANNUAL REPORTS FROM HOUSING CREDIT AGENCIES.—Each agency which allocates any housing credit amount to any building for any calendar year shall submit to the Secretary (at such time and in such manner as the Secretary shall prescribe) an annual report specifying—

"(A) the amount of housing credit amount allocated to each building for such year,

"(B) sufficient information to identify each such building and the taxpayer with respect thereto, and

"(C) such other information as the Secretary may require. The penalty under section 6652(j) shall apply to any failure to submit the report required by the preceding sentence on the date prescribed therefor.

"(m) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section, including regulations—

"(1) dealing with—

"(A) projects which include more than 1 building or only a portion of a building,

"(B) buildings which are placed in service in portions,

"(2) providing for the application of this section to short taxable years, and

"(3) preventing the avoidance of the rules of this section.

"(n) TERMINATION.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the State housing credit ceiling under subsection (h) shall be zero for any calendar year after 1989.

"(2) CARRYOVER OF 1989 LIMIT FOR CERTAIN PROJECTS IN PROGRESS.—

"(A) IN GENERAL.—The aggregate housing credit amount of any agency for 1989 which is not allocated for 1989 shall be treated for purposes of applying this section to any building described in subparagraph (B) as the housing credit amount of such agency for 1990.

"(B) DESCRIPTION.—A building is described in this subparagraph if—

"(i) such building is constructed, reconstructed, or rehabilitated by the taxpayer,

"(ii) more than 10 percent of the reasonably anticipated cost of such construction, reconstrcution, or rehabilitation has been incurred as of January 1, 1989, and

"(iii) sucb building is placed in service before January 1, 1991.

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 227 of 247 PageID #: 227

"(C) CERTAIN RULE NOT TO APPLY.—Subsection (h)(6)(B)(i) shall not apply for purposes of this paragraph."

(b) LOW-INCOME HOUSING CREDIT TREATED AS OTHER BUSINESS CREDITS.—

(1) Subsection (b) of section 38 (relating to current year business credits), as amended by this Act, is amended by striking out "plus" at the end of paragraph (3), but striking out the period at the end of paragraph (4) and inserting in lieu thereof ", plus", and by adding at the end thereof the following new paragraph:

"(5) the low-income housing credit determined under section 42(a)."

(2) Subsection (d) of section 38 is amended by inserting "42(a)," before "46(a)".

(c) RECAPTURE TAX NOT TO REDUCE MINIMUM TAX.—Paragraph (1) of section 55(c), as amended by section 701 of this Act, is amended by inserting "or section 42(j)" after "section 47".

(d) CLERICAL AMENDMENT.—The table of sections for subpart D of part IV of subchapter A of chapter 1 is amended by adding at the end thereof the following new item:

"Sec. 42. Low-income housing credit."

(e) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to buildings placed in service after December 31, 1986, in taxable years ending after such date.

(2) SPECIAL RULE FOR REHABILITATION EXPENDITURES.—Subsection (e) of section 42 of the Internal Revenue Code of 1986 (as added by this section) shall apply for purposes of paragraph (1).

(f) TRANSITIONAL RULES.—

(1) LIMITATION TO NON-ACRS BUILDINGS NOT TO APPLY TO CERTAIN BUILDINGS, ETC.—

(A) IN GENERAL.—In the case of a building which is part of a project described in subparagraph (B)—

(i) section 42(c)(2)(B) of the Internal Revenue Code of 1986 (as added by this section) shall not apply, and

(ii) such building shall be treated as not federally subsidized for purposes of section 42(b)(1)(A) of such Code.

(B) PROJECT DESCRIBED.—A project is described in this subparagraph if—

(i) an urban development action grant application with respect to such project was submitted on September 13, 1984,

(ii) a zoning commission map amendment related to such project was granted on July 17, 1985, and

(iii) the number assigned to such project by the Federal Housing Administration is 023–36602.

(C) ADDITIONAL UNITS ELIGIBLE FOR CREDIT.—In the case of a building to which subparagraph (A) applies and which is part of a project which meets the requirements of subparagraph (D), for each low-income unit in such building which is occupied by individuals whose income is 30 percent or less of area median gross income, one additional unit (not otherwise a low-income unit) in such building shall be treated as a low-income unit for purposes of such section 42.

(D) PROJECT DESCRIBED.—A project is described in this subparagraph if—

(i) rents charged for units in such project are restricted by State regulations,

(ii) the annual cash flow of such project is restricted by State law,

(iii) the project is located on land owned by or ground leased from a public housing authority,

(iv) construction of such project begins on or before December 31, 1986, and units within such project are placed in service on or before June 1, 1990, and

(v) for a 20-year period, 20 percent or more of the residential units in such project are occupied by individuals whose income is 50 percent or less of area median gross income.

(E) MAXIMUM ADDITIONAL CREDIT.—The maximum annual additional credit allowable under section 42 of such Code by reason of subparagraph (C) shall not exceed 25 percent of the eligible basis of the building.

(2) ADDITIONAL ALLOCATION OF HOUSING CREDIT CEILING.—

(A) IN GENERAL.—There is hereby allocated to each housing credit agency described in subparagraph (B) an additional housing credit dollar amount determined in accordance with the following table:

| For calendar year: | The additional allocation is: |
|---|---|
| 1987 | $3,900,000 |
| 1988 | $7,600,000 |
| 1989 | $1,300,000. |

(B) HOUSING CREDIT AGENCIES DESCRIBED.—The housing credit agencies described in this subparagraph are:

(i) A corporate governmental agency constituted as a public benefit corporation and established in 1971 under the provisions of Article XII of the Private Housing Finance Law of the State.

(ii) A city department established on December 20, 1979, pursuant to chapter XVIII of a municipal code of such city for the purpose of supervising and coordinating the formation and execution of projects and programs affecting housing within such city.

(iii) The State housing finance agency referred to in subparagraph (C), but only with respect to projects described in subparagraph (C).

(C) PROJECT DESCRIBED.—A project is described in this subparagraph if such project is a qualified low-income housing project which—

(i) receives financing from a State housing finance agency from the proceeds of bonds issued pursuant to chapter 708 of the Acts of 1966 of such State pursuant to loan commitments from such agency made between May 8, 1984, and July 8, 1986, and

(ii) is subject to subsidy commitments issued pursuant to a program established under chapter 574 of the Acts of 1983 of such State having award dates from such agency between May 31, 1984, and June 11, 1985.

(D) SPECIAL RULES.—

(i) Any building—

PUBLIC LAW 99–514—OCT. 22, 1986     100 STAT. 2207

(I) which is allocated any housing credit dollar amount by a housing credit agency described in clause (iii) of subparagraph (B), and

(II) which is placed in service after June 30, 1986, and before January 1, 1987,

shall be treated for purposes of the amendments made by this section as placed in service on January 1, 1987.

(ii) Section 42(c)(2)(B) of the Internal Revenue Code of 1986 shall not apply to any building which is allocated any housing credit dollar amount by any agency described in subparagraph (B).

(E) ALL UNITS TREATED AS LOW INCOME UNITS IN CERTAIN CASES.—In the case of any building—

(i) which is allocated any housing credit dollar amount by any agency described in subparagraph (B), and

(ii) which after the application of subparagraph (D)(ii) is a qualified low-income building at all times during any taxable year,

such building shall be treated as described in section 42(b)(1)(B) of such Code and having an applicable fraction for such year of 1.

(3) CERTAIN PROJECTS PLACED IN SERVICE BEFORE 1987.—

(A) IN GENERAL.—In the case of a building which is part of a project described in subparagraph (B)—

(i) section 42(c)(2)(B) of such Code shall not apply,

(ii) such building shall be treated as placed in service during the first calendar year after 1986 and before 1990 in which such building is a qualified low-income building (determined after the application of clause (i)), and

(iii) for purposes of section 42(h) of such Code, such building shall be treated as having allocated to it a housing credit dollar amount equal to the dollar amount appearing in the clause of subparagraph (B) in which such building is described.

(B) PROJECT DESCRIBED.—A project is described in this subparagraph if the code number assigned to such project by the Farmers' Home Administration appears in the following table:

| The code number is: | The housing credit dollar amount is: |
| --- | --- |
| (i) 49284553664.......................................................... | $16,000 |
| (ii) 4927742022446...................................................... | $22,000 |
| (iii) 49270742276087.................................................... | $64,000 |
| (iv) 49027074238729 3.................................................. | $48,000 |
| (v) 4927074218234...................................................... | $32,000 |
| (vi) 49270742274019.................................................... | $36,000 |
| (vii) 51460742345074................................................... | $53,000. |

(C) DETERMINATION OF ADJUSTED BASIS.—The adjusted basis of any building to which this paragraph applies for purposes of section 42 of such Code shall be its adjusted basis as of the close of the taxable year ending before the first taxable year of the credit period for such building

(D) CERTAIN RULES TO APPLY.—Rules similar to the rules of subparagraph (E) of paragraph (2) shall apply for purposes of this paragraph.

(4) DEFINITIONS.—For purposes of this subsection, terms used in such subsection which are also used in section 42 of the Internal Revenue Code of 1986 (as added by this section) shall have the meanings given such terms by such section 42.

# Subtitle G—Merchant Marine Capital Construction Funds

### SEC. 261. PROVISIONS RELATING TO MERCHANT MARINE CAPITAL CONSTRUCTION FUNDS.

(a) PURPOSE.—The purpose of this section is to coordinate the application of the Internal Revenue Code of 1986 with the capital construction program under the Merchant Marine Act, 1936.

(b) AMENDMENT OF 1986 CODE.—Chapter 77 (relating to miscellaneous provisions) is amended by adding at the end thereof the following new section:

"SEC. 7518. TAX INCENTIVES RELATING TO MERCHANT MARINE CAPITAL CONSTRUCTION FUNDS.

"(a) CEILING ON DEPOSITS.—

"(1) IN GENERAL.—The amount deposited in a fund established under section 607 of the Merchant Marine Act, 1936 (hereinafter in this section referred to as a 'capital construction fund') shall not exceed for any taxable year the sum of:

"(A) that portion of the taxable income of the owner or lessee for such year (computed as provided in chapter 1 but without regard to the carryback of any net operating loss or net capital loss and without regard to this section) which is attributable to the operation of the agreement vessels in the foreign or domestic commerce of the United States or in the fisheries of the United States,

"(B) the amount allowable as a deduction under section 167 for such year with respect to the agreement vessels,

"(C) if the transaction is not taken into account for purposes of subparagraph (A), the net proceeds (as defined in joint regulations) from—

"(i) the sale or other disposition of any agreement vessel, or

"(ii) insurance or indemnity attributable to any agreement vessel, and

"(D) the receipts from the investment or reinvestment of amounts held in such fund.

"(2) LIMITATIONS ON DEPOSITS BY LESSEES.—In the case of a lessee, the maximum amount which may be deposited with respect to an agreement vessel by reason of paragraph (1)(B) for any period shall be reduced by any amount which, under an agreement entered into under section 607 of the Merchant Marine Act, 1936, the owner is required or permitted to deposit for such period with respect to such vessel by reason of paragraph (1)(B).

"(3) CERTAIN BARGES AND CONTAINERS INCLUDED.—For purposes of paragraph (1), the term 'agreement vessel' includes barges and containers which are part of the complement of such vessel and which are provided for in the agreement.

"(b) REQUIREMENTS AS TO INVESTMENTS.—

"(1) IN GENERAL.—Amounts in any capital construction fund shall be kept in the depository or depositories specified in the agreement and shall be subject to such trustee and other fiduciary requirements as may be specified by the Secretary.

"(2) LIMITATION ON FUND INVESTMENTS.—Amounts in any capital construction fund may be invested only in interest-bearing securities approved by the Secretary; except that, if such Secretary consents thereto, an agreed percentage (not in excess of 60 percent) of the assets of the fund may be invested in the stock of domestic corporations. Such stock must be currently fully listed and registered on an exchange registered with the Securities and Exchange Commission as a national securities exchange, and must be stock which would be acquired by prudent men of discretion and intelligence in such matters who are seeking a reasonable income and the preservation of their capital. If at any time the fair market value of the stock in the fund is more than the agreed percentage of the assets in the fund, any subsequent investment of amounts deposited in the fund, and any subsequent withdrawal from the fund, shall be made in such a way as to tend to restore the fund to a situation in which the fair market value of the stock does not exceed such agreed percentage.

"(3) INVESTMENT IN CERTAIN PREFERRED STOCK PERMITTED.—For purposes of this subsection, if the common stock of a corporation meets the requirements of this subsection and if the preferred stock of such corporation would meet such requirements but for the fact that it cannot be listed and registered as required because it is nonvoting stock, such preferred stock shall be treated as meeting the requirements of this subsection.

"(c) NONTAXABILITY FOR DEPOSITS.—

"(1) IN GENERAL.—For purposes of this title—

"(A) taxable income (determined without regard to this section and section 607 of the Merchant Marine Act, 1936) for the taxable year shall be reduced by an amount equal to the amount deposited for the taxable year out of amounts referred to in subsection (a)(1)(A),

"(B) gain from a transaction referred to in subsection (a)(1)(C) shall not be taken into account if an amount equal to the net proceeds (as defined in joint regulations) from such transaction is deposited in the fund,

"(C) the earnings (including gains and losses) from the investment and reinvestment of amounts held in the fund shall not be taken into account,

"(D) the earnings and profits (within the meaning of section 316) of any corporation shall be determined without regard to this section and section 607 of the Merchant Marine Act, 1936, and

"(E) in applying the tax imposed by section 531 (relating to the accumulated earnings tax), amounts while held in the fund shall not be taken into account.

"(2) ONLY QUALIFIED DEPOSITS ELIGIBLE FOR TREATMENT.—Paragraph (1) shall apply with respect to any amount only if such amount is deposited in the fund pursuant to the agreement and not later than the time provided in joint regulations.

"(d) ESTABLISHMENT OF ACCOUNTS.—For purposes of this section—

"(1) IN GENERAL.—Within a capital construction fund 3 accounts shall be maintained:

"(A) the capital account,

"(B) the capital gain account, and

"(C) the ordinary income account.

"(2) CAPITAL ACCOUNT.—The capital account shall consist of—

"(A) amounts referred to in subsection (a)(1)(B),

"(B) amounts referred to in subsection (a)(1)(C) other than that portion thereof which represents gain not taken into account by reason of subsection (c)(1)(B),

"(C) the percentage applicable under section 243(a)(1) of any dividend received by the fund with respect to which the person maintaining the fund would (but for subsection (c)(1)(C)) be allowed a deduction under section 243, and

"(D) interest income exempt from taxation under section 103.

"(3) CAPITAL GAIN ACCOUNT.—The capital gain account shall consist of—

"(A) amounts representing capital gains on assets held for more than 6 months and referred to in subsection (a)(1)(C) or (a)(1)(D), reduced by

"(B) amounts representing capital losses on assets held in the fund for more than 6 months.

"(4) ORDINARY INCOME ACCOUNT.—The ordinary income account shall consist of—

"(A) amounts referred to in subsection (a)(1)(A),

"(B)(i) amounts representing capital gains on assets held for 6 months or less and referred to in subsection (a)(1)(C) or (a)(1)(D), reduced by

"(ii) amounts representing capital losses on assets held in the fund for 6 months or less,

"(C) interest (not including any tax-exempt interest referred to in paragraph (2)(D)) and other ordinary income (not including any dividend referred to in subparagraph (E)) received on assets held in the fund,

"(D) ordinary income from a transaction described in subsection (a)(1)(C), and

"(E) the portion of any dividend referred to in paragraph (2)(C) not taken into account under such paragraph.

"(5) CAPITAL LOSSES ONLY ALLOWED TO OFFSET CERTAIN GAINS.— Except on termination of a capital construction fund, capital losses referred to in paragraph (3)(B) or in paragraph (4)(B)(ii) shall be allowed only as an offset to gains referred to in paragraph (3)(A) or (4)(B)(i), respectively.

"(e) PURPOSES OF QUALIFIED WITHDRAWALS.—

"(1) IN GENERAL.—A qualified withdrawal from the fund is one made in accordance with the terms of the agreement but only if it is for:

"(A) the acquisition, construction, or reconstruction of a qualified vessel,

"(B) the acquisition, construction, or reconstruction of barges and containers which are part of the complement of a qualified vessel, or

"(C) the payment of the principal on indebtedness incurred in connection with the acquisition, construction, or reconstruction of a qualified vessel or a barge or container which is part of the complement of a qualified vessel. Except to the extent provided in regulations prescribed by the Secretary, subparagraph (B), and so much of subparagraph (C)

as relates only to barges and containers, shall apply only with respect to barges and containers constructed in the United States.

"(2) PENALTY FOR FAILING TO FULFILL ANY SUBSTANTIAL OBLIGATION.—Under joint regulations, if the Secretary determines that any substantial obligation under any agreement is not being fulfilled, he may, after notice and opportunity for hearing to the person maintaining the fund, treat the entire fund or any portion thereof as an amount withdrawn from the fund in a nonqualified withdrawal.

"(f) TAX TREATMENT OF QUALIFIED WITHDRAWALS.—

"(1) ORDERING RULE.—Any qualified withdrawal from a fund shall be treated—

"(A) first as made out of the capital account,

"(B) second as made out of the capital gain account, and

"(C) third as made out of the ordinary income account.

"(2) ADJUSTMENT TO BASIS OF VESSEL, ETC., WHERE WITHDRAWAL FROM ORDINARY INCOME ACCOUNT.—If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the ordinary income account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion.

"(3) ADJUSTMENT TO BASIS OF VESSEL, ETC., WHERE WITHDRAWAL FROM CAPITAL GAIN ACCOUNT.—If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the capital gain account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion.

"(4) ADJUSTMENT TO BASIS OF VESSELS, ETC., WHERE WITHDRAWALS PAY PRINCIPAL ON DEBT.—If any portion of a qualified withdrawal to pay the principal on any indebtedness is made out of the ordinary income account or the capital gain account, then an amount equal to the aggregate reduction which would be required by paragraphs (2) and (3) if this were a qualified withdrawal for a purpose described in such paragraphs shall be applied, in the order provided in joint regulations, to reduce the basis of vessels, barges, and containers owned by the person maintaining the fund. Any amount of a withdrawal remaining after the application of the preceding sentence shall be treated as a nonqualified withdrawal.

"(5) ORDINARY INCOME RECAPTURE OF BASIS REDUCTION.—If any property the basis of which was reduced under paragraph (2), (3), or (4) is disposed of, any gain realized on such disposition, to the extent it does not exceed the aggregate reduction in the basis of such property under such paragraphs, shall be treated as an amount referred to in subsection (g)(3)(A) which was withdrawn on the date of such disposition. Subject to such conditions and requirements as may be provided in joint regulations, the preceding sentence shall not apply to a disposition where there is a redeposit in an amount determined under joint regulations which will, insofar as practicable, restore the fund to the position it was in before the withdrawal.

"(g) TAX TREATMENT OF NONQUALIFIED WITHDRAWALS.—

"(1) IN GENERAL.—Except as provided in subsection (h), any withdrawal from a capital construction fund which is not qualified withdrawal shall be treated as a nonqualified withdrawal.

"(2) ORDERING RULE.—Any nonqualified withdrawal from a fund shall be treated—

"(A) first as made out of the ordinary income account,
"(B) second as made out of the capital gain account, and
"(C) third as made out of the capital account.

For purposes of this section, items withdrawn from any account shall be treated as withdrawn on a first-in-first-out basis; except that (i) any nonqualified withdrawal for research, development, and design expenses incident to new and advanced ship design, machinery and equipment, and (ii) any amount treated as a nonqualified withdrawal under the second sentence of subsection (f)(4), shall be treated as withdrawn on a last-in-first-out basis.

"(3) OPERATING RULES.—For purposes of this title—

"(A) any amount referred to in paragraph (2)(A) shall be included in income as an item of ordinary income for the taxable year in which the withdrawal is made,

"(B) any amount referred to in paragraph (2)(B) shall he included in income for the taxable year in which the withdrawal is made as an item of gain realized during such year from the disposition of an asset held for more than 6 months, and

"(C) for the period on or before the last date prescribed for payment of tax for the taxable year in which this withdrawal is made—

"(i) no interest shall be payable under section 6601 and no addition to the tax shall be payable under section 6651,

"(ii) interest on the amount of the additional tax attributable to any item referred to in subparagraph (A) or (B) shall be paid at the applicable rate (as defined in paragraph (4)) from the last date prescribed for payment of the tax for the taxable year for which such item was deposited in the fund, and

"(iii) no interest shall be payable on amounts referred to in clauses (i) and (ii) of paragraph (2) or in the case of any nonqualified withdrawal arising from the application of the recapture provision of section 606(5) of the Merchant Marine Act of 1936 as in effect on December 31, 1969.

"(4) INTEREST RATE.—For purposes of paragraph (3)(C)(ii), the applicable rate of interest for any nonqualified withdrawal—

"(A) made in a taxable year beginning in 1970 or 1971 is 8 percent, or

"(B) made in a taxable year beginning after 1971, shall be determined and published jointly by the Secretary of the Treasury or his delegate and the applicable Secretary and shall bear a relationship to 8 percent which the Secretaries determine under joint regulations to be comparable to the relationship which the money rates and investment yields for the calendar year immediately preceding the beginning of the taxable year bear to the money rates and investment yields for the calendar year 1970.

"(5) AMOUNT NOT WITHDRAWN FROM FUND AFTER 25 YEARS FROM DEPOSIT TAXED AS NONQUALIFIED WITHDRAWAL.—

"(A) IN GENERAL.—The applicable percentage of any amount which remains in a capital construction fund at the

close of the 26th, 27th, 28th, 29th, or 30th taxable year following the taxable year for which such amount was deposited shall be treated as a nonqualified withdrawal in accordance with the following table:

| "If the amount remains in the fund at the close of the— | The applicable percentage is— |
| --- | --- |
| 26th taxable year | 20 percent |
| 27th taxable year | 40 percent |
| 28th taxable year | 60 percent |
| 29th taxable year | 80 percent |
| 30th taxable year | 100 percent. |

"(B) EARNINGS TREATED AS DEPOSITS.—The earnings of any capital construction fund for any taxable year (other than net gains) shall be treated for purposes of this paragraph as an amount deposited for such taxable year.

"(C) AMOUNTS COMMITTED TREATED AS WITHDRAWN.—For purposes of subparagraph (A), an amount shall not be treated as remaining in a capital construction fund at the close of any taxable year to the extent there is a binding contract at the close of such year for a qualified withdrawal of such amount with respect to an identified item for which such withdrawal may be made.

"(D) AUTHORITY TO TREAT EXCESS FUNDS AS WITHDRAWN.— If the Secretary determines that the balance in any capital construction fund exceeds the amount which is appropriate to meet the vessel construction program objectives of the person who established such fund, the amount of such excess shall be treated as a nonqualified withdrawal under subparagraph (A) unless such person develops appropriate program objectives within 3 years to dissipate such excess.

"(E) AMOUNTS IN FUND ON JANUARY 1, 1987.—For purposes of this paragraph, all amounts in a capital construction fund on January 1, 1987, shall be treated as deposited in such fund on such date.

"(6) NONQUALIFIED WITHDRAWALS TAXED AT HIGHEST MARGINAL RATE.—

"(A) IN GENERAL.—In the case of any taxable year for which there is a nonqualified withdrawal (including any amount so treated under paragraph (5)), the tax imposed by chapter 1 shall be determined—

"(i) by excluding such withdrawal from gross income, and

"(ii) by increasing the tax imposed by chapter 1 by the product of the amount of such withdrawal and the highest rate of tax specified in section 1 (section 11 in the case of a corporation).

With respect to the portion of any nonqualified withdrawal made out of the capital gain account during a taxable year to which section 1(i) or 1201(a) applies, the rate of tax taken into account under the preceding sentence shall not exceed 28 percent (34 percent in the case of a corporation).

"(B) TAX BENEFIT RULE.—If any portion of a nonqualified withdrawal is properly attributable to deposits (other than earnings on deposits) made by the taxpayer in any taxable year which did not reduce the taxpayer's liability for tax under chapter 1 for any taxable year preceding the taxable year in which such withdrawal occurs—

"(i) such portion shall not be taken into account under subparagraph (A), and

"(ii) an amount equal to such portion shall be treated as allowed as a deduction under section 172 for the taxable year in which such withdrawal occurs.

"(C) COORDINATION WITH DEDUCTION FOR NET OPERATING LOSSES.—Any nonqualified withdrawal excluded from gross income under subparagraph (A) shall be excluded in determining taxable income under section 172(b)(2).

"(h) CERTAIN CORPORATE REORGANIZATIONS AND CHANGES IN PARTNERSHIPS.—Under joint regulations—

"(1) a transfer of a fund from one person to another person in a transaction to which section 381 applies may be treated as if such transaction did not constitute a nonqualified withdrawal, and

"(2) a similar rule shall be applied in the case of a continuation of a partnership.

"(i) DEFINITIONS.—For purposes of this section, any term defined in section 607(k) of the Merchant Marine Act, 1936 which is also used in this section (including the definition of 'Secretary') shall have the meaning given such term by such section 607(k) as in effect on the date of the enactment of this section."

(c) CREDITS NOT ALLOWED AGAINST INCREASE IN TAX.—Paragraph (2) of section 26(b) is amended by striking out "and" at the end of subparagraph (G), by striking out the period at the end of subparagraph (H) and inserting in lieu thereof ", and", and by adding at the end thereof the following new subparagraph:

"(I) subparagraph (A) of section 7518(g)(6) (relating to nonqualified withdrawals from capital construction funds taxed at highest marginal rate)."

(d) DEPARTMENTAL REPORTS AND CERTIFICATION.—Section 607 of the Merchant Marine Act, 1936, is amended by adding at the end thereof the following new subsection:

"(m) DEPARTMENTAL REPORTS AND CERTIFICATION.—

"(1) IN GENERAL.—For each calendar year, the Secretaries shall each provide the Secretary of the Treasury, within 120 days after the close of such calendar year, a written report with respect to those capital construction funds that are under their jurisdiction.

"(2) CONTENTS OF REPORTS.—Each report shall set forth the name and taxpayer identification number of each person—

"(A) establishing a capital construction fund during such calendar year;

"(B) maintaining a capital construction fund as of the last day of such calendar year;

"(C) terminating a capital construction fund during such calendar year;

"(D) making any withdrawal from or deposit into (and the amounts thereof) a capital construction fund during such calendar year; or

"(E) with respect to which a determination has been made during such calendar year that such person has failed to fulfill a substantial obligation under any capital construction fund agreement to which such person is a party."

(e) CONFORMING AMENDMENTS.—

PUBLIC LAW 99–514—OCT. 22, 1986 100 STAT. 2215

(1) Subparagraph (A) of section 607(d)(1) of the Merchant Marine Act, 1936 is amended by inserting "and section 7518 of such Code" after "this section".

(2) Subparagraph (D) of section 607(d)(1) of such Act is amended by inserting "and section 7518 of such Code" after "this section".

(3) Subparagraph (C) of section 607(e)(2) of such Act is amended by striking out "85 percent" and inserting in lieu thereof "the percentage applicable under section 243(a)(1) of the Internal Revenue Code of 1986".

(4) Subparagraph (E) of section 607(e)(4) of such Act is amended to read as follows:

"(E) the portion of any dividend referred to in paragraph (2)(C) not taken into account under such paragraph."

(5) Paragraph (3) of section 607(g) of such Act is amended to read as follows:

"(3) If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the capital gain account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion."

(6) Subsection (h) of section 607 of such Act is amended by adding at the end thereof the following new paragraphs:

"(5) AMOUNT NOT WITHDRAWN FROM FUND AFTER 25 YEARS FROM DEPOSIT TAXED AS NONQUALIFIED WITHDRAWAL.—

"(A) IN GENERAL.—The applicable percentage of any amount which remains in a capital construction fund at the close of the 26th, 27th, 28th, 29th, or 30th taxable year following the taxable year for which such amount was deposited shall be treated as a nonqualified withdrawal in accordance with the following table:

| "If the amount remains in the fund at the close of the— | The applicable percentage is— |
|---|---|
| 26th taxable year | 20 percent |
| 27th taxable year | 40 percent |
| 28th taxable year | 60 percent |
| 29th taxable year | 80 percent |
| 30th taxable year | 100 percent. |

"(B) EARNINGS TREATED AS DEPOSITS.—The earnings of any capital construction fund for any taxable year (other than net gains) shall be treated for purposes of this paragraph as an amount deposited for such taxable year.

"(C) AMOUNTS COMMITTED TREATED AS WITHDRAWN.—For purposes of subparagraph (A), an amount shall not be treated as remaining in a capital construction fund at the close of any taxable year to the extent there is a binding contract at the close of such year for a qualified withdrawal of such amount with respect to an identified item for which such withdrawal may be made.

"(D) AUTHORITY TO TREAT EXCESS FUNDS AS WITHDRAWN.— If the Secretary determines that the balance in any capital construction fund exceeds the amount which is appropriate to meet the vessel construction program objectives of the person who established such fund, the amount of such excess shall be treated as a nonqualified withdrawal under subparagraph (A) unless such person develops appropriate program objectives within 3 years to dissipate such excess.

"(E) AMOUNTS IN FUND ON JANUARY 1, 1987.—For purposes of this paragraph, all amounts in a capital construction fund on January 1, 1987, shall be treated as deposited in such fund on such date.

"(6) NONQUALIFIED WITHDRAWALS TAXED AT HIGHEST MARGINAL RATE.—

"(A) IN GENERAL.—In the case of any taxable year for which there is a nonqualified withdrawal (including any amount so treated under paragraph (5)), the tax imposed by chapter 1 of the Internal Revenue Code of 1986 shall be determined—

"(i) by excluding such withdrawal from gross income, and

"(ii) by increasing the tax imposed by chapter 1 of such Code hy the product of the amount of such withdrawal and the highest rate of tax specified in section 1 (section 11 in the case of a corporation) of such Code.

With respect to the portion of any nonqualified withdrawal made out of the capital gain account during a taxable year to which section 1(j) or 1201(a) of such Code applies, the rate of tax taken into account under the preceding sentence shall not exceed 28 percent (34 percent in the case of a corporation).

"(B) TAX BENEFIT RULE.—If any portion of a nonqualified withdrawal is properly attributable to deposits (other than earnings on deposits) made by the taxpayer in any taxable year which did not reduce the taxpayer's liability for tax under chapter 1 for any taxable year preceding the taxable year in which such withdrawal occurs—

"(i) such portion shall not be taken into account under subparagraph (A), and

"(ii) an amount equal to such portion shall be treated as allowed as a deduction under section 172 of such Code for the taxable year in which such withdrawal occurs.

"(C) COORDINATION WITH DEDUCTION FOR NET OPERATING LOSSES.—Any nonqualified withdrawal excluded from gross income under subparagraph (A) shall be excluded in determining taxable income under section 172(b)(2) of the Internal Revenue Code of 1986."

(f) CLERICAL AMENDMENT.—The table of sections for chapter 77 is amended by adding at the end thereof the following new item:

"Sec. 7518. Tax incentives relating to merchant marine capital construction funds."

(g) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1986.

# TITLE III—CAPITAL GAINS

## Subtitle A—Individual Capital Gains

SEC. 301. REPEAL OF EXCLUSION FOR LONG-TERM CAPITAL GAINS OF INDIVIDUALS.

(a) IN GENERAL.—Section 1202 (relating to deduction for capital gains) is hereby repealed.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2217

(b) CONFORMING AMENDMENTS.—

(1) Section 62(a) (defining adjusted gross income), as amended by section 132, is amended by striking out paragraph (3) and redesignating paragraphs (4), (5), (6), (7), (10), (11), (12), (13), (14), and (15) as paragraphs (3) through (12), respectively.

(2) Section 170(e)(1) (relating to certain contributions of ordinary income and capital gain property) is amended by striking out "40 percent (28⁄46 in the case of a corporation) of".

(3) Paragraph (2) of section 172(d) (relating to modifications with respect to net operating loss deduction) is amended to read as follows:

"(2) CAPITAL GAINS AND LOSSES OF TAXPAYERS OTHER THAN CORPORATIONS.—In the case of a taxpayer other than a corporation, the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from sales or exchanges of capital assets."

(4) Paragraph (1) of section 219(f) (defining compensation) is amended by striking out "paragraph (7)" and inserting in lieu thereof "paragraph (6)".

(5)(A) Section 223 (relating to cross references) is amended to read as follows:

"SEC. 223. CROSS REFERENCE.

"For deductions in respect of a decedent, see section 691."

(B) The table of sections for part VII of subchapter B of chapter 1 is amended by striking out "references" in the item relating to section 223 and inserting in lieu thereof "reference".

(6) Paragraph (4) of section 642(c) (relating to deduction for amounts paid or permanently set aside for a charitable purpose) is amended—

(A) by striking out the 1st sentence, and

(B) by striking out "ADJUSTMENTS" in the paragraph heading and inserting in lieu thereof "COORDINATION WITH SECTION 681".

(7) Paragraph (3) of section 643(a) (relating to distributable net income) is amended by striking out the last sentence.

(8) Paragraph (4) of section 691(c) (relating to deduction for estate tax) is amended—

(A) by striking out "1201, 1202, and 1211, and for purposes of section 57(a)(9)" and inserting in lieu thereof "1(j), 1201, and 1211", and

(B) by striking out "CAPITAL GAIN DEDUCTION, ETC.—" in the paragraph heading and inserting in lieu thereof "CAPITAL GAIN PROVISIONS.—".

(9) The second sentence of paragraph (2) of section 871(a) (relating to income not connected with United States business) is amended by striking out "such gains and losses shall be determined without regard to section 1202 (relating to deduction for capital gains) and".

(10) Subsection (b) of section 1211 (relating to limitation on capital losses) is amended to read as follows:

"(b) OTHER TAXPAYERS.—In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of—

"(1) $3,000 ($1,500 in the case of a married individual filing a separate return), or

"(2) the excess of such losses over such gains."

(11) Paragraph (2) of section 1212(b) (relating to capital loss carrybacks and carryovers) is amended to read as follows:

"(2) SPECIAL RULE.—For purposes of determining the excess referred to in subparagraph (A) or (B) of paragraph (1), an amount equal to the amount allowed for the taxable year under paragraph (1) or (2) of section 1211(b) shall be treated as a short-term capital gain in such year."

(12) Paragraph (1) of section 1402(i) (relating to special rules for options and commodities dealers) is amended to read as follows:

"(1) IN GENERAL.—Notwithstanding subsection (a)(3)(A), in determining the net earnings from self-employment of any options dealer or commodities dealer, there shall not be excluded any gain or loss (in the normal course of the taxpayer's activity of dealing in or trading section 1256 contracts) from section 1256 contracts or property related to such contracts."

(13) The table of sections for part I of subchapter P of chapter 1 is amended by striking out the item relating to section 1202.

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1986.

SEC. 302. 28-PERCENT CAPITAL GAINS RATE FOR TAXPAYERS OTHER THAN CORPORATIONS.

(a) IN GENERAL.—Section 1 (relating to tax imposed on individuals), as amended by sections 101 and 1411, is amended by adding at the end thereof the following new subsection:

"(j) MAXIMUM CAPITAL GAINS RATE.—

"(1) IN GENERAL.—If a taxpayer has a net capital gain for any taxable year to which this subsection applies, then the tax imposed by this section shall not exceed the sum of—

"(A) a tax computed at the rates and in the same manner as if this subsection had not been enacted on the greater of—

"(i) the taxable income reduced by the amount of net capital gain, or

"(ii) the amount of taxable income taxed at a rate below 28 percent, plus

"(B) a tax of 28 percent of the amount of taxable income in excess of the amount determined under subparagraph (A), plus

"(C) the amount of increase determined under subsection (g).

"(2) YEARS TO WHICH SUBSECTION APPLIES.—This subsection shall apply to—

"(A) any taxable year beginning in 1987, and

"(B) any taxable year beginning after 1987 if the highest rate of tax set forth in subsection (a), (b), (c), (d), or (e) (whichever applies) for such taxable year exceeds 28 percent."

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 1986.

(c) TRANSITIONAL RULE.—The tax under section 1 of the Internal Revenue Code of 1986 on the long-term capital gain on rights to royalties paid under leases and assignments binding on Septem-

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2219

ber 25, 1985, by a limited partnership formed on March 1, 1977, which on October 30, 1979, assigned leases and which assignment was amended on April 27, 1981, shall not exceed 20 percent.

# Subtitle B—Repeal of Corporate Capital Gains Treatment

### SEC. 311. REPEAL OF CORPORATE CAPITAL GAINS TREATMENT.

(a) GENERAL RULE.—Section 1201 (relating to alternative tax for corporations) is amended to read as follows:

"SEC. 1201. ALTERNATIVE TAX FOR CORPORATIONS.

"(a) GENERAL RULE.—If for any taxable year a corporation has a net capital gain and any rate of tax imposed by section 11, 511, or 831(a) (whichever is applicable) exceeds 34 percent (determined without regard to the last sentence of section 11(b)), then, in lieu of any such tax, there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

"(1) a tax computed on the taxable income reduced by the amount of the net capital gain, at the rates and in the manner as if this subsection had not been enacted, plus

"(2) a tax of 34 percent of the net capital gain.

"(b) CROSS REFERENCES.—

"For computation of the alternative tax—

"(1) in the case of life insurance companies, see section 801(a)(2),

"(2) in the case of regulated investment companies and their shareholders, see section 852(b)(3)(A) and (D), and

"(3) in the case of real estate investment trusts, see section 857(b)(3)(A)."

(b) TECHNICAL AMENDMENTS.—

(1) Clause (iii) of section 852(b)(3)(D) is amended by striking out "72 percent" and inserting in lieu thereof "66 percent".

(2) Subparagraph (E) of section 593(b)(2), as in effect before the amendments made by title IX, is amended by adding "and" at the end of clause (iii), by striking out clause (iv), and by redesignating clause (v) as clause (iv).

(3) The second sentence of section 631(c) is amended by striking out "Such owner" and inserting in lieu thereof "If for the taxable year of such gain or loss the maximum rate of tax imposed by this chapter on any net capital gain is less than such maximum rate for ordinary income, such owner".

(4) Paragraphs (1) and (2) of section 1445(e) (as amended by title XVIII) are each amended by striking out "28 percent" and inserting in lieu thereof "34 percent".

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply to taxable years beginning after December 31, 1986.

(d) TRANSITIONAL RULES.—

(1) TAXABLE YEARS WHICH BEGIN IN 1986 AND END IN 1987.—In the case of any taxable year which begins before January 1, 1987, and ends on or after such date, paragraph (2) of section 1201(a) of the Internal Revenue Code of 1954, as in effect on the date before the date of enactment of this Act, shall be applied as if it read as follows:

"(2) the sum of—

"(A) 28 percent of the lesser of—

"(i) the net capital gain determined by taking into account only gain or loss which is properly taken into account for the portion of the taxable year before January 1, 1987, or

"(ii) the net capital gain for the taxable year, and

"(B) 34 percent of the excess (if any) of—

"(i) the net capital gain for the taxable year, over

"(ii) the amount of the net capital gain taken into account under subparagraph (A)."

(2) REVOCATION OF ELECTIONS UNDER SECTION 631(a).—Any election under section 631(a) of the Internal Revenue Code of 1954 made (whether by a corporation or a person other than a corporation) for a taxable year beginning before January 1, 1987, may be revoked by the taxpayer for any taxable year ending after December 31, 1986. For purposes of determining whether the taxpayer may make a further election under such section, such election (and any revocation under this paragraph) shall not be taken into account.

## Subtitle C—Incentive Stock Options

### SEC. 321. REPEAL OF REQUIREMENT THAT INCENTIVE STOCK OPTIONS ARE EXERCISABLE ONLY IN CHRONOLOGICAL ORDER; MODIFICATION OF $100,000 LIMITATION.

(a) GENERAL RULE.—Subsection (b) of section 422A is amended by inserting "and" at the end of paragraph (6) and by striking out paragraphs (7) and (8) and inserting in lieu thereof the following new paragraph:

"(7) under the terms of the plan, the aggregate fair market value (determined at the time the option is granted) of the stock with respect to which incentive stock options are exercisable for the 1st time by such individual during any calendar year (under all such plans of the individual's employer corporation and its parent and subsidiary corporations) shall not exceed $100,000."

(b) CONFORMING AMENDMENTS.—

(1) Subsection (c) of section 422A is amended—

(A) by striking out paragraphs (4) and (7), and

(B) by redesignating paragraphs (5), (6), (8), (9), and (10) as paragraphs (4), (5), (6), (7), and (8), respectively.

(2) The last sentence of section 422A(c)(1) is amended by striking out "paragraph (8) of subsection (b) and paragraph (4) of this subsection" and inserting in lieu thereof "paragraph (7) of subsection (b)".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to options granted after December 31, 1986.

## Subtitle D—Straddles

### SEC. 331. YEAR-END RULE EXPANDED.

(a) IN GENERAL.—Subparagraph (E) of section 1092(c)(4) (defining straddle) is amended—

(1) by inserting "or the stock is disposed of at a loss" in clause (i) after "closed",

(2) by striking out "is" in clause (ii) and inserting in lieu thereof "or gains on such options are", and

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 243 of 247 PageID #: 243

(3) by inserting "or option" after "stock" and "or the disposition of such stock" after "options" in clause (iii).

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to positions established on or after January 1, 1987.

# TITLE IV—AGRICULTURE, ENERGY, AND NATURAL RESOURCES

## Subtitle A—Agriculture

### SEC. 401. LIMITATION ON EXPENSING OF SOIL AND WATER CONSERVATION EXPENDITURES.

(a) GENERAL RULE.—Subsection (c) of section 175 (relating to soil and water conservation expenditures) is amended by adding at the end thereof the following new paragraph:

"(3) ADDITIONAL LIMITATIONS.—

"(A) EXPENDITURES MUST BE CONSISTENT WITH SOIL CONSERVATION PLAN.—Notwithstanding any other provision of this section, subsection (a) shall not apply to any expenditures unless such expenditures are consistent with—

"(i) the plan (if any) approved by the Soil Conservation Service of the Department of Agriculture for the area in which the land is located, or

"(ii) if there is no plan described in clause (i), any soil conservation plan of a comparable State agency.

"(B) CERTAIN WETLAND, ETC., ACTIVITIES NOT QUALIFIED.—Subsection (a) shall not apply to any expenditures in connection with the draining or filling of wetlands or land preparation for center pivot irrigation systems."

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to amounts paid or incurred after December 31, 1986, in taxable years ending after such date.

### SEC. 402. REPEAL OF SPECIAL TREATMENT FOR EXPENDITURES FOR CLEARING LAND.

(a) IN GENERAL.—Section 182 (relating to expenditures by farmers for clearing land) is hereby repealed.

(b) TECHNICAL AMENDMENTS.—

(1) Paragraph (1) of section 263(a) (relating to capital expenditures) is amended by striking out subparagraph (E) and by redesignating subparagraphs (F), (G), and (H) as subparagraphs (E), (F), and (G), respectively.

(2) Subparagraph (A) of section 1252(a)(1) (relating to gain from disposition of farm land) is amended by striking out "(relating to expenditures by farmers for clearing land)" and inserting in lieu thereof "(as in effect on the day before the date of the enactment of the Tax Reform Act of 1986)".

(3) The table of sections for part VI of subchapter B of chapter 1 is amended by striking out the item relating to section 182.

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to amounts paid or incurred after December 31, 1985, in taxable years ending after such date.

**SEC. 403. TREATMENT OF DISPOSITIONS OF CONVERTED WETLANDS OR HIGHLY ERODIBLE CROPLANDS.**

(a) GENERAL RULE.—Part IV of subchapter P of chapter 1 (relating to special rules for determining capital gains and losses) is amended by adding at the end thereof the following new section:

**"SEC. 1257. DISPOSITION OF CONVERTED WETLANDS OR HIGHLY ERODIBLE CROPLANDS.**

"(a) GAIN TREATED AS ORDINARY INCOME.—Any gain on the disposition of converted wetland or highly erodible cropland shall be treated as ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle, except that this section shall not apply to the extent such gain is recognized as ordinary income under any other provision of this part.

"(b) LOSS TREATED AS LONG-TERM CAPITAL LOSS.—Any loss recognized on the disposition of converted wetland or highly erodible cropland shall be treated as a long-term capital loss.

"(c) DEFINITIONS.—For purposes of this section—

"(1) CONVERTED WETLAND.—The term 'converted wetland' means any converted wetland (as defined in section 1201(4) of the Food Security Act of 1985 (16 U.S.C. 3801(4))) held—

"(A) by the person whose activities resulted in such land being converted wetland, or

"(B) by any other person who at any time used such land for farming purposes.

"(2) HIGHLY ERODIBLE CROPLAND.—The term 'highly erodible cropland' means any highly erodible cropland (as defined in section 1201(6) of the Food Security Act of 1985 (16 U.S.C. 3801(6))), if at any time the taxpayer used such land for farming purposes (other than the grazing of animals).

"(3) TREATMENT OF SUCCESSORS.—If any land is converted wetland or highly erodible cropland in the hands of any person, such land shall be treated as converted wetland or highly erodible cropland in the hands of any other person whose adjusted basis in such land is determined (in whole or in part) by reference to the adjusted basis of such land in the hands of such person.

"(d) SPECIAL RULES.—Under regulations prescribed by the Secretary, rules similar to the rules applicable under section 1245 shall apply for purposes of subsection (a). For purposes of sections 170(e), 341(e)(12), and 751(c), amounts treated as ordinary income under subsection (a) shall be treated in the same manner as amounts treated as ordinary income under section 1245."

(b) CLERICAL AMENDMENT.—The table of sections for part IV of subchapter P of chapter 1 is amended by adding at the end thereof the following new item:

"Sec. 1257. Disposition of converted wetlands or highly erodible croplands."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to dispositions of converted wetland or highly erodible cropland (as defined in section 1257(c) of the Internal Revenue Code of 1986 as added by this section) first used for farming after March 1, 1986, in taxable years ending after that date.

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 245 of 247 PageID #: 245

SEC. 404. LIMITATION ON CERTAIN PREPAID FARMING EXPENSES.

(a) GENERAL RULE.—Section 464 (relating to limitations on deductions in case of farming syndicates) is amended by adding at the end thereof the following new subsection:

"(f) SUBSECTIONS (a) AND (b) TO APPLY TO CERTAIN PERSONS PREPAYING 50 PERCENT OR MORE OF CERTAIN FARMING EXPENSES.—

"(1) IN GENERAL.—In the case of a taxpayer to whom this subsection applies, subsections (a) and (b) shall apply to the excess prepaid farm supplies of such taxpayer in the same manner as if such taxpayer were a farming syndicate.

"(2) TAXPAYER TO WHOM SUBSECTION APPLIES.—This subsection applies to any taxpayer for any taxable year if such taxpayer—

"(A) does not use an accrual method of accounting,

"(B) has excess prepaid farm supplies for the taxable year, and

"(C) is not a qualified farm-related taxpayer.

"(3) QUALIFIED FARM-RELATED TAXPAYER.—

"(A) IN GENERAL.—For purposes of this subsection, the term 'qualified farm-related taxpayer' means any farm-related taxpayer if—

"(i)(I) the aggregate prepaid farm supplies for the 3 taxable years preceding the taxable year are less than 50 percent of,

"(II) the aggregate deductible farming expenses (other than prepaid farm supplies) for such 3 taxable years, or

"(ii) the taxpayer has excess prepaid farm supplies for the taxable year by reason of any change in business operation directly attributable to extraordinary circumstances.

"(B) FARM-RELATED TAXPAYER.—For purposes of this paragraph, the term 'farm-related taxpayer' means any taxpayer—

"(i) whose principal residence (within the meaning of section 1034) is on a farm,

"(ii) who has a principal occupation of farming, or

"(iii) who is a member of the family (within the meaning of subsection (c)(2)(E)) of a taxpayer described in clause (i) or (ii).

"(4) DEFINITIONS.—For purposes of this subsection—

"(A) EXCESS PREPAID FARM SUPPLIES.—The term 'excess prepaid farm supplies' means the prepaid farm supplies for the taxable year to the extent the amount of such supplies exceeds 50 percent of the deductible farming expenses for the taxable year (other than prepaid farm supplies).

"(B) PREPAID FARM SUPPLIES.—The term 'prepaid farm supplies' means any amounts which are described in subsection (a) or (b) and would be allowable for a subsequent taxable year under the rules of subsections (a) and (b).

"(C) DEDUCTIBLE FARMING EXPENSES.—The term 'deductible farming expenses' means any amount allowable as a deduction under this chapter (including any amount allowable as a deduction for depreciation or amortization) which is properly allocable to the trade or business of farming."

(b) CONFORMING AMENDMENTS.—

Case 1:20-cv-03087-AMD-LB   Document 1   Filed 07/09/20   Page 246 of 247 PageID #: 246

(1) The heading for section 464 is amended by striking out "IN CASE OF FARMING SYNDICATES" and inserting in lieu thereof "FOR CERTAIN FARMING".

(2) The table of sections for subpart C of part II of subchapter E of chapter 1 is amended by striking out "in case of farming syndicates" in the item relating to section 464 and inserting in lieu thereof "for certain farming expenses".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to amounts paid or incurred after March 1, 1986, in taxable years beginning after such date.

## SEC. 405. TAX TREATMENT OF DISCHARGE OF CERTAIN INDEBTEDNESS OF SOLVENT FARMERS.

(a) IN GENERAL.—Section 108 (relating to income from discharge of indebtedness) is amended by adding at the end thereof the following new subsection:

"(g) SPECIAL RULES FOR DISCHARGE OF QUALIFIED FARM INDEBTEDNESS OF SOLVENT FARMERS.—

"(1) IN GENERAL.—For purposes of this section and section 1017, the discharge by a qualified person of qualified farm indebtedness of a taxpayer who is not insolvent at the time of the discharge shall be treated in the same manner as if the discharge had occurred when the taxpayer was insolvent.

"(2) QUALIFIED FARM INDEBTEDNESS.—For purposes of this subsection, indebtedness of a taxpayer shall be treated as qualified farm indebtedness if—

"(A) such indebtedness was incurred directly in connection with the operation by the taxpayer of the trade or business of farming, and

"(B) 50 percent or more of the average annual gross receipts of the taxpayer for the 3 taxable years preceding the taxable year in which the discharge of such indebtedness occurs is attributable to the trade or business of farming.

"(3) QUALIFIED PERSON.—For purposes of this subsection, the term 'qualified person' means a person described in section 46(c)(8)(D)(iv)."

(b) BASIS ADJUSTMENT.—Section 1017(b) (relating to basis adjustment) is amended by adding at the end thereof the following new paragraph:

"(4) ORDERING RULE IN THE CASE OF QUALIFIED FARM INDEBTEDNESS.—Any amount which is excluded from gross income under section 108(a) by reason of the discharge of qualified farm indebtedness (within the meaning of section 108(g)(2)) and which under subsection (b) of section 108 is to be applied to reduce basis shall be applied—

"(A) first to reduce the tax attributes described in section 108(b)(2) (other than subparagraph (D) thereof),

"(B) then to reduce basis of property other than property described in subparagraph (C), and

"(C) then to reduce the basis of land used or held for use in the trade or business of farming."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to discharges of indebtedness occurring after April 9, 1986, in taxable years ending after such date.

PUBLIC LAW 99–514—OCT. 22, 1986          100 STAT. 2225

**SEC. 406. RETENTION OF CAPITAL GAINS TREATMENT FOR SALES OF DAIRY CATTLE UNDER MILK PRODUCTION TERMINATION PROGRAM.**

The amendments made by subtitles A and B of title III shall not apply to any gain from the sale of dairy cattle under a valid contract with the United States Department of Agriculture under the milk production termination program to the extent such gain is properly taken into account under the taxpayer's method of accounting after January 1, 1987, and before September 1, 1987.

# Subtitle B—Treatment of Oil, Gas, Geothermal, and Hard Minerals

**SEC. 411. TREATMENT OF INTANGIBLE DRILLING COSTS AND MINERAL EXPLORATION AND DEVELOPMENT COSTS.**

(a) TREATMENT UNDER SECTION 291.—

(1) INCREASE IN PERCENTAGE DISALLOWANCE.—Paragraph (1) of section 291(b) (relating to special rules for treatment of intangible drilling costs and mineral exploration and development costs) is amended by striking out "20 percent" and inserting in lieu thereof "30 percent".

(2) TREATMENT OF DISALLOWED AMOUNT.—Subsection (b) of section 291 is amended by striking out paragraphs (2), (3), (4), (5), and (6) and inserting in lieu thereof the following new paragraphs:

"(2) AMORTIZATION OF AMOUNTS NOT ALLOWABLE AS DEDUCTIONS UNDER PARAGRAPH (1).—The amount not allowable as a deduction under section 263(c), 616(a), or 617(a) (as the case may be) for any taxable year by reason of paragraph (1) shall be allowable as a deduction ratably over the 60-month period beginning with the month in which the costs are paid or incurred.

"(3) DISPOSITIONS.—For purposes of section 1254, any deduction under paragraph (2) shall be treated as a deduction allowable under section 263(c), 616(a), or 617(a) (whichever is appropriate).

"(4) INTEGRATED OIL COMPANY DEFINED.—For purposes of this subsection, the term 'integrated oil company' means, with respect to any taxable year, any producer (within the meaning of section 4996(a)(1)) of crude oil other than an independent producer (within the meaning of section 4992(b)).

"(5) COORDINATION WITH COST DEPLETION.—The portion of the adjusted basis of any property which is attributable to amounts to which paragraph (1) applied shall not be taken into account for purposes of determining depletion under section 611."

(b) TREATMENT OF COSTS INCURRED OUTSIDE THE UNITED STATES.—

(1) INTANGIBLE DRILLING AND DEVELOPMENT COSTS.—

(A) IN GENERAL.—Section 263 (relating to capital expenditures) is amended by adding at the end thereof the following new subsection:

"(i) SPECIAL RULES FOR INTANGIBLE DRILLING AND DEVELOPMENT COSTS INCURRED OUTSIDE THE UNITED STATES.—In the case of intangible drilling and development costs paid or incurred with respect to an oil, gas, or geothermal well located outside the United States—

"(1) subsection (c) shall not apply, and